## Exhibit 1

**DIP Credit Agreement**

#93141705v12

**FILING VERSION**

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION TERM LOAN CREDIT
AGREEMENT

dated as of April [24], 2020,

among

SPEEDCAST INTERNATIONAL LIMITED (ACN 600 699 241),
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

as Parent,

SPEEDCAST COMMUNICATIONS, INC.,
a Debtor and Debtor-in-Possession under Chapter 11 of the Bankruptcy Code,

as the Borrower,

THE LENDERS NAMED HEREIN

and

CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH,

as Administrative Agent, Collateral Agent and Security Trustee

Error! Unknown document property name.

## TABLE OF CONTENTS

PAGE

### ARTICLE I
### DEFINITIONS

SECTION 1.01.   Defined Terms ................................................................................1
SECTION 1.02.   Terms Generally.............................................................................35
SECTION 1.03.   LLC Division ..................................................................................35
SECTION 1.04.   Classification of Loans and Borrowings........................................36
SECTION 1.05.   Dutch Terms...................................................................................36

### ARTICLE II
### THE CREDITS

SECTION 2.01.   Commitments and Loans ................................................................36
SECTION 2.02.   Loans..............................................................................................38
SECTION 2.03.   Borrowing Procedure .....................................................................39
SECTION 2.04.   Evidence of Debt; Repayment of Loans .........................................39
SECTION 2.05.   Fees ................................................................................................40
SECTION 2.06.   Interest on Loans............................................................................41
SECTION 2.07.   Default Interest...............................................................................41
SECTION 2.08.   Alternate Rate of Interest ...............................................................42
SECTION 2.09.   Termination of Commitments..........................................................42
SECTION 2.10.   Conversion and Continuation of Borrowings ..................................42
SECTION 2.11.   Repayment of Borrowings ..............................................................43
SECTION 2.12.   Voluntary Prepayment ...................................................................44
SECTION 2.13.   Mandatory Prepayments ................................................................44
SECTION 2.14.   Reserve Requirements; Change in Circumstances .........................45
SECTION 2.15.   Change in Legality .........................................................................46
SECTION 2.16.   Indemnity .......................................................................................47
SECTION 2.17.   Pro Rata Treatment ........................................................................47
SECTION 2.18.   Sharing of Setoffs ..........................................................................47
SECTION 2.19.   Payments ........................................................................................48
SECTION 2.20.   Taxes..............................................................................................48
SECTION 2.21.   [Reserved]......................................................................................52
SECTION 2.22.   Assignment of Loans Under Certain Circumstances; Duty to Mitigate ..........52
SECTION 2.23.   [Reserved]......................................................................................54
SECTION 2.24.   Parent as Borrower Agent..............................................................54
SECTION 2.25.   Disbursement of Funds from the Escrow Account ..........................54
SECTION 2.26.   Defaulting Lenders.........................................................................56
SECTION 2.27.   Payments to Administrative Agent for Fronting Exposure.............57

### ARTICLE III
### REPRESENTATIONS AND WARRANTIES

SECTION 3.01.   Organization; Powers......................................................................57

Error! Unknown document property name.

SECTION 3.02.   Authorization ................................................................................58
SECTION 3.03.   Enforceability .................................................................................58
SECTION 3.04.   Governmental Approvals ...............................................................58
SECTION 3.05.   Financial Statements ......................................................................59
SECTION 3.06.   No Material Adverse Change ..........................................................59
SECTION 3.07.   Title to Properties; Possession Under Leases .................................59
SECTION 3.08.   Subsidiaries ....................................................................................60
SECTION 3.09.   Litigation; Compliance with Laws ..................................................60
SECTION 3.10.   Agreements .....................................................................................60
SECTION 3.11.   Federal Reserve Regulations ..........................................................61
SECTION 3.12.   Investment Company Act ................................................................61
SECTION 3.13.   Use of Proceeds ..............................................................................61
SECTION 3.14.   Tax Returns .....................................................................................61
SECTION 3.15.   No Material Misstatements ..............................................................62
SECTION 3.16.   Employee Benefit Plans ..................................................................62
SECTION 3.17.   Environmental Matters ....................................................................63
SECTION 3.18.   Insurance .........................................................................................64
SECTION 3.19.   Security Documents .........................................................................64
SECTION 3.20.   Location of Material Owned Real Property .....................................64
SECTION 3.21.   Labor Matters ..................................................................................64
SECTION 3.22.   [Reserved] ........................................................................................64
SECTION 3.23.   Sanctions, Anti-Terrorism and Anti-Bribery Laws .........................65
SECTION 3.24.   Senior Indebtedness .........................................................................65
SECTION 3.25.   Australian Tax Consolidation ...........................................................65
SECTION 3.26.   Trustee; Benefit; Financial Assistance; Etc .....................................66
SECTION 3.27.   Beneficial Ownership .......................................................................66
SECTION 3.28.   Cases; Orders ...................................................................................66

## ARTICLE IV
## CONDITIONS

SECTION 4.01.   Credit Event .....................................................................................67
SECTION 4.02.   Delayed Draw Borrowing .................................................................72
SECTION 4.03.   Disbursements ..................................................................................73

## ARTICLE V
## AFFIRMATIVE COVENANTS

SECTION 5.01.   Existence; Businesses and Properties ...............................................75
SECTION 5.02.   Insurance ..........................................................................................75
SECTION 5.03.   Obligations and Taxes ......................................................................76
SECTION 5.04.   Financial Statements, Reports, etc ...................................................77
SECTION 5.05.   Litigation and Other Notices ...........................................................80
SECTION 5.06.   Employee Benefits ...........................................................................80
SECTION 5.07.   Maintaining Records; Access to Properties and Inspections;
                 Maintenance of Ratings .....................................................................81
SECTION 5.08.   Use of Proceeds................................................................................81

ii

Error! Unknown document property name.

SECTION 5.09.   Compliance with Environmental Laws.................................................81
SECTION 5.10.   Preparation of Environmental Reports.............................................82
SECTION 5.11.   Guarantors; Further Assurances; Etc ..............................................82
SECTION 5.12.   Senior Indebtedness .........................................................................84
SECTION 5.13.   Compliance with Tax Sharing Agreement and Tax Funding Agreement........85
SECTION 5.14.   Post-Closing Matters ........................................................................85
SECTION 5.15.   Federal Reserve Regulations.............................................................85
SECTION 5.16.   Milestones ........................................................................................86
SECTION 5.17.   Lender Conference Calls...................................................................88
SECTION 5.18.   Chief Restructuring Officer ..............................................................88
SECTION 5.19.   Priority of Liens ...............................................................................88
SECTION 5.20.   Bankruptcy Related Matters .............................................................90

ARTICLE VI
NEGATIVE COVENANTS

SECTION 6.01.   Indebtedness......................................................................................92
SECTION 6.02.   Liens..................................................................................................94
SECTION 6.03.   Sale and Lease-Back Transactions....................................................97
SECTION 6.04.   Investments, Loans and Advances ....................................................97
SECTION 6.05.   Mergers, Consolidations and Sales of Assets ...................................99
SECTION 6.06.   Dividends and Distributions; Restrictions on Ability of Subsidiaries to
                Pay Dividends ...................................................................................99
SECTION 6.07.   Transactions with Affiliates............................................................100
SECTION 6.08.   Business of Parent and Subsidiaries ...............................................100
SECTION 6.09.   Other Indebtedness and Agreements ..............................................100
SECTION 6.10.   [Reserved].......................................................................................102
SECTION 6.11.   Fiscal Year ......................................................................................102
SECTION 6.12.   [Reserved].......................................................................................102
SECTION 6.13.   Certain Issuances of Equity Interests .............................................102
SECTION 6.14.   Sanctions-Compliant Repayment of Obligations............................102
SECTION 6.15.   Budget Variance..............................................................................102
SECTION 6.16.   Liquidity..........................................................................................103
SECTION 6.17.   Subsidiaries.....................................................................................103
SECTION 6.18.   Additional Bankruptcy Matters.......................................................103

ARTICLE VII
EVENTS OF DEFAULT

SECTION 7.01.   Events of Default .............................................................................104
SECTION 7.02.   Application of Proceeds ...................................................................111

ARTICLE VIII
THE AGENTS, ETC.; CERTAIN ERISA MATTERS

SECTION 8.01.   The Administrative Agent, the Collateral Agent and the Security
                Trustee, Etc ....................................................................................112

iii

SECTION 8.02.   Certain ERISA Matters ................................................................... 119

ARTICLE IX
MISCELLANEOUS

SECTION 9.01.   Notices ........................................................................................... 121
SECTION 9.02.   Survival of Agreement ................................................................... 124
SECTION 9.03.   Binding Effect ................................................................................ 125
SECTION 9.04.   Successors and Assigns .................................................................. 125
SECTION 9.05.   Expenses; Indemnity ...................................................................... 129
SECTION 9.06.   Right of Setoff ................................................................................ 132
SECTION 9.07.   Applicable Law ............................................................................... 132
SECTION 9.08.   Waivers; Amendment ..................................................................... 132
SECTION 9.09.   Interest Rate Limitation ................................................................. 135
SECTION 9.10.   Entire Agreement ........................................................................... 135
SECTION 9.11.   WAIVER OF JURY TRIAL ........................................................... 135
SECTION 9.12.   Severability ..................................................................................... 135
SECTION 9.13.   Counterparts .................................................................................... 136
SECTION 9.14.   Headings ......................................................................................... 136
SECTION 9.15.   Jurisdiction; Consent to Service of Process; Waivers.................... 136
SECTION 9.16.   Conversion of Currencies ............................................................... 137
SECTION 9.17.   Confidentiality ................................................................................ 138
SECTION 9.18.   [Reserved] ....................................................................................... 139
SECTION 9.19.   [Reserved] ....................................................................................... 139
SECTION 9.20.   No Advisory or Fiduciary Responsibility ....................................... 139
SECTION 9.21.   USA PATRIOT Act and Beneficial Ownership Regulation Notice ............. 139
SECTION 9.22.   [Reserved] ....................................................................................... 140
SECTION 9.23.   Acknowledgment and Consent to Bail-In of EEA Financial Institutions ...... 140
SECTION 9.24.   Certain Privacy Principles and Laws .............................................. 140
SECTION 9.25.   Release of Liens .............................................................................. 141
SECTION 9.26.   Exclusion of Certain PPSA Provisions ........................................... 141
SECTION 9.27.   DIP Orders ...................................................................................... 142

SCHEDULES

Schedule 1.01(a)        Agreed Security Principles
Schedule 1.01(b)        Excluded Subsidiaries
Schedule 1.01(c)        Operating Accounts
Schedule 1.01(d)        Initial Subsidiary Guarantors
Schedule 2.01           Lenders; Commitments
Schedule 3.01           Organization; Powers
Schedule 3.08           Subsidiaries
Schedule 3.09           Litigation
Schedule 3.10(b)        Agreements
Schedule 3.17           Environmental Matters
Schedule 3.18           Insurance

iv

Schedule 3.19          Additional Security Requirements
Schedule 3.20          Material Owned Real Property
Schedule 3.21          Labor Matters
Schedule 4.01(d)       Initial Security Documents and Certain Closing Deliverables
Schedule 4.01(j)       Existing Indebtedness for Borrowed Money
Schedule 5.14          Post-Closing Matters
Schedule 6.01          Indebtedness
Schedule 6.02          Liens
Schedule 6.04          Investments
Schedule 6.07          Transactions with Affiliates

EXHIBITS

Exhibit A          Form of Administrative Questionnaire
Exhibit B          Form of Assignment and Acceptance
Exhibit C          Form of Borrowing Request
Exhibit D          Form of Guarantee Agreement
Exhibit E          Form of Security Trust Deed
Exhibit F          Form of Compliance Certificate
Exhibit G          Form of Solvency Certificate
Exhibit H          Form of Promissory Note
Exhibit I          [Reserved]
Exhibit J-1        Form of U.S. Tax Compliance Certificate
Exhibit J-2        Form of U.S. Tax Compliance Certificate
Exhibit J-3        Form of U.S. Tax Compliance Certificate
Exhibit J-4        Form of U.S. Tax Compliance Certificate
Exhibit K          Form of Notice of Disbursement
Exhibit L          Form of Liquidity Certificate
Exhibit M          Form of Global Subordinated Intercompany Note
Exhibit N          Interim Order

**Error! Unknown document property name.**

SENIOR SECURED SUPERPRIORITY DEBTOR-IN-POSSESSION TERM LOAN CREDIT AGREEMENT, dated as of April [24], 2020 (this "***Agreement***"), among SPEEDCAST INTERNATIONAL LIMITED (ACN 600 699 241), a company organized under the laws of Australia and registered in Victoria, Australia and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code ("***Parent***"), SPEEDCAST COMMUNICATIONS, INC., a Texas corporation and a debtor and debtor-in-possession under Chapter 11 of the Bankruptcy Code (the "***Borrower***"), the Lenders (as defined in Article I) and CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH, as administrative agent (in such capacity, including any successor thereto, the "***Administrative Agent***") for the Lenders, as collateral agent (in such capacity, including any successor thereto, the "***Collateral Agent***") for the Secured Parties, and as security trustee (in such capacity, including any successor thereto, the "***Security Trustee***") for the Secured Parties.

On April [23], 2020 (the "***Petition Date***"), the Borrower, Parent and certain Subsidiary Guarantors (each a "***Debtor***" and collectively, the "***Debtors***") filed voluntary petitions with the Bankruptcy Court commencing their respective cases that are pending under Chapter 11 of the Bankruptcy Code (each case of the Borrower and each other Debtor, a "***Case***" and collectively, the "***Cases***") and have continued in the possession of their assets and management of their business pursuant to Section 1107(a) and 1108 of the Bankruptcy Code.

The Borrower has requested that the Lenders extend credit (or be deemed to extend credit) to the Borrower in the form of new money loans in an aggregate principal amount of up to $90,000,000 and loans issued hereunder in substitution and exchange (and prepayment) of existing Pre-Petition First Lien Loans in an aggregate principal amount equal $90,000,000 pursuant to this Agreement (collectively, the "***DIP Term Facility***"), with all of the Borrower's obligations under the DIP Term Facility to be guaranteed by Parent and each Subsidiary Guarantor.

The priority of the DIP Term Facility with respect to the Collateral granted to secure the Obligations shall be as set forth in the Interim Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court and in the DIP Intercreditor Agreement.

The Borrower, Parent and the Subsidiary Guarantors are engaged in related businesses, and Parent and each Subsidiary Guarantors will derive substantial direct and indirect benefit from the making of the extensions of credit under this Agreement.

The parties hereto agree as follows:

ARTICLE I

Definitions

SECTION 1.01.  ***Defined Terms***.  As used in this Agreement, the following terms shall have the meanings specified below:

Error! Unknown document property name.

"***ABR***", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"***Acceptable Plan***" shall mean a plan of reorganization implementing an Approved Restructuring (which may, for the avoidance of doubt and without limitation, contemplate one or more sale of assets).

"***Acceptable Sale Transaction***" shall mean a sale of assets pursuant to section 363 of the Bankruptcy Code that is utilized to implement an Approved Restructuring and includes bid procedures that, without limitation, permit credit bidding of the Obligations at the full face amount thereof in accordance with Section 8.01.

"***Ad Hoc Group of Lenders***" shall mean those certain Lenders represented by the Ad Hoc Lender Advisors as of the Closing Date.

"***Ad Hoc Lender Advisors***" shall mean (i) Davis Polk, (ii) Greenhill, (iii) KWM and (iv) any other financial advisor, auditor, attorney, accountant, appraiser, auditors, business valuation expert, environmental engineer or consultant, turnaround consultant, and other consultants, professionals and experts reasonably retained by the Ad Hoc Group of Lenders and/or the Required Lenders with the prior consent of Parent (not to be unreasonably withheld or delayed).

"***Additional Roll-Up Loan***" shall have the meaning assigned to such term in Section 2.01(b).

"***Adjusted LIBO Rate***" shall mean, with respect to any Eurocurrency Borrowing for any Interest Period, an interest rate per annum equal to the LIBO Rate in effect for such Interest Period multiplied by Statutory Reserves.

"***Administrative Agent***" shall have the meaning assigned to such term in the introductory paragraph to this Agreement.

"***Administrative Questionnaire***" shall mean an Administrative Questionnaire substantially in the form of Exhibit A, or such other form as may be supplied by the Administrative Agent.

"***Affected Financial Institution***" shall mean (a) any EEA Financial Institution or (b) any UK Financial Institution.

"***Affiliate***" shall mean, when used with respect to a specified person, another person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the person specified.

"***Agent Fees***" shall have the meaning assigned to such term in Section 2.05.

"***Agents***" shall have the meaning assigned to such term in Article VIII.

2

"**Agreed Security Principles**" means the principles set out in Schedule 1.01(a) hereto (Agreed Security Principles).

"**Agreement**" shall have the meaning assigned to such term in the introductory paragraph to this Agreement.

"**Agreement Value**" shall mean, in respect of any one or more Hedging Agreements, after taking into account the effect of any legally enforceable netting agreement relating to any such Hedging Agreement, (i) for any date on or after the date such Hedging Agreement has been closed out and termination value(s) determined in accordance therewith, such termination value(s) and (ii) for any date prior to the date referenced in clause (i), the amount(s) determined as the mark-to-market value(s) for such Hedging Agreement, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Hedging Agreement (which may include a Lender or any Affiliate of a Lender).

"**Agreement Currency**" shall have the meaning assigned to such term in Section 9.16(b).

"**Alternate Base Rate**" shall mean, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus ½ of 1% and (c) the Adjusted LIBO Rate in effect on such day for a one-month Interest Period commencing on the second Business Day after such day <u>plus</u> 1.00%; *provided* that the Alternate Base Rate shall not be less than 3.00%.  If the Administrative Agent shall have determined (which determination shall be conclusive absent manifest error) that it is unable to ascertain the Federal Funds Effective Rate or the Adjusted LIBO Rate for any reason, including the inability or failure of the Administrative Agent to obtain sufficient quotations in accordance with the terms of the definition thereof, the Alternate Base Rate shall be determined without regard to clause (b) or (c), as applicable, of the preceding sentence until the circumstances giving rise to such inability no longer exist.  The term "**Prime Rate**" shall mean the rate of interest per annum determined from time to time by the Administrative Agent as its prime rate in effect at its principal office in New York City and notified to the Borrower.  The term "**Federal Funds Effective Rate**" shall mean, for any day, the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System of the United States, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for the day for such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.  Any change in the Alternate Base Rate due to a change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate shall be effective on the effective date of such change in the Prime Rate, the Federal Funds Effective Rate or the Adjusted LIBO Rate, as the case may be.

"**Anti-Bribery Laws**" shall have the meaning assigned to such term in Section 3.23(b)**Error! Reference source not found.**.

"**Applicable Creditor**" shall have the meaning assigned to such term in Section 9.16(b).

**Error! Unknown document property name.**

"*Applicable Rate*" shall mean, for any day, with respect to (a) Roll-Up Loans, 1.75% per annum and (b) with respect to New-Money Loans, (i) 8.00% per annum, in the case of a Eurocurrency Loan, or (ii) 7.00% per annum, in the case of an ABR Loan.

"*Approved Budget*" shall mean the Initial DIP Budget or the then most current DIP Budget prepared by Parent and approved by the Required IC Lenders and the Required Lenders pursuant to Section 5.04(j), as applicable.

"*Approved Restructuring*" shall mean a restructuring transaction (or series of transactions) to be implemented through (a) prior to the occurrence of a Plan Election, an Acceptable Sale Transaction or (b) following the occurrence of a Plan Election, an Acceptable Plan, in each case with the consent of the Required IC Lenders, the Required Lenders and the Required First Lien Lenders, with terms and conditions and definitive documents acceptable to the Required IC Lenders, the Required Lenders and the Required First Lien Lenders, in each case in their sole discretion (including, except as otherwise agreed by the Required IC Lenders, the Required Lenders and the Required First Lien Lenders, in each case in their sole discretion, as such terms, conditions and/or documents are amended, restated, amended and restated, supplemented, superseded and/or otherwise modified).

"*Asset Sale*" shall mean the sale, transfer or other disposition (by way of merger, casualty, condemnation or otherwise and including by way of a Sale and Leaseback) by Parent or any Subsidiary to any person other than any Loan Party of (a) any Equity Interests of any Subsidiary (other than directors' or foreign nationals' qualifying shares) or (b) any other assets of Parent or any Subsidiary (other than sales, transfers or other dispositions in the ordinary course of business and consistent with the Approved Budget).

"*Assignment and Acceptance*" shall mean an assignment and acceptance entered into by a Lender and an assignee, and accepted by the Administrative Agent, substantially in the form of Exhibit B or such other form as shall be approved by the Administrative Agent.

"*ASX*" means ASX Limited.

"*Auction*" shall have the meaning assigned to such term in Section 5.16(c).

"*Australian Corporations Act*" shall mean the Corporations Act 2001 of Australia (Cth).

"*Australian Employee Benefit Account*" shall mean any bank account established or designated as such (including after the date of this Agreement) in accordance with clause 9 of the Forbearance Agreement and held with an Australian authorized deposit taking institution which is secured in favor of the Secured Parties for the sole purpose of holding funds to pay when due entitlements of Australian employees which would have priority under sections 556(1)(e), 556(1)(f) and 556(1)(g) of the Australian Corporations Act.

"*Australian Privacy Principles*" shall mean the Australian Privacy Principles in Schedule 1 of the Privacy Act 1988 (Cth) of Australia.

4

Error! Unknown document property name.

"***Australian Tax Act***" shall mean the Income Tax Assessment Act 1936 of Australia or the Income Tax Assessment Act 1997 of Australia, as the context requires, and includes any amended or successor provisions thereof.

"***Australian Withholding Tax***" means any Australian Tax required to be withheld or deducted from any payment or deemed payment of interest or other payment under Division 11A of Part III of the Australian Tax Act or Subdivision 12-F of Schedule 1 to the Taxation Administration Act 1953 (Cth).

"***Avoidance Action***" shall mean the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548 and 550 of the Bankruptcy Code.

"***Avoidance Proceeds***" shall mean any proceeds or property recovered, unencumbered or otherwise in connection with successful Avoidance Actions, whether by judgment, settlement or otherwise.

"***Bail-In Action***" shall mean the exercise of any Write-Down and Conversion Powers by the applicable Resolution Authority in respect of any liability of an Affected Financial Institution.

"***Bail-In Legislation***" shall mean (a) with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law, regulation rule or requirement for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule and (b) with respect to the United Kingdom,  Part I of the United Kingdom Banking Act 2009 (as amended from time to time) and any other law, regulation or rule applicable in the United Kingdom relating to the resolution of unsound or failing banks, investment firms or other financial institutions or their affiliates (other than through liquidation, administration or other insolvency proceedings).

"***Bankruptcy Code***" shall mean Title 11 of the United States Code entitled "***Bankruptcy***" as now or hereafter in effect, or any successor statute.

"***Bankruptcy Court***" shall mean the United States Bankruptcy Court for the Southern District of Texas, or any appellate court having jurisdiction over the Cases from time to time.

"***Bankruptcy Rules***" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Cases.

"***Beneficial Ownership Certification***" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"***Beneficial Ownership Regulation***" means 31 C.F.R. § 1010.230.

"***Benefit Plan***" shall mean any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of

Error! Unknown document property name.

Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"***Bid Procedures Motion***" shall have the meaning assigned to such term in Section 5.16(c).

"***Bid Procedures Order***" shall have the meaning assigned to such term in Section 5.16(c).

"***Board***" shall mean the Board of Governors of the Federal Reserve System of the United States of America.

"***Borrower Materials***" shall have the meaning assigned to such term in Section 9.01.

"***Borrower***" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"***Borrowing***" shall mean a group of Loans of a single Type made (or, in the case of Roll-Up Loans, deemed made) by the Lenders on, and converted or continued on, the same date and, in the case of Eurocurrency Loans, as to which a single Interest Period is in effect.

"***Borrowing Minimum***" shall mean $500,000.

"***Borrowing Multiple***" shall mean $100,000.

"***Borrowing Request***" shall mean a request by Parent in accordance with the terms of Section 2.03 and substantially in the form of Exhibit C, or such other form as shall be approved by the Administrative Agent.

"***Breakage Event***" shall have the meaning assigned to such term in Section 2.16.

"***Budget Test Period***" shall have the meaning specified in the definition of "Budget Variance Report".

"***Budget Variance Report***" shall mean a variance report, in a form satisfactory to Greenhill (which may take direction from the Required IC Lenders and the Required Lenders) and certified by the chief financial officer and chief restructuring officer of Parent, setting forth (a) (x) for the period beginning on the Petition Date through the second to last Friday prior to delivery of such variance report (the "***Cumulative Budget Test Period***") and (y) the rolling four-week period most recently ended on the second to last Friday prior to the delivery of such variance report (commencing on the first Friday following the fourth anniversary following the Petition Date) (the "***Budget Test Period***"), (i) the cumulative negative variance (as compared to the Approved Budget) of the aggregate cash receipts of the Loan Parties and their Subsidiaries (presented on a line-item basis) and (ii) the cumulative positive variance (as compared to the Approved Budget) of the aggregate operating disbursements made by the Loan Parties and their Subsidiaries (presented on a line-item basis) and (b) an explanation, in reasonable detail, of any material variance and a distinction between permanent and timing-related variances.

6

"***Business Day***" shall mean any day other than a Saturday, Sunday or day on which banks in New York City are authorized or required by law to close; *provided* that when used in connection with a Eurocurrency Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"***Capital Lease Obligations***" of any person shall mean the obligations of such person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as, or accounted for in a similar way to, a finance lease or capital lease on a balance sheet or statement of financial position of such person under GAAP, and the amount of such obligations shall be the principal or capitalized amount thereof determined in accordance with GAAP.

"***Carve-Out***" shall have the meaning assigned to such term in the Interim Order or the Final Order, as applicable.

"***Case***" and "***Cases***" shall have the meaning assigned to such term in the recitals to this Agreement.

"***Cash Collateral***" shall have the meaning assigned to such term in the Interim Order or the Final Order, as applicable.

"***Change in Law***" shall mean (a) the adoption of any law, rule or regulation after the Closing Date, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the Closing Date or (c) compliance by any Lender (or, for purposes of Sections 2.14 and 2.15, by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the Closing Date; *provided* that, notwithstanding anything herein to the contrary, (i) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith, (ii) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or non-U.S. regulatory authorities, in each case pursuant to Basel III, and (iii) any law or regulation that implements or applies Basel III Standards (including the Capital Requirement Regulation (EU) no. 575/2013 dated 26 June 2013 and the Capital Requirement Directive 2013/36/EU dated 26 June 2013), shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

A "***Change of Control***" shall be deemed to have occurred if (a) any person or group shall (i) own directly or indirectly, beneficially or of record, shares representing more than 50% of the aggregate ordinary voting power represented by the issued and outstanding Equity Interests of Parent or (ii) obtain or acquire the power to appoint or remove all, or the majority, of the directors or other equivalent officers of Parent; (b) any "change of control" (or similar event, however denominated) with respect to Parent or any of its Subsidiaries shall occur under and as defined in any indenture or agreement in respect of Indebtedness in an outstanding principal amount in excess of the Threshold Amount to which Parent or any of its Subsidiaries is a party and incurred on or after the Petition Date; (c) any person or group shall otherwise directly or

7

**Error! Unknown document property name.**

indirectly Control Parent or (d) Parent shall cease to own beneficially, directly or indirectly, 100% of the issued and outstanding Equity Interests of the Borrower.

"***Charges***" shall have the meaning assigned to such term in Section 9.09.

"***Closing Date***" shall mean the date on which the conditions precedent set forth in Section 4.01 shall have been satisfied or waived, notice of which date shall be provided by the Administrative Agent to the Lenders (provided that references in any other Loan Document to "Funding Date" shall be a reference to the Closing Date).

"***Class***" shall mean, when used in reference to (a) any Loan or Borrowing, whether such Loan, or the Loans comprising such Borrowing, are Roll-Up Loans or New Money Loans, and (b) any Lender, whether such Lender has a Loan or Borrowing with respect to a particular Class of Loans or Borrowings.

"***Code***" shall mean the United States Internal Revenue Code of 1986, as amended from time to time.

"***Collateral***" shall mean all the "Collateral" (or equivalent term) as defined in the Interim Order (and, when entered into, the Final Order) and (a) all the "Collateral", "Pledged Collateral" and any similar term as defined in any Security Document, (b) the "Trust" and the "Trust Fund" (as such terms are defined in the Security Trust Deed), (c) the Mortgaged Properties and (d) any other asset that is otherwise subject to any Transaction Security Interest (as defined in the Security Trust Deed), pursuant to this Agreement or any Security Document.

"***Collateral Agent***" shall have the meaning assigned to such term in the introductory paragraph to this Agreement.

"***Commitment***" shall mean, with respect to any Lender, individually or collectively, as the context may require, such Lender's Initial Commitment or Delayed Draw Commitment. The aggregate amount of the Commitments as of the Closing Date is $90,000,000, as set forth on the Commitment Schedule.

"***Commitment Schedule***" shall mean the Schedule attached hereto as Schedule 2.01.

"***Commitment Fee***" shall have the meaning assigned to such term in Section 2.05(b).

"***Committee***" shall mean the official committee of unsecured creditors appointed in the Cases pursuant to section 1102 of the Bankruptcy Code.

"***Commodity Exchange Act***" shall mean the United States Commodity Exchange Act (7 § 1 et seq.), as amended from time to time, and any successor statute.

"***Communications***" shall have the meaning assigned to such term in Section 9.01.

"***Compliance Certificate***" shall mean a certificate of the chief financial officer and the chief restructuring officer of Parent, substantially in the form of Exhibit F or such other form as shall be approved by the Administrative Agent.

**Error! Unknown document property name.**

"*Confirmation Order*" shall have the meaning assigned to such term in Section 5.16(c).

"*Connection Income Taxes*" shall mean Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"*Control*" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract or otherwise, and the terms "*Controlling*" and "*Controlled*" shall have meanings correlative thereto; *provided* that any reference to "Control" in the definition of "Change of Control" shall have the meaning given in section 50AA of the Australian Corporations Act.

"*Credit Date*" shall mean the date on which any Borrowing is made.

"*Cumulative Budget Test Period*" shall have the meaning assigned to such term in the definition of "Budget Test Period."

"*Davis Polk*" shall mean Davis Polk & Wardwell LLP, acting in their capacity as counsel to the Ad Hoc Group of Lenders.

"*Debtor*" shall have the meaning assigned to such term in the recitals of this Agreement.

"*Debtor Relief Laws*" shall mean the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, judicial management, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief statute, law, ordinance, rule or regulation of the United States of America, any State thereof or the District of Columbia, or other applicable jurisdictions from time to time in effect.

"*Declined Amounts*" shall have the meaning assigned to such term in Section 2.13(e).

"*Declining Lender*" shall have the meaning assigned to such term in Section 2.13(e).

"*Default*" shall mean any event or condition which upon notice, lapse of time or both would constitute an Event of Default.

"*Defaulting Lender*" shall mean, subject to Section 2.26(b), any Lender that has (a) failed to fund any portion of its Loans within two Business Days of the date required to be funded by it hereunder, unless such Lender notifies the Administrative Agent in writing that such failure is the result of such Lender's good faith determination that a condition precedent to funding (specifically identified in such writing, including, if applicable, by reference to a specific Default) has not been satisfied, (b) notified any Borrower and the Administrative Agent in writing that it does not intend to comply with any of its funding obligations under this Agreement or has made a public statement to the effect that it does not intend to comply with its funding obligations under this Agreement or generally under other agreements in which it commits to extend credit, unless such writing or public statement indicates that such position is based on such Lender's good-faith determination that a condition precedent to funding (specifically identified, including, if applicable, by reference to a specific Default) has not been

9

Error! Unknown document property name.

satisfied, (c) failed, within three Business Days after written request by the Administrative Agent, to confirm in writing that it will comply with the terms of this Agreement relating to its obligations to fund prospective Loans; *provided* that any such Lender shall cease to be a Defaulting Lender under this clause (c) upon receipt of such confirmation by the Administrative Agent, (d) otherwise failed to pay over to the Administrative Agent or any other Lender any other amount (other than a *de minimis* amount) required to be paid by it hereunder within two Business Days of the date when due, unless the subject of a good faith dispute, (e) (i) has been adjudicated as, or determined by any Governmental Authority having regulatory authority over such person or its assets to be, insolvent or has a parent company that has been adjudicated as, or determined by any Governmental Authority having regulatory authority over such person or its assets to be, insolvent or (ii) become (other than via an Undisclosed Administration) the subject of a bankruptcy, judicial management, examinership, administration, insolvency or similar proceeding under any Debtor Relief Law, or has had a receiver, examiner, conservator, trustee, administrator, assignee for the benefit of creditors or similar person charged with reorganization or liquidation of its business or custodian, appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment or has a parent company that has become (other than via an Undisclosed Administration) the subject of a bankruptcy, judicial management, examinership, insolvency or similar proceeding under any Debtor Relief Law, or has had a receiver, examiner, conservator, trustee, administrator, assignee for the benefit of creditors or similar person charged with reorganization or liquidation of its business or custodian appointed for it, or has taken any action in furtherance of, or indicating its consent to, approval of or acquiescence in any such proceeding or appointment; *provided* that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachments on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender, or (f) has, or has a direct or indirect parent company that has, become the subject of a Bail-In Action.  Any determination by the Administrative Agent that a Lender is a Defaulting Lender under this definition shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender upon delivery of written notice of such determination to Parent and each Lender (or each Lender of the applicable Class).

"**Delayed Draw Borrowing Date**" shall mean the date on which the conditions precedent in Section 4.02 have been satisfied and the Delayed Draw Loan is made, which shall be no earlier than the Final Order Entry Date.

"**Delayed Draw Commitment**" shall mean, with respect to each Lender, the commitment of such Lender to make a Delayed Draw Loan to the Borrower in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on the Commitment Schedule, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.  The aggregate amount of the Lenders' Delayed Draw Commitments on the Closing Date is $55,000,000.

Error! Unknown document property name.

"*Delayed Draw Commitment Fee*" shall have the meaning assigned to such term in Section 2.05(d).

"*Delayed Draw Commitment Termination Date*" shall mean the earlier to occur of (a) the Delayed Draw Borrowing Date and (b) the Termination Date.

"*Delayed Draw Loan*" shall have the meaning assigned to such term in Section 2.01.

"*DIP Budget*" shall mean a budget in form and substance satisfactory to the Required IC Lenders and the Required Lenders delivered on or prior to the Closing Date and updated from time to time as set forth Section 5.04(j), setting forth on a weekly basis, among other things, Parent's and its Subsidiaries' projected cash receipts and cash disbursements (including professional fee expenses and capital expenditures) during such period.

"*DIP Intercreditor Agreement*" shall mean that certain Intercreditor Agreement, dated as of the date hereof, among Parent, the Borrower, the borrowers party to the Pre-Petition First Lien Credit Agreement, the Collateral Agent, the Security Trustee, the Pre-Petition First Lien Security Agents and the other parties thereto.

"*DIP Term Facility*" shall have the meaning assigned to such term in the recitals to this Agreement.

"*Disbursement*" shall mean a release of funds from the Escrow Account.

"*Disbursement Date*" shall mean the date of the release of funds from the Escrow Account constituting a Disbursement.

"*Disbursement Termination Instruction*" shall have the meaning assigned to such term in Section 2.25(b).

"*Disclosure and Solicitation Documents*" shall have the meaning assigned to such term in Section 5.16(c).

"*Disclosure Statement Order*" shall have the meaning assigned to such term in Section 5.16(c).

"*Disqualified Stock*" shall mean any Equity Interest that, by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable), or upon the happening of any event, (a) matures (excluding any maturity as the result of an optional redemption by the issuer thereof) or is mandatorily redeemable, pursuant to a sinking fund obligation or otherwise, or is redeemable at the option of the holder thereof, in whole or in part, or requires the payment of any cash dividend or any other scheduled payment constituting a return of capital, in each case at any time on or prior to the first anniversary of the Stated Maturity Date, or (b) is convertible into or exchangeable (unless at the sole option of the issuer thereof) for (i) debt securities or (ii) any Equity Interest referred to in clause (a) above, in each case at any time prior to the first anniversary of the Stated Maturity Date.

**Error! Unknown document property name.**

"***Dollar Equivalent***" shall mean, on any date of determination, with respect to any amount denominated in any currency other than dollars, the equivalent in dollars of such amount, determined by the Administrative Agent using the applicable Exchange Rate with respect to such currency at the time in effect.

"***dollars***", "***Dollars***" or "***$***" shall mean lawful money of the United States of America.

"***EEA Financial Institution***" shall mean (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"***EEA Member Country***" shall mean any member state of the European Union, Iceland, Liechtenstein and Norway.

"***EEA Resolution Authority***" shall mean any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"***environment***" shall mean ambient air, surface water and groundwater (including potable water, navigable water and wetlands), the land surface or subsurface strata, the workplace or as otherwise defined in any Environmental Law.

"***Environmental Claim***" shall mean any written notice of violation, claim, demand, order, directive, cost recovery action or other cause of action by, or on behalf of, any Governmental Authority or any person for damages, injunctive or equitable relief, personal injury (including sickness, disease or death), Remedial Action costs, tangible or intangible property damage, natural resource damages, nuisance, pollution, any adverse effect on the environment caused by any Hazardous Material, or for fines, penalties or restrictions, resulting from or based upon (a) the existence, or the continuation of the existence, of a Release (including sudden or non-sudden, accidental or non-accidental Releases), (b) exposure to any Hazardous Material, (c) the presence, use, handling, transportation, storage, treatment or disposal of any Hazardous Material or (d) the violation or alleged violation of any Environmental Law or Environmental Permit.

"***Environmental Law***" shall mean any and all applicable present and future treaties, laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, notices or binding agreements issued, promulgated or entered into by or with any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the presence, management, Release or threatened Release of any hazardous or toxic material or to health and safety matters.

"***Environmental Permit***" shall mean any permit, approval, authorization, certificate, license, variance, filing or permission required by or from any Governmental Authority pursuant to any Environmental Law.

12

Error! Unknown document property name.

"*Equity Interests*" shall mean shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity interests in any person and any option, warrant or other right (other than Indebtedness that is convertible into, or exchangeable for, any such equity interest) entitling the holder thereof to purchase or otherwise acquire any such equity interest.

"*Equity Issuance*" shall mean any issuance or sale by Parent or any Subsidiary of any Equity Interests of Parent or any Subsidiary, as applicable.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

"*ERISA Affiliate*" shall mean any trade or business (whether or not incorporated) that, together with the Borrower or Parent, is treated as a single employer under Section 414(b) or (c) of the Code, or solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.  When any provision of this Agreement relates to a past event, the term "ERISA Affiliate" includes any person who was an ERISA Affiliate at the time of such past event.

"*ERISA Event*" shall mean (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder, with respect to a Plan (other than an event for which the 30-day notice period has been waived); (b) the adoption of any amendment to a Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code; (c) the failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA, whether or not waived, under any Plan; (d) the filing of an application for a waiver of the minimum funding standard with respect to any Plan; (e) the failure of any Loan Party or an ERISA Affiliate to make any required contributions to a Plan or Multiemployer Plan on or before the due date for such contributions; (f) the incurrence of any liability under Title IV of ERISA with respect to the termination of any Plan or the incurrence of Withdrawal Liability by any Loan Party or any of its ERISA Affiliates from any Multiemployer Plan; (g) the receipt by any Loan Party or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to the intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (h) the receipt by any Loan Party or any ERISA Affiliate of any notice concerning a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Title IV of ERISA, or is in an endangered, critical and declining, or critical status, within the meaning of Section 305 of ERISA; (i) the occurrence of a non-exempt "prohibited transaction" within the meaning of Section 4075 of the Code of Section 406 of ERISA with respect to which any Loan Party or any of its Subsidiaries is a "disqualified person", within the meaning of Section 4975 of the Code, or a "party-in-interest", within the meaning of Section 3(14) of ERISA, or with respect to which any Loan Party or any such Subsidiary could otherwise be liable; (j) the failure of any Benefit Plan of any Loan Party or any ERISA Affiliate that is intended to be qualified under Section 401(a) of the Code to be so qualified; (k) the incurrence of any other liability by any Loan Party or any of its ERISA Affiliates to the PBGC or to any Plan or any trust established under Title IV of ERISA; and (l) any Non-U.S. Benefit Event.

13

"*Escrow Agreement*" shall mean the escrow agreement, dated as of April [24], 2020, between the Escrow Account Deposit Bank, the Administrative Agent and the Borrower governing the terms of the Escrow Account.

"*Escrow Account*" shall mean the deposit account in the name of, and for the account of, the Administrative Agent maintained by the Escrow Account Deposit Bank as account number [_____].

"*Escrow Account Deposit Bank*" shall mean The Bank of New York Mellon, in its capacity as depository bank in respect of the Escrow Account.

"*EU Bail-In Legislation Schedule*" shall mean the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"*Eurocurrency*", when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"*Events of Default*" shall have the meaning assigned to such term in Section 7.01.

"*Exchange Rate*" shall mean, on any day, with respect to any currency other than dollars (for purposes of determining the Dollar Equivalent) the rate at which such currency may be exchanged into dollars as set forth at approximately 11:00 a.m., New York City time, on such date on the applicable Bloomberg Key Cross Currency Rates Page.  In the event that any such rate does not appear on any Bloomberg Key Cross Currency Rates Page, the Exchange Rate shall be determined by reference to such other publicly available service for displaying exchange rates selected by the Administrative Agent for such purpose, or, at the discretion of the Administrative Agent, such Exchange Rate shall instead be the spot rate of exchange of the Administrative Agent, at or about 10:00 a.m., local time in such market, on such date for the purchase of dollars for delivery two Business Days later; *provided* that, if at the time of any such determination, for any reason, no such spot rate is being quoted, the Administrative Agent may use any other reasonable method it deems appropriate to determine such rate, and such determination shall be presumed correct absent manifest error.

"*Excluded Subsidiaries*" shall mean the Subsidiaries listed on Schedule 1.01(b) hereto and any other Subsidiary designated as an "Excluded Subsidiary" by Parent (which may include any Subsidiary whose Guarantee would result in material adverse tax consequences to Parent or its Subsidiaries as determined by Parent in good faith) with the consent of the Required IC Lenders and the Required Lenders (each in their sole discretion).

"*Excluded Taxes*" shall mean any of the following Taxes imposed on or with respect to, or required to be withheld or deducted from a payment to, the Administrative Agent or any Lender: (i) Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes of the Administrative Agent or any Lender (or any Transferee), in each case (A) imposed by the jurisdiction under the laws of which the Administrative Agent or such Lender (or Transferee) is organized or incorporated, or the jurisdiction in which the Administrative Agent's or such Lender's (or Transferee's) principal

14

Error! Unknown document property name.

office or applicable lending office is located (or any political subdivision thereof) or (B) that are Other Connection Taxes, (ii) Taxes attributable to such recipient's failure to comply with Section 2.20(f), (iii) in the case of a Lender (or Transferee thereof), Taxes imposed by a Governmental Authority in the United States or Hong Kong, in each case on amounts payable to or for the account of such Lender (or Transferee thereof) with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (x) such Lender (or Transferee thereof) acquires such interest in the Loan or Commitment by way of assignment (other than pursuant to an assignment made at the request of Parent) or (y) such Lender (or Transferee thereof) changes its lending office, except in each case to the extent that pursuant to Section 2.20, amounts with respect to such Taxes were payable either to the assignor of such Lender (or Transferee thereof) immediately before such Lender (or Transferee thereof) acquired the applicable interest in such Loan or Commitment or to such Lender (or Transferee thereof) immediately before it changed its lending office and (iv) any U.S. federal withholding Taxes arising under FATCA.

"***Exit Fee***" shall have the meaning assigned to such term in Section 2.05(c).

"***Extraordinary Receipts***" shall mean an amount equal to (a) any cash payments or proceeds (including Permitted Investments) received (directly or indirectly) by or on behalf of Parent or any of its Subsidiaries not in the ordinary course of business and not consisting of Net Cash Proceeds described in Section 2.13(a) in respect of (i) insurance proceeds in connection with a casualty event, (ii) foreign, United States, state or local tax refunds, (iii) pension plan reversions, (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) indemnity payments (other than to the extent such indemnity payments are (A) immediately payable to a Person that is not an Affiliate of Parent or any of its Subsidiaries or (B) received by Parent or its Subsidiaries as reimbursement for any payment previously made to such Person) and (vi) any purchase price adjustment received in connection with any purchase agreement to the extent not constituting Net Cash Proceeds, minus (b) (A) any selling and settlement costs and out-of-pocket expenses (including reasonable broker's fees or commissions and legal fees) and any taxes paid or reasonably estimated to be payable by Parent or its Subsidiaries (after taking into account any tax credits or deductions actually realized by Parent or the Borrower with respect to the transactions described in clause (a) of this definition) in connection with the transactions described in clause (a) of this definition, and (B) for purposes of determining Extraordinary Receipts under Section 2.13, any funding loss expenses incurred by the Borrower under Section 2.16 as a result of a mandatory prepayment required by Section 2.13.

"***FATCA***" shall mean Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof, any agreements entered into pursuant to Section 1471(b)(1) of the Code and any fiscal or regulatory legislation, rules or practices adopted pursuant to any intergovernmental agreement, treaty or convention among Governmental Authorities implementing such Sections of the Code.

"***FCPA***" shall have the meaning assigned to such term in Section 3.23(b).

Error! Unknown document property name.

"*Federal Funds Effective Rate*" shall have the meaning assigned to such term in the definition of "Alternate Base Rate".

"*Fee Letter*" shall mean that certain Fee Letter, dated as of the Closing Date, among the Agents and the Borrower.

"*Fees*" shall mean the Agent Fees, the Commitment Fee, the Exit Fee and the Delayed Draw Commitment Fee.

"*Final Order*" shall mean an order of the Bankruptcy Court (and as to which no stay has been entered) authorizing and approving on a final basis, among other things, the DIP Term Facility and the Transactions contemplated by this Agreement (including the Roll-Up in consideration for providing the New Money Loans) in the form of the Interim Order (with only such modifications thereto as are necessary to convert the Interim Order to a final order and such other modifications as are (subject to Section 9.08) satisfactory to the Required IC Lenders and the Required Lenders (and with respect to any provision that affects the rights or duties of any Agent, the applicable Agent) in their sole discretion) (as the same may be amended, supplemented, or modified from time to time after entry thereof (subject to Section 9.08) with the consent of the Required IC Lenders and the Required Lenders (and with respect to any provision that affects the rights or duties of any Agent, the applicable Agent) in their sole discretion).

"*Final Order Entry Date*" shall mean the date on which the Final Order is entered by the Bankruptcy Court.

"*Financial Officer*" of any person shall mean the chief financial officer, a Vice President-Finance, principal accounting officer, Head of Capital Management or Group Financial, Treasurer or Controller of such person and any other officer or similar official thereof responsible for financial matters of such person (or any other person reasonably acceptable to the Administrative Agent).

"*Forbearance Agreement*" shall mean that certain Forbearance Agreement dated as of April 1, 2020 entered into by and among Parent, the Borrower, the other Loan Parties party thereto, Prepetition First Lien Administrative Agent and certain of the lenders under the Prepetition First Lien Credit Agreement party thereto.

"*GAAP*" shall mean Australian Accounting Standards and Interpretations issued by the Australian Accounting Standards Board and the Australian Corporations Act, applied on a consistent basis, or similar accounting standards and interpretation as applied locally for the respective Subsidiary.

"*Government Business*" or "*Government Business Subsidiaries*" shall mean, collectively, UltiSat, Inc. and each direct and indirect subsidiary thereof.

"*Governmental Authority*" shall mean the government of any Specified Jurisdiction, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or

16

Error! Unknown document property name.

pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"***Granting Lender***" shall have the meaning assigned to such term in Section 9.04(j).

"***Greenhill***" shall mean Greenhill & Co., LLC, acting in their capacity as financial advisor to the Ad Hoc Group of Lenders.

"***Group Liabilities***" has the meaning given in section 721-10 of the Australian Tax Act.

"***Guarantee***" of or by any person shall mean any obligation, contingent or otherwise, of such person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligations of any other person (the "***primary obligor***") in any manner, whether directly or indirectly, and including any obligation of such person, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligations or to purchase (or to advance or supply funds for the purchase of) any security for the payment of such Indebtedness or other obligations, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligations of the payment of such Indebtedness or other obligations or (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligations; *provided*, *however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

"***Guarantee Agreement***" shall mean the Guarantee Agreement, substantially in the form of Exhibit D, among Parent, the Subsidiaries of Parent party thereto, the Security Trustee and the Collateral Agent, for the benefit of the Secured Parties.

"***Guarantors***" shall mean Parent and the Subsidiary Guarantors.

"***Hazardous Materials***" shall mean all explosive or radioactive materials, substances or wastes, hazardous or toxic materials, substances or wastes, pollutants, solid, liquid or gaseous wastes, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls ("***PCBs***") or PCB-containing materials or equipment, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law.

"***Head Company***" has the meaning given in section 703-15 of the Australian Tax Act.

"***Hedging Agreement***" shall mean (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b)

17

**Error! Unknown document property name.**

any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of ISDA Master Agreement, including any such obligations or liabilities under any ISDA Master Agreement.

"*IC Lender New Money Exposure*" shall have the meaning assigned to such term in the definition of "Required IC Lenders."

"*Indebtedness*" of any person shall mean, without duplication, (a) all obligations of such person for borrowed money, (b) all obligations of such person evidenced by bonds, debentures, notes, loan stock or similar instruments, (c) receivables sold or discounted (other than to the extent sold on a non-recourse basis or in the ordinary course of business and not as part of a financing transaction), (d) all obligations of such person under conditional sale or other title retention agreements relating to property or assets purchased by such person (excluding trade accounts payable and other accrued obligations, in each case incurred in the ordinary course of business), (e) all obligations of such person issued or assumed as the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business) with payment terms exceeding 120 days, (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such person, whether or not the obligations secured thereby have been assumed, but limited to the lower of (i) the fair market value of such property and (ii) the amount of the Indebtedness so secured, (g) all Guarantees by such person of Indebtedness of others, (h) all Capital Lease Obligations and Synthetic Lease Obligations of such person, (i) net obligations of such Person under any Hedging Agreements, valued at the Agreement Value thereof, (j) all obligations of such person as an account party in respect of letters of credit, bond, bank guarantee or similar instrument issued by a bank or financial institution, (k) all obligations of such person as an account party in respect of bankers' acceptances and any other amount raised under any acceptance credit, bill acceptance or bill endorsement facility, and (l) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Disqualified Stock of such Person or any other Person or any warrants, rights or options to acquire such equity interests, valued, in the case of redeemable preferred interests, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends.  The Indebtedness of any person shall include the Indebtedness of any partnership in which such person is a general partner, to the extent such person is liable therefor as a result of such person's ownership interest in or other relationship with such entity, except to the extent the express terms of such Indebtedness do not provide that such person is liable therefor.  Notwithstanding the foregoing, the term "Indebtedness" shall not include, for any Person, obligations of such Person in respect of operating leases.

"*Indemnified Taxes*" shall mean (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b), to the extent not described in (a), Other Taxes.

"*Indemnitee*" shall have the meaning assigned to such term in Section 9.05(b).

"*Independent Network Review*" shall mean an independent review of Parent's and its Subsidiaries' network by a network engineering firm acceptable to the Required Lenders.

18

**Error! Unknown document property name.**

"*Ineligible Assignee*" shall mean (a) Parent or any Affiliate of Parent, (b) any natural person (or any holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, any natural person), (c) any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute a Defaulting Lender or a Subsidiary thereof or (d) a Person that at the time of such assignment, is the subject of Sanctions.

"*Information*" shall have the meaning assigned to such term in Section 9.17.

"*Initial Commitment*" shall mean, with respect to each Lender, the commitment of such Lender to make an Initial Loan to the Borrower in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on the Commitment Schedule, as such amount may be adjusted from time to time in accordance with this Agreement. The aggregate amount of the Lenders' Initial Commitments on the Closing Date is $35,000,000.

"*Initial Committing Lenders*" shall mean those Lenders identified on Schedule 2.01 hereto as "Initial Committing Lenders."

"*Initial DIP Budget*" shall have the meaning assigned to such term in Section 4.01(n)(i).

"*Initial Loan*" shall have the meaning assigned to such term in Section 2.01.

"*Initial Roll-Up Loan*" shall have the meaning assigned to such term in Section 2.01(b).

"*Intellectual Property*" shall have the meaning assigned to such term in the Agreed Security Principles.

"*Intelsat*" shall mean Intelsat US LLC and its Affiliates.

"*Instelsat Agreement*" shall mean any agreements with Intelsat that are in effect immediately prior to the Petition Date or that take effect following the Petition Date.

"*Intercompany Note*" shall mean that certain Global Subordinated Intercompany Note, dated as of the Closing Date, substantially in the form of Exhibit M.

"*Intercreditor Agreement*" shall mean the DIP Intercreditor Agreement and any other intercreditor agreement executed in connection with any transaction requiring such agreement to be executed pursuant to the terms hereof, among any of the Agents or any other party, as the case may be, on such terms that are reasonably acceptable to the Agents, in each case, as amended, restated, supplemented or otherwise modified or replaced from time to time with the consent of the Administrative Agent.

"*Interest Payment Date*" shall mean (a) with respect to any ABR Loan or Roll-Up Loans, the last Business Day of each calendar month and the Termination Date, and (b) with respect to any Eurocurrency Loan, the last day of the Interest Period applicable to the Borrowing of which such Loan is a part and the Termination Date.

"*Interest Period*" shall mean (a) as to any Eurocurrency Borrowing, the period commencing on the date of such Borrowing and ending on the numerically corresponding day

Error! Unknown document property name.

(or, if there is no numerically corresponding day, on the last day) in the calendar month that is one month thereafter and (b) as to any ABR Borrowing, the period commencing on the date of such Borrowing and ending on the earliest of (i) the last Business Day of each calendar month and (ii) the Stated Maturity Date; *provided* that (i) if any Interest Period for any Eurocurrency Borrowing would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any Interest Period for any Eurocurrency Borrowing that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period and (iii) no Interest Period for any Loan shall extend beyond the maturity date of such Loan.  Interest shall accrue from and including the first day of an Interest Period to but excluding the last day of such Interest Period.  For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.  Notwithstanding the foregoing, the Interest Period with respect to the borrowing of the Loans shall be a period commencing on the Closing Date and ending on [__], [__].

"***Interest Rate Protection Agreement***" shall mean any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement or similar agreement or arrangement entered into in the ordinary course of business of Parent or any Subsidiary and solely for non-speculative purposes.

"***Interim Order***" shall mean an order of the Bankruptcy Court, in the form set forth in Exhibit N, authorizing on an interim basis, among other things, the DIP Term Facility and the Transactions contemplated by this Agreement (including the Roll-Up), with only such modifications as are satisfactory to the Borrower and the Required Lenders (and with respect to any provision that affects the rights or duties of any Agent, the applicable Agent) in their sole discretion.

"***Interim Order Entry Date***" shall mean the date on which the Interim Order is entered by the Bankruptcy Court.

"***Interpolated Rate***" shall mean, in relation to the LIBO Rate for any Borrowing, the rate which results from interpolating on a linear basis between: (a) the rate published by ICE Benchmark Administration Limited (or another commercially available source as designated by the Administrative Agent from time to time) for the LIBO Rate for the longest period (for which that rate is available) which is less than the Interest Period for such Borrowing and (b) the rate appearing on such screen or other source, as the case may be, for the shortest period (for which that rate is available) which exceeds the Interest Period for such Borrowing as of approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period.

"***ISDA Master Agreement***" shall mean the Master Agreement (Multicurrency-Cross Border) published by the International Swap and Derivatives Association, Inc., as in effect from time to time.

"***Judgment Currency***" shall have the meaning assigned to such term in Section 9.16(b).

**Error! Unknown document property name.**

"***Key Employee or Director***" shall mean any director or officer of any Loan Party or Subsidiary or management personnel employed or to be employed by any Loan Party or Subsidiary, in each case, that has or will be entitled to (A) annual total cash compensation in excess of $300,000 or (B) a severance payment in excess of $200,000.

"***KWM***" shall mean King & Wood Mallesons, acting in their capacity as counsel to the Ad Hoc Group of Lenders.

"***Lenders***" shall mean each person listed on the signature pages hereto as a lender with a Commitment or an outstanding Loan, including each Person identified as a "Lender" on Schedule 2.01 and any Person that becomes a party hereto pursuant to an Assignment and Acceptance, other than, in each case, any such Person that has ceased to be a party hereto pursuant to an Assignment and Acceptance.

"***LIBO Rate***" shall mean, with respect to any Eurocurrency Borrowing for any Interest Period, the rate per annum determined by the Administrative Agent at approximately 11:00 a.m. (London time) on the date that is two Business Days prior to the beginning of the relevant Interest Period (as specified in the applicable Borrowing Request) by reference to the Intercontinental Exchange Benchmark Administration Ltd. rates for deposits in dollars (as set forth by any service selected by the Administrative Agent that has been nominated by the Intercontinental Exchange Benchmark Administration Ltd. (or any successor or substitute agency) as an authorized information vendor for the purpose of displaying such rates), for a period equal to one month; *provided* that, to the extent that an interest rate is not ascertainable pursuant to the foregoing provisions of this definition, the "LIBO Rate" for the relevant Interest Period shall be (a) the Interpolated Rate, for a period equal in length to such Interest Period or (b) if such rate is not available at such time for any other reason, a comparable successor rate that is, at such time, broadly accepted by the syndicated loan market for loans denominated in Dollars in lieu of the "LIBO Rate", as determined by the Administrative Agent, or, if no such broadly accepted comparable successor rate exists at such time, a successor index rate as the Administrative Agent may determine with the consent of Parent and the Required Lenders. Notwithstanding the foregoing, the "LIBO Rate" in respect of any Interest Period applicable to any Borrowings will be deemed to be 2.00% per annum if the LIBO Rate for such Interest Period calculated pursuant to the foregoing provisions would otherwise be less than 2.00% per annum.

"***Lien***" shall mean, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, encumbrance, charge or security interest in or on such asset, (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset and (c) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities (and including, for the avoidance of doubt, any "security interest" as defined in sections 12(1) or 12(2) of the PPSA).

"***Liquidity***" shall mean, at any time, an amount equal to the amount of Parent's unrestricted cash calculated in a manner consistent with determining Parent's "Ending Unrestricted Cash" as set forth in the Approved Budget.

"***Liquidity Certificate***" shall mean a certificate substantially in the form of Exhibit L.

Error! Unknown document property name.

"***LLC Division***" shall mean the statutory division of any limited liability company into two or more limited liability companies pursuant to Section 18-217 of the Delaware Limited Liability Company Act or a comparable provision of a different jurisdiction's laws.

"***Loan Documents***" shall mean this Agreement, each Intercreditor Agreement, the Guarantee Agreement, the Security Documents, the promissory notes, if any, executed and delivered pursuant to Section 2.04(e) and any other document executed by or on behalf of any of the Loan Parties (including any officer or employee thereof) and delivered to any of the Secured Parties in connection with the foregoing.

"***Loan Parties***" shall mean the Borrower and the Guarantors.

"***Loans***" shall mean (i) an Initial Loan made by a Lender to the Borrower pursuant to Section 2.01(a)(i) of this Agreement, (ii) a Delayed Draw Loan made by Lender to the Borrower pursuant to Section 2.01(a)(ii) and (iii) a Roll-Up Loan.  The Loans shall be Eurocurrency Loans or ABR Loans.

"***Margin Stock***" shall have the meaning assigned to such term in Regulation U.

"***Material Adverse Effect***" shall mean (a) a material adverse effect on the business, assets, financial condition or operating results of Parent and its Subsidiaries, taken as a whole, (b) material impairment of the ability of the Borrower or of the Loan Parties (taken as a whole) to perform their obligations under the Loan Documents or (c) material impairment of the rights of, remedies of or benefits available to the Lenders under any Loan Document; *provided* that "Material Adverse Effect" shall expressly exclude (i) any matters disclosed in any "first day" pleadings or declarations and (ii) the effect of filing the Cases, the events and conditions related to, resulting from and/or leading up thereto and the effects thereon and any action required to be taken under the Loan Documents or the Orders.

"***Material Owned Real Property***" shall mean real property which is owned by Parent or another Loan Party with a fair market value in excess of $500,000.

"***Maximum Rate***" shall have the meaning assigned to such term in Section 9.09.

"***Milestones***" shall mean the Milestones set forth in Section 5.16.

"***Moody's***" shall mean Moody's Investors Service, Inc., or any successor thereto.

"***Mortgaged Properties***" shall mean the Material Owned Real Properties with respect to which a Mortgage is executed and delivered in accordance with Section 6 of the Agreed Security Principles or Section 5.11.

"***Mortgages***" shall mean the mortgages, deeds of trust, assignments of leases and rents, modifications and other security documents delivered pursuant to Section 6 of the Agreed Security Principles or Section 5.11, each in form and substance reasonably acceptable to the Agents.

22

**Error! Unknown document property name.**

"**Multiemployer Plan**" shall mean a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"**Net Cash Proceeds**" shall mean (a) with respect to any Asset Sale, the cash proceeds received by Parent or any Subsidiary (including cash proceeds subsequently received (as and when received) in respect of non-cash consideration initially received and including all insurance settlements and condemnation awards), net of (i) transaction expenses (including reasonable broker's fees or commissions, legal fees, accounting fees, investment banking fees and other professional fees, transfer and similar taxes and Parent's good faith estimate of income taxes paid or payable in connection with the receipt of such cash proceeds), (ii) amounts provided as a reserve, in accordance with GAAP, including pursuant to any escrow arrangement, against any liabilities under any indemnification obligations or purchase price adjustment associated with such Asset Sale (*provided* that, to the extent and at the time any such amounts are released from such reserve, such amounts shall constitute Net Cash Proceeds), (iii) in the case of insurance settlements and condemnation awards, amounts previously paid by Parent and its Subsidiaries consistent with the Approved Budget to replace or restore the affected property, and (iv) the principal amount, premium or penalty, if any, interest and other amounts on any Indebtedness for borrowed money which is secured by the asset sold in such Asset Sale and is required to be repaid with such proceeds (other than any such Indebtedness assumed by the purchaser of such asset), (b) with respect to any issuance or incurrence of Indebtedness or any Equity Issuance, the cash proceeds thereof, net of all taxes and customary fees, commissions, costs and other expenses (including reasonable broker's fees or commissions, legal fees, accounting fees, investment banking fees and other professional fees, and underwriter's discounts and commissions) incurred in connection therewith and (c) with respect to any Extraordinary Receipts, 100% of such cash or proceeds received by Parent or any Subsidiary.

"**New Money Loans**" shall mean, individually or collectively, as the context may require, the Initial Loans and the Delayed Draw Loans.

"**Non-Debtor Subsidiary**" shall mean any Subsidiary of Parent that is not a Debtor.

"**Non-U.S. Benefit Event**" shall mean, with respect to any Non-U.S. Pension Plan, (a) the existence of unfunded liabilities in excess of the amount permitted under any applicable law, or in excess of the amount that would be permitted absent a waiver from a Governmental Authority, (b) the failure to make the required contributions or payments, under any applicable law, on or before the due date for such contributions or payments, (c) the receipt of a notice by a Governmental Authority relating to the intention to terminate any such Non-U.S. Pension Plan or to appoint a trustee or similar official to administer any such Non-U.S. Pension Plan, or alleging the insolvency of any such Non-U.S. Pension Plan and (d) the incurrence of any liability in excess of $25,000,000 (or the Dollar Equivalent thereof in another currency) by any Loan Party or any of its Subsidiaries under applicable law on account of the complete or partial termination of such Non-U.S. Pension Plan or the complete or partial withdrawal of any participating employer therein, or (e) the occurrence of any transaction that is prohibited under any applicable law and could reasonably be expected to result in the incurrence of any liability by any Loan Party or any of its Subsidiaries, or the imposition on any Loan Party or any of its Subsidiaries of any fine, excise tax or penalty resulting from any noncompliance with any applicable law, in each case in excess of $25,000,000 (or the Dollar Equivalent thereof in another currency).

23

**DEBTOR EXHIBIT NO. 007**
**Page 30 of 153**

"***Non-U.S. Lender***" shall mean any Lender that not a U.S. Person.

"***Non-U.S. Pension Plan***" shall mean any plan, fund, scheme, or program that (i) is not subject to United States law, (ii) provides retirement income to employees or results in the deferral of income by employees for periods extending to the termination of covered employment or beyond, (iii) is maintained or contributed to by any Loan Party or any Subsidiary or with respect to which any such entities could reasonably be expected to have any current, future or contingent liability or responsibility, and (iv) is maintained for or contributed to on behalf of employees whose principal place of employment is outside the United States.

"***Non-U.S. Subsidiary***" shall mean any Subsidiary that is not a U.S. Subsidiary.

"***Notice of Disbursement***" shall mean a notice substantially in the form of Exhibit K.

"***Obligations***" shall mean all obligations defined as "Obligations" in the Guarantee Agreement.

"***Operating Account***" shall mean each of the deposit accounts maintained by Parent and its Subsidiaries listed on Schedule 1.01(c).

"***Orders***" shall mean the Interim Order and the Final Order, as applicable, in each case upon entry thereof by the Bankruptcy Court.

"***Organization Documents***" shall mean (a) with respect to any corporation, the certificate or articles of incorporation or articles of association and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement or limited liability company agreement (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction).

"***Other Connection Taxes***" shall mean, with respect to any recipient, Taxes imposed as a result of a present or former connection between such recipient and the jurisdiction imposing such Tax (other than connections arising from such recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"***Other Taxes***" shall mean any current or future stamp, documentary, excise, transfer, sales, property or similar Taxes, charges or levies (including mortgage recording Taxes and similar fees) that arise from any payment made hereunder or under any other Loan Document or from the execution, delivery, enforcement or registration of, or otherwise with respect to, this Agreement or any other Loan Document imposed by any Governmental Authority in the United

24

Error! Unknown document property name.

States or the jurisdiction in which Parent or the Borrower has a place of business other than any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made at the request of the Borrower).

"*Parent*" shall have the meaning assigned to such term in the introductory paragraph of this Agreement.

"*Participant Register*" shall have the meaning assigned to such term in Section 9.04(f)(ii).

"*Participating Member State*" shall mean any member state of the European Union that has the Euro as its lawful currency in accordance with legislation of the European Union relating to Economic and Monetary Union.

"*PBGC*" shall mean the Pension Benefit Guaranty Corporation referred to and defined in ERISA.

"*Permitted Investments*" shall mean:

(a)      direct obligations of the United States of America or by any of its agencies or instrumentalities, in each case maturing within ten years from the date of acquisition thereof;

(b)      direct obligations of any State of the United States of America (or any political subdivision or public instrumentality thereof), U.S. or non-U.S. corporations, or U.S. or non-U.S. commercial banking institutions having, at such date of acquisition, a rating of at least "A" by S&P or "A2" by Moody's, in each case maturing within eighteen months from the date of acquisition thereof;

(c)      investments in commercial paper and variable rate notes maturing within one year from the date of acquisition thereof and having, at such date of acquisition, the highest short-term credit rating obtainable from S&P or from Moody's;

(d)      investments in certificates of deposit, banker's acceptances and time deposits maturing within one year from the date of acquisition thereof issued or guaranteed by or placed with, and money market, checking or demand deposit accounts issued or offered by, (i) the Administrative Agent or any U.S. office of any commercial bank organized under the laws of the United States of America or any State thereof or (ii) a commercial banking institution organized and located in a country recognized by the United States of America, in each case that has a combined capital and surplus and undivided profits of not less than $250,000,000 (or the Dollar Equivalent thereof in another currency);

(e)      repurchase obligations with a term of not more than ninety days for underlying securities of the types described in clause (a) above entered into with any bank meeting the qualifications specified in clause (c) above;

(f)      (i) investments in money market funds which invest substantially all their assets in securities of the types described in clauses (a) through (e) above or (ii) enhanced yield funds or European money market funds having, at such date of acquisition, a rating of at least

25

**Error! Unknown document property name.**

"A" by S&P or "A2" by Moody's and that are capable of being fully liquidated at their respective net asset values at any time within ten Business Days;

(g)     dollars, Euros or the currency of any country having a long-term credit rating of at least "A" by S&P or "A2" by Moody's and any other foreign currency held by Parent or any of the Subsidiaries in the ordinary course of business; and

(h)     other short-term investments utilized by Parent or any Non-U.S. Subsidiary in accordance with normal investment practices for cash management in investments of a type analogous to the foregoing.

"*person*" or "*Person*" shall mean any natural person, corporation, business trust, joint venture, association, company, limited liability company, partnership, other business entity or Governmental Authority.

"*Petition Date*" shall have the meaning assigned to such term in the recitals to this Agreement.

"*PIK Interest*" shall have the meaning assigned to such term in Section 2.06(c).

"*Plan*" shall mean any employee pension benefit plan, as defined in Section 3(2) of ERISA, (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which any Loan Party or any ERISA Affiliate is (or, if such Plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"*Plan Asset Regulations*" shall mean 29 CFR § 2510.3-101 et seq., as modified by Section 3(42) of ERISA, as amended from time to time.

"*Plan Election*" means an election by the Required Lenders, the Required IC Lenders and the Required First Lien Lenders to have an Approved Restructuring implemented through an Acceptable Plan rather than an Acceptable Sale Transaction, which election shall be made within fourteen days of the Petition Date or at such later date as agreed to by the Required IC Lenders.

"*Platform*" shall have the meaning assigned to such term in Section 9.01.

"*Post-Petition*" means the time period commencing immediately upon the filing of the Cases.

"*PPSA*" shall mean the Personal Property Securities Act 2009 (Cth).

"*PPSR*" shall mean the register established under section 147 of the PPSA.

"*Pre-Petition First Lien Administrative Agent*" shall mean the administrative agent under the Pre-Petition First Lien Credit Agreement.

26

**DEBTOR EXHIBIT NO. 007**
**Page 33 of 153**

"**Pre-Petition First Lien Agents**" shall mean, individually or collectively, as the context may require, the Pre-Petition First Lien Administrative Agent and the Pre-Petition First Lien Security Agents.

"**Pre-Petition First Lien Credit Agreement**" shall mean that certain Syndicated Facility Agreement, dated as of May 15, 2018, among, *inter alios*, Parent, the Borrower, the other borrowers named therein, the lenders named therein, the issuing banks named therein, the Pre-Petition First Lien Agent and the Pre-Petition Security Agents.

"**Pre-Petition First Lien Lenders**" shall means lenders under the Pre-Petition First Lien Credit Agreement holding Pre-Petition First Lien Loans.

"**Pre-Petition First Lien Loan Documents**" shall mean the "Loan Documents" as defined in the Pre-Petition First Lien Credit Agreement.

"**Pre-Petition First Lien Loans**" shall mean the Loans (under and as defined in) the Pre-Petition First Lien Credit Agreement, including, for the avoidance of doubt, the New Incremental Term Loans (as defined in the Incremental Assumption and Amendment Agreement, dated as of October 16, 2018).

"*Pre-Petition First Lien Obligations*" shall mean the "Obligations" as such term is defined in the Pre-Petition First Lien Credit Agreement.

"**Pre-Petition First Lien Security Agents**" shall mean the collateral agent and security trustee under the Pre-Petition First Lien Credit Agreement.

"**Pre-Petition First Lien Security Documents**" shall mean the "Security Documents" as defined in the Pre-Petition First Lien Credit Agreement.

"**Prime Rate**" shall have the meaning assigned to such term in the definition of the term "Alternate Base Rate".

"**Private Lenders**" shall mean Lenders other than Public Lenders.

"**PTE**" shall mean a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"**Public Lender**" shall have the meaning assigned to such term in Section 9.01.

"**Purchase Money Indebtedness**" shall mean any Indebtedness of Parent or any Subsidiary to any seller or other person incurred to finance the acquisition (including in the case of a Capital Lease Obligation or Synthetic Lease Obligation, the lease), construction, improvement or repair of any fixed or capital assets and which is (i) incurred prior to or within 90 days of such acquisition or the completion of such construction, improvement or repair and (ii) secured only by the assets so acquired, constructed, improved or repaired and proceeds and products thereof, accessions thereto and improvements thereon.

27

Error! Unknown document property name.

"***Qualified Capital Stock***" of any Person shall mean any Equity Interest of such Person that is not Disqualified Stock.

"***Receiver***" means a receiver and manager or other receiver appointed in respect of all or any part of the Collateral and shall, if allowed by law, include an administrative receiver.

"***Register***" shall have the meaning assigned to such term in Section 9.04(d).

"***Regulation T***" shall mean Regulation T of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"***Regulation U***" shall mean Regulation U of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"***Regulation X***" shall mean Regulation X of the Board as from time to time in effect and all official rulings and interpretations thereunder or thereof.

"***Related Business***" shall mean any business that is the same, similar or otherwise reasonably related, ancillary or complementary to the businesses of Parent and its Subsidiaries on the Closing Date.

"***Related Parties***" shall mean, with respect to any specified Person, such Person's Affiliates and the respective directors, trustees, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"***Release***" shall mean any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing, depositing, dispersing, emanating or migrating of any Hazardous Material in, into, onto or through the environment.

"***Remedies Notice Period***" shall have the meaning assigned to such term in Section 7.01.

"***Remedial Action***" shall mean (a) "remedial action" as such term is defined in the United States Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. Section 9601(24), and (b) all other actions required by any Governmental Authority or voluntarily undertaken to: (i) clean up, remove, treat, abate or in any other way address any Hazardous Material in the environment; (ii) prevent the Release or threat of Release, or minimize the further Release of any Hazardous Material so it does not migrate or endanger or threaten to endanger public health, welfare or the environment; or (iii) perform studies and investigations in connection with, or as a precondition to, (i) or (ii) above.

"***Required First Lien Lenders***" shall mean the "Required Lenders" under and as defined in the Pre-Petition First Lien Credit Agreement.

"***Required IC Lenders***" shall mean Initial Committing Lenders having outstanding New Money Loans and New Money Commitments (such loans and commitments, the "***IC Lender New Money Exposure***") representing more than 50% of the sum of all New Money Loans outstanding and New Money Commitments at such time; *provided* that if at any time there are three or more Initial Committing Lenders, "Required IC Lenders" shall include two or more

28

Error! Unknown document property name.

unaffiliated Initial Committing Lenders; *provided*, *further*, that at any time an Initial Committing Lender holds less than 50% of its IC Lender New Money Exposure as of the date hereof, such Lender shall no longer be considered as an Initial Committing Lender for purposes of calculating Required IC Lenders.

"***Required Lenders***" shall mean, at any time, Lenders having outstanding Loans and Commitments representing more than 50% of the sum of all Loans outstanding and Commitments at such time; *provided* that the Loans and Commitments of any Defaulting Lender shall be disregarded in the determination of Required Lenders at any time.

"***Resolution Authority***" shall mean an EEA Resolution Authority or, with respect to any UK Financial Institution, a UK Resolution Authority.

"***Responsible Officer***" of any person shall mean any executive officer or Financial Officer of such person and any other officer or similar official thereof responsible for the administration of the obligations of such person in respect of this Agreement (or any other person reasonably acceptable to the Administrative Agent).

"***Restricted Payment***" shall have the meaning assigned to such term in Section 6.06(a).

"***Roll Up***" shall have the meaning assigned to such term in Section 2.01(b).

"***Roll-Up Date***" shall have the meaning assigned to such term in Section 2.01(b).

"***Roll-Up Loan***" shall have the meaning assigned to such term in Section 2.01(b).

"***Roll-Up Schedule***" shall have the meaning assigned to such term in Section 2.01(b).

"***S&P***" shall mean S&P Global Ratings, or any successor thereto.

"***Sale and Leaseback***" shall have the meaning set forth in Section 6.03.

"***Sale Order***" shall have the meaning assigned to such term in Section 5.16(c).

"***Sanctioned Country***" shall mean, at any time, a country or territory which is itself the subject or target of any Sanctions.

"***Sanctioned Person***" shall mean, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or by the United Nations Security Council, the European Union, any EU Member State (including the United Kingdom), Australia, Singapore, or any country in which Parent or any of its Subsidiaries operate, (b) any Person located, organized or resident in a Sanctioned Country or (c) any Person directly or indirectly owned, 50 percent or more, or controlled by any such Person or Persons described in the foregoing clauses (a) and (b).

"***Sanctions***" shall mean economic or financial sanctions or trade embargoes, as well as anti-terrorism laws (including the USA PATRIOT ACT) imposed, administered or enforced

29

Error! Unknown document property name.

from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury or the U.S. Department of State, or (b) the United Nations Security Council, the European Union, any EU Member State (including the United Kingdom), Australia, Singapore, or any country in which Parent or any of its Subsidiaries operate.

"*SEC*" shall mean the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"*Secured Parties*" shall have the meaning assigned to such term in the Guarantee Agreement.

"*Securities Act*" shall mean the United States Securities Act of 1933, as amended.

"*Security Documents*" shall mean the Security Trust Deed, each of the agreements and instruments listed on Part I of Schedule 4.01(d) hereto and, after execution and delivery thereof, Part I of Schedule 5.14 hereto and each of the security agreements, mortgages and other instruments and documents (including any Mortgages) executed and delivered pursuant to any of the foregoing or pursuant to Section 5.11 or the Agreed Security Principles.

"*Security Trust Deed*" shall mean the Security Trust Deed, substantially in the form of Exhibit E, executed by the Security Trustee, for the benefit of the Secured Parties.

"*Security Trustee*" shall have the meaning assigned to such term in the introductory paragraph to this Agreement.

"*Singapore Companies Act*" shall mean the Companies Act, Chapter 50 of Singapore.

"*Skadden*" shall mean Skadden, Arps, Slate, Meagher & Flom LLP, acting in their capacity as counsel to the Agents.

"*SPC*" shall have the meaning assigned to such term in Section 9.04(j).

"*Specified Jurisdiction*" shall mean the United States, Australia, Hong Kong, the United Kingdom, any member state of the European Economic Area and any Participating Member State.

"*Stated Maturity Date*" shall mean January [22], 2021.

"*Statutory Reserves*" shall mean a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by any Governmental Authority to which the Administrative Agent or any Lender (including any branch, Affiliate or other fronting office making or holding a Loan) is subject for any category of deposits or liabilities customarily used to fund loans or by reference to which interest rates applicable to Loans are determined.  Such reserve, liquid asset or similar percentages shall include those imposed pursuant to Regulation D of the Board (and for purposes of Regulation D, Eurocurrency Loans denominated in dollars

Error! Unknown document property name.

30

shall be deemed to constitute Eurocurrency Liabilities (as defined in Regulation D of the Board)).  Loans shall be deemed to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under Regulation D or any other applicable law, rule or regulation.  Statutory Reserves shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"*Subordinated Indebtedness*" shall mean Indebtedness of Loan Party that (i) is contractually subordinated in right of payment to the Obligations pursuant to subordination terms that are reasonably satisfactory to the Administrative Agent, (ii) matures after, and does not require any scheduled amortization or other scheduled payments of principal prior to, the date that is six months after the Stated Maturity Date, (iii) by its terms, or by the terms of any security into which it is convertible or exchangeable or otherwise, would not be required for any reason to be redeemed, repurchased or repaid on or prior to the date that is six months after the Stated Maturity Date (other than upon the occurrence of a "change of control" or upon the occurrence of an event of default or mandatory prepayment or redemption event, but only so long as any such requirement to be redeemed, repurchased or repaid upon the occurrence of such event is subject to the prior payment in full of all of the Obligations), (iv) is not convertible into or exchangeable for debt securities of Parent or any Subsidiary prior to the date that is six months after the Stated Maturity Date and (v) has terms and conditions (other than interest rate and redemption premiums), taken as a whole, that are not materially less favorable to any Loan Party than the terms and conditions customary at the time for high-yield subordinated debt securities issued in a public offering in the reasonable determination of the Administrative Agent.

"*Subordinated Indebtedness Documents*" shall mean each of the agreements, documents and instruments providing for or evidencing any Subordinated Indebtedness permitted to be issued or incurred under Section 6.01, as amended, supplemented or otherwise modified in accordance with Section 6.09(a).

"*subsidiary*" shall mean, with respect to any person (herein referred to as the "*parent*"), any corporation, partnership, limited liability company, association or other business entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or more than 50% of the general partnership interests are, at the time any determination is being made, owned, Controlled or held, or (b) that is, at the time any determination is made, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"*Subsidiary*" shall mean any subsidiary of Parent.

"*Subsidiary Guarantors*" shall mean each person listed on Schedule 1.01(d) and each other person that becomes party to the Guarantee Agreement as a Guarantor, and the permitted successors and assigns of each such person.

"*Superpriority Claim*" shall mean any administrative expense claim in the case of any Loan Party having priority over any and all administrative expenses, diminution claims and all other priority claims against the Debtors, subject only to the Carve-Out, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all

Error! Unknown document property name.

administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 365, 503(b), 506(c) (subject only to and effective upon entry of the Final Order), 507(a), 507(b), 726, 1113 or 1114 of the Bankruptcy Code.

"*Syndication End Date*" shall mean the date not later than fifteen days after the Petition Date on which the initial syndication of the Loans and Commitments has been completed (or such earlier or later date as notified to the Administrative Agent by the Required IC Lenders).

"*Synthetic Lease*" shall mean a lease of property or assets (other than inventory) designed to permit the lessee (a) to claim depreciation on such property or assets under U.S. tax law and (b) to treat such lease as an operating lease or not to reflect the leased property or assets on the lessee's balance sheet or statement of financial position under GAAP.

"*Synthetic Lease Obligations*" shall mean, as to any person, an amount equal to the sum of (a) the obligations of such person to pay rent or other amounts under any Synthetic Lease which are attributable to principal or that would appear on a balance sheet or statement of financial position of such person in accordance with GAAP if such obligations were accounted for as Capital Lease Obligations and, without duplication, (b) the amount of any purchase price payment under any Synthetic Lease assuming the lessee exercises the option to purchase the leased property at the end of the lease term.

"*Tax Authority*" shall mean any revenue, customs, fiscal or governmental authority competent to impose or collect any taxation (or any interest, fine, surcharge or penalty relating thereto).

"*Tax Consolidated Group*" shall mean a Consolidated Group or a MEC Group as those terms are defined in the Australian Tax Act.

"*Tax Funding Agreement*" shall mean any agreement, deed or document which determines the funding and payment of Group Liabilities of the Head Company of a Tax Consolidated Group.

"*Tax Sharing Agreement*" shall mean an agreement between the members of a Tax Consolidated Group which takes effect as a tax sharing agreement under section 721-25 of the Australian Tax Act and which complies with the Australian Tax Act and any law, official directive, request, guidance or policy (whether or not having the effect of law) issued in connection with the Australian Tax Act.

"*Taxes*" shall mean all current or future taxes, duties, levies, imposts, deductions, charges, withholdings (including backup withholdings), assessments, fees or other charged imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"*Termination Date*" shall mean the earliest of (a) the Stated Maturity Date, (b) the effective date of any plan for the reorganization of the Borrower or any other Debtor under chapter 11 of the Bankruptcy Code, (c) the consummation of a sale or other disposition of all or substantially all of the assets of the Debtors under section 363 of the Bankruptcy Code, (d) the date of acceleration of the Loans and the termination of unused Commitments with respect to the

**Error! Unknown document property name.**

DIP Term Facility in accordance with the terms of this Agreement upon and during the continuance of an Event of Default and (e) the date that is thirty (30) days after the Petition Date (or such later date as may be agreed by the Required IC Lenders and the Required Lenders), unless the Final Order Entry Date has occurred on or prior to such date.

"*Test Period*" in effect at any time shall mean the most recent period of two consecutive fiscal half-year periods of Parent (or, in the case of monthly financial statements, the most recent period of three consecutive fiscal month periods) ended on or prior to such time in respect of which financial statements have been or are required to be delivered pursuant to Section 5.04(a) or 5.04(a), as applicable.

"*Threshold Amount*" shall mean $500,000.  In connection with any reference to the Threshold Amount of any Indebtedness, the "principal amount" of the obligations of Parent or any Subsidiary in respect of any Hedging Agreement at any time shall be the Agreement Value of such Hedging Agreement at such time.

"*Transactions*" shall mean, collectively, the execution and delivery by the Loan Parties of the Loan Documents to which they are a party, the making (or deemed making) of the Borrowings hereunder on the Closing Date or the Delayed Draw Borrowing Date, the guaranteeing of the Obligations and the granting of the security interests and the provision of the Collateral pursuant to the terms of this Agreement, the Security Documents and the other Loan Documents.

"*Transferee*" shall mean any transferee or assignee, including a participation holder, of any Agent or any Lender.

"*Type*", when used in respect of any Loan or Borrowing, shall refer to the Rate by reference to which interest on such Loan or on the Loans comprising such Borrowing is determined.  For purposes hereof, the term "*Rate*" shall include the Adjusted LIBO Rate and the Alternate Base Rate.

"*UCC*" shall mean the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in any applicable jurisdiction.

"*UK Financial Institution*" shall mean any BRRD Undertaking (as such term is defined under the PRA Rulebook (as amended form time to time) promulgated by the United Kingdom Prudential Regulation Authority) or any person falling within IFPRU 11.6 of the FCA Handbook (as amended from time to time) promulgated by the United Kingdom Financial Conduct Authority, which includes certain credit institutions and investment firms, and certain affiliates of such credit institutions or investment firms.

"*UK Resolution Authority*" shall mean the Bank of England or any other public administrative authority having responsibility for the resolution of any UK Financial Institution.

"*Undisclosed Administration*" shall mean, in relation to a Lender or its direct or indirect parent company, the appointment of an administrator, provisional liquidator, conservator, receiver, trustee, custodian or other similar official by a supervisory authority or regulator under or based on the law in the country where such Lender or its direct or indirect parent company is

Error! Unknown document property name.

subject to home jurisdiction supervision if, and solely for so long as, applicable law requires that such appointment is not to be publicly disclosed.

"*Unrestricted Cash*" shall mean, at any time, the aggregate amount of cash, to the extent that the use of such cash for application to the payment of the Obligations is not prohibited by law or any contract or other agreement and such cash is free and clear of all Liens (other than Liens in favor of any of the Agents and other Liens permitted under Sections 6.02(b), **Error! Reference source not found.** and **Error! Reference source not found.**); *provided*, for the avoidance of doubt, that Unrestricted Cash shall include, at any time of determination, cash held in the Escrow Account.

"*U.S. Person*" shall mean any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"*U.S. Subsidiary*" shall mean a Subsidiary incorporated or organized under the laws of the United States of America, any State thereof or the District of Columbia.

"*U.S. Tax Compliance Certificate*" shall have the meaning assigned to such term in Section 2.20(f)(ii)(B)(3).

"*USA PATRIOT Act*" shall mean The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Title III of Pub. L. No. 107-56 (signed into law October 26, 2001)).

"*wholly owned Subsidiary*" of any person shall mean a subsidiary of such person of which securities (except for directors' and foreign nationals' qualifying shares) or other ownership interests representing 100% of the outstanding Equity Interests are, at the time any determination is being made, owned, controlled or held by such person or one or more wholly owned subsidiaries of such person or by such person and one or more wholly owned subsidiaries of such person.

Unless the context otherwise requires, as used in this Agreement, "*wholly owned Subsidiary*" shall mean a wholly owned Subsidiary of Parent that is a Subsidiary.

"*Withdrawal Liability*" shall mean liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"*Withholding Agent*" shall have the meaning assigned to such term in Section 2.20(g).

"*Write-Down and Conversion Powers*" shall mean, (a) with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule, and (b) with respect to the United Kingdom,  any powers of the applicable Resolution Authority under the Bail-In Legislation to cancel, reduce, modify or change the form of a liability of any UK Financial Institution or any contract or instrument under which that liability arises, to convert all or part of that liability into shares, securities or obligations of that person or any other person, to

34

**Error! Unknown document property name.**

provide that any such contract or instrument is to have effect as if a right had been exercised under it or to suspend any obligation in respect of that liability or any of the powers under that Bail-In Legislation that are related to or ancillary to any of those powers.

SECTION 1.02.  ***Terms Generally***.  The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.  All references herein to Articles, Sections, Exhibits and Schedules shall be deemed references to Articles and Sections of, and Exhibits and Schedules to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, (a) any reference in this Agreement to any Loan Document shall mean such Loan Document as amended, restated, supplemented or otherwise modified from time to time in each case, in accordance with the express terms of such Loan Document, (b) any reference in this Agreement to any law or regulation shall mean such law or regulation as amended, restated, supplemented or otherwise modified from time to time, and (c) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; *provided* that if Parent notifies the Administrative Agent that Parent wishes to amend any covenant in Article VI or any related definition to eliminate the effect of any change in GAAP occurring after the date of this Agreement on the operation of such covenant (or if the Administrative Agent notifies Parent that the Required Lenders wish to amend Article VI or any related definition for such purpose), then Parent's and its Subsidiaries' compliance with such covenant shall be determined on the basis of GAAP in effect immediately before the relevant change in GAAP became effective, until either such notice is withdrawn or such covenant is amended in a manner satisfactory to Parent and the Required Lenders.  Notwithstanding anything to the contrary herein, (i) all accounting and financial terms used herein shall be construed, and all financial computations pursuant hereto shall be made, without giving effect to any election under U.S. Financial Accounting Standards Board ASC 825-10, or its equivalent under Australian Accounting Standards Board Accounting Standards (including under AASB No. 7, 132 and 139) to value any Indebtedness or other liabilities of any Loan Party or Subsidiary at "fair value", as defined therein and (ii) for purposes of determining the outstanding amount of any Indebtedness, any original issue discount with respect to such Indebtedness shall not be deducted in determining the outstanding amount of such Indebtedness.

SECTION 1.03.   *LLC Division*.  Any reference herein to a merger, consolidation, amalgamation, assignment, sale or transfer or disposition or similar term, shall be deemed to apply to a division of or by a limited liability company, or an allocation of assets to a series of a limited liability company (or the unwinding of such a division or allocation), as if it were a merger, consolidation, amalgamation, assignment, sale or transfer or disposition, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company shall constitute a separate Person hereunder (and each division of any limited liability company that is a Subsidiary, subsidiary, joint venture or any other like term shall also constitute such a Person or entity), and to the extent any covenant in any Loan Document is applicable to such limited

Error! Unknown document property name.

liability company immediately prior to such division, such covenant shall apply to any Person resulting from such division immediately after such division.

SECTION 1.04.  **Classification of Loans and Borrowings**.  For purposes of this Agreement, Loans may be classified and referred to by Type (*e.g.*, a "Eurocurrency Loan"). Borrowings also may be classified and referred to by Type (*e.g.*, a "Eurocurrency Borrowing").

SECTION 1.05.  **Dutch Terms**. In this Agreement:

(a)    "moratorium" includes surséance van betaling;

(b)    an "administrator" includes a bewindvoerder;

(c)    a "receiver" includes a curator;

(d)    a "winding-up", "administration" or "dissolution" includes failliet verklaard and ontbonden;

(e)    "inability to pay its debts" includes the giving of a notice to the Dutch tax authorities under Section 36(2) of the Dutch 1990 Tax Collection Act (Invorderingswet 1990); and

(f)    "levy upon assets" includes an executory attachment (executoriaal beslag) and an interlocutory attachment (conservatoir beslag).

ARTICLE II

The Credits

SECTION 2.01.  **Commitments and Loans**.    (a) Subject to the terms and conditions hereof and in the Orders and relying upon the representations and warranties herein set forth, each Lender agrees, severally and not jointly, to (i) following entry of the Interim Order and the satisfaction of the conditions to Borrowing set forth in Section 4.01, make a term loan to the Borrower in a single Borrowing on the Closing Date in a principal amount in Dollars not to exceed such Lender's Initial Commitment (the "**Initial Loan**") and (ii) following satisfaction of the conditions to Borrowing set forth in Section 4.02, make an additional delayed draw term loan to the Borrower in a single Borrowing on the Delayed Draw Borrowing Date (the "**Delayed Draw Loans**") in an aggregate principal amount not to exceed such Lender's Delayed Draw Commitment.  Once funded, each Initial Loan and each Delayed Draw Loan shall be a "Loan" and a "New Money Loan" for all purposes under this Agreement and the other Loan Documents.

(b)    Subject to the terms and conditions set forth herein and in consideration for providing the New Money Loans, (i) subject to entry of the Interim Order, on the Syndication End Date, Pre-Petition First Lien Loans held by Pre-Petition First Lien Lenders (after giving effect to, and assuming the settlement of, any pending assignments of such Pre-Petition First Lien Loans on the Syndication End Date) who are also Lenders or Affiliates of Lenders hereunder shall be automatically substituted and exchanged for (and prepaid on a cashless basis

36

Error! Unknown document property name.

by) loans hereunder (the "*Initial Roll-Up Loans*"), in a principal amount equal to 100% of the Initial Commitments on the Closing Date allocated pro rata among such Lenders in accordance with the respective principal amounts of their Initial Loans as of such date and (ii) subject to entry of the Final Order, on the Final Order Entry Date, Pre-Petition First Lien Loans held by Pre-Petition First Lien Lenders (after giving effect to, and assuming the settlement of, any pending assignments of such Pre-Petition First Lien Loans on the Final Order Entry Date) who are also Lenders or Affiliates of Lenders hereunder shall be automatically substituted and exchanged for (and prepaid on a cashless basis by) loans hereunder (the "*Additional Roll-Up Loans*" and, together with the Initial Roll-Up Loans, the "*Roll-Up Loans*"), in a principal amount equal to 100% of the Delayed Draw Commitments on the Closing Date allocated pro rata among such Lenders in accordance with the respective principal amounts of their Delayed Draw Commitments as of such date (without giving effect to any assignment of a Delayed Draw Commitment by such Lender to a fronting lender in connection with the provision of fronting services related to the funding of Delayed Draw Loans) (the Initial Roll-Up Loans shall constitute and be deemed Loans outstanding hereunder on the Syndication End Date and the Additional Roll-Up Loans shall constitute and be deemed Loans outstanding hereunder on the Final Order Entry Date and the Roll-Up Loans shall constitute a Class of Loans) (the foregoing substitution and exchange of Pre-Petition First Lien Loans into Roll-Up Loans shall be defined herein, generally, as the "*Roll-Up*" and, the date upon which a Roll-Up occurs shall be defined herein as a "*Roll-Up Date*").   The parties hereto hereby agree that prior to each of the Syndication End Date and the Final Order Entry Date, the Ad Hoc Lender Advisors shall deliver a schedule to the Administrative Agent (the "*Roll-Up Schedule*") that will include (i) in the case of the Syndication End Date, (x) the name of each Lender or Affiliate of a Lender whose Pre-Petition First Lien Loans will be substituted and exchanged for (and prepaid on a cashless basis by) Initial Roll-Up Loans on the Syndication End Date, (y) the amount of Initial Roll-Up Loans to be received by each Lender or Affiliate of a Lender on the Syndication End Date and (z) the aggregate amount of Pre-Petition First Lien Loans held by each Lender holding Initial Roll-Up Loans after giving effect to the Roll-Up and (ii) in the case of the Final Order Entry Date, (x) the name of each Lender or Affiliate of a Lender whose Pre-Petition First Lien Loans will be exchanged for (and prepaid on a cashless basis by) Additional Roll-Up Loans hereunder on the Final Order Entry Date, (y) the amount of Additional Roll-Up Loans to be received by each Lender or Affiliate of a Lender on the Final Order Entry Date and (z) the aggregate amount of Pre-Petition First Lien Loans held by each Lender holding Additional Roll-Up Loans after giving effect to the Roll-Up, which such schedule may be attached to this Agreement and modified from time to time without the consent of any Lender.   Furthermore, the parties agree that each Affiliate of a Lender that will receive Roll-Up Loans hereunder and that is not already a Lender hereunder at the time thereof must become a Lender hereunder, by executing a joinder to this Agreement in form and substance reasonably satisfactory to the Administrative Agent, on or prior to the entry of the Syndication End Date (in the case of the Initial Roll-Up Loans) or the Final Order Entry Date (in the case of the Additional Roll-Up Loans), as applicable, in order to receive its portion of the Roll-Up.   The Administrative Agent and the Pre-Petition First Lien Administrative Agent may each conclusively rely on the provisions of this Section 2.01(b) in adjusting the Register and the Register (as defined in the Pre-Petition First Lien Credit Agreement) to reflect (x) the substitution and exchange (and prepayment on a cashless basis) of an aggregate outstanding principal amount of the Pre-Petition First Lien Loans of each Lender participating in the Roll-Up equal to the amount set forth opposite such Lender's name on the

**Error! Unknown document property name.**

schedules provided pursuant to clauses (i) and (ii) above, (y) the Roll-Up Loans to be received by the Lenders on the Roll-Up Date and (z) the aggregate amount of Pre-Petition First Lien Loans held by each Lender holding Roll-Up Loans after giving effect to the applicable Roll-Up). Amounts borrowed, deemed borrowed or exchanged under this Section 2.01(b) and, following the Roll-Up, repaid or prepaid, may not be reborrowed.

SECTION 2.02.  *Loans*.  (a) Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their applicable Commitments; *provided* that the failure of any Lender to make its Loan shall not in itself relieve any other Lender of its obligation to lend hereunder (it being understood, however, that no Lender shall be responsible for the failure of any other Lender to make any Loan required to be made by such other Lender). Loans comprising any Borrowing shall be in an aggregate principal amount that is (i) an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum or (ii) equal to the remaining available balance of the applicable Commitments.

(b)    Subject to Sections 2.06, 2.08 and 2.15, (i) each Borrowing of New Money Loans made by the Borrower shall be comprised entirely of ABR Loans or Eurocurrency Loans as Parent may request pursuant to Section 2.03.  Each Lender may at its option make its New Money Loan by causing any U.S. or non-U.S. branch or other Affiliate of such Lender to make such Loan; *provided* that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)    Each Lender shall make its New Money Loan to be made by it hereunder on the proposed date thereof by wire transfer of immediately available funds to the Escrow Account not later than 11:00 a.m., New York City time.

(d)    Unless the Administrative Agent shall have received notice from a Lender prior to the date of the Borrowing that such Lender will not make available to the Administrative Agent such Lender's portion of the Borrowing, the Administrative Agent may assume that such Lender has made such portion available to the Administrative Agent on the date of the Borrowing in accordance with Section 2.02(c) above and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower on such date a corresponding amount.  If the Administrative Agent shall have so made funds available then, to the extent that such Lender shall not have made such portion available to the Administrative Agent, such Lender and the Borrower severally agree to repay to the Administrative Agent forthwith on demand such corresponding amount together with interest thereon, for each day from the date such amount is made available to the Borrower to but excluding the date such amount is repaid to the Administrative Agent at (i) in the case of the Borrower, a rate per annum equal to the interest rate applicable at the time to the Loans comprising the Borrowing and (ii) in the case of such Lender, a rate determined by the Administrative Agent to represent its cost of overnight or short-term funds in the applicable currency (which determination shall be conclusive absent manifest error).  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount shall constitute such Lender's Loan as part of the Borrowing for purposes of this Agreement.

38

**Error! Unknown document property name.**

(e)      Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request any Interest Period with respect to any Eurocurrency Borrowing that would end after the Stated Maturity Date.

SECTION 2.03.  ***Borrowing Procedure***.   In order to request a Borrowing of New-Money Loans, Parent shall email, hand deliver or fax to the Administrative Agent a duly completed Borrowing Request (a) in the case of an ABR Borrowing, not later than 1:00 p.m., New York City time, one Business Day before the proposed Credit Date and (b) in the case of a Eurocurrency Borrowing, not later than 11:00 a.m., New York City time, three Business Days before the proposed Credit Date.  Each Borrowing Request shall be irrevocable, shall be signed by Parent and shall specify the following information: (i) whether it is to be a Eurocurrency Borrowing or an ABR Borrowing; (ii) the date of such Borrowing (which shall be a Business Day); (iii) the number and location of the account to which funds are to be disbursed (which shall be the Escrow Account) and (iv) the amount of such Borrowing; *provided* that notwithstanding any contrary specification in any such Borrowing Request, the requested Borrowing shall comply with the requirements set forth in Section 2.02.  If no election as to the Type of Borrowing is specified in the Borrowing Request, then the requested Borrowing shall be an ABR Borrowing.  The Administrative Agent shall promptly advise the applicable Lenders of any notice given pursuant to this Section 2.03 (and the contents thereof), of each Lender's portion of the requested Borrowing and the wire instructions for the Escrow Account to which Loans made in connection with the requested Borrowing are to be wired.

SECTION 2.04.  ***Evidence of Debt; Repayment of Loans***.

(a)      The Borrower hereby unconditionally promises to pay to the Administrative Agent, for the account of each Lender, the principal amount of each Loan of such Lender as provided in Section **Error! Reference source not found.**.

(b)      Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender from time to time, including the amounts of principal and interest payable and paid to such Lender from time to time under this Agreement.

(c)      The Administrative Agent shall maintain accounts in which it will record (i) the amount of each Loan made hereunder, the Type thereof and, if applicable, the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower or any Guarantor and each Lender's share thereof.

(d)      Subject to Section 9.04(d), the entries made in the accounts maintained pursuant to Sections 2.04(b) and 2.04(c) above shall be prima facie evidence of the existence and amounts of the obligations therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligations of the Borrower to repay the Loans made to the Borrower in accordance with their terms.

39

**DEBTOR EXHIBIT NO. 007**
**Page 46 of 153**

(e)        Any Lender may request that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in substantially the form set forth in Exhibit H, or otherwise in a form and substance reasonably acceptable to the Administrative Agent and Parent.

SECTION 2.05.   *Fees*.  (a) The Borrower agrees to pay (or cause to be paid) to each Agent in dollars, for its own account, the agency fees from time to time agreed to in writing by the Borrower and such Agent (the "***Agent Fees***").

(b)        The Borrower agrees to pay to each Lender, through the Administrative Agent, on the Closing Date, a commitment fee (the "***Commitment Fee***") equal to 2.00% of the Commitment of such Lender on such date (as in effect immediately prior to giving effect to the funding of any Loans on such date), which such fee shall be payable in the form of original issue discount (by reducing the amount of the Loan advanced by each Lender in the amount of such Lender's Commitment Fee).

(c)        With respect to each repayment or prepayment of Loans under Section 2.13, any other repayment or prepayment of Loans upon maturity (scheduled or otherwise), any acceleration of the Loans and/or the other Obligations with respect thereto (regardless of whether before or after the occurrence of an Event of Default or the commencement of any bankruptcy or insolvency proceeding or any other proceeding under any Debtor Relief Law (including any deemed repayment or satisfaction in connection therewith)) and/or any mandatory assignment of the Loans of a non-consenting Lender pursuant to Section 2.22, in each case whether in full or in part, the Borrower shall be required to pay an amount equal to 5.00% of the amount of the Loans (including any Roll-Up Loans) repaid, prepaid, accelerated or assigned (the "***Exit Fee***"), in each case, concurrently with such repayment, prepayment, acceleration or assignment.  For the avoidance of doubt, it is understood and agreed that, if the Loans are accelerated or otherwise become due prior to the Stated Maturity Date, in each case whether in full or in part (regardless of whether before or after the occurrence of an Event of Default or the commencement of any bankruptcy or insolvency proceeding or any other proceeding under any Debtor Relief Law), the Exit Fee will also automatically be due and payable as though the Loans were being repaid, prepaid or assigned and shall constitute part of the Obligations with respect to the Loans.  For the avoidance of doubt, the Exit Fee shall also be due and payable (i) in the event the Loans (or any notes representing the Loans) are satisfied or released by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by another means and/or (ii) upon the satisfaction, release, payment, restructuring, reorganization, replacement, reinstatement, defeasance or compromise of any Obligations (and/or this Agreement or the notes evidencing any Obligations) in any insolvency proceeding or other proceeding pursuant to any Debtor Relief Laws, foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by other means or the making of a distribution of any kind in any insolvency proceeding or under any Debtor Relief Law to the Administrative Agent, for the account of the Lenders, in full or partial satisfaction of the Obligations.

(d)        The Borrower agrees to pay to the Administrative Agent for the account of each Lender a commitment payment (a "***Delayed Draw Commitment Fee***") equal to 0.50% *per annum* of the average daily unused amount of each Delayed Draw Commitment of such Lender

Error! Unknown document property name.

during the period from and including the date hereof to but excluding the Delayed Draw Commitment Termination Date. Accrued Delayed Draw Commitment Fee shall be payable on the Delayed Draw Commitment Termination Date. The Delayed Draw Commitment Fee shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day).

(e)     All Fees shall be paid on the dates due, in immediately available funds in cash (to the extent provided above), to the Administrative Agent for distribution (other than the Agency Fees), if and as appropriate, among the Lenders. Once paid, none of the Fees shall be refundable under any circumstances, absent manifest error in the calculation of such Fees.

SECTION 2.06. ***Interest on Loans***.  (a) Subject to the provisions of Section 2.07, the New Money Loans comprising each ABR Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be, and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the sum of (i) the Alternate Base Rate and (ii) the Applicable Rate for such Loans in effect.

(b)     Subject to the provisions of Section 2.07, the New Money Loans comprising each Eurocurrency Borrowing shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) at a rate per annum equal to the sum of (i) the Adjusted LIBO Rate for the Interest Period in effect for such Borrowing and (ii) the Applicable Rate for such Loans in effect.

(c)     The Roll-Up Loans shall bear interest (computed on the basis of the actual number of days elapsed over a year of 365 or 366 days, as the case may be, and calculated from and including the date of such Borrowing to but excluding the date of repayment thereof) at a rate per annum equal to the sum of (i) the Alternate Base Rate and (ii) the Applicable Rate for such Loans in effect, *provided* that a portion of the interest on Roll-Up Loans equal to a rate per annum equal to the sum of (i) the Alternative Base Rate and (ii) 0.75% shall be payable in kind as compounded interest and added to the aggregate principal amount of the Roll-Up Loans (such interest, "***PIK Interest***"); *provided, further*, that in no event shall the cash portion of the interest payable in respect of the Roll-Up Loans be less than 1.00% per annum of the outstanding aggregate principal amount of the Roll-Up Loans at any time.

(d)     Interest on each Loan shall be payable (i) on the Interest Payment Dates applicable to such Loan except as otherwise provided in this Agreement and (ii) in dollars (other than PIK Interest, which shall be paid in kind on each Interest Payment Date). The applicable Alternate Base Rate or Adjusted LIBO Rate for each Interest Period or day within an Interest Period, as the case may be, shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

SECTION 2.07. ***Default Interest***.  Upon the occurrence and during the continuance of an Event of Default, unless waived by the Required Lenders, the Borrower shall on demand from time to time pay interest, to the extent permitted by law, on all Obligations owing by it hereunder at a fluctuating interest rate *per annum* at all times (after as well as before judgment) (a) in the case of principal and interest, at the rate that would otherwise be applicable

41

**Error! Unknown document property name.**

thereto pursuant to Section 2.06 plus 2.00% *per annum* and (b) in the case of any other amount payable hereunder, at a rate *per annum* equal to the rate applicable to ABR Loans plus 2.00% *per annum*.

SECTION 2.08.  *Alternate Rate of Interest*.  In the event, and on each occasion, that on the day two Business Days prior to the commencement of any Interest Period for a Eurocurrency Borrowing, the Administrative Agent shall have determined that (i) deposits in the principal amounts of the Loans comprising such Borrowing are not generally available in the relevant market, (ii) the rates at which such deposits are being offered will not adequately and fairly reflect the cost to any Lender of making or maintaining its Eurocurrency Loan during such Interest Period, or (iii) reasonable means do not exist for ascertaining the Adjusted LIBO Rate, the Administrative Agent shall, as soon as practicable thereafter, give written (including by email) or fax notice explaining such determination or notification to Parent and the Lenders.  In the event of any such determination by the Administrative Agent, until the Administrative Agent shall have advised Parent and the Lenders that the circumstances giving rise to such notice no longer exist, any request for a Eurocurrency Borrowing pursuant to Section 2.03 or 2.10 shall be deemed to be a request for an ABR Borrowing.  Each determination by the Administrative Agent or a Lender hereunder shall be conclusive absent manifest error.

SECTION 2.09.  Termination of Commitments.  Following its making of the Initial Loan on the Closing Date, the Initial Commitment of each Lender shall terminate.  The Delayed Draw Commitment of each Lender shall terminate on the Delayed Draw Commitment Termination Date and, to the extent applicable, after the making of any Delayed Draw Term Loan on such date.

SECTION 2.10.  *Conversion and Continuation of Borrowings*.  The Borrower shall have the right at any time upon prior irrevocable notice to the Administrative Agent (a) not later than 1:00 p.m., New York City time, one Business Day prior to conversion, to convert the full aggregate principal amount of a Eurocurrency Borrowing into an ABR Borrowing and (b) not later than 12:00 (noon), New York City time, three Business Days prior to conversion or continuation, to convert the full aggregate principal amount of an ABR Borrowing into a Eurocurrency Borrowing or to continue any Eurocurrency Borrowing as a Eurocurrency Borrowing for an additional Interest Period, subject in each case to the following:

(i)      each conversion or continuation shall be made pro rata among the Lenders in accordance with the respective principal amounts of the Loans comprising the converted or continued Borrowing;

(ii)      each conversion shall be effected by each Lender and the Administrative Agent by recording for the account of such Lender the new Loan of such Lender resulting from such conversion and reducing the Loan (or portion thereof) of such Lender being converted by an equivalent principal amount;

(iii)      accrued interest on any Eurocurrency Loan (or portion thereof) being converted shall be paid by the Borrower at the time of conversion;

42

Error! Unknown document property name.

(iv)     if any Eurocurrency Borrowing is converted at a time other than the end of the Interest Period applicable thereto, the Borrower shall pay, upon demand, any amounts due to the Lenders pursuant to Section 2.16;

(v)     any portion of a Borrowing maturing or required to be repaid in less than 14 days may not be converted into or continued as a Eurocurrency Borrowing;

(vi)     any portion of a Eurocurrency Borrowing that cannot be converted into or continued as a Eurocurrency Borrowing by reason of the immediately preceding clause shall be automatically converted at the end of the Interest Period in effect for such Borrowing into an ABR Borrowing;

(vii)     no Interest Period may be selected for any Eurocurrency Borrowing that would end later than the Stated Maturity Date; and

(viii)     upon notice to Parent from the Administrative Agent given at the request of the Required Lenders, after the occurrence and during the continuance of a Default or Event of Default, (A) no outstanding Borrowing may be converted into, or continued as, a Eurocurrency Borrowing and (B) unless repaid, each Eurocurrency Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Each notice pursuant to this Section 2.10 shall be irrevocable and shall refer to this Agreement and specify (i) the identity and amount of the Borrowing that Parent requests be converted or continued, (ii) whether such Borrowing is to be converted to or continued as a Eurocurrency Borrowing or an ABR Borrowing and (iii) if such notice requests a conversion, the date of such conversion (which shall be a Business Day).  For the avoidance of doubt, all Eurocurrency Borrowings shall have an Interest Period of one month. The Administrative Agent shall advise the Lenders of any notice given pursuant to this Section 2.10 and of each Lender's portion of any converted or continued Borrowing.  If Parent shall not have given notice in accordance with this Section 2.10 to continue any Borrowing into a subsequent Interest Period (and shall not otherwise have given notice in accordance with this Section 2.10 to convert such Borrowing), such Borrowing shall, at the end of the Interest Period applicable thereto (unless repaid pursuant to the terms hereof), automatically be continued as an ABR Borrowing. Notwithstanding any contrary provisions herein, the currency of an outstanding Borrowing may not be changed in connection with any conversion or continuation of such Borrowing. Notwithstanding anything in this Agreement to the contrary, Roll-Up Loans shall not be converted into Eurocurrency Loans.

SECTION 2.11.  ***Repayment of Borrowings***.

(a)     To the extent not previously paid, all Loans (including the Roll-Up Loans) shall be due and payable on the Termination Date, together with accrued and unpaid interest on the principal amount to be paid to but excluding the date of payment and the Exit Fee.

(b)     All repayments pursuant to this Section 2.11 shall be applied in accordance with Section 2.19(c) and subject to Section 2.05(c) and 2.16, but shall otherwise be without premium or penalty.

Error! Unknown document property name.

SECTION 2.12.  *Voluntary Prepayment*.

(a)      The Borrower shall have the right at any time and from time to time to prepay any Borrowing, in whole or in part, upon prior written notice (or telephone notice promptly confirmed by written notice) to the Administrative Agent given before 1:00 p.m. New York City Time, three Business Days before such prepayment; *provided* that each partial prepayment shall be in an amount that is an integral multiple of the Borrowing Multiple and not less than the Borrowing Minimum.

(b)      Each notice of prepayment shall specify the prepayment date and the principal amount of each Borrowing (or portion thereof) to be prepaid, shall be irrevocable and shall commit the Borrower to prepay such Borrowing by the amount stated therein on the date stated therein.

(c)      All prepayments under this Section 2.12 shall be applied in accordance with Section 2.19(c) and subject to Sections 2.05(c) and 2.16 in all respects but otherwise without premium or penalty. Notwithstanding anything to the contrary contained in this Section 2.12(c), a notice of prepayment may state that such notice is conditioned upon the effectiveness of other credit facilities, in which case such notice may be revoked by Parent (by written (including by email) or fax notice to the Administrative Agent on or prior to the specified effective date) if such condition is not satisfied.  All prepayments under this Section 2.12 shall be accompanied by accrued interest on the principal amount being prepaid to but excluding the date of payment and the Exit Fee.

SECTION 2.13.  *Mandatory Prepayments*.

(a)      Not later than the second Business Day following the receipt of Net Cash Proceeds by Parent or any Subsidiary in respect of any Asset Sale, the Borrower shall apply 100% of the Net Cash Proceeds received with respect thereto to prepay outstanding Loans in an aggregate principal amount equal to 100% of such Net Cash Proceeds.

(b)      Not later than the second Business Day following the receipt of Net Cash Proceeds by Parent or any Subsidiary in respect of Extraordinary Receipts in excess of $500,000 in the aggregate for all such Extraordinary Receipts during the term of this Agreement, the Borrower shall cause to be prepaid an aggregate principal amount of Loans in an amount equal to 100% of all such excess Net Cash Proceeds received therefrom.

(c)      In the event that Parent or any Subsidiary shall receive Net Cash Proceeds from the issuance or incurrence of any Indebtedness by Parent or any Subsidiary (other than any cash proceeds from the issuance or incurrence of Indebtedness permitted pursuant to Section 6.01), then the Borrower shall, substantially simultaneously with the receipt of such Net Cash Proceeds by Parent or any Subsidiary, apply an amount equal to 100% of such Net Cash Proceeds to prepay outstanding Loans.

(d)      Parent shall deliver to the Administrative Agent, at the time of each prepayment required under this Section 2.13, (i) a certificate signed by a Financial Officer of Parent setting forth in reasonable detail the calculation of the amount of such prepayment and (ii) to the extent practicable, at least three Business Days' prior written notice of such prepayment.

44

Error! Unknown document property name.

Each notice of prepayment shall specify the prepayment date, the Type of each Loan being prepaid and the principal amount of each Loan (or portion thereof) to be prepaid.    All prepayments of Borrowings under this Section 2.13 shall be applied in accordance with Section 2.19(c) and subject to Sections 2.05(c) and 2.16, but shall otherwise be without premium or penalty.    All prepayments of Borrowings under this Section 2.13 shall be accompanied by accrued and unpaid interest on the principal amount to be prepaid to but excluding the date of payment and the Exit Fee.

(e)    [Reserved].

(f)    Notwithstanding any of the other provisions of Section 2.13, each Lender may elect not to accept all (but not less than all) of its pro rata percentage of any mandatory prepayment (any such Lender, a "***Declining Lender***", and any such declined amounts, the "***Declined Amounts***") of Loans required to be made pursuant to clauses (a) and (b) of this Section 2.13 by providing written notice (each, a "***Rejection Notice***") to the Administrative Agent no later than 5:00 p.m., New York City time, on the Business Day of such Lender's receipt of notice from the Administrative Agent regarding such prepayment.  If a Lender fails to deliver a Rejection Notice to the Administrative Agent within the time frame specified above such failure will be deemed an acceptance of the total amount of such mandatory prepayment of Loans.  Any Declined Amounts shall be offered to Lenders that are not Declining Lenders on a pro rata basis, and any Declined Amounts remaining thereafter shall be applied to prepay other Indebtedness to the extent required by the terms thereof and, after giving effect thereto, any remaining amounts may be retained by the Borrower.

SECTION 2.14.  ***Reserve Requirements; Change in Circumstances***.    (a) Notwithstanding any other provision of this Agreement, if any Change in Law shall change the basis of taxation of payments to any Agent or any Lender of the principal of or interest on any Eurocurrency Loan made by such Lender or any Fees or other amounts payable under any Loan Document (other than changes in respect of Indemnified Taxes, Taxes described in clauses (ii), (iii), (iv) and (v) of the definition of Excluded Taxes and Connection Income Taxes), or shall impose, modify or deem applicable any reserve, special deposit, liquidity or similar requirement against assets of, deposits with or for the account of or credit extended by any Lender (except any such reserve requirement which is reflected in the Adjusted LIBO Rate) or shall impose on such Lender or the London interbank market any other condition affecting this Agreement or Eurocurrency Loans made by such Lender or participation therein, and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurocurrency Loan or purchasing or maintaining a participation therein or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise) by an amount deemed by such Lender to be material, then the Borrower will pay to such Lender, as the case may be, upon demand such additional amount or amounts as will compensate such Lender, as the case may be, for such additional costs incurred or reduction suffered.

(b)    If any Lender shall have determined that any Change in Law (including any regarding liquidity or capital adequacy) has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender pursuant hereto to a level

45

**Error! Unknown document property name.**

below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to liquidity or capital adequacy) by an amount deemed by such Lender to be material, then from time to time the Borrower shall pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in clause (a) or (b) above and setting forth in reasonable detail the basis for, and calculation of, such amount or amounts shall be delivered to Parent and shall be conclusive absent manifest error. Notwithstanding anything in this Section 2.14 to the contrary, no Lender shall be entitled to any additional amount or amounts under this Section 2.14 unless and only if such Lender is generally seeking similar compensation from similarly situated borrowers (which are parties to credit or loan documentation containing a provision similar to this Section 2.14), as determined by such Lender in its reasonable discretion. The Borrower shall pay such Lender the amount shown as due on any such certificate delivered by it within twenty (20) days after its receipt of the same.

(d)     Failure or delay on the part of any Lender to demand compensation for any increased costs or reduction in amounts received or receivable or reduction in return on capital shall not constitute a waiver of such Lender's right to demand such compensation. The protection of this Section shall be available to each Lender regardless of any possible contention of the invalidity or inapplicability of the law, rule, regulation, agreement, guideline or other change or condition that shall have occurred or been imposed.

SECTION 2.15.  *Change in Legality*.  (a) Notwithstanding any other provision of this Agreement, if any Change in Law shall make it unlawful for any Lender to make or maintain any Eurocurrency Loan or to give effect to its obligations as contemplated hereby with respect to any Eurocurrency Loan, then, by written notice to Parent and to the Administrative Agent:

(i)     such Lender may declare that Eurocurrency Loans will not thereafter (for the duration of such unlawfulness) be made by such Lender hereunder (or be continued for additional Interest Periods) and ABR Loans will not thereafter (for such duration) be converted into Eurocurrency Loans, whereupon any request for a Eurocurrency Borrowing (or to convert an ABR Borrowing to a Eurocurrency Borrowing or to continue a Eurocurrency Borrowing for an additional Interest Period) shall, as to such Lender only, be deemed a request for an ABR Loan (or a request to continue an ABR Loan as such for an additional Interest Period or to convert a Eurocurrency Loan into an ABR Loan, as the case may be), unless such declaration shall be subsequently withdrawn; and

(ii)     such Lender may require that all outstanding Eurocurrency Loans made by it be converted to ABR Loans  in which event all such Eurocurrency Loans shall be automatically converted to such ABR Loans as of the effective date of such notice as provided in clause (b) below.

(iii)     In the event any Lender shall exercise its rights under (i) or (ii) above, all payments and prepayments of principal that would otherwise have been applied to repay

Error! Unknown document property name.

the Eurocurrency Loans that would have been made by such Lender or the converted Eurocurrency Loans of such Lender shall instead be applied to repay the ABR Loans made by such Lender in lieu of, or resulting from the conversion of, such Eurocurrency Loans.

(b)     For purposes of this Section 2.15, a notice to Parent by any Lender shall be effective as to each Eurocurrency Loan made by such Lender, if lawful, on the last day of the Interest Period currently applicable to such Eurocurrency Loan; in all other cases such notice shall be effective on the date of receipt by Parent.

SECTION 2.16.  *Indemnity*.  The Borrower shall indemnify each Lender against any loss or expense, including any break-funding cost that such Lender may sustain or incur as a consequence of (a) any event, other than a default by such Lender in the performance of its obligations hereunder, which results in (i) such Lender receiving or being deemed to receive any amount on account of the principal of any Eurocurrency Loan prior to the end of the Interest Period in effect therefor, (ii) the conversion of any (A) Eurocurrency Loan to an ABR Loan or (B) Interest Period with respect to any Eurocurrency Loan, in each case other than on the last day of the Interest Period in effect therefor, or (iii) any Eurocurrency Loan to be made by such Lender (including any Eurocurrency Loan to be made pursuant to a conversion or continuation under Section 2.10) not being made after notice of such Loan shall have been given by Parent hereunder (any of the events referred to in this clause (a) being called a "***Breakage Event***") or (b) any default in the making of any payment or prepayment required to be made hereunder.  In the case of any Breakage Event, such loss shall include an amount equal to the excess, as reasonably determined by such Lender, of (i) its cost of obtaining funds for the Eurocurrency Loan that is the subject of such Breakage Event for the period from the date of such Breakage Event to the last day of the Interest Period in effect (or that would have been in effect) for such Loan over (ii) the amount of interest likely to be realized by such Lender in redeploying the funds released or not utilized by reason of such Breakage Event for such period.  A certificate of any Lender setting forth any amount or amounts which such Lender is entitled to receive pursuant to this Section 2.16, together with a reasonably detailed calculation thereof, shall be delivered to Parent and shall be conclusive absent manifest error.

SECTION 2.17.  *Pro Rata Treatment*.  Except as required under Section 2.15, each Borrowing, each payment or prepayment of principal of any Borrowing, each payment of interest on a Borrowing and each conversion of any Borrowing to or continuation of any Borrowing as a Borrowing of any Type shall be allocated pro rata among the Lenders in accordance with their respective applicable Commitments (or, if such Commitments shall have expired or been terminated, in accordance with the respective principal amounts of their outstanding Loans).  Each Lender agrees that in computing such Lender's portion of any Borrowing to be made hereunder, the Administrative Agent may, in its discretion, round each Lender's percentage of such Borrowing to the next higher or lower whole dollar.

SECTION 2.18.  *Sharing of Setoffs*.  Each Lender agrees that if it shall, through the exercise of a right of banker's lien, setoff or counterclaim against the Borrower or any other Loan Party, or pursuant to a secured claim under Section 506 of Title 11 of the United States Code or other security or interest arising from, or in lieu of, such secured claim, received by such Lender under any applicable bankruptcy, judicial management, insolvency, examinership or

47

Error! Unknown document property name.

other similar law or otherwise, or by any other means, obtain payment (voluntary or involuntary) in respect of any of its Loans as a result of which the unpaid principal portion of its Loans and accrued interest thereon shall be proportionately less than the unpaid portion of the Loans and accrued interest thereon of any other Lender, it shall be deemed simultaneously to have purchased from such other Lender at face value, and shall promptly pay to such other Lender the purchase price for, a participation in the Loans and interest thereon of such other Lender, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of the principal of and accrued interest on their respective Loans; *provided* that (a) if any such purchase or purchases or adjustments shall be made pursuant to this Section 2.18 and the payment giving rise thereto shall thereafter be recovered, such purchase or purchases or adjustments shall be rescinded to the extent of such recovery and the purchase price or prices or adjustment restored without interest, and (b) the provisions of this Section 2.18 shall not be construed to apply to any payment made by any Loan Party pursuant to and in accordance with the express terms of this Agreement (including any payment received pursuant to Section 2.15). The Borrower expressly consents to the foregoing arrangements and agrees that any Lender holding a participation in a Loan deemed to have been so purchased may exercise any and all rights of banker's lien, setoff or counterclaim with respect to any and all moneys owing by the Borrower to such Lender by reason thereof as fully as if such Lender had made a Loan directly to the Borrower in the amount of such participation.

SECTION 2.19. **Payments**. (a) The Borrower shall make each payment hereunder and under any other Loan Document prior to 1:00 p.m., New York City time, on the date when due in immediately available funds, without setoff, defense or counterclaim. Each such payment shall be made to such account as shall from time to time be specified in a writing delivered to Parent and the Borrower by the Administrative Agent. All Loans hereunder shall be denominated and made, and all payments of principal and interest, Fees or otherwise hereunder or under any other Loan Document in respect thereof shall be made, in dollars. Unless otherwise agreed by Parent and each Lender to receive any such payment, all other amounts due hereunder or under any other Loan Document shall be payable in dollars.

(b) Whenever any payment (including principal of or interest on any Borrowing or any Fees or other amounts) hereunder or under any other Loan Document shall become due, or otherwise would occur, on a day that is not a Business Day, such payment may be made on the next succeeding Business Day, and such extension of time shall in such case be included in the computation of interest or Fees, if applicable.

(c) Any prepayment of a Loan shall be accompanied by all accrued and unpaid interest on the amount prepaid, the Exit Fee in accordance with Section 2.05(c) and, in the case of a prepayment of a Eurocurrency Loan only, any additional amounts required pursuant to Section 2.16. Subject to the Carve-Out, each prepayment of Loans pursuant to Sections 2.11, 2.12 and 2.13 shall be applied by Administrative Agent, in accordance with Section 7.02 unless otherwise specified in the Orders.

SECTION 2.20. **Taxes**. For purposes of this Section, (x) the term "Lender" shall include any Transferee of a Lender and (y) the term "Administrative Agent" shall include any Transferee of the Administrative Agent and, other than for purposes of clauses (e) and (f) below, each other Agent or any Transferee thereof.

Error! Unknown document property name.

(a)     Any and all payments by or on behalf of any Loan Party hereunder and under any other Loan Document shall be made, in accordance with Section 2.19, free and clear of and without deduction for any Taxes imposed by any Governmental Authority, except as required by applicable law.  If any Loan Party shall be required under applicable law to deduct any Taxes from or in respect of any sum payable hereunder or under any other Loan Document to the Administrative Agent or any Lender, (i) if such Taxes are Indemnified Taxes, the applicable Loan Party shall pay an additional amount (an "***additional amount***") as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.20) the Administrative Agent or any Lender shall receive an amount equal to the sum it would have received had no such deductions for Indemnified Taxes been made, (ii) such Loan Party shall make such deductions and (iii) such Loan Party shall pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     In addition, the Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)     Each Loan Party will indemnify the Administrative Agent and each Lender for the full amount of Indemnified Taxes attributable to it (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by the Administrative Agent or such Lender, as the case may be, and any liability (including penalties, interest and expenses (including reasonable attorney's fees and expenses)) arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability prepared by the Administrative Agent or a Lender, or the Administrative Agent on its behalf, absent manifest error, shall be final, conclusive and binding for all purposes.  Such indemnification shall be made within twenty (20) days after the date the Administrative Agent or any Lender makes written demand therefor.

(d)     Each Lender shall severally indemnify the Administrative Agent, within ten (10) Business Days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that the Loan Parties have not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(f)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this clause (d).

(e)     As soon as practicable after the date of any payment of Indemnified Taxes or Other Taxes by the Borrower or any other Loan Party to the relevant Governmental Authority,

49

Error! Unknown document property name.

the Borrower or such other Loan Party will deliver to the Administrative Agent, at its address referred to in Section 9.01, the original or a certified copy of a receipt issued by such Governmental Authority evidencing payment thereof.

(f)      (i) Each Lender that is entitled to an exemption from, or reduction of, withholding Tax with respect to payments by the Borrower under this Agreement and the other Loan Documents shall deliver to Parent (with a copy to the Administrative Agent), at the time or times prescribed by applicable law, such properly completed and executed documentation prescribed by applicable law or reasonably requested by Parent (including, for the avoidance of doubt, applicable Australian law, which documentation shall include such Lender's Australian Business Number or Tax File Number or details of a relevant exemption) as will permit such payments to be made without withholding or at a reduced rate.  In addition, any Lender, if reasonably requested by Parent or the Administrative Agent, shall deliver such other documentation prescribed by applicable law (including, for the avoidance of doubt, applicable Australian law) or reasonably requested by Parent or the Administrative Agent as will enable Parent or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Parent and the Administrative Agent in writing of its legal inability to do so.  Notwithstanding anything to the contrary in this Section 2.20(f), the completion, execution and submission of such documentation shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)      Without limiting the generality of the foregoing,

(A)      any Lender that is a U.S. Person holding a Loan or Commitment extended to the Borrower shall deliver to Parent and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Parent or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)      any Non-U.S. Lender holding a Loan or Commitment extended to the Borrower shall, to the extent it is legally entitled to do so, deliver to Parent and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Parent or the Administrative Agent), whichever of the following is applicable:

(1)      in the case of a Non-U.S. Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to

50

Error! Unknown document property name.

the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed originals of IRS Form W-8ECI;

(3)     in the case of a Non-U.S. Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit J-1 to the effect that such Non-U.S. Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "***U.S. Tax Compliance Certificate***") and (y) executed copies of IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable; or

(4)     to the extent a Non-U.S. Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-2 or Exhibit J-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; *provided* that if the Non-U.S. Lender is a partnership and one or more direct or indirect partners of such Non-U.S. Lender are claiming the portfolio interest exemption, such Non-U.S. Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit J-4 on behalf of each such direct and indirect partner; and

(C)     any Non-U.S. Lender shall, to the extent it is legally entitled to do so, deliver to Parent and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Non-U.S. Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Parent or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Parent or the Administrative Agent to determine the withholding or deduction required to be made.

(g)     If a payment made to a Lender under any Loan Document would be subject to United States federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the applicable Loan Party or Administrative Agent (such applicable party a "***Withholding Agent***"), at the time or times prescribed by law and at such time or times reasonably requested by the Withholding Agent, such documentation prescribed by applicable law (including as prescribed

51

Error! Unknown document property name.

by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Withholding Agent as may be necessary for the Withholding Agent to comply with its obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (g), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(h)     Nothing contained in this Section 2.20 or in Section 2.21 shall require any Lender or the Administrative Agent to make available any of its Tax returns (or any other information that it deems to be confidential or proprietary).

(i)     Each party's obligations under this Section 2.20 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

(j)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund or a credit in respect of any Taxes as to which it has been indemnified pursuant to this Section 2.20 (including by the payment of additional amounts pursuant to such sections), it shall reduce the additional amount owed to such party pursuant to Section 2.20(a) by such credit or it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund or credit, as applicable), net of all out of pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund or credit, as applicable).  Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this clause (j) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund or credit, as applicable, to such Governmental Authority.  Notwithstanding anything to the contrary in this clause (j), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this clause (j) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund or credit, as applicable, had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid.  This clause (j) shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

SECTION 2.21.   [Reserved].

SECTION 2.22.   *Assignment of Loans Under Certain Circumstances; Duty to Mitigate*.  (a) In the event (i) any Lender delivers a certificate requesting compensation pursuant to Section 2.14, (ii) any Lender delivers a notice described in Section 2.15, (iii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender pursuant to Section 2.20, (iv) any Lender becomes a Defaulting Lender or (v) any Lender refuses to consent to a proposed amendment, waiver, consent or other modification of

52

Error! Unknown document property name.

this Agreement or any other Loan Documents which has been approved by the Required Lenders, as applicable, and which additionally requires the consent of such Lender for approval pursuant to Section 9.08(b), Parent may, at its sole expense and effort (including with respect to the processing and recordation fee referred to in Section 9.04(b)), upon notice to such Lender and the Administrative Agent, require such Lender to transfer and assign, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all of its interests, rights (other than its existing rights to payments pursuant to Section 2.14 or Section 2.20) and obligations under this Agreement to an assignee (other than any Ineligible Assignee) that shall assume such assigned obligations (which assignee may be another Lender, if a Lender accepts such assignment); *provided* that (A) such assignment shall not conflict with any law, rule or regulation or order of any court or other Governmental Authority having jurisdiction, (B) Parent shall have received the prior written consent of the Administrative Agent, which consent shall not be unreasonably withheld and (C) the Borrower or such assignee shall have paid to the affected Lender in immediately available funds an amount equal to the sum of the principal of and interest accrued to the date of such payment on the outstanding Loans of such Lender, plus all Fees and other amounts accrued for the account of such Lender hereunder (including any amounts under Sections 2.05, 2.14 and 2.16), in each case with respect to the Loans subject to such assignment; *provided, further,* that, if prior to any such transfer and assignment the circumstances or event that resulted in such Lender's claim for compensation under Section 2.14 or notice under Section 2.15 or the amounts paid pursuant to Section 2.20, as the case may be, cease to cause such Lender to suffer increased costs or reductions in amounts received or receivable or reduction in return on capital, or cease to have the consequences specified in Section 2.15, or cease to result in amounts being payable under Section 2.20, as the case may be (including as a result of any action taken by such Lender pursuant to clause (b) below), or if such Lender shall waive its right to claim further compensation under Section 2.14 in respect of such circumstances or event or shall withdraw its notice under Section 2.15 or shall waive its right to further payments under Section 2.20 in respect of such circumstances or event or shall consent to the proposed amendment, waiver, consent or other modification, as the case may be, then such Lender shall not thereafter be required to make any such transfer and assignment hereunder. Any such Lender shall be deemed to have consented to an assignment under this Section 2.22(a) if it does not execute and deliver an Assignment and Acceptance to the Administrative Agent within two Business Days after having received a request therefor.

(b)     If (i) any Lender shall request compensation under Section 2.14, (ii) any Lender delivers a notice described in Section 2.15 or (iii) the Borrower is required to pay any additional amount to any Lender or any Governmental Authority on account of any Lender, pursuant to Section 2.20, then such Lender shall use reasonable efforts (which shall not require such Lender to incur an unreimbursed loss or unreimbursed cost or expense or otherwise take any action inconsistent with its internal policies or legal or regulatory restrictions or suffer any disadvantage or burden deemed by it to be significant) (A) to file any certificate or document reasonably requested in writing by Parent or (B) to assign its rights and delegate and transfer its obligations hereunder to another of its offices, branches or Affiliates, if such filing or assignment would materially reduce its claims for compensation under Section 2.14 or enable it to withdraw its notice pursuant to Section 2.15 or would materially reduce amounts payable pursuant to Section 2.20, as the case may be, in the future.  Parent hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such filing or assignment, delegation and transfer.

Error! Unknown document property name.

SECTION 2.23.   [Reserved].

SECTION 2.24.   *Parent as Borrower Agent*.

(a)      The Borrower hereby appoints Parent as its agent, attorney-in- fact and representative for purposes of (i) making any borrowing requests or other requests required under this Agreement and the other Loan Documents, including requests for disbursement from the Escrow Account, (ii) the giving and receipt of notices by and to the Borrower under this Agreement and the other Loan Documents, (iii) the delivery of any documents, agreements, instruments, requests, consents, approvals, certificates, reports, statements or written materials required to be delivered by the Borrower under this Agreement and the other Loan Documents, (iv) making any determination, selection, designation or judgment, including, without limitation, those requiring the satisfaction or the discretion of the Borrower, under this Agreement or the other Loan Documents and (v) all other purposes incidental to any of the foregoing.

(b)      The Borrower agrees that any action taken by Parent as the agent, attorney-in-fact and representative of the Borrower shall be binding upon the Borrower to the same extent as if directly taken by the Borrower and that each Agent and each Lender shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, approval, report, statement, instrument, agreement, document or other writing believed by it to be genuine and to have been signed or sent by Parent.

(c)      The Borrower and each party hereto agrees that, notwithstanding any implication to the contrary, payments of principal, interest, fees, charges and other amounts designated by this Agreement or the terms of any other Loan Document to be made by the Borrower may be paid to the recipient by Parent directly in each case.

SECTION 2.25.   *Disbursement of Funds from the Escrow Account*.

(a)      Subject to Section 2.25(b) below and the terms of the Escrow Agreement, from and after the Closing Date, Parent shall have the right to request disbursement of the funds on deposit in the Escrow Account from time to time (but not more frequently than four times in any four week period) by delivering a written notice to the Administrative Agent in the form attached as Exhibit K hereto (each such notice, a "***Notice of Disbursement***") no later than the time required pursuant to Section 4.03(a). Each Notice of Disbursement shall be irrevocable and shall specify the following information (i) the amount of such Disbursement, (ii) the Disbursement Date (which shall be a Business Day complying with this Section 2.25 and Section 4.03), (iii) the intended use of proceeds of such Disbursement in reasonable detail, (iv) that as of the date of such Disbursement, the conditions set forth in the Escrow Agreement, this Section 2.25 and in Section 4.03 are satisfied and (v) the wiring instructions of the applicable Operating Account to which the proceeds of such Disbursement are to be disbursed. Following receipt of each Notice of Disbursement, the Administrative Agent shall submit a draw notice to the Escrow Account Deposit Bank in accordance with the terms of the Escrow Agreement, authorizing the release of the Disbursement from the Escrow Account into the applicable Operating Account identified in the Notice of Disbursement. If the Administrative Agent has received a written Disbursement Termination Instruction from the Required Lenders prior to 5:00 p.m., New York City time one Business Day prior to the proposed Disbursement Date (the "***Termination Cutoff***

Error! Unknown document property name.

*Time*") and such Disbursement Termination Instruction has not been withdrawn by the Required Lenders prior to Termination Cutoff Time, then the Administrative Agent shall use commercially reasonable efforts to rescind the draw notice previously delivered to the Escrow Account Deposit Bank in accordance with the terms of the Escrow Agreement.  Promptly after receipt by the Administrative Agent of a Notice of Disbursement pursuant to this Section 2.25, the Administrative Agent will notify each Lender of the proposed Disbursement.

(b)      On and after the date of receipt by the Administrative Agent of a written direction from the Required Lenders (which may be by email) instructing the Administrative Agent that it may no longer honor any instruction from Parent with respect to the Escrow Account due to any of the conditions set forth in this Section 2.25 or Section 4.03 being unsatisfied or incapable of satisfaction (a "*Disbursement Termination Instruction*"), Parent shall have no right to request any such withdrawal from the Escrow Account and the Administrative Agent shall not honor any such request from the Parent except as provided below and in the following sentence; *provided* that (a) for each proposed Disbursement, the Administrative Agent may honor any such request from the Parent for such Disbursement to the extent that a Disbursement Termination Instruction is received at or after the Termination Cutoff Time for such Disbursement, and (b) the Agents shall not be liable for (i) any action or failure to act under the Escrow Agreement or this Section 2.25 that arises directly or indirectly from following the direction or other instructions of the Required Lenders or (ii) any Disbursements, or any actions or inactions related thereto, to the extent that a Disbursement Termination Instruction was received by the Administrative Agent after the Termination Cutoff Time in respect of such Disbursement, including any electronic funds or wire transfers processed or initiated in connection with such proposed Disbursement (whether or not such transfer was processed or initiated prior to or after such Termination Cutoff Time). Any Disbursement Termination Instruction received by the Administrative Agent from the Required Lenders shall remain in effect until such time, if any, as the Administrative Agent shall have received a written termination of such Disbursement Termination Instruction from the Required Lenders.

(c)      With respect to any Disbursement from the Escrow Account hereunder, the Administrative Agent shall be entitled to conclusively rely upon, and shall be fully protected in relying upon, (i) any Notice of Disbursement submitted by Parent as evidence that all conditions precedent to a Disbursement from the Escrow Account have been satisfied and (ii) any Disbursement Termination Instruction received by it. Notwithstanding anything herein to the contrary, the Administrative Agent shall have no obligation to direct the Escrow Account Deposit Bank to disburse any amount from the Escrow Account in excess of the amounts then held in the Escrow Account. The Agents shall have no duty to inquire or investigate whether any condition precedent to a withdrawal from the Escrow Account has been satisfied.

(d)      For the avoidance of doubt, all proceeds of Loans held in the Escrow Account shall be Loans for all purposes hereunder and, notwithstanding that the proceeds of such Loans are held in the Escrow Account, shall bear interest in accordance with this Agreement and shall be subject to all other terms and provisions of this Agreement and the other Loan Documents to the same extent as all other Loans.

55

Error! Unknown document property name.

SECTION 2.26.  **Defaulting Lenders**. (a) Notwithstanding any provision of this Agreement to the contrary, if any Lender becomes a Defaulting Lender, then, until such time as such Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)       Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in the definition of Required Lenders.

(ii)      Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Section 7.01 or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 9.06 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Borrower may request (so long as no Default or Event of Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Borrower, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; *provided* that if (x) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share and (y) such Loans were made at a time when the conditions set forth in Section 4.03 were satisfied or waived, such payment shall be applied solely to pay the Loans of all non-Defaulting Lenders on a *pro rata* basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the applicable Lenders on a *pro rata* basis.  Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.26(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)       If the Borrower and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, such Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held *pro rata* by the Lenders in accordance with their applicable Commitments, whereupon such Lender will cease to be a Defaulting Lender; *provided* that no adjustments will be made retroactively with respect to fees

56

Error! Unknown document property name.

accrued or payments made by or on behalf of the Borrower while that Lender was a Defaulting Lender; *provided*, *further*, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from such Lender having been a Defaulting Lender.

SECTION 2.27. ***Payments to Administrative Agent for Fronting Exposure***. Notwithstanding anything in this Agreement or any other Loan Document to the contrary, but subject to the Orders, until the date that the Fronting Lender (as defined below) has been paid in full in cash for all accrued and unpaid interest and Fees in respect of the Commitments and Loans from time to time held by the Administrative Agent or any of its Affiliates, in its capacity as a Lender, in connection with facilitating the funding of any of the New Money Loans (the "***Fronting Lender***"; such accrued amounts, the "***Fronting Exposure***"), (i) at all times on and after the Closing Date, an amount equal to the Fronting Exposure at such time shall be maintained in the Escrow Account, which amount shall not be permitted to be disbursed for any purpose other than to pay such amount to the Fronting Lender (or the Administrative Agent on its behalf) in cash and (ii) at any time that an Event of Default shall have occurred and be continuing, the Administrative Agent is authorized, in its sole discretion, to withdraw an amount equal to the Fronting Exposure at such time from the Escrow Account without any further action by any Loan Party or any Lender; the Borrower is deemed to have delivered a Notice of Disbursement in furtherance of the foregoing; and each Lender hereby consents to such disbursement irrespective of whether a Disbursement Termination Instruction is then in effect or the conditions precedent to a Disbursement have been otherwise satisfied.

ARTICLE III

Representations and Warranties

Each of Parent and the Borrower represents and warrants to each Agent, the Collateral Agent and each of the Lenders that:

SECTION 3.01. ***Organization; Powers***.  Except as set forth on Schedule 3.01, Parent and each of the Subsidiaries (including the Borrower) (a) is a corporation, partnership, limited liability company or other entity, duly incorporated or formed, as the case may be, validly existing and in good standing (other than with respect to any Subsidiary organized in a jurisdiction that does not have a concept of good standing) under the laws of the jurisdiction of its incorporation or organization, (b) has all requisite power and authority to own its property and assets and to carry on its business as now conducted and as proposed to be conducted, (c) is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required, except where the failure to so qualify could not reasonably be expected to result in a Material Adverse Effect, and (d) subject to the entry of the Orders and the terms thereof, has the power and authority to execute, deliver and perform its obligations under each of the Loan Documents and each other agreement or instrument contemplated thereby to which it is or will be a party and, in the case of the Borrower, to borrow hereunder.  The Borrower is a wholly owned Subsidiary.

57

Error! Unknown document property name.

SECTION 3.02.  **Authorization**.   Each of the Transactions will, at the time it occurs, (a) subject to the entry of the Orders and the terms thereof, have been duly authorized by all requisite corporate, limited liability company, limited partnership, other organizational action (including, if required, stockholders', members' or partners' action), as applicable, of each Loan Party and (b) not (i) violate (A) other than violations arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy Code, any provision of law, statute, rule or regulation in any material respect, (B) the Organization Documents of any Loan Party or Subsidiary or (C) other than violations arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy Code, any order of any Governmental Authority applicable to any Loan Party or Subsidiary, (ii) other than violations arising as a result of the commencement of the Cases and except as otherwise excused by the Bankruptcy Code, violate any provision of, be in conflict with, result in a breach of or constitute (alone or with notice or lapse of time or both) a default under, or give rise to any right to accelerate or to require the prepayment, repurchase or redemption of any obligation under any indenture, agreement or other instrument to which Parent or any Subsidiary is a party or by which any of them or any of their property is or may be bound, except, in the case of this clause (ii), where such violation, conflict, breach or default could not reasonably be expected to result in a Material Adverse Effect or (iii) result in the creation or imposition of any Lien upon or with respect to any property or assets now owned or hereafter acquired by the Borrower, Parent or any Subsidiary Guarantor (other than any Lien created hereunder or under the Security Documents).

SECTION 3.03.  **Enforceability**.  Subject to the Orders and the terms thereof, this Agreement has been duly executed and delivered by each Loan Party hereto and constitutes, and subject to the Orders and the terms thereof, each other Loan Document has either been duly executed and delivered by each Loan Party thereto and constitutes (or, when executed and delivered by each Loan Party thereto, will have been duly executed and delivered and constitute) a legal, valid and binding obligation of such Loan Party enforceable against such Loan Party in accordance with its terms, subject to applicable bankruptcy, judicial management, insolvency, examinership, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law (in each case other than with respect to the Debtors).

SECTION 3.04.  **Governmental Approvals**.  Subject to the Orders and the terms thereof, no material action, consent or approval of, registration or filing with or any other action by any Governmental Authority (other than the entry of the Orders) is or will be required in connection with the Transactions, except for (a) the filing of Uniform Commercial Code financing statements or PPSA financing statements, as applicable, (b) other approvals and filings in respect of any Collateral made or obtained in accordance with the Agreed Security Principles and that are in full force and effect (except to the extent not required to have been made or obtained or be in full force and effect at such time pursuant to the express terms of the Agreed Security Principles), (c) a notification to the Defense Security Service ("**DSS**") of the U.S. Department of Defense of the security being granted in respect of Equity Interests in and assets of UltiSat Inc. and the submission of a SF 328 Certificate Pertaining to Foreign Interests to the DSS in respect of this Agreement and the security being granted in respect of Equity Interests in and assets of UltiSat Inc. (the submission of such SF 328 Certificate to occur as promptly as reasonably practicable after the Closing Date), and (d) such as have been made or obtained and are in full force and effect.

58

Error! Unknown document property name.

SECTION 3.05.  *Financial Statements*.

(a)  Parent has heretofore furnished to the Lenders its consolidated statement of financial position and related statements of profit (or loss) and other comprehensive income, changes in stockholders' equity and cash flows as of and [for the fiscal year ended December 31, 2018], audited by and accompanied by the opinion of PricewaterhouseCoopers LLP, independent public accountants and the unaudited half-year consolidated statement of financial position and related statements of profit (or loss) and other comprehensive income, changes in stockholders' equity and cash flows for the fiscal half-year ended June 30, 2019 and the fiscal year ended December 31, 2019.  Such financial statements present fairly in all material respects the financial condition and results of operations and cash flows of Parent and its consolidated Subsidiaries as of such dates and for such periods.  Such statements of financial position and the notes thereto disclose all material liabilities, direct or contingent, of Parent and its consolidated Subsidiaries as of the dates thereof required to be reflected in accordance with GAAP.  Such financial statements were prepared in accordance with GAAP applied on a consistent basis except as otherwise noted therein.  As of the Closing Date, neither Parent nor any Subsidiary has any contingent liability or liability for Taxes, long-term lease or unusual forward or long-term commitment that is not reflected in such financial statements or the notes thereto and that, in any such case, is material in relation to the business, operations, assets or financial condition of Parent and the Subsidiaries, taken as a whole.

(b)  The Initial DIP Budget, which was delivered to the Administrative Agent and the Lenders on or prior to the Closing Date, and each subsequent DIP Budget was prepared in good faith based upon assumptions Parent believed to be reasonable assumptions on the date of delivery of such DIP Budget.  To the knowledge of Parent, no facts exist that (individually or in the aggregate) would result in any material change in the then-applicable Approved Budget.  The Borrower shall deliver to the Administrative Agent updates to the DIP Budget in accordance with Section 5.04(j).

SECTION 3.06. *No Material Adverse Change*.  Since the Petition Date, no event, change, circumstance or condition has occurred that, individually or in the aggregate, has had, or could reasonably be expected to have, a Material Adverse Effect.

SECTION 3.07. *Title to Properties; Possession Under Leases*.  (a) Each of Parent and its Subsidiaries has good and marketable title to, or valid leasehold interests in, or valid license to use, all its material properties and assets (including all Mortgaged Property), except for defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties and assets for their intended purposes.  All such material properties and assets are free and clear of Liens, other than Liens expressly permitted by Section 6.02.

(b)  Each of Parent and its Subsidiaries has complied in all material respects with all obligations under all material leases and licenses to which it is a party and all such leases are in full force and effect.  Each of Parent and its Subsidiaries enjoys peaceful and undisturbed possession under all such material leases and licenses.

Error! Unknown document property name.

(c)     No Borrower has received any written notice of, nor has any knowledge of, any pending or contemplated condemnation proceeding affecting the Mortgaged Properties or any sale or disposition thereof in lieu of condemnation.

(d)     Neither Parent nor any of its Subsidiaries is obligated under any right of first refusal, option or other contractual right to sell, assign or otherwise dispose of any Mortgaged Property or any interest therein, in any such case, except to the extent disclosed in writing to the Administrative Agent and permitted by Article VI.

SECTION 3.08.   *Subsidiaries*.   Schedule 3.08 sets forth as of the Closing Date a list of all Subsidiaries and the percentage ownership interest of the applicable owner therein. The Equity Interests or other ownership interests so indicated on Schedule 3.08 are fully paid and non-assessable and are owned by Parent, directly or indirectly through its Subsidiaries (other than with respect to Equity Interests or other ownership interests that have been sold or otherwise disposed of in accordance with Section 6.05), free and clear of all Liens, except for (i) as of the Closing Date, Liens created under the Pre-Petition First Lien Security Documents and the Security Documents and (ii) after the Closing Date, Liens permitted by Section 6.02.

SECTION 3.09.   *Litigation; Compliance with Laws*.   (a) Except for the Cases or as set forth on Schedule 3.09, there are not any actions, suits or proceedings at law or in equity or by or before any Governmental Authority now pending or, to the knowledge of Parent or the Borrower, threatened against or affecting Parent or any of its Subsidiaries or any business, property or rights of any such person (i) that involve any Loan Document or the Transactions or (ii) as to which there is a reasonable probability of an adverse determination and that, if adversely determined, could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  Since the Closing Date, there has been no change in the status of the matters disclosed on Schedule 3.09 that, individually or in the aggregate, has resulted in, or materially increased the likelihood of, a Material Adverse Effect.

(b)     Except as excused by the Bankruptcy Code, none of Parent or any of its Subsidiaries or any of their respective material properties or assets is in violation of, nor will the continued operation of their material properties and assets as currently conducted violate, any law, rule or regulation (including the USA PATRIOT Act, any zoning, building, Environmental Law, ordinance, code or approval or any building permits) or any restrictions of record or agreements affecting the Mortgaged Property, or is in default with respect to any judgment, writ, injunction, decree or order of any Governmental Authority, where such violation or default could reasonably be expected to result in a Material Adverse Effect.

(c)     Certificates of occupancy and required permits are in effect for each Mortgaged Property as currently constructed, except where the failure to have the same could not reasonably be expected to result in a Material Adverse Effect.

(d)     [Reserved].

SECTION 3.10.   *Agreements*.   (a) Neither Parent nor any of its Subsidiaries is a party to any agreement or instrument or subject to any corporate restriction that has resulted or could reasonably be expected to result in a Material Adverse Effect.

60

Error! Unknown document property name.

(b)      Except as set forth on Schedule 3.10(b), neither Parent nor any of its Subsidiaries is in default in any manner under any provision of any indenture or other agreement or instrument evidencing Indebtedness, or any other material agreement or instrument to which it is a party or by which it or any of its properties or assets are or may be bound, where such default could reasonably be expected to result in a Material Adverse Effect.

SECTION 3.11.  *Federal Reserve Regulations*.  (a) Neither Parent nor any of its Subsidiaries is engaged, or will engage, principally, or as one of its important activities, in the business of purchasing or carrying Margin Stock (within the meaning of Regulation U issued by the Board), or extending credit for the purpose of purchasing or carrying Margin Stock.  None of Parent or any of its Subsidiaries owns Margin Stock as of the Closing Date.

(b)      No part of the proceeds of any Loan will be used, whether directly or indirectly, and whether immediately, incidentally or ultimately, for any purpose that entails a violation of, or that is inconsistent with, the provisions of the Regulations of the Board, including Regulation T, U or X.

SECTION 3.12.  *Investment Company Act*.  Neither Parent nor any of its Subsidiaries is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940.

SECTION 3.13.  *Use of Proceeds*.  The proceeds of the Loans will be used solely in accordance with the Orders and the Approved Budget, (a) to pay fees and expenses in connection with the Transactions, (b) for working capital and other general corporate purposes of the Debtors (and, to the extent permitted hereunder, by way of intercompany loans to the Subsidiaries of Parent that are not Debtors) following the commencement of the Cases, (c) to pay payments in respect of Adequate Protection (as defined in the Interim Order or Final Order, as applicable) as authorized by the Bankruptcy Court in the applicable Order, (d) to pay obligations arising from or related to the Carve-Out and (e) for other purposes upon the prior written consent of the Required IC Lenders, in each case, not in contravention of any applicable law and not in violation of this Agreement or the other Loan Documents; *provided* that in no event shall any part of the proceeds of Loans or Cash Collateral be used to prosecute, investigate or for proceedings to, contest the claims of the Agents, Lenders, Pre-Petition First Lien Agents or Pre-Petition First Lien Lenders or the liens in favor of the Secured Parties or the secured parties under the Pre-Petition First Lien Loan Documents that secure the Obligations or Pre-Petition First Lien Obligations, or prevent, hinder or delay any of the Agents' or the Pre-Petition First Lien Agents' enforcement or realization upon any of the Collateral or collateral securing the Pre-Petition First Lien Obligations, other than with respect to seeking a determination of whether an Event of Default has not occurred or is not continuing; *provided* that up to $50,000 in the aggregate of the proceeds of Loans, the Collateral, the collateral securing any Pre-Petition First Lien Obligations and the Carve-Out shall be made available to the Committee for investigation costs in respect of any pre-petition Indebtedness and liens in accordance with the Interim Order (or the Final Order, as applicable).

SECTION 3.14.  *Tax Returns*.  Each of Parent and its Subsidiaries has filed or caused to be filed all federal and material state, local and non-U.S. Tax returns required to have been filed by it and has paid or caused to be paid all Taxes shown as due on such Tax returns and

61

**Error! Unknown document property name.**

all assessments received by it (in each case giving effect to applicable extensions), except (i) Taxes that are being contested in good faith by appropriate proceedings diligently conducted and for which Parent or such Subsidiary, as applicable, shall have set aside on its books adequate reserves in accordance with GAAP or (ii) Taxes that need not be paid pursuant to an order of the Bankruptcy Court or pursuant to the Bankruptcy Code.  There is no tax assessment proposed in writing against Parent or the Subsidiaries that would, if made, have a Material Adverse Effect. Neither Parent nor any Subsidiary is party to any tax sharing agreement or tax funding agreement except as contemplated in and in accordance with Section 3.25 and as otherwise reviewed and approved by the Administrative Agent in its reasonable discretion.

SECTION 3.15.  ***No Material Misstatements***.  All information, reports, financial statements, exhibits and schedules (other than any forecast, projection or information of a general economic or industry specific nature), including any DIP Budget, furnished by or on behalf of any Loan Party in writing to any Agent or any Lender in connection with the negotiation of any Loan Document or included therein or delivered pursuant thereto (including and together with all information furnished by or on behalf of any Loan Party to any Agent or any Lender in writing after the Closing Date in connection with any Loan Document) is or will be, when furnished, complete and correct in all material respects when taken as a whole and does not or will not, when furnished, contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements contained therein not materially misleading, in the light of the circumstances under which they were, are or will be made (after giving effect to all supplements and updates thereto); *provided* that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, Parent and the Borrower represent only that (i) it acted in good faith and upon assumptions believed by management of Parent and the Borrower to be reasonable at the time such assumption was made and at the time such information, report, financial statement, exhibit or schedule was so furnished and exercised due care in the preparation of such information, report, financial statement, exhibit or schedule and (ii) such forecast or projection was based upon accounting principles consistent with the historical audited financial statements of Parent and its consolidated Subsidiaries (it being recognized that actual results during the period or periods covered by such projections may differ from the projected results and that such differences may be material).

SECTION 3.16.  ***Employee Benefit Plans***.  (a) Each of the Loan Parties and their respective ERISA Affiliates are in compliance in all material respects with the applicable provisions of ERISA and the Code and the regulations and published interpretations thereunder. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, could reasonably be expected to result in a Material Adverse Effect.  The present value of all benefit liabilities under each Plan (as determined on a plan termination basis based on assumptions specified for this purpose under PBGC regulations) did not, as of December 31, 2019, exceed the fair market value of the assets of each Plan, and the present value of all benefit liabilities of all underfunded Plans (as determined on a plan termination basis based on assumptions specified for this purpose under PBGC regulations) did not, as of December 31, 2019, exceed the fair market value of the assets of all such underfunded Plans, in each case, by an amount that could reasonably be expected to result in a Material Adverse Effect.

**Error! Unknown document property name.**

(b)     Each Non-U.S. Pension Plan is in compliance in all respects with all requirements of law applicable thereto and the respective requirements of the governing documents for such plan, except for instances of non-compliance which could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  With respect to each Non-U.S. Pension Plan, none of the Loan Parties, their respective Subsidiaries or any of their respective directors, officers, employees or agents have engaged in a transaction which would subject any Loan Party or any of its Subsidiaries, directly or indirectly, to a tax, assessment or civil penalty which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.  With respect to each Non-U.S. Pension Plan, reserves have been established in the financial statements furnished to Lenders in respect of any unfunded liabilities in accordance with applicable law and prudent business practice or, where required, in accordance with ordinary accounting practices in the jurisdiction in which such Non-U.S. Pension Plan is maintained.  The aggregate unfunded liabilities with respect to such Non-U.S. Pension Plans could not reasonably be expected to result in a Material Adverse Effect; the present value of the aggregate accumulated benefit liabilities of all such Non-U.S. Pension Plans (based on those assumptions used to fund each such Non-U.S. Pension Plan) did not, as of December 31, 2019, exceed the fair market value of the assets of all such Non-U.S. Pension Plans, by an amount that could reasonably be expected to result in a Material Adverse Effect.  There are no actions, suits or claims (other than routine claims for benefits) pending or threatened against any Loan Party or any of its Subsidiaries with respect to any Non-U.S. Pension Plan which could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

SECTION 3.17.  ***Environmental Matters***.  Except as set forth in Schedule 3.17:

(a)     the properties owned, leased or operated by each of Parent and its Subsidiaries (the "***Properties***") do not contain any Hazardous Materials in amounts or concentrations which (i) constitute, or constituted a violation of, (ii) require Remedial Action under, or (iii) could give rise to liability under, Environmental Laws, which violations, Remedial Actions and liabilities, in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(b)     the Properties and all operations of each of Parent and its Subsidiaries are in compliance in all respects, and in the last five years have been in compliance, with all Environmental Laws, and all necessary Environmental Permits have been obtained and are in effect, except to the extent that such non-compliance or failure to obtain any necessary permits, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect;

(c)     there have been no Releases or threatened Releases at, from, under or proximate to the Properties or otherwise in connection with the current or former operations of Parent or its Subsidiaries, which Releases or threatened Releases, in the aggregate, could reasonably be expected to result in a Material Adverse Effect;

(d)     neither Parent nor any of its Subsidiaries has received any notice of an Environmental Claim in connection with the Properties or the current or former operations of Parent or such Subsidiaries or with regard to any person whose liabilities for environmental matters Parent or such Subsidiaries has retained or assumed, in whole or in part, contractually, by

63

Error! Unknown document property name.

operation of law or otherwise, which, in the aggregate, could reasonably be expected to result in a Material Adverse Effect, nor do Parent or its Subsidiaries have reason to believe that any such notice will be received or is being threatened; and

(e)     Hazardous Materials have not been transported from the Properties, nor have Hazardous Materials been generated, treated, stored or disposed of at, on or under any of the Properties in a manner that could give rise to liability under any Environmental Law, nor have Parent or its Subsidiaries retained or assumed any liability, contractually, by operation of law or otherwise, with respect to the generation, treatment, storage or disposal of Hazardous Materials, which liabilities, in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

SECTION 3.18.  *Insurance*.   Schedule 3.18 sets forth a true, complete and correct description of all material insurance maintained by Parent or any of its Subsidiaries as of the Closing Date.  As of the Closing Date, such insurance is in full force and effect and all premiums that were due and payable have been duly paid.  Each of Parent and its Subsidiaries has insurance in such amounts and covering such risks and liabilities as are in accordance with normal industry practice.

SECTION 3.19.  *Security Documents*.   Subject to the entry of the Orders and the terms thereof, each Security Document, (a) upon execution and delivery thereof by the parties thereto and (b) the satisfaction of those additional requirements, as set forth on Schedule 3.19, imposed by the jurisdiction under the laws of which such Security Document is governed, will create in favor of the Collateral Agent or the Security Trustee, as the case may be, for the benefit of the Secured Parties, a legal, valid and enforceable security interest in the Collateral (as defined in such Security Document) and the proceeds thereof.

SECTION 3.20.  *Location of Material Owned Real Property*. Except set forth on Schedule 3.20, as of the Closing Date, none of the Loan Parties own any Material Owned Real Property.

SECTION 3.21.  *Labor Matters*.   Except as set forth on Schedule 3.21, as of the Closing Date, there are no strikes, lockouts or slowdowns against Parent or any of its Subsidiaries pending or, to the knowledge of Parent or the Borrower, threatened.   Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, (i) the hours worked by and payments made to employees of Parent and its Subsidiaries have not been in violation of the Fair Labor Standards Act or any other applicable federal, state, local or non-U.S. law dealing with such matters and (ii) all payments due from Parent or any of its Subsidiaries, or for which any claim may be made against Parent or any such Subsidiary, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of Parent or such Subsidiary.   The consummation of the Transactions will not give rise to any right of termination or right of renegotiation on the part of any union under any collective bargaining agreement to which Parent or any of its Subsidiaries is bound.

SECTION 3.22.   [Reserved].

64

Error! Unknown document property name.

SECTION 3.23.  *Sanctions, Anti-Terrorism and Anti-Bribery Laws*.

(a)     None of Parent, any of its Subsidiaries or any of their respective directors or officers nor, to the knowledge of Parent or any of its Subsidiaries, any agent, employee or Affiliate of any of the foregoing is a Sanctioned Person.  Each of Parent and its Subsidiaries, and each of their respective directors and officers and, to the knowledge of Parent and its Subsidiaries, their respective employees, agents, and Affiliates, are in compliance with applicable Sanctions.  The Borrower will not directly or, to its knowledge, indirectly, use the proceeds of the Loans or otherwise make available such proceeds to any person,  for the purpose of financing the activities of any person, in any country, region or territory, that is subject to any country-, region- or territory-wide Sanctions or for any other purpose or in any other manner that will result in a violation of Sanctions by any person (including any person participating in the Loans, whether as underwriter, advisor, investor or otherwise).

(b)     Parent, its Subsidiaries and their respective directors, officers and employees and, to the knowledge of Parent or any of its Subsidiaries, the agents of Parent and its Subsidiaries, are in compliance with the Foreign Corrupt Practices Act of 1977, as amended, and the rules and regulations thereunder (the "*FCPA*") and any other applicable anti-corruption or anti-bribery law, rules and regulations of any jurisdiction (collectively, "*Anti-Bribery Laws*") in all material respects.  The Borrower will not directly or, to its knowledge, indirectly, use the proceeds of the Loans or otherwise make available such proceeds to any person for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or any other person, in order to obtain, retain or direct business or obtain any improper advantage, in violation of any applicable Anti-Bribery Laws.

(c)     Each of Parent and its Subsidiaries has implemented and maintains in effect policies and procedures designed to ensure compliance by Parent and its Subsidiaries, and each of their respective directors, officers, agents, employees and Affiliates, with applicable Sanctions and applicable Anti-Bribery Laws.

SECTION 3.24.  *Senior Indebtedness*.     To the extent any Subordinated Indebtedness is outstanding, (i) the Loans and other Obligations constitute "senior indebtedness", "designated senior indebtedness" or other comparable term for all purposes of, and as defined in, the Subordinated Indebtedness Documents related thereto and (ii) the Obligations (together with, subject to the DIP Intercreditor Agreement, the Pre-Petition First Lien Obligations) are designated as the sole "senior indebtedness", "designated senior indebtedness" or other comparable term, as applicable, under and as defined in the Subordinated Indebtedness Documents related thereto.

SECTION 3.25.  *Australian Tax Consolidation*.  Each Loan Party is either not a member of a Tax Consolidated Group or a member of a Tax Consolidated Group for which the Head Company is Parent and all members of the Tax Consolidated Group are at all times parties to:

(a)     A Tax Sharing Agreement, which is in full force and effect and at all times covers all Group Liabilities of such Tax Consolidated Group from the date that the Tax Sharing Agreement is signed.

65

Error! Unknown document property name.

(b)      A Tax Funding Agreement which includes:

(i)      reasonably appropriate arrangements for the funding of tax payments by the Head Company having regard to the position of each member of such Tax Consolidated Group;

(ii)      an undertaking from the Head Company of such Tax Consolidated Group to compensate each other member adequately for loss of tax attributes (including tax losses and tax offsets) as a result of being a member of such Tax Consolidated Group; and

(iii)      reasonably appropriate arrangements to ensure payments by members of such Tax Consolidated Group to the Head Company under the Tax Funding Agreement are used to discharge relevant Group Liabilities of such Tax Consolidated Group.

SECTION 3.26.   *Trustee; Benefit; Financial Assistance; Etc.*

(a)      No Loan Party is the trustee of any trust or settlement, other than disclosed to the Administrative Agent prior to the date on which it became a Loan Party.

(b)      Each Loan Party will receive reasonable commercial benefits from entering into the Loan Documents to which it is a party, in each case to the extent relevant in the jurisdiction in which such Loan Party is domiciled.

(c)      No Loan Party has contravened or will contravene Chapter 2E or 2J of the Australian Corporations Act (or any equivalent legislation under the law of any jurisdiction other than the Commonwealth of Australia) by entering into any Loan Document or participating in any transaction in connection with any Loan Document.

(d)      No Loan Party is subject to regulation under any other federal, provincial or state statute or regulation which may limit its ability to incur Indebtedness or which may otherwise render all or any portion of the Obligations unenforceable.

SECTION 3.27.   *Beneficial Ownership*.   As of the Closing Date, the information included in the Beneficial Ownership Certification, if applicable, is true and correct in all respects.

SECTION 3.28.   *Cases; Orders*.

(a)      The Cases were commenced on the Petition Date in accordance with applicable Laws and proper notice thereof was given for (i) the motion seeking approval of the Loan Documents and the Interim Order and, when applicable, Final Order, (ii) the hearing for the entry of the Interim Order, and (iii) the hearing for the entry of the Final Order (*provided* that notice of the final hearing will be given as soon as reasonably practicable after such hearing has been scheduled).

(b)      After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed

66

Error! Unknown document property name.

administrative expense claims in the Cases having priority over all administrative expense claims and unsecured claims against the Debtors now existing or hereafter arising, of any kind whatsoever, including all administrative expense claims of the kind specified in sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under section 364(c)(l) of the Bankruptcy Code, subject to (i) the Carve-Out and (ii) the priorities set forth in the Interim Order or Final Order, as applicable.

(c)     After the entry of the Interim Order and pursuant to and to the extent provided in the Interim Order, the Final Order and the DIP Intercreditor Agreement, the Obligations will be secured by a valid and perfected Lien on all of the Collateral and with the priority set forth in the Interim Order or the Final Order and the DIP Intercreditor Agreement.

(d)     The Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed (whether by statutory stay or otherwise), vacated, or, without the Administrative Agent's, the Required IC Lenders' and Required Lenders' consent, modified or amended. The Loan Parties are in compliance in all material respects with the Interim Order (with respect to the period on and after entry of the Interim Order and prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order).

(e)     Notwithstanding the provisions of section 362 of the Bankruptcy Code, and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Termination Date (whether by acceleration or otherwise) of any of the Obligations, the Administrative Agent, the Collateral Agent, the Security Trustee and Lenders shall be entitled to immediate payment of such Obligations and, subject to Section 7.01, to enforce the remedies provided for hereunder or under applicable Laws, without further notice, motion or application to, hearing before, or order from, the Bankruptcy Court.

ARTICLE IV

Conditions

SECTION 4.01.  ***Credit Event***.  The effectiveness of this Agreement and the obligation of each Lender to make Initial Loans hereunder on the Closing Date are subject to the satisfaction of the following conditions:

(a)     The Administrative Agent shall have received duly executed counterparts of (i) this Agreement that, when taken together, bear the signatures of Parent, the Borrower and each Lender, (ii) the Guarantee Agreement that, when taken together, bear the signatures of Parent and each of its Subsidiaries identified on Schedule 1.01(d), (iii) the DIP Intercreditor Agreement that, when taken together, bear the signatures of the Collateral Agent, the Security Trustee, the Pre-Petition First Lien Security Agents, the Borrower and Parent and each of its Subsidiaries identified on Schedule 1.01(d), (iv) the Fee Letter that, when taken together, bear the signatures of the Borrower and (iv) the Intercompany Note.

67

**Error! Unknown document property name.**

(b)     The Administrative Agent shall have received a certificate, dated the Closing Date and signed by a Responsible Officer of Parent, in form and substance satisfactory to the Administrative Agent, (i) confirming that (A) the representations and warranties set forth in Article III hereof and in each other Loan Document shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality, Material Adverse Effect or words of similar import, in all respects) on and as of the date of Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall have been true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality, Material Adverse Effect or words of similar import, in all respects) as of such earlier date and (B) at the time of and immediately after the Closing Date and the making of the Initial Loans hereunder, no Event of Default or Default shall have occurred and be continuing and (ii) certifying as to such other matters as may be reasonably requested by the Administrative Agent.

(c)     The Borrower shall have paid (or caused to have been paid), when and as due (or, in the case of amounts due on the Closing Date, shall substantially contemporaneously with the making of the Initial Loans to be made on the Closing Date, pay), all fees that under the terms hereof or of the Fee Letter are due and payable on or prior to such date, as well as all out-of-pocket expenses (including the fees, disbursements and other charges of the Ad Hoc Lender Advisors, Skadden, each other counsel to each Agent, the advisors to the Pre-Petition First Lien Agents and the advisors to the ad hoc group of Pre-Petition First Lien Lenders) in connection with the Transactions required to be reimbursed or paid by the Borrower under the terms hereof or of the Fee Letter (to the extent that reasonably detailed statements therefor have been delivered to Parent at least one (1) Business Day in advance of the Closing Date).

(d)     The Security Documents set forth in Part I of Schedule 4.01(d) shall have been duly executed by each Loan Party that is to be a party thereto and shall be in full force and effect, and (other than any such filings set out in Schedule 5.14) all filings and recordations with respect thereto required pursuant to the Agreed Security Principles shall have been made and be in full force and effect (or arrangements reasonably satisfactory to the Agents to make such filings and recordations shall have been made). The Collateral Agent or the Security Trustee, as the case may be, on behalf of the Secured Parties, shall (subject to such perfection actions set out in Schedule 5.14) have a perfected security interest in the Collateral of the type and the priority described in each such Security Document.  To the extent not delivered to the Pre-Petition First Lien Administrative Agent prior to the Closing Date, the Collateral Agent or the Security Trustee, as the case may be, shall have received all possessory Collateral required to be delivered to such Agent on the Closing Date pursuant to the Agreed Security Principles and the Security Documents, together with duly executed undated blank stock powers, or other equivalent instruments of transfer reasonably acceptable to such Agent. With respect to any Subsidiary Guarantor incorporated or registered in Singapore, the Administrative Agent shall have received a copy of the letter of authorisation and confirmation addressed to Linklaters Singapore Pte. Ltd. duly signed by such Subsidiary Guarantor.

(e)     The Administrative Agent shall have received the results of a search of the Uniform Commercial Code filings (or equivalent filings), judgment filings and tax filings made with respect to the Loan Parties in the states (or other jurisdictions) of formation of such persons

68

Error! Unknown document property name.

and in which the chief executive office of each such person is located (including the PPSR in respect of each Loan Party incorporated in Australia), in each case as indicated on Part II of Schedule 4.01(d), and in such other jurisdictions as may be reasonably required by the Agents, together with copies of the financing statements (or similar documents) disclosed by such search, and the results of such other Lien searches listed on Part II of Schedule 4.01(d), and accompanied by evidence satisfactory to the Administrative Agent that the Liens indicated in any such financing statement (or similar document or such other search results) are permitted under Section 6.02 or have been or will be contemporaneously released or terminated pursuant to arrangements reasonably satisfactory to the Agents.

(f)        The Administrative Agent shall have received, subject to Section 5.14, a copy of, or a certificate as to coverage under, the insurance policies required by Section 5.02 and the applicable provisions of the Agreed Security Principles and the Security Documents, together with such endorsements, loss payee provisions or similar amendments required by the applicable provisions of the Agreed Security Principles and the Security Documents, all in form and substance reasonably satisfactory to the Administrative Agent.

(g)        The Administrative Agent shall have received (i) a certificate as to the good standing of each Loan Party (except for CapRock UK Limited, HCT Acquisition, LLC and Cosmos Holdings Acquisition Corp.) as of a recent date, from the Secretary of State of the State (or comparably entity) of the state (or comparable jurisdiction) of its organization (or, if such jurisdiction does not issue such certificates, a comparable document or the results of searches of official registries demonstrating good standing or lack of insolvency proceedings against such Loan Party, as available) (or, in the case of a Loan Party that is incorporated in France, an electronic version of its Kbis extract, an electronic version of its non-bankruptcy certificate (*certificat négatif de recherche en matière de procédures collectives*)) and an electronic version of its *état des inscriptions et des privilèges* in relation to such Loan Party incorporated in France, each dated no earlier than fifteen (15) calendar days before the Closing Date); (ii) a certificate of the Secretary, Assistant Secretary, President, Director or other Responsible Officer, as applicable, of each Loan Party dated the Closing Date and certifying (A) that attached thereto are true and complete copies of the Organization Documents, including all amendments thereto, certified as of a recent date by such Secretary of State (or comparable entity) (or, if no such certification is available, comparable certification or an extract of such documents filed with any official registry, as available), in each case, of such Loan Party as in effect on the Closing Date and at all times since a date prior to the date of the resolutions described in clause (B) below, (B) that attached thereto is a true and complete copy of resolutions (or in the case of a Loan Party that is incorporated in Australia, extracts of resolutions) duly adopted by the Board of Directors (or comparable governing body, and including any applicable shareholder resolutions) of such Loan Party authorizing the execution, delivery and performance of the Loan Documents to which such Loan Party is a party and, in the case of the Borrower, the borrowings hereunder, and that such resolutions have not been modified, rescinded or amended and are in full force and effect, and (C) as to the incumbency and specimen signature of each officer or other authorized signatory executing any Loan Document or any other document delivered in connection herewith on behalf of such Loan Party; (iii) a certificate of another officer or authorized signatory as to the incumbency and specimen signature of the Secretary, Assistant Secretary or director executing the certificate pursuant to clause (ii) above; (iv) a certificate signed by a director or secretary of each Loan Party that is an Australian incorporated company, certifying that (A) before entering

69

**Error! Unknown document property name.**

into any Loan Document to which it is a party, has, in connection with the execution, delivery and performance of each such Loan Document, complied with chapter 2E of the Australian Corporations Act, and (B) it is in compliance with section 260A of the Australian Corporations Act; and (v) each of the other deliverables listed on Part III of Schedule 4.01(d) and such other documents as the Administrative Agent may reasonably request.

(h)     The Administrative Agent shall have received, on behalf of the Agents and the Lenders, a favorable written opinion of each counsel listed on Part IV of Schedule 4.01(d), in each case, in form and substance reasonably satisfactory to the Required Lenders and the Administrative Agent and (A) dated the Closing Date, (B) addressed to the Agents and the Lenders (where permissible under local law) and (C) covering such matters as the Administrative Agent shall reasonably request, and the Loan Parties hereby request such counsel to deliver such opinions.

(i)     The Lenders and the Administrative Agent shall have received, at least five Business Days prior to the Closing Date, to the extent reasonably requested in advance, all documentation and other information required by regulatory authorities under the Beneficial Ownership Regulation and applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act.

(j)     Immediately after giving effect to the Transactions and the other transactions contemplated hereby, Parent and the Subsidiaries shall have no outstanding Indebtedness for borrowed money or preferred stock other than (i) Indebtedness outstanding under this Agreement, (ii) Indebtedness incurred and outstanding under the Pre-Petition First Lien Loan Documents and (iii) Indebtedness described on Schedule 4.01(j).

(k)     The Administrative Agent shall have received the financial statements and opinion referred to in Section 3.05.

(l)     All requisite Governmental Authorities and third parties shall have approved or consented to the Transactions and the other transactions contemplated hereby to the extent required, all applicable appeal periods shall have expired and except for the Cases, there shall not be any pending or threatened litigation, governmental, administrative or judicial action that could reasonably be expected to restrain, prevent or impose burdensome conditions on the Transactions or the other transactions contemplated hereby.

(m)     The Petition Date shall have occurred, and the Borrower, Parent and each other Guarantor (other than the Government Business Subsidiaries and each other Subsidiary as agreed to by the Required Lenders and the Required IC Lenders) shall be a debtor and a debtor-in-possession in the Cases.

(n)     The Administrative Agent and the Lenders shall have received a copy of the DIP Budget in form and substance satisfactory to the Required IC Lenders and the Required Lenders (the "*Initial DIP Budget*").

(o)     (x) The Escrow Account shall have been opened, (y) the Escrow Agreement (in form and substance satisfactory to the Administrative Agent, the Required IC Lenders and the Required Lenders) shall have been entered into and be effective and (z) the

70

Error! Unknown document property name.

proceeds of the Initial Loans funded on the Closing Date (net of the fees described in Section 2.05) shall be deposited into the Escrow Account concurrently with the making of such Initial Loans.

(p)     The Administrative Agent shall have received a duly executed Borrowing Request.

(q)     The representations and warranties set forth in Article III hereof and in each other Loan Document shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality, Material Adverse Effect or words of similar import, in all respects) on and as of the Closing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall have been true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality, Material Adverse Effect or words of similar import, in all respects) as of such earlier date.

(r)     At the time of and immediately after giving effect to the Closing Date and the making of the Initial Loans hereunder, no Default or Event of Default shall have occurred and be continuing or would result therefrom.

(s)     The Cases of any of the Debtors shall not have been dismissed or converted into cases under chapter 7 of the Bankruptcy Code.

(t)     A motion, in form and substance satisfactory to the Lenders (and with respect to any provision that affects the rights or duties of any Agent, the Administrative Agent), seeking approval of the DIP Term Facility, shall have been filed in each of the Cases within one (1) day of the Petition Date.

(u)     All "first day" orders and all related pleadings intended to be entered on or prior to the Interim Order Entry Date shall have been entered by the Bankruptcy Court and shall be in form and substance acceptable to the Required IC Lenders, the Required Lenders, the Administrative Agent and the Pre-Petition First Lien Administrative Agent, it being understood that drafts approved by Ad Hoc Lender Advisors, the Administrative Agent and the Pre-Petition First Lien Administrative Agent prior to the Petition Date are acceptable.

(v)     None of the Borrowers (as defined in the Pre-Petition First Lien Credit Agreement) shall have made any payments after the Petition Date on account of any Indebtedness arising prior to the Petition Date unless such payment is expressly authorized by the "first day" orders or the Orders and is made with the consent of the Required IC Lenders and the Required Lenders in their sole discretion.

(w)     No trustee under chapter 7 or chapter 11 of the Bankruptcy Code or examiner with expanded powers shall have been appointed in any of the Cases.

(x)     The Interim Order Entry Date shall have occurred not later than five (5) calendar days following the Petition Date, and the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required IC

Error! Unknown document property name.

Lender, the Required Lenders and the Administrative Agent, and the Administrative Agent shall have received a certified copy of the Interim Order entered by the Bankruptcy Court.

(y)     Each Intelsat Agreement shall be in full force and effect (and shall not have been rejected or terminated by Intelsat in any insolvency proceeding).

(z)     The release of all claims and causes of action against the Lenders, the Agents, the agents and issuing banks under the Pre-Petition First Lien Credit Agreement and the Pre-Petition First Lien Lenders, in each case in form and substance satisfactory to the Required IC Lenders, the Administrative Agent and the Pre-Petition First Lien Administrative Agent.

(aa)     None of the Pre-Petition First Lien Lenders shall have exercised any remedies under the Pre-Petition First Lien Loan Documents against any Non-Debtor Subsidiary.

By delivering the Borrowing Request required pursuant to Section 4.01(p), on the Closing Date, the Borrower shall be deemed to have represented and warranted that the conditions specified in paragraphs (q), (r) and (y) above have been satisfied.

SECTION 4.02.  ***Delayed Draw Borrowing***. The obligations of the Lenders to make the Delayed Draw Loan hereunder shall not become effective until the date on which each of the following conditions is satisfied:

(a)     The Closing Date shall have occurred.

(b)     Parent shall have paid (or caused to have been paid), when and as due (or, in the case of amounts due on the Delayed Draw Borrowing Date, shall substantially contemporaneously with the making of the Delayed Draw Loans to be made on the Delayed Draw Borrowing Date, pay), all fees that under the terms hereof or of the Fee Letter are due and payable on or prior to such date, as well as all out-of-pocket expenses (including the fees, disbursements and other charges of the Ad Hoc Lender Advisors, Skadden, each other counsel to each Agent, the advisors to the Pre-Petition First Lien Agents, and the advisors to the ad hoc group of Pre-Petition First Lien Lenders) in connection with the Transactions required to be reimbursed or paid by the Borrower under the terms hereof or of the Fee Letter (to the extent that reasonably detailed statements therefor have been delivered to Parent at least one (1) Business Day in advance of the Delayed Draw Borrowing Date); *provided* that, in the case of each Lender, such Lender's accrued and unpaid Delayed Draw Commitment Fee may be offset against the proceeds of the Delayed Draw Loans.

(c)     The Administrative Agent shall have received a duly executed Borrowing Request.

(d)     The representations and warranties set forth in Article III hereof and in each other Loan Document shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality, Material Adverse Effect or words of similar import, in all respects) on and as of the Delayed Draw Borrowing Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall have been true and correct in all material respects (or, in the case of any representations and warranties qualified by

Error! Unknown document property name.

materiality, Material Adverse Effect or words of similar import, in all respects) as of such earlier date.

(e)     At the time of and immediately after giving effect to the making of the Delayed Draw Loans, no Default or Event of Default shall have occurred and be continuing or would result therefrom.

(f)     At any time prior to the Delayed Draw Borrowing Date, the Interim Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required IC Lenders, the Required Lenders and Administrative Agent.

(g)     The Final Order Entry Date shall have occurred and the Final Order shall be in full force and effect, shall not have been vacated or reversed, and shall not be subject to any stay (*provided* that, for the avoidance of doubt, no Lender holding Delayed Draw Commitments shall be required to fund any Delayed Draw Loans to the extent that the Final Order does not approve the Roll-Up that is to be consummated on the Delayed Draw Borrowing Date pursuant to Section 2.01(b)).

(h)     Each Intelsat Agreement shall be in full force and effect (and shall not have been rejected or terminated by Intelsat in any insolvency proceeding).

(i)     Parent shall have delivered an updated DIP Budget in accordance with Section 5.04(j) and such updated DIP Budget shall have become an Approved Budget in accordance therewith.

(j)     An additional Milestone that is acceptable to the Required Lenders and the Required IC Lenders shall have been added and shall be effective in accordance with the terms of Section 5.16 setting forth the deadline by which an Approved Restructuring must be consummated (including, as applicable, the effective date of an Acceptable Plan and/or the closing of an Acceptable Sale Transaction), which milestone shall be no sooner than fourteen days after the entry of the order confirming an Acceptable Plan or the order approving an Acceptable Sale Transaction.

By delivering the Borrowing Request required pursuant to Section 4.02(c), on the Delayed Draw Borrowing Date, the Borrower shall be deemed to have represented and warranted that the conditions specified in Sections paragraphs (e), (f), (g) and (h) above have been satisfied.

SECTION 4.03.   ***Disbursements***.   The obligation of the Administrative Agent to authorize the release of funds from the Escrow Account in connection with a Disbursement is subject solely to the prior or concurrent satisfaction or waiver of the following conditions:

(a)     The Administrative Agent shall have received by not later than 10:00 a.m., New York City time, (i) in the case of any Disbursement made on the Closing Date, on the date that is one (1) Business Days prior to such Disbursement Date and (ii) in the case of any other Disbursement, on the date that is five (5) Business Days prior to such Disbursement Date, a duly executed Notice of Disbursement signed by a Responsible Officer of Parent.

73

Error! Unknown document property name.

(b)     The Administrative Agent shall have received a certificate, dated the Disbursement Date and signed by a Responsible Officer of Parent, in form and substance satisfactory to the Administrative Agent, confirming that (i) the representations and warranties set forth in Article III hereof and in each other Loan Document shall be true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality, Material Adverse Effect or words of similar import, in all respects) on and as of such Disbursement Date with the same effect as though made on and as of such date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they shall have been true and correct in all material respects (or, in the case of any representations and warranties qualified by materiality, Material Adverse Effect or words of similar import, in all respects) as of such earlier date, (ii) at the time of and immediately after the Disbursement Date, no Event of Default or Default shall have occurred and be continuing and (iii) if the requested Disbursement Date shall occur on or prior to the date that is thirty days after the Closing Date, the requirements in clause (d) below are satisfied after giving effect to the applicable Disbursement.

(c)     The Administrative Agent shall have received written confirmation from Greenhill (which may take direction from the Required Lenders) that such Disbursement is consistent with the Approved Budget in all respects and does not exceed an amount equal to the lesser of (x) the aggregate disbursements projected to be made in the Approved Budget within the immediately succeeding seven days and (y) an amount equal to $15,000,000 less the amount of Liquidity as of such Disbursement Date after giving effect to such disbursement.

(d)     (i) Parent shall, concurrently with the applicable Disbursement Notice, provide a liquidity forecast, in a form substantially consistent with the Approved Budget, certified by the chief financial officer of Parent, demonstrating, to the satisfaction of the Required Lenders or their advisors, that the Debtors' lowest projected Liquidity over the two-week period after such withdrawal (after giving effect thereto) will not exceed $15,000,000.

(e)     As of each Disbursement Date, the Interim Order or, following the Final Order Entry Date, the Final Order shall be in full force and effect and shall not have been vacated or reversed, shall not be subject to a stay, and shall not have been modified or amended in any respect without the prior written consent of the Required IC Lenders, the Required Lenders and Administrative Agent.

Each Lender, by becoming a party to this Agreement, hereby authorizes and directs the Administrative Agent to (i) conclusively rely, without further action or verification, on each Notice of Disbursement and each certificate and written confirmation received by it in connection with this Section 4.03 or that purports to be delivered pursuant to this Section 4.03, and (ii) release funds from the Escrow Account on each Disbursement Date.

ARTICLE V

Affirmative Covenants

Parent and the Borrower each covenants and agrees with each Lender that so long as this Agreement shall remain in effect and until the Commitments have been terminated and the

Error! Unknown document property name.

principal of and interest on each Loan, all Fees and all other expenses or amounts then payable under any Loan Document shall have been paid in full in cash (other than contingent indemnification obligations not then due and payable), it will, and will cause each of its Subsidiaries to:

SECTION 5.01.  ***Existence; Businesses and Properties***.  (a) Do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence, except as otherwise expressly permitted under Section 6.05.

(b)  Do or cause to be done all things necessary to obtain, preserve, renew, extend and keep in full force and effect the rights, licenses, permits, franchises, authorizations, patents, copyrights, trademarks and trade names (and all other intellectual property) material to the conduct of its business; maintain and operate such business in substantially the manner in which it is presently conducted and operated or in an otherwise prudent manner; except as otherwise excused by the Bankruptcy Code, comply in all material respects with all applicable laws, rules, regulations (including any zoning, building, Environmental Law, ordinance, code or approval or any building permits or any restrictions of record or agreements affecting the Mortgaged Properties, ERISA, Sanctions, the FCPA, other Anti-Bribery Laws, the USA PATRIOT Act and other Anti-Terrorism Laws) and decrees and orders of any Governmental Authority, whether now in effect or hereafter enacted unless failure to comply could not reasonably be expected to result in a Material Adverse Effect; and at all times maintain and preserve all property material to the conduct of such business and keep such property in good repair, working order and condition (ordinary wear and tear excepted) and from time to time make, or cause to be made, all needful and proper repairs, renewals, additions, improvements and replacements thereto necessary in order that the business carried on in connection therewith may be conducted at all times in a commercially reasonable manner.

(c)  (i) Maintain in effect and enforce policies and procedures reasonably designed to ensure compliance by Parent, its subsidiaries, and each of their respective directors, officers, employees, agents and Affiliates, with applicable Sanctions, and (ii) conduct its business in compliance with applicable Sanctions and applicable Anti-Bribery Laws.

SECTION 5.02.  ***Insurance***.  (a) Keep its insurable properties adequately insured at all times by financially sound and reputable insurers; maintain such other insurance (including self-insurance), to such extent and against such risks, including fire and other risks insured against by extended coverage, as is customary with companies in the same or similar businesses operating in the same or similar locations and of same or similar size, including public liability insurance against claims for personal injury or death or property damage occurring upon, in, about or in connection with the use of any properties owned, occupied or controlled by it; and maintain such other insurance as may be required by law.

(b)  If at any time the area in which any of the Mortgaged Property is located is designated (i) a "flood hazard area" in any Flood Insurance Rate Map published by the United States Federal Emergency Management Agency (or any successor agency), obtain flood insurance in such total amount as the Administrative Agent, the Collateral Agent or the Required Lenders may from time to time require, and otherwise comply with the National Flood Insurance Program as set forth in the United States Flood Disaster Protection Act of 1973, as it may be

**Error! Unknown document property name.**

amended from time to time, and other applicable flood laws, or (ii) a "Zone 1" area, obtain earthquake insurance in such total amount as the Administrative Agent, the Collateral Agent or the Required Lenders may from time to time require.

(c)     Notify the Agents immediately whenever any separate insurance is taken out by any Loan Party concurrent in form or contributing in the event of loss with that required to be maintained under this Section 5.02 or pursuant to the Agreed Security Principles; and promptly deliver to the Agents a duplicate original copy of such policy or policies (including, for the avoidance of doubt, any required flood or earthquake policy or policies).

(d)     In connection with the covenants set forth in this Section 5.02 and any covenants with respect to insurance set forth in the Agreed Security Principles, it is understood and agreed that:

(i)     none of the Agents, the Lenders or their respective agents or employees shall be liable for any loss or damage insured by the insurance policies required to be maintained under this Section 5.02 or pursuant to the Agreed Security Principles, it being understood that (A) the Borrower and the other Loan Parties shall look solely to their insurance companies or any other parties other than the aforesaid parties for the recovery of such loss or damage and (B) such insurance companies shall have no rights of subrogation against the Agents, the Lenders or their agents or employees.  If, however, the insurance policies do not provide waiver of subrogation rights against such parties, as required above, then Parent and the Borrower each hereby agrees, to the extent permitted by law, to waive its right of recovery, if any, against the Agents, the Lenders and their agents and employees; and

(ii)     the designation of any form, type or amount of insurance coverage by any Agent or the Required Lenders under this Section 5.02 or the Agreed Security Principles shall in no event be deemed a representation, warranty or advice by any Agent or the Lenders that such insurance is adequate for the purposes of the business of Parent and its Subsidiaries or the protection of their properties and the Agents and the Required Lenders shall have the right from time to time to require the Borrower and the other Loan Parties to keep other insurance in such form and amount as any Agent or the Required Lenders may reasonably request; *provided* that such insurance shall be obtainable on commercially reasonable terms.

SECTION 5.03.  ***Obligations and Taxes***.  In accordance with the Bankruptcy Code and subject to any required approval by the Bankruptcy Court in the case of the Debtors (it being understood that no Debtor shall be obligated to make any payments hereunder that may, in its reasonable judgment, result in a violation of any applicable law, including the Bankruptcy Code, without an order of the Bankruptcy Court authorizing such payments), pay its Indebtedness and other obligations promptly and in accordance with their terms and pay and discharge promptly when due all material Taxes (in the case of any Debtor, solely to the extent arising after the Petition Date) imposed upon it or upon its income or profits or in respect of its property, before the same shall become delinquent or in default, as well as all lawful claims for labor, materials and supplies or otherwise that, if unpaid, could reasonably be expected to give rise to a Lien upon such properties or any part thereof; *provided* that such payment and discharge

Error! Unknown document property name.

shall not be required with respect to any such obligation or Taxes so long as the validity or amount thereof shall be contested in good faith by appropriate proceedings diligently conducted and Parent or Subsidiary shall have set aside on its books adequate reserves with respect thereto in accordance with GAAP and such contest operates to suspend collection of the contested obligation or Taxes and enforcement of a Lien and, in the case of a Mortgaged Property, there is no risk of forfeiture of such property.

    SECTION 5.04. ***Financial Statements, Reports, etc***. In the case of Parent, furnish to the Administrative Agent (for distribution by the Administrative Agent to each Lender) and the Ad Hoc Lender Advisors, in each case as provided below:

    (a) within ninety days after the end of the first fiscal half-year period of each fiscal year, its consolidated statement of financial position and related statements of profit (or loss) and other comprehensive income, changes in stockholders' equity and cash flows showing the financial condition of Parent and its consolidated Subsidiaries as of the close of such fiscal half-year period and the results of its operations and the operations of such Subsidiaries during such fiscal half-year period and the then elapsed portion of the fiscal year, and comparative figures for the same periods in the immediately preceding fiscal year, accompanied by a narrative report, all certified by the chief financial officer and chief restructuring officer as fairly presenting in all material respects the financial condition and results of operations of Parent and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied (except as otherwise disclosed therein), subject to normal year-end audit adjustments;

    (b) within thirty days after the end of each fiscal month of Parent and its consolidated Subsidiaries (or, in the case of the fiscal month of Parent and its consolidated Subsidiaries ended March 31, 2020, within forty-five days after the end of such fiscal month) its unaudited consolidated monthly financial statements as of the close of such fiscal month, which shall include its consolidated statement of financial position and related statements of profit (or loss) and other comprehensive income, changes in stockholders' equity and cash flows, all certified by the chief financial officer and chief restructuring officer as fairly presenting in all material respects the financial condition and results of operation of Parent and its consolidated Subsidiaries on a consolidated basis in accordance with GAAP consistently applied (except as otherwise disclosed therein), subject to normal year-end adjustments;

    (c) concurrently with any delivery of financial statements under Section 5.04(a) and (b) above, a Compliance Certificate, certifying that no Event of Default or Default has occurred or, if such an Event of Default or Default has occurred, specifying the nature and extent thereof and any corrective action taken or proposed to be taken with respect thereto;

    (d) promptly after the same become publicly available, copies of all periodic and other reports, proxy statements and other materials filed by Parent or any Subsidiary with the SEC, the Australian Securities and Investments Commission, ASX or any other securities exchange, or distributed to its shareholders (or any class of them) or its creditors generally (or any class of them), as the case may be;

    (e) promptly after the request by any Agent or by any Lender (acting through the Administrative Agent), all documentation and other information that such Agent or Lender

77

**Error! Unknown document property name.**

**DEBTOR EXHIBIT NO. 007**
**Page 84 of 153**

reasonably requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the USA PATRIOT Act and the Beneficial Ownership Regulation;

(f)      promptly, from time to time, such other information regarding the operations, business affairs and financial condition of Parent or any Subsidiary, or compliance with the terms of any Loan Document, as the Administrative Agent or any Lender (acting through the Administrative Agent) may reasonably request;

(g)      promptly, notice of any change in (i) authorized signatories of Parent or the Borrower, which notice shall be certified by a Responsible Officer of Parent or the Borrower, as applicable, and accompanied by specimen signatures of any new authorized signatories or (ii) the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified in parts (c) or (d) of the Beneficial Ownership Certification;

(h)      not less than five Business Days prior to the holding thereof, in the case of semi-annual earnings conference calls, and promptly after notice to shareholders with respect to any other conference call, notice of each conference call to be held by Parent for its shareholders (or any class of them);

(i)      not later than five Business Days following the end of each fiscal month (beginning with the fiscal month ending April 30, 2020), a Liquidity Certificate;

(j)      on or prior to the Closing Date, the Initial DIP Budget. The Initial DIP Budget may be updated from time to time upon the request of the Required IC Lenders, the Required Lenders or Parent; *provided* that (i) in the case of a request by Parent, the Lenders have received not less than three Business Days' prior written notice of the delivery of such updated DIP Budget, (ii) in the case of a request by the Required IC Lenders or the Required Lenders, such updated DIP Budget shall be delivered to the Administrative Agent and the Lenders not later than three Business Days following the date of such request, (iii) any such updated DIP Budget must be approved by the Required IC Lenders and the Required Lenders in their sole discretion and (iv) to the extent any such updated DIP Budget is approved by the Required IC Lenders and the Required Lenders, the line item amounts set forth therein shall only be used to calculate the projected line items commencing with the week in which such updated DIP Budget is so approved and for subsequent weeks set forth therein, and any prior weeks tested as part of any then applicable Test Period shall be calculated using the projected line items set forth in the applicable previously Approved Budget; *provided*, *further*, that not later than ten Business Days prior to the Delayed Draw Borrowing Date, Parent shall deliver to the Administrative Agent and the Lenders an updated DIP Budget with refined and updated estimates and assumptions, which such updated DIP Budget shall be approved by the Required IC Lenders and the Required Lenders in their sole discretion.  Upon delivery on the Closing Date, in the case of the Initial DIP Budget, and upon such approval by the Required IC Lenders and the Required Lenders pursuant to this Section 5.04(j) with respect to a DIP Budget required to be approved pursuant to this Section 5.04(j), such DIP Budget shall constitute, together with the Initial DIP Budget, the "*Approved Budget*";

78

Error! Unknown document property name.

(k)      not later than by the end of Monday of every week (or, to the extent such Monday is not a Business Day, the next Business Day thereafter), a Budget Variance Report. Each such report shall be certified by the chief financial officer and chief restructuring officer of Parent as being prepared in good faith and fairly presenting in all material respects the information set forth therein;

(l)      not later than by the end of Monday of every week (or to the extent such Monday is not a Business Day, the next Business Day thereafter), a report, in a form reasonably acceptable to Greenhill, specifying (A) the aggregate bank and book cash balances of Parent and its consolidated Subsidiaries (the "**Consolidated Cash Balances**") and (B) the book Consolidated Cash Balance, net of all (I) restricted cash, (II) cash subject to a Lien other than Liens securing the Obligations, Liens pursuant to the Pre-Petition First Lien Loan Documents and customary Liens in favor of depository banks permitted under this Agreement, (III) cash segregated or set aside as a deposit, for the purpose of being held in escrow or for any other purpose in connection with the payment or support of obligations to third parties and (IV) all "Government/Proxy Cash" (as such term is used in the presentation made by the Loan Parties to certain lenders under the Pre-Petition First Lien Credit Agreement on March 23, 2020) (the "**Consolidated Available Cash Balance**"), in each case as of the close of business on each Business Day during the week ended on Friday of the prior week;

(m)      promptly after the receipt or delivery thereof (but in no event later than one Business Day of a Responsible Officer of Parent or the Borrower being made aware of the receipt or delivery thereof), the Loan Parties shall deliver to Greenhill and the Administrative Agent copies of all material communications received by or delivered to any of the Loan Parties' or any other Subsidiaries' customers, vendors or suppliers (including, for the avoidance of doubt, communications received from or delivered to Intelsat, Inmarsat plc, Telesat, European Organisation of Telecommunications by Satellite S.A., SES S.A. and any affiliates or representatives of the foregoing (collectively, the "**Key Suppliers**"));

(n)      upon the request of any Ad Hoc Lender Advisor, the Loan Parties shall use reasonable best efforts to cause direct contact (including through the arrangement of virtual or telephonic conferences) with (i) members of senior management of each of the Key Suppliers and (ii) internal personnel and outside consultants and advisors working on, or engaged with respect to, Parent's transformation plan, in each case at reasonable times and locations (if applicable) to be mutually agreed; *provided* that Parent's and the Borrower's advisors and members of senior management of Parent and the Borrower shall be entitled to participate in or otherwise receive any communications in connection with the foregoing;

(o)      not later than by the end of Monday of every week (or to the extent such Monday is not a Business Day, the next Business Day thereafter), a written statement setting forth the amount of cash and Investments made pursuant and the current amount outstanding in respect of the Intercompany Note;

(p)      not later than the Monday of every other week (or to the extent such Monday is not a Business Day, the next Business Day thereafter) commencing with the first Monday following the Petition Date, a rolling 13-week cash flow forecast commencing with the

Error! Unknown document property name.

week in which the immediately preceding Monday occurs (with such supporting detail as the Ad Hoc Lender Advisors may request);

(q)     promptly upon request by the Administrative Agent and otherwise on the first Business Day of each calendar month, with respect to each Australian Employee Benefit Account, details of the relevant financial institution with which such account is held, the account details and details of the amount standing to the credit of each such account; and

(r)     promptly upon request by the Administrative Agent or any Lender, any Weekly Statement (as defined in the Orders) delivered the Debtors pursuant to the terms of the Orders.

SECTION 5.05.  *Litigation and Other Notices*.  Furnish to the Administrative Agent and each Lender, promptly after obtaining knowledge thereof, written notice of the following:

(a)     any Event of Default or Default, specifying the nature and extent thereof and the corrective action (if any) taken or proposed to be taken with respect thereto;

(b)     the filing or commencement of, or any threat or notice of intention of any person to file or commence, any action, suit or proceeding, whether at law or in equity or by or before any Governmental Authority, against Parent or any Affiliate thereof that could reasonably be expected to result in a Material Adverse Effect;

(c)     the occurrence or reasonable expectation of an occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, or is reasonably expected to occur, could reasonably be expected to result in (i) the imposition of a Lien on Parent or any Subsidiary that is not permitted by Section 6.02 or (ii) a Material Adverse Effect, in any such case, together with a statement of a Financial Officer of Parent setting forth details as to such ERISA Event and the action, if any, that Parent and/or any relevant Subsidiary proposes to take with respect thereto;

(d)     any development with respect to Parent or any Subsidiary that has resulted in, or could reasonably be expected to result in, a Material Adverse Effect;

(e)     Parent being removed from the official list of the ASX, or any class of securities in Parent being suspended from trading on the ASX for a continuous period of ten (10) Business Days or longer (for reasons other than there being an imminent announcement of a major acquisition or merger transaction); and

(f)     within fifteen days after the end of each fiscal month of Parent and its consolidated Subsidiaries, unaudited summary consolidated income statement and balances of key working capital accounts.

SECTION 5.06.  *Employee Benefits*.  Comply in all material respects with the applicable provisions of ERISA and the Code and the laws applicable to any Non-U.S. Pension Plan and (b) furnish to the Administrative Agent, promptly upon request of the Administrative

80

Error! Unknown document property name.

Agent or a Lender, deliver to the Administrative Agent copies of the most recent Annual Report (Form 5500 Series), including all Schedules thereto, with respect to each Plan.

SECTION 5.07. **Maintaining Records; Access to Properties and Inspections; Maintenance of Ratings**.  (a) Keep proper books of record and account in which full, true and correct entries in conformity in all material respects with GAAP and all requirements of law are made of all dealings and transactions in relation to its business and activities.  Each Loan Party will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender to visit and inspect the financial records and the properties of Parent or any Subsidiary at reasonable times and as often as reasonably requested and to make extracts from and copies of such financial records, and permit any representatives designated by the Administrative Agent or any Lender to discuss the affairs, finances and condition of Parent or any Subsidiary with the officers thereof and (provided that a representative of Parent is given the opportunity to be present) independent accountants therefor; *provided* that, so long as no Event of Default has occurred and is continuing, any such visit and inspection by the Administrative Agent in excess of one per calendar year shall be at the expense of the Administrative Agent and any such visit and inspection by a Lender shall be at the expense of such Lender (unless the Administrative Agent is not conducting a visit and/or inspection during such year and the Borrower has not reimbursed (and is not obligated to reimburse) another Lender for any such visit and/or inspection during such year).

(b) In the case of the Borrower, use commercially reasonable best efforts to cause the New Money Loans and the Roll-Up Loans provided for hereunder, from and after the date that is forty-five days after the Petition Date, to be continuously publicly rated (but no specific rating) by S&P and Moody's.

SECTION 5.08. **Use of Proceeds**.  Use the proceeds of the Loans only for the purposes described in Section 3.13, and ensure that no proceeds of the Loans will be used, advanced or otherwise made available, directly or indirectly, by Parent, the Borrower or any Subsidiary (i) to any person conducting activities that would constitute a violation of Sanctions, (ii) for the purposes of funding any activity, business, or transaction with a Sanctioned Person or in a Sanctioned Country, (iii) that would result in the violation of any applicable Sanctions or (iv) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any person in violation of the FCPA or any other applicable Anti-Bribery Law.

SECTION 5.09. **Compliance with Environmental Laws**.  Comply, and cause all lessees and other persons occupying its Properties to comply, in all material respects with all Environmental Laws and Environmental Permits applicable to its operations and Properties; obtain and renew all material Environmental Permits necessary for its operations and Properties; and conduct any Remedial Action required by Environmental Law in accordance with Environmental Laws in all material respects; *provided* that no Borrower nor any of the Subsidiaries shall be required to undertake any Remedial Action to the extent that its obligation to do so is being contested in good faith and by proper proceedings and appropriate reserves are being maintained with respect to such circumstances in accordance with GAAP.

81

**DEBTOR EXHIBIT NO. 007**
**Page 88 of 153**

SECTION 5.10.  **Preparation of Environmental Reports**.  If an Event of Default caused by reason of a breach of Section 3.17 or 5.09 shall have occurred and be continuing, at the request of the Required Lenders through the Administrative Agent, provide to the Lenders within 45 days after such request, at the expense of the Loan Parties, an environmental site assessment report or environmental compliance report (as the case may be) regarding the matters which are the subject of such default, prepared by an environmental consulting firm reasonably acceptable to the Administrative Agent and identifying, to the extent relevant to the subject of such default, the likely presence or absence of a Release of Hazardous Materials and the likely extent of such Release, or the nature and details regarding the non- compliance with applicable Environmental Law, and the estimated cost of any Remedial Action or any other activity required to bring the Properties into compliance with Environmental Laws in connection with such default.

SECTION 5.11.  **Guarantors; Further Assurances; Etc.**

(a)     Take, or cause to be taken, all actions necessary or reasonably requested by any Agent to ensure that the Guarantee requirements set forth below are satisfied when required to be satisfied, subject to any applicable limitations set forth in the Agreed Security Principles and Section 5.14 and Section 6.18 in all respects:

(i)     Notwithstanding anything to the contrary in Section 5.11(a)(ii), (x) Parent and each "Subsidiary Borrower" and each "Guarantor" under and as defined in the Pre-Petition First Lien Credit Agreement shall at all times be required to be Guarantors and (y) in no event shall any Subsidiary become a guarantor under the Pre-Petition First Lien Loan Documents or any other Indebtedness in excess of the Threshold Amount unless such Subsidiary shall have become an additional Subsidiary Guarantor in accordance with this Section 5.11.

(ii)     Parent will ensure that, on an after the Closing Date, each Subsidiary of Parent (other than an Excluded Subsidiary) is a Subsidiary Guarantor.

(iii)     Failure to satisfy the requirements of Section 5.11(a)(i) or (ii) will not constitute a Default or Event of Default if, as promptly as practicable (but in any event within twenty (20) days after the date on which any Subsidiary is required to become a Subsidiary Guarantor (or such later date as the Administrative Agent shall approve in its sole discretion)), any such Subsidiary shall have become additional Subsidiary Guarantors by executing and delivering to the Agents a supplement or joinder to the Guarantee Agreement.  Additional Subsidiary Guarantors pursuant to this clause (iii) may include, to the extent in consultation with and reasonably acceptable to the Administrative Agent, Subsidiaries incorporated, organized or formed under the laws of a jurisdiction in which none of the existing Guarantors are incorporated, organized or formed.  In the event any additional Subsidiary Guarantors are required to be joined pursuant to this clause (iii), Parent shall use commercially reasonable efforts to identify the proposed additional Subsidiary Guarantor(s) in the Compliance Certificate for the relevant Test Period.

82

Error! Unknown document property name.

(iv)     In addition to complying with the requirements of Section 5.02(a)(i) and (ii) and any joinder requirements set forth in clause (iii) above, each wholly owned U.S. Subsidiary and each wholly owned Subsidiary that is incorporated, organized or formed under the laws of Australia, to the extent not already a Subsidiary Guarantor, shall become a Subsidiary Guarantor by executing and delivering to the Agents a supplement or joinder to the Guarantee Agreement, in any such case, within twenty (20) days after the date on which such person became a wholly owned Subsidiary (or such later date as the Administrative Agent shall approve in its sole discretion).

(v)     In the event any Subsidiary that is not a Guarantor directly or indirectly owns any Equity Interests in any Subsidiary Guarantor (or other person that is required to become a Subsidiary Guarantor pursuant to this Section 5.11(a) or the Agreed Security Principles), such Subsidiary shall become a Subsidiary Guarantor by executing and delivering to the Agents a supplement or joinder to the Guarantee Agreement, as promptly as practicable (but in any event no later than the date applicable to the relevant Subsidiary Guarantor (or other relevant person) whose Equity Interests are directly or indirectly owned by such Subsidiary, or such later date as the Administrative Agent shall approve in its sole discretion).

(vi)     [Reserved].

(vii)     In connection with any joinder or supplement to the Guarantee Agreement or other additional Guarantee pursuant to this Section, each Subsidiary that becomes a Subsidiary Guarantor after the Closing Date shall have delivered to the Administrative Agent such corporate documentation (including all applicable "know your customer" documentation and information required to comply with the Beneficial Ownership Regulation), charter documents, by-laws, resolutions and legal opinions, in each case, consistent with those provided or required to be provided by the Loan Parties under Section 4.01 on the Closing Date, modified as appropriate for the jurisdiction of incorporation or organization of such Subsidiary or otherwise as may be agreed to by the Administrative Agent.

(b)     Take, or cause to be taken, all actions (limited to commercially reasonable actions, where so stated in the Agreed Security Principles and in the Security Documents) necessary or reasonably requested by any Agent to ensure that the requirements set forth in the Agreed Security Principles are satisfied when required to be satisfied.  Subject to any applicable limitations set forth in the Agreed Security Principles, execute any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code, PPSR and other financing statements, mortgages and deeds of trust) that may be required under the Agreed Security Principles, under Schedule 5.14 or under applicable law, or that the Required Lenders or any Agent may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and first priority of the security interests created or intended to be created by the Security Documents.  In addition, from time to time, Parent and the other Loan Parties will, at their cost and expense, promptly secure the Obligations by pledging or creating, or causing to be pledged or created, perfected security interests with respect to such of their assets and properties acquired after the Closing Date as would constitute Collateral under any

83

Error! Unknown document property name.

Security Document or is required to constitute Collateral pursuant to the Agreed Security Principles (it being understood that it is the intent of the parties that the Obligations shall be secured by, among other things, substantially all the assets of the Loan Parties (including assets acquired subsequent to the Closing Date but excluding (i) any assets as to which the Administrative Agent shall determine in its reasonable discretion, in consultation with Parent, that the costs of obtaining a security interest in the same are excessive in relation to the benefit to the Lenders of the security intended to be afforded thereby, and (ii) any assets of a type specifically excluded as Collateral in accordance with the Agreed Security Principles). All such after-acquired assets shall automatically constitute fully perfected first priority Liens on, and security interest in, all right, title and interest of the Loan Parties, pursuant to and as described in Section 5.20 and the Interim Order or the Final Order, as applicable. Such security interests and Liens will be created under and as required by the Security Documents and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance reasonably satisfactory to the Collateral Agent or the Security Trustee, as the context may require, and Parent shall deliver or cause to be delivered to the Lenders all such instruments and documents (including legal opinions, flood hazard determination forms, evidence of any insurance required by Section 5.02 or pursuant to the Agreed Security Principles (including flood or earthquake insurance), surveys, title insurance policies (including any endorsements thereto) and lien searches (including, applicable, UCC and PPSR searches)) as any Agent shall reasonably request to evidence compliance with this Section. In furtherance of the foregoing, Parent will give prior written notice to the Administrative Agent of (A) the acquisition by it or any other Loan Party of any Material Owned Real Property, and (B) any Subsidiary that is not a Loan Party being required to become a Guarantor pursuant to the Agreed Security Principles. With respect to any Subsidiary incorporated or registered in Singapore that becomes a Subsidiary Guarantor after the Closing Date, the Administrative Agent shall have received a copy of the letter of authorisation and confirmation addressed to Linklaters Singapore Pte. Ltd. duly signed by such Subsidiary Guarantor.

(c)    Unless Parent has given the Agents at least ten days' prior written notice, neither Parent nor any other Loan Party will change (i) its legal name, (ii) its jurisdiction of organization, (iii) its chief executive office, (iv) its corporate or legal structure or (v) its Federal Taxpayer Identification Number. Parent and each other Loan Party agrees not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the Uniform Commercial Code, PPSA or otherwise that are required in order for the Collateral Agent and/or the Security Trustee to continue at all times following such change to have a valid, legal and perfected first priority security interest in all the Collateral. Parent and each other Loan Party agrees promptly to notify the Agents if any material portion of the Collateral owned or held by such Loan Party is damaged or destroyed.

SECTION 5.12. *Senior Indebtedness*.    Provide that to the extent any Subordinated Indebtedness is outstanding, (i) the Loans and other Obligations constitute "senior indebtedness", "designated senior indebtedness" or other comparable term for all purposes of, and as defined in, the Subordinated Indebtedness Documents related thereto and (ii) the Obligations (together with, subject to the DIP Intercreditor Agreement, the Pre-Petition First Lien Obligations) are designated as the sole "senior indebtedness", "designated senior indebtedness" or other comparable term, as applicable, under and as defined in the Subordinated Indebtedness Documents related thereto [and the Liens securing the Obligations benefit from the

84

Error! Unknown document property name.

lien subordination and other related provisions running to the benefit of the Secured Parties under the relevant Intercreditor Agreement].

SECTION 5.13. ***Compliance with Tax Sharing Agreement and Tax Funding Agreement***. In relation to any Tax Consolidated Group of which it is or becomes a member:

(a)     take all action available to it to ensure that each member of the Tax Consolidated Group:

(i)     becomes a party to a Tax Sharing Agreement which covers all Group Liabilities of such Tax Consolidated Group and a Tax Funding Agreement for such Tax Consolidated Group at the time it becomes a member of such Tax Consolidated Group; and

(ii)     fully complies with the Tax Sharing Agreement and the Tax Funding Agreement;

(b)     take all action available to it to ensure that the Tax Sharing Agreement and the Tax Funding Agreement remain valid, binding and enforceable;

(c)     ensure that it gives the Australian Taxation Office a copy of the Tax Sharing Agreement within the period required by section 721-25(3)(b) of the Australian Tax Act if the Australian Taxation Office gives a notice requiring it to do so;

(d)     enforce all of its material rights under the Tax Sharing Agreement and the Tax Funding Agreement in a manner consistent to that which a reasonable prudent person in its position would act as if the other parties to those agreements were independent persons with whom it had dealt with at arm's length;

(e)     notify the Administrative Agent of any material breach of a term of the Tax Sharing Agreement or the Tax Funding Agreement to the extent that the breach impacts the Lenders (or any of them) promptly after its occurrence; and

(f)     seek the consent of the Administrative Agent before making any amendment or other modification to the Tax Sharing Agreement or Tax Funding Agreement, in any such case, other than with respect to such amendments or modifications that are not materially adverse to the interests of the Lenders (in their capacities as such).

SECTION 5.14. ***Post-Closing Matters***. Satisfy the requirements set forth in Schedule 5.14 on or before the date specified for such requirements, in each case as such date may be extended at the sole discretion of the Administrative Agent so long as the relevant Loan Parties are working diligently to complete, or cause the applicable Subsidiary to complete, the applicable requirement, as determined by the Administrative Agent in its sole discretion.

SECTION 5.15. ***Federal Reserve Regulations***. If at any time a Loan Party or any of its Subsidiaries owns any Margin Stock, promptly notify the Administrative Agent and, if requested by the Administrative Agent, each Loan Party will furnish to the Administrative Agent

Error! Unknown document property name.

and each Lender a statement in conformity with the requirements of FR Form G 3 or FR Form U 1, as applicable, referred to in Regulation U.

SECTION 5.16.   *Milestones*.   The Loan Parties shall ensure the satisfaction of the following milestones (collectively, the "*Milestones*" and each a "*Milestone*"), unless waived or extended with the consent of either the Required IC Lenders or the Required Lenders (in each case, in their sole discretion) (which may be by email)):

(a)      by no later than the date that is five days following the Petition Date, entry by the Bankruptcy Court of the Interim Order;

(b)      by no later than the date that is forty days following the Petition Date, entry by the Bankruptcy Court of the Final Order;

(c)      by no later than the date that is seven days following the Petition Date, the Loan Parties shall have delivered to the Secured Parties and the Ad Hoc Lender Group an initial analysis in respect of the tax and regulatory consequences and requirements in connection with both an Acceptable Plan and an Acceptable Sale Transaction, in each case that are reasonably acceptable to the Required IC Lenders, and:

(i)      unless a Plan Election has occurred, then:

(A)      by no later than the date that is fourteen days following the date on which the Loan Parties have determined the structure and material terms of the Approved Restructuring pursuant to Section 5.16(c) above, the filing with the Bankruptcy Court of a motion to approve bid procedures in respect of such Acceptable Sale Transaction (the "*Bid Procedures Motion*");

(B)      by no later than the date that is twenty-four days following the filing of the Bid Procedures Motion, the entry by the Bankruptcy Court of an order approving such Bid Procedures Motion (the "*Bid Procedures Order*");

(C)      by no later than the date that is thirty-five days following the entry by the Bankruptcy Court of the Bid Procedures Order, the commencement of an auction in connection with such Acceptable Sale (the "*Auction*"), unless, in accordance with the Bid Procedures Order, no Auction is required; and

(D)      by no later than the date that is five days following earlier of (1) the date of conclusion of the Auction and (2) the date on which it is determined, pursuant to the terms of the Bid Procedures Order, that no auction is required to be held, the entry by the Bankruptcy Court of an order approving such Acceptable Sale Transaction, if applicable (the "*Sale Order*");

(ii)      following the occurrence of a Plan Election:

(A)      by no later than the date that is fourteen days following the date of such Plan Election, the filing with the Bankruptcy Court of such Acceptable Plan, along with a disclosure statement in connection with such Acceptable Plan, a

Error! Unknown document property name.

motion seeking approval to solicit votes in respect of such Acceptable Plan and solicitation materials in connection therewith (collectively, the "***Disclosure and Solicitation Documents***");

(B)    by no later than the date that is seventeen days following the filing with the Bankruptcy Court of the Disclosure and Solicitation Documents, entry by the Bankruptcy Court of an order (which order may be a conditional order) approving the disclosure statement and solicitation of votes in respect of such Acceptable Plan (the "***Disclosure Statement Order***"); and

(C)    by no later than the date that is fifty-five days following the entry by the Bankruptcy Court of the Disclosure Statement Order, entry by the Bankruptcy Court of an order approving such Acceptable Plan (the "***Confirmation Order***"); and

*provided* that, for the avoidance of doubt (x) the Approved Restructuring and all terms, conditions and documentation in respect thereof, including, without limitation, any Acceptable Plan, Disclosure and Solicitation Documents, Disclosure Statement Order, Confirmation Order, Bid Procedures Order, Sale Order and/or other documentation in connection with an Acceptable Plan or Acceptable Sale Transaction shall be subject to the consent requirements set forth in the definition of "Approved Restructuring", (y) the Bid Procedures Motion and Procedures Order shall be consistent with the definition of "Acceptable Sale Transaction" and (z) notwithstanding the foregoing, the deadlines set forth in this Section 5.16(c) may be extended by the Required IC Lenders or the Required Lenders (in each case, in their sole discretion), in accordance with the initial paragraph of Section 5.16 and (z) the Bid Procedures Motion;

(d)    by no later than May 8, 2020, the Administrative Agent and the Ad Hoc Lender Advisors shall have received a phase two report from the Independent Network Review, which such phase two report shall be in scope as is set forth in that certain engagement letter, dated as of April 20, 2020, between Parent and Northern Sky Research, and such other scope of analysis as is acceptable to Greenhill (which may seek direction from the Required IC Lenders) to the Required IC Lenders (including the delivery of such other information related to Parent's and its Subsidiaries' customers and suppliers following delivery of such phase two report as is reasonably requested by the Required IC Lender);

(e)    by no later than May 15, 2020, the Parent shall have delivered to the Administrative Agent and the Ad Hoc Lender Advisors, a draft long-term business plan in form and scope as required by clause (g) below;

(f)    by no later than May 15, 2020, Parent shall have delivered to the Administrative Agent and the Ad Hoc Lender Advisors a separation analysis for the Government Businesses Subsidiaries in a form satisfactory to the Required IC Lenders (in their sole discretion); and

(g)    by no later than May 29, 2020, the Parent shall have delivered to the Administrative Agent and the Ad Hoc Lender Advisors, in each case in a form that has been approved by the board of directors (or similar governing body) of the Parent and in form and

Error! Unknown document property name.

substance satisfactory to the Required IC Lenders (in their sole discretion), an updated long-term business plan (which shall cover, among other things, cost reductions, bandwidth capacity and teleport consolidation) that includes pro forma balance sheets and statements of profit (and loss) and cash flows for the Parent and its Subsidiaries on a consolidated basis for the fiscal years ending December 31, 2020, December 31, 2021, December 31, 2022 and December 31, 2023, which such consolidated pro forma financial statements shall be prepared on a month-by-month basis for the fiscal years ending December 31, 2020 and December 31, 2021 and on a quarterly basis thereafter.

SECTION 5.17.  *Lender Conference Calls*.   Host a conference call with representatives of the Administrative Agent (which, for the avoidance of doubt, shall not be obligated to join such call) and the Lenders (including the Ad Hoc Lender Advisors) not more than once per week upon reasonable prior notice to be held at such time as reasonably designated by Parent (in consultation with the Administrative Agent and the Ad Hoc Lender Advisors), at which conference call Parent shall make available the executive management team (including the chief restructuring officer) and their advisors and there shall be discussed the DIP Budget and the Budget Variance Reports for the prior week related thereto, the Loan Parties' financial condition, business operations, liquidity, business plan and projections.

SECTION 5.18.  *Chief Restructuring Officer*.  Parent will at all times from and after the Closing Date engage Michael Healy or another Person acceptable to the Required IC Lenders as chief restructuring officer, which officer shall have such powers and authority as is reasonably acceptable to the Required IC Lenders.

SECTION 5.19.  *Priority of Liens*.  Each Loan Party that is a Debtor hereby covenants, represents and warrants that, upon entry of the Interim Order (and when applicable, the Final Order), its Obligations hereunder and under the other Loan Documents:

(a)      pursuant to section 364(c)(1) of the Bankruptcy Code, shall at all times constitute an allowed Superpriority Claim against each of the Loan Parties that are Debtors on a joint and several basis, which will be payable from and have recourse to all pre- and post-petition property of the Loan Parties and all proceeds thereof (excluding Avoidance Actions but including, subject to entry of a Final Order, Avoidance Proceeds), subject only to the Carve-Out to the extent provided in the Interim Order or the Final Order, as applicable and any payments or proceeds on account of such Superpriority Claim shall be distributed in accordance with Section 7.02;

(b)      pursuant to section 364(c)(2) of the Bankruptcy Code and subject to the Carve-Out to the extent provided in the Interim Order or Final Order, as applicable, shall be secured by a valid, binding, continuing, enforceable, fully-perfected first priority senior security interest and Lien on all of the assets of the Loan Parties that are Debtors, whether currently existing or thereafter acquired, of the same nature, scope and type as the Collateral that are not subject to (x) valid, perfected and non-avoidable liens as of the Petition Date or (y) valid Liens in existence as of the Petition Date that are perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code, excluding Avoidance Actions but including, subject to entry of the Final Order, Avoidance Proceeds;

88

Error! Unknown document property name.

(c)     pursuant to section 364(d)(1) of the Bankruptcy Code and subject only to the Carve-Out to the extent provided in the applicable Order, shall at all times be secured by (i) a valid, binding, continuing, enforceable, fully-perfected first priority priming security interest in and Lien upon the property of the Loan Parties that are Debtors of the same nature, scope and type as the Collateral to the extent that such Collateral is subject to existing Liens that secure the Pre-Petition First Lien Obligations and (ii) such priming liens shall be senior in all respects to any [Adequate Protection Liens] (as defined in the Orders);

(d)     pursuant to section 364(c)(3) of the Bankruptcy Code, subject only to the Carve-Out to the extent provided in the applicable Order and except as provided in clause (c) above, shall be secured by a valid, binding, continuing, enforceable, fully-perfected junior security interest in and Lien on the Collateral, which is subject to (A) valid, perfected and non-avoidable senior Liens in existence at the time of the commencement of the Cases (other than Liens securing the Pre-Petition First Lien Obligations) and (B) valid senior Liens (other than Liens securing the obligations under the Pre-Petition First Lien Credit Agreement) in existence at the time of such commencement that are perfected subsequent to such commencement as permitted by section 546(b) of the Bankruptcy Code, with the priority of the Liens in respect of the DIP Term Facility as set forth in the Orders;

(e)     shall not be subject or subordinate to (i) any Lien or security interest that is avoided and preserved for the benefit of the Loan Parties that are Debtors and their estates under section 551 of the Bankruptcy Code or (ii) unless otherwise provided for in the Loan Documents, any Liens arising after the Petition Date including, without limitation, any Liens or security interests granted in favor of any federal, state, municipal or other domestic or foreign governmental unit (including any regulatory body), commission, board or court for any liability of the Loan Parties that are Debtors;

(f)     each Loan Party hereby confirms and acknowledges that, pursuant to the Interim Order (and, when entered, the Final Order), the Liens in favor of the Collateral Agent or Security Trustee on behalf of and for the benefit of the Secured Parties in all of the assets of the Loan Parties shall be created and perfected without the recordation or filing in any land records or filing offices of any Mortgage, assignment or similar instrument (in each case (other than with respect to Debtors that are U.S. Loan Parties) to the extent the Interim Order (and, when entered, the Final Order) is effective to create and perfect under local law);

(g)     each Loan Party further agrees that, upon the request of the Administrative Agent, in the exercise of the Required Lenders' reasonable business judgment and subject to the Agreed Security Principles, such Loan Party shall execute and deliver to the Administrative Agent, as soon as reasonably practicable following such request but in any event within thirty days following such request (as may be extended by the Administrative Agent, acting on the prior written instruction of the Required Lenders), Mortgages in recordable form with respect to any real property constituting Material Owned Real Property and identified by the Administrative Agent (acting at the direction of the Required Lenders) on terms reasonably satisfactory to the Administrative Agent and the Required Lenders, including any ancillary deliverables described in the Agreed Security Principles;

89

Error! Unknown document property name.

(h)     for the avoidance of doubt, the Collateral shall exclude Avoidance Actions, but shall, subject to entry of the Final Order, include Avoidance Proceeds;

(i)     Subject to and effective only upon entry of the Final Order, except to the extent of the Carve-Out, no costs or expenses of administration of the Cases or any future proceeding that may result therefrom, including a case under chapter 7 of the Bankruptcy Code, shall be charged against or recovered from the Collateral pursuant to sections 105 or 506(c) of the Bankruptcy Code, the enhancement of collateral provisions of section 552 of the Bankruptcy Code, or any other legal or equitable doctrine (including, without limitation, unjust enrichment) or any similar principle of Law, without the prior written consent of Administrative Agent and the Required Lenders, as the case may be with respect to their respective interests, and no consent shall be implied from any action, inaction or acquiescence by Administrative Agent or the Lenders. In no event shall any Agent or the Lenders be subject to (i) the "equities of the case" exception contained in section 552(b) of the Bankruptcy Code (subject only to and effective upon entry of the Final Order), or (ii) the equitable doctrine of "marshaling" or any other similar doctrine with respect to the Collateral; and

(j)     Except for the Carve-Out, the Superpriority Claims shall at all times be senior to the rights of any Loan Party, any chapter 11 trustee and, subject to section 726 of the Bankruptcy Code, any chapter 7 trustee, or any other creditor (including, without limitation, Post-Petition counterparties and other Post-Petition creditors) in the Cases or any subsequent proceedings under the Bankruptcy Code, including, without limitation, any chapter 7 cases (if any of the Cases are converted to cases under chapter 7 of the Bankruptcy Code).

SECTION 5.20.  ***Bankruptcy Related Matters***.  Parent shall, and shall cause each of its Subsidiaries to:

(a)     cause all proposed (i) "first day" orders, (ii) "second day" orders, (iii) orders related to or affecting the Loans, the Loan Documents and the Pre-Petition First Lien Loan Documents, any other financing or use of Cash Collateral, any sale or other disposition of Collateral outside the ordinary course, cash management, adequate protection, any plan of reorganization and/or any disclosure statement related thereto, (iv) orders concerning the financial condition of Parent or any of its Subsidiaries or other Indebtedness of the Loan Parties or seeking relief under section 363, 365, 1113 or 1114 of the Bankruptcy Code or section 9019 of the Federal Rules of Bankruptcy Procedure, (v) orders authorizing additional payments to critical vendors and (vi) orders establishing procedures for administration of the Cases or approving significant transactions submitted to the Bankruptcy Court, in each case, proposed by the Debtors to be in accordance with and permitted by the terms of this Agreement and acceptable to the Required IC Lenders in their sole discretion (and (x) with respect to any provision that affects the rights or duties of any Agent, the Administrative Agent and (y) with respect to any orders described in clause (v) above, acceptable to the Required IC Lenders in their sole discretion) in all respects, it being understood and agreed that the forms of orders approved by the Required IC Lenders and the Required Lenders (and with respect to any provision that affects the rights or duties of any Agent, the Administrative Agent) prior to the Petition Date are in accordance with and permitted by the terms of this Agreement and are acceptable in all respects;

90

Error! Unknown document property name.

(b)      comply in all material respects with each order entered by the Bankruptcy Court in connection with the Cases;

(c)      comply in a timely manner with their obligations and responsibilities as debtors-in-possession under the Bankruptcy Code, the Bankruptcy Rules, the Interim Order and the Final Order, as applicable, and any other order of the Bankruptcy Court;

(d)      promptly upon the Administrative Agent's written request (acting at the direction of the Required IC Lenders or the Required Lenders), each Loan Party shall provide the Administrative Agent with copies of any informational packages provided to potential bidders, draft agency agreements, purchase agreements, status reports, and updated information related to the sale or any other transaction and copies of any such bids and any updates, modifications or supplements to such information and materials; *provided* that any Lender that is a potential bidder shall not receive such information and materials;

(e)      provide the Administrative Agent and the Lenders with reasonable access to non-privileged information (including historical information) and relevant personnel regarding strategic planning, cash and liquidity management, operational and restructuring activities, in each case subject to customary confidentiality restrictions;

(f)      deliver to counsel to the Ad Hoc Lender Advisors and to counsel to the Administrative Agent (to the extent practicable) promptly as soon as available but no later than two Business Days prior to filing, copies of all proposed non-ministerial or administrative pleadings, motions, applications, orders, financial information and other documents to be filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Cases or any other party in interest, and shall consult in good faith with the Required Lenders' advisors regarding the form and substance of any such document;

(g)      if not otherwise filed on the Bankruptcy Court's electronic docketing system, as soon as available, deliver to the Administrative Agent (for distribution to the Lenders), the Ad Hoc Lender Advisors and to counsel to the Administrative Agent promptly as soon as available, copies of all final pleadings, motions, applications, orders, financial information and other documents filed by or on behalf of the Loan Parties with the Bankruptcy Court in the Cases, or distributed by or on behalf of the Loan Parties to any official or unofficial committee appointed or appearing in the Cases, in each case subject to any confidentiality provisions; and

(h)      Parent shall provide at least seven Business Days' (or such shorter notice acceptable to the Required IC Lenders in their sole discretion) prior written notice to the Required Lenders prior to any assumption or rejection of any Loan Party's or any other Subsidiary's material contracts or material non-residential real property leases pursuant to section 365 of the Bankruptcy Code, and no such contract or lease shall be assumed or rejected without the consent if the Required IC Lenders inform the Borrower in writing within three (3) Business Days of receipt of the notice from the Borrower referenced above that it objects to such assumption or rejection, as applicable.

Error! Unknown document property name.

ARTICLE VI

Negative Covenants

Each of Parent and the Borrower covenants and agrees with each Lender that, so long as this Agreement shall remain in effect and until the Commitments have been terminated and the principal of and interest on each Loan, all Fees and all other expenses or amounts then payable under any Loan Document have been paid in full in cash (other than contingent indemnification obligations not then due and payable), unless the Required Lenders shall otherwise consent in writing, Parent will not, and will not cause or permit any of the Subsidiaries to:

SECTION 6.01.  ***Indebtedness***.  Incur, create, assume or permit to exist any Indebtedness, except that Parent and any Subsidiary may incur, create, assume or permit to exist:

(a)     Indebtedness existing on the Closing Date; provided that Indebtedness pursuant to this subclause in an aggregate outstanding amount on the Closing Date in excess of $500,000 shall be set forth on Schedule 6.01;

(b)     Indebtedness pursuant to those certain Hedging Agreements (as in effect on the Closing Date) with ING Bank N.V. and Credit Agricole CIB; *provided* the notional value of such Hedging Agreements shall not, in the aggregate, exceed the aggregate notional value as of the date hereof;

(c)     (x) Indebtedness created under this Agreement and the other Loan Documents and (y) Indebtedness outstanding on the Closing Date under the Pre-Petition First Lien Credit Agreement and the other Pre-Petition First Lien Loan Documents as in effect on the Closing Date, *plus* accrued and unpaid interest thereunder;

(d)     [Reserved];

(e)     Indebtedness under transactional banking facilities or local lines of credit provided by any bank or financial institution that are used as part of the ordinary operation of the business of Parent or any Restricted Subsidiary; *provided* that (i) the aggregate principal amount of all Indebtedness outstanding pursuant to this clause shall not exceed $1,000,000 at any time and (ii) such Indebtedness shall not be secured by a Lien on any Collateral;

(f)     intercompany Indebtedness of Parent and the Subsidiaries to the extent permitted by Section 6.04(b) or 6.04(c); *provided* that any such Indebtedness of a Loan Party or any other Debtor shall be unsecured and subordinated in right of payment to the Obligations and evidenced by the Intercompany Note;

(g)     Indebtedness (i) arising in connection with endorsement of instruments for deposit and (ii) consisting of the financing of insurance premiums, in each case in the ordinary course of business;

(h)     Indebtedness arising under indemnity agreements to title insurers to cause such title insurers to issue to any Agent mortgagee title insurance policies;

92

Error! Unknown document property name.

(i)        Indebtedness of Parent or any Subsidiary that may be deemed to exist in connection with agreements providing for indemnification, purchase price adjustments, earn-outs and similar obligations in connection with acquisitions or sales of assets and/or businesses permitted by this Agreement;

(j)        Indebtedness with respect to performance bonds, bid bonds, appeal bonds, surety bonds, commercial guarantees (tender, advance payment, performance, completion and warranty period guarantees) and similar obligations (other than in respect of other Indebtedness) or with respect to workers' compensation, unemployment insurance and other social security legislation, in each case (i) consistent with the Approved Budget and (ii) incurred in the ordinary course of business and reimbursement obligations in respect of any of the foregoing;

(k)        Indebtedness consisting of Purchase Money Indebtedness or Capital Lease Obligations; *provided* that (i) the incurrence of any such Indebtedness pursuant to this clause shall be consistent with the Approved Budget and (ii) the aggregate principal amount of all Indebtedness outstanding pursuant to this clause shall not at any time exceed $750,000;

(l)        [Reserved];

(m)        [Reserved];

(n)        Indebtedness (other than Indebtedness for borrowed money) of Parent or any Subsidiary; *provided* that (i) the aggregate principal amount of all Indebtedness outstanding pursuant to this clause shall not at any time exceed $300,000 and (ii) such Indebtedness shall not be secured by a Lien on any Collateral;

(o)        [Reserved];

(p)        [Reserved];

(q)        [Reserved];

(r)        Indebtedness of Parent or any Subsidiary arising under any cash pooling, netting or set-off arrangement entered into by Parent or any Subsidiary in the ordinary course of its banking arrangements for the purpose of netting debit and credit balances of Parent and its Subsidiaries.

(s)        Indebtedness arising under a Tax Funding Agreement or Tax Sharing Agreement to which Parent or any Subsidiary is a party or is subject to; *provided* that any such Tax Funding Agreement or Tax Sharing Agreement complies with Section 5.13;

(t)        [Reserved];

(u)        Indebtedness in respect of letters of credit, bank guarantees and similar instruments issued pursuant to arrangements other than under this Agreement on behalf of or to support obligations of Parent or any Restricted Subsidiary that are not prohibited under this Agreement; provided that the aggregate amount of all Indebtedness incurred following the

**Error! Unknown document property name.**

Closing Date outstanding pursuant to this clause (including contingent reimbursement obligations) shall not at any time exceed $1,600,000;

(v)     any Indebtedness arising by operation of law as a result of the existence of a fiscal unity (*fiscale eenheid*) of which any Subsidiary incorporated or organized under the laws of The Netherlands is a member;

(w)     Indebtedness (i) arising from the honoring by a bank or other financial institution of a check, draft or similar instrument inadvertently (except in the case of daylight overdrafts) drawn against insufficient funds in the ordinary course of business; provided, however, that such Indebtedness is extinguished within ten Business Days of incurrence and (ii) with respect to credit cards, credit card processing services, debit cards, stored value cards and purchase cards incurred in the ordinary course of business;

(x)     [Reserved];

(y)     [Reserved]; and

(z)     any guarantee entered into for the purpose of obtaining or complying with an order under Part 2M.6 of the Australian Corporations Act (or an equivalent provision).

SECTION 6.02.  *Liens*.  Create, incur, assume or permit to exist any Lien on any property or assets (including Equity Interests or other securities of any person, including any Subsidiary) now owned or hereafter acquired by it or on any income or revenues or rights in respect of any thereof, except:

(a)     Liens on property or assets of Parent and its Subsidiaries existing on the Closing Date; *provided* that (i) Liens pursuant to this clause securing obligations in an aggregate outstanding amount on the Closing Date in excess of $500,000 shall be set forth on Schedule 6.02 and (ii) such Liens shall secure only those obligations which they secure on the Closing Date and extensions, renewals and replacements thereof permitted hereunder; *provided* that clauses (i) and (ii) shall not apply to Liens securing Indebtedness permitted under Section 6.01(b) and (c)(y);

(b)     (x) any Lien created under the Loan Documents and (y) any Lien created under the Pre-Petition First Lien Loan Documents;

(c)     [Reserved];

(d)     Liens for Taxes arising Post-Petition not yet due or which are being contested in compliance with Section 5.03;

(e)     carriers', warehousemen's, mechanics', materialmen's, workmen's; repairmen's, landlord's, suppliers' or other like Liens and other Liens (not securing Indebtedness) arising by operation of law, in any such case, arising in the ordinary course of business and securing obligations that are not due and payable or which are being contested in compliance with Section 5.03;

94

Error! Unknown document property name.

(f)       subject to the Orders and the terms thereof, pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

(g)       deposits to secure the performance of bids, trade contracts (other than for Indebtedness), payment of premiums to insurance carriers, leases (other than Capital Lease Obligations), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(h)       zoning restrictions, easements, rights-of-way, restrictions on use of real property and other similar encumbrances incurred in the ordinary course of business which, in the aggregate, are not substantial in amount and do not materially detract from the value of the property subject thereto or interfere with the ordinary conduct of the business of Parent or any of its Subsidiaries;

(i)       Liens on the Collateral granted to provide adequate protection pursuant to the Interim Order (and, when entered, the Final Order);

(j)       Liens in favor of, or customary deposits on reserve held by, a credit card or debit card processor or service provider arising in the ordinary course of business pursuant to the standard terms and conditions of such processor or service provider and relating solely to the amounts paid or payable thereunder;

(k)       purchase money security interests and other Liens securing Indebtedness permitted pursuant to Section **Error! Reference source not found.**; *provided* that (i) any such Lien shall encumber only the asset acquired, constructed, improved or repaired with the proceeds of such Indebtedness and proceeds and products thereof, accessions thereto and improvements thereon (it being understood that individual financings of the type permitted under Section **Error! Reference source not found.** provided by any lender may be cross-collateralized to other financings of such type provided by such lender or its Affiliates), (ii) any such Liens are incurred prior to or within 90 days of such acquisition or the completion of such construction, improvement or repair, (iii) the Indebtedness secured thereby does not exceed 100% of the lesser of the cost or the fair market value of such assets at the time of such acquisition or the completion of such construction, improvement or repair and, as applicable, such additional amounts permitted pursuant to Section **Error! Reference source not found.**;

(l)       judgment Liens securing judgments after the Petition Date not constituting an Event of Default under Section 7.01;

(m)       Liens in favor of any Loan Party (other than Liens on any Collateral);

(n)       Liens provided for by one of the following transactions if the transaction does not, in substance, secure payment or performance of an obligation: (i) a transfer of an account or chattel paper, (ii) a commercial consignment or (iii) a PPS lease (each as defined in the PPSA);

(o)       Liens arising from precautionary UCC filing statements regarding operating leases or consignments filed prior to the Petition Date;

95

**Error! Unknown document property name.**

(p)      (i) contractual or statutory Liens of landlords, to the extent relating to the property and assets relating to any lease agreements with such landlord (so long as the rent payable under any such lease agreement is not more than 30 days past due, unless being contested in good faith and for which adequate reserves have been established in accordance with GAAP), and (ii) contractual Liens of suppliers (including sellers of goods) and customers in the ordinary course of business to the extent limited to property or assets relating to such contract;

(q)      Liens representing any interest or title of a licensor, lessor or sublicensor or sublessor under any lease or license permitted by this Agreement and consistent with the Approved Budget;

(r)      leases of the tangible properties of Parent or any Subsidiary, entered into in the ordinary course of business of Parent or such Subsidiary, so long as such leases do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of Parent or such Subsidiary or (ii) materially impair the use (for its intended purposes) or the value of the property subject thereto;

(s)      licenses of the Intellectual Property of Parent or any Subsidiary granted in the ordinary course of business so long as such licenses do not, individually or in the aggregate, (i) interfere in any material respect with the ordinary conduct of the business of Parent or such Subsidiary, or (ii) materially impair the value of the Intellectual Property subject thereto;

(t)      Liens on deposits, bank accounts and/or receivables forming part of an arrangement permitted pursuant to Section 6.01(r), to the extent securing claims arising in the context of such arrangement in the ordinary course of business;

(u)      Liens arising under conditional sale, hire purchase or other title retention arrangement or arrangements having similar effect in respect of the sale of goods in the ordinary course of trading and on the supplier's standard or usual terms and not arising as a result of any default or omission by Parent or any of its Subsidiaries;

(v)      Liens (i) in favor of customs and revenue authorities arising as a matter of law to secure payment of customs duties arising Post-Petition in connection with the importation of goods in the ordinary course of business and (ii) Liens on specific items of inventory or other goods and proceeds thereof of Parent or any Subsidiary securing Parent's or such Subsidiary's obligations in respect of bankers' acceptances or documentary letters of credit permitted by this Agreement and issued or created after the Petition Date for the account of Parent or such Subsidiary to facilitate the purchase, shipment or storage of such inventory or other goods in the ordinary course of business; and

(w)      (i) Liens arising after the Petition Date that are contractual rights of set-off or netting (A) relating to the establishment of depositary relations with banks not granted in connection with the issuance of Indebtedness and (B) in respect of credits or similar arrangements pursuant to agreements entered into in the ordinary course of business; provided that no Loan Party has deposited any cash or Permitted Investments with the counterparty to such agreement to secure such right of set-off, (ii) Liens arising after the Petition Date

96

Error! Unknown document property name.

encumbering reasonable customary initial deposits and margin deposits, and similar Liens attaching to commodity trading accounts or other brokerage accounts and (iii) customary Liens arising after the Petition Date on deposit accounts, custody accounts, other bank accounts or other clearing bank facilities held with any bank or other financial institution under the standard terms and conditions of such bank or other financial institution.

SECTION 6.03.  ***Sale and Lease-Back Transactions***.    Enter into any arrangement, directly or indirectly, with any person whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property which it intends to use for substantially the same purpose or purposes as the property being sold or transferred (a "***Sale and Leaseback***").

SECTION 6.04.  ***Investments, Loans and Advances***.    Purchase, hold or acquire any Equity Interests, evidences of indebtedness or other securities of, make or permit to exist any loans or advances to, or make or permit to exist any other investment or any other interest in, any other person (it being understood and agreed that "investment" shall include any purchase, lease or other acquisition (in one transaction or a series of transactions) of all or substantially all of the assets of any other person or any line of business, unit or division of any other person), except:

(a)    investments by Parent and its Subsidiaries existing on the Closing Date; *provided* that, other than with respect to investments in the Equity Interests of the Subsidiaries, investments pursuant to this clause in an aggregate amount on the Closing Date in excess of $500,000 shall be set forth on Schedule 6.04;

(b)    (i) investments made after the Closing Date among Loan Parties and (ii) investments made after the Closing Date by any Subsidiary that is not a Loan Party in any Loan Party or other Subsidiary; *provided* that (x) any loans or advances made to a Loan Party pursuant to this clause shall be unsecured and subordinated in right of payment to the Obligations and evidenced by the Intercompany Note and pledged to the Collateral Agent and/or the Security Trustee, for the benefit of the Secured Parties pursuant to the applicable Security Documents;

(c)    investments made after the Closing Date by any Loan Party in any Subsidiary that is not a Loan Party (including any Guarantees by any Loan Party of any Indebtedness or other obligations of any Subsidiary that is not a Loan Party and any loans and advances made by any Loan Party to any Subsidiary that is not a Loan Party); *provided* that (i) at the time of such investment and immediately after giving effect thereto, no Default or Event of Default shall have occurred and be continuing or would result therefrom, (ii) the aggregate amount (determined without giving effect to any adjustments for increases or decreases in value or any write down or write off thereof) of all investments outstanding pursuant to this clause shall not exceed $500,000 and shall be consistent with the Approved Budget in all respects and (iii) any loans or advances made pursuant to this clause shall be evidenced by the Intercompany Note and pledged to the Collateral Agent and/or the Security Trustee, for the benefit of the Secured Parties pursuant to the applicable Security Documents;

(d)    [Reserved];

(e)    [Reserved];

97

Error! Unknown document property name.

(f)      Permitted Investments;

(g)      Parent and the Subsidiaries may make loans and advances to their respective employees, officers and directors for payroll, moving, entertainment, travel and other similar expenses in the ordinary course of business in an amount not to exceed $500,000 at any time outstanding;

(h)      [Reserved];

(i)      investments received in connection with the bankruptcy or reorganization of, or settlement of delinquent accounts and disputes with, customers and suppliers, in each case in the ordinary course of business;

(j)      [Reserved];

(k)      promissory notes or other investments received as consideration, or retained, in connection with sales or other dispositions of assets, including any Asset Sale permitted pursuant to Section 6.05;

(l)      investments by Parent and the Subsidiaries consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business and payable or dischargeable in accordance with customary trade terms and, in each case, consistent with the Approved Budget;

(m)      Guarantees constituting Indebtedness permitted by Section 6.01 (other than Guarantees by any Loan Party of any obligations of any person that is not a Loan Party);

(n)      [Reserved];

(o)      [Reserved];

(p)      Hedging Agreements to the extent permitted by Section 6.01(b);

(q)      investments resulting from pledges or deposits described in Sections 6.02(f) and 6.02(g);

(r)      any Guarantee (i) entered into for the purpose of obtaining or complying with an order under Part 2M.6 of the Australian Corporations Act (or an equivalent provision), (ii) under a Tax Funding Agreement or Tax Sharing Agreement to which Parent or any Subsidiary is a party or is subject to; provided that any such Tax Funding Agreement or Tax Sharing Agreement complies with Section 5.13, and/or (iii) given in order to comply with obligations under workers' compensation, unemployment insurance and other social security legislation, in each case incurred in the ordinary course of business; and

(s)      any declaration of joint and several liability (*hoofdelijke aansprakelijkheid*) as referred to in section 2:403 of the Dutch Civil Code.

Error! Unknown document property name.

SECTION 6.05.  ***Mergers, Consolidations and Sales of Assets.***  (a) Merge into or consolidate with any other person, or permit any other person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of the assets of Parent and the Subsidiaries (whether now owned or hereafter acquired) or less than all the Equity Interests of any Subsidiary (in each case including by LLC Division), except that:

(i)     Parent and any Subsidiary may purchase and sell inventory in the ordinary course of business; and

(ii)     if at the time thereof and immediately after giving effect thereto no Event of Default or Default shall have occurred and be continuing and consistent with the Approved Budget, (A) any Subsidiary may merge into the Borrower in a transaction in which the Borrower is the surviving corporation and the Borrower's jurisdiction of incorporation shall remain the same as immediately prior to such merger and (B) any Subsidiary may sell, transfer, lease or otherwise dispose of all or substantially all of its assets (including upon a voluntary liquidation or dissolution of such Subsidiary) to the Borrower.

(b)     Engage in any Asset Sale (including any LLC Division) not otherwise prohibited by Section 6.05(a), except for any dispositions resulting from any casualty or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding of, any property or asset of Parent or any Subsidiary.

SECTION 6.06. ***Dividends and Distributions; Restrictions on Ability of Subsidiaries to Pay Dividends***.

(a)     Declare or pay, directly or indirectly, any dividend or make any other distribution (by reduction of capital or otherwise), whether in cash, property, securities or a combination thereof, with respect to any Equity Interests of Parent or any Subsidiary or directly or indirectly make any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of (or permit any Subsidiary to purchase or acquire) any Equity Interests of Parent or any Subsidiary or set aside any amount for any such purpose or incur any obligation (contingent or otherwise) to do so (any of the foregoing, a "***Restricted Payment***"); *provided* that any Subsidiary may declare and pay dividends or make other distributions ratably to its equity holders.

(b)     Enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (i) the ability of any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets to secure any Obligation, or (ii) the ability of any Subsidiary to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to Parent or any other Subsidiary or to Guarantee any Obligation of Parent or any other Subsidiary; *provided* that (A) the foregoing shall not apply to restrictions and conditions imposed by law, the Orders or by any Loan Document, (B) the foregoing shall not apply to restrictions and conditions in any Pre-Petition First Lien Loan Document as in effect on the date hereof, (C) the foregoing shall not apply to

Error! Unknown document property name.

restrictions and conditions imposed on any Subsidiary that is not a Loan Party by the terms of any Indebtedness of such Subsidiary permitted to be incurred hereunder, (D) clause (i) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, (E) clause (i) of the foregoing shall not apply to customary provisions in leases and other contracts restricting the assignment thereof, (F) the foregoing shall not apply to customary restrictions on cash or other deposits or net worth required by customers under contracts entered into in the ordinary course of business and consistent with the Approved Budget if such provisions apply only to the Person (and the equity interests in such Person) that is the subject thereof and (G) the foregoing shall not apply to customary restrictions and conditions contained in any agreement relating to any Asset Sale (or other disposition of assets) permitted under this Agreement pending the consummation of such Asset Sale (or other disposition of assets).

SECTION 6.07.   ***Transactions with Affiliates***.   Sell or transfer any property or assets to, or purchase or acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates other than (a) transactions on terms and conditions (taken as a whole) not materially less favorable to Parent or such Subsidiary than could be obtained on an arm's-length basis from unrelated third parties; provided that such restriction shall not apply to any transaction between or among Loan Parties, and (b) to the extent constituting transactions with Affiliates that would otherwise be prohibited under this Section 6.07: (i) transactions between or among Subsidiaries that are not Loan Parties, to the extent otherwise permitted under Section 6.04 and not involving another Affiliate, (ii) loans or advances to employees, officers and directors permitted under Section 6.04(g), (iii) the payment of reasonable fees to directors of Parent or any Subsidiary who are not employees of Parent or any Subsidiary, and compensation and employee benefit arrangements paid to, and indemnities provided for the benefit of, directors, officers or employees of Parent or the Subsidiaries in the ordinary course of business and consistent with the Approved Budget, (iv) Parent may issue and sell Qualified Capital Stock to its Affiliates (other than the Borrower and the Subsidiaries), (v) transactions permitted under Sections 6.01 and 6.06 and (vi) Parent and the Subsidiaries may perform their respective obligations under the arrangements existing on the Closing Date and specified in Schedule 6.07.

SECTION 6.08.   ***Business of Parent and Subsidiaries***.   Engage at any time in any business or business activity other than the Related Business.

SECTION 6.09.   ***Other Indebtedness and Agreements***.   (a) Permit any (i) waiver, supplement, modification, amendment, termination or release of any indenture, instrument or agreement pursuant to which any Indebtedness of Parent or any Subsidiary is outstanding if the effect of such waiver, supplement, modification, amendment, termination or release would materially increase the obligations of the obligor or confer additional material rights on the holder of such Indebtedness in a manner adverse to Parent, any Subsidiary, any Agent or the Lenders (it being understood that any amendment to the Pre-Petition First Lien Credit Agreement or any other loan document in respect thereof shall be deemed to be adverse to Parent, any Subsidiary, any Agent or any Lender for purposes of this clause (a)(i) unless such amendments are permitted under the terms of the DIP Intercreditor Agreement or any Order); *provided* that nothing herein shall prohibit any supplement, modification or amendment of any indenture, instrument or agreement solely in relation to, or solely for the purpose of, issuing or

100

**Error! Unknown document property name.**

otherwise incurring new Indebtedness that is not prohibited under Section 6.01, (ii) waiver, supplement, modification, amendment, termination or release of any Subordinated Loan Document that (x) results in the Subordinated Indebtedness provided or evidenced thereby no longer complying with the definition of "Subordinated Indebtedness", or (y) would materially increase the obligations of the obligor or obligors thereunder or confer additional material rights on the holder or holders of such Subordinated Indebtedness in a manner materially adverse to Parent, any of the Subsidiaries or the Lenders, (iii) amendment or modification of any Pre-Petition First Lien Loan Document in contravention of the DIP Intercreditor Agreement, (iv) waiver, supplement, modification or amendment of Organization Documents, to the extent any such waiver, supplement, modification or amendment under this clause (iv) would be adverse to the Lenders in any material respect (as determined in good faith by Parent and reasonably acceptable to the Administrative Agent), (v) waiver, supplement, modification or amendment to any Intelsat Agreement without the consent of the Required IC Lenders (in their sole discretion), (vi) without the consent of Greenhill (who (A) shall have been provided not less than two Business Days' prior written notice (it being understood that Greenhill shall have no obligation to consent to any such request and any failure to respond shall not be deemed to be a consent thereof), (B) shall have been kept reasonably apprised by the Borrower's financial advisors of the material events and circumstances leading up to such request and (C) may solicit direction in connection therewith from the Required IC Lenders), enter into any payment plans and/or settlements (including the extension of any time periods for payment) with respect to past due amounts owed to any suppliers or owing from customers, or any other restructuring of any supplier or customer relationship (including any amendment, waiver or modification of any supplier or customer contract), in each case, outside the ordinary course of business; *provided* that the foregoing clause (vi) shall apply only with respect to agreements or transactions involving (I) the top twenty  customers based on total revenues during the trailing twelve month period ending as of the most recently ended fiscal month, (II) payment plans and/or settlements that shall create a variance in receipts in excess of $500,000 for the forecast period ending December 31, 2020 or December 31, 2021, (III) the top ten (10) bandwidth and service providers during the trailing twelve month period ending as of the most recently ended fiscal month and (IV) vendors with outstanding amounts greater than $750,000 for Parent and its Subsidiaries taken as a whole, (vii) modify any obligations owed by any Loan Party or any Subsidiary to any supplier, service provider or other vendor in a manner that causes such obligations to constitute Indebtedness that would be pari passu with or senior to (including with respect to lien, payment and structural priority) the Obligations or the Pre-Petition First Lien Obligations, except as expressly consented to in writing (including by email) by the Required Lenders and the Required IC Lenders or (viii) make, enter into or implement any amendment, waiver, supplement or other modification to any employment agreement or employee compensation plan, in each case solely to the extent such agreement or compensation plan relates to a Key Employee or Director, or the payment of any amount contemplated by such agreements or plans before the date on which such amount becomes due and payable pursuant to the terms of the such agreements or plans, as applicable, or the payment of any bonus, incentive, retention, severance, change of control or termination payments pursuant to the terms of such agreements or plans, as applicable, or the entry into any new employment agreement or employee compensation plan with any such Key Employee or Director.

(b)      Make any distribution, whether in cash, property, securities or a combination thereof, in respect of, or pay, or commit to pay, or directly or indirectly redeem,

Error! Unknown document property name.

repurchase, retire or otherwise acquire for consideration, or set apart any sum for the aforesaid purposes, any Indebtedness that is unsecured or that is secured by Liens on any Collateral that are junior to the Liens securing the other Obligations or any Subordinated Indebtedness.

(c)     Make any voluntary or optional payment or prepayment of any Indebtedness under the Pre-Petition First Lien Loan Documents.

(d)     Permit any waiver, supplement, modification, amendment, termination or release of any agreement with any material customer or vendor.

SECTION 6.10.   [Reserved]

SECTION 6.11.   *Fiscal Year*.  Permit the fiscal year of any Loan Party to end on a day other than December 31.

SECTION 6.12.   [Reserved].

SECTION 6.13.   *Certain Issuances of Equity Interests*.   Issue any Equity Interest, except that (a) Parent may issue Equity Interests, to the extent not otherwise prohibited by or in violation of this Agreement; (b) with respect to any Subsidiary (and subject to any applicable requirements in Section 5.11 and the Agreed Security Principles), such Subsidiary may issue Equity Interests for stock splits, stock dividends and additional issuances of Equity Interests which do not decrease the percentage ownership in any class of Equity Interests of such issuing Subsidiary owned by any Loan Party or any other Subsidiary that owns Equity Interests in such issuing Subsidiary; provided that this clause (b) shall permit any such decrease in such percentage ownership in any class of Equity Interests of such issuing Subsidiary solely to the extent that such decrease is accompanied by a corresponding increase in the percentage ownership in such class of Equity Interests of such issuing Subsidiary owned by a Loan Party, which Equity Interests are pledged to secure the Obligations; (c) [reserved]; and (d) with respect to any Subsidiary that is not a Loan Party and none of the Equity Interests in which are owned by a Loan Party, such Subsidiary may issue Equity Interests to Parent or any other wholly owned Subsidiary.

SECTION 6.14.   *Sanctions-Compliant Repayment of Obligations*.  Use, directly or indirectly, any funds or assets derived from or used in any activity, business, or transaction with a Sanctioned Person, in a Sanctioned Country, or that otherwise violates Sanctions, to repay or discharge any Obligations or any portion thereof, except to the extent that such activity, business, or transaction and such use of funds or assets would be lawful for a person required to comply with Sanctions.

SECTION 6.15.   *Budget Variance*.  Parent will not permit with respect to each Budget Test Period as of the last day thereof, in each case as depicted in the Approved Budget (i) the negative variance (as compared to the budgeted amounts set forth in the Approved Budget) of the aggregate actual cash receipts received by the Loan Parties and the other Subsidiaries that corresponds to the line items in the Approved Budget under the headings "Customer receipts" (excluding dividends from the Government Business and "Total Receipts," in each case, to exceed 10%, (ii) the positive variance (as compared to the budgeted amounts set forth in the Approved Budget) of the aggregate actual disbursements made by the Loan Parties and the other

102

Subsidiaries that correspond to the line items in the Approved Budget under the heading "Bandwidth payments" to exceed 10%, (iii) the positive variance (as compared to the budgeted amounts set forth in the Approved Budget) of the aggregate actual disbursements made by the Loan Parties and the other Subsidiaries that correspond to the line items in the Approved Budget under the heading "Total Disbursements" (excluding "Bandwidth Payments" and "Capex") to exceed 10%, (iv) the positive variance (as compared to the budgeted amounts set forth in the Approved Budget) of the aggregate actual disbursements made by the Loan Parties and the other Subsidiaries that correspond to the line items in the Approved Budget under the heading "Capex" to exceed 10% and (v) solely for the Cumulative Budget Test Period, the positive variance (as compared to the budgeted amounts set forth in the Approved Budget) of the aggregate actual disbursements made by the Loan Parties and the other Subsidiaries that correspond to the line items in the Approved Budget under the heading "Professional Fees" to exceed 10%.

SECTION 6.16.  *Liquidity*.  Commencing with the fiscal month ending April 30, 2020, permit Liquidity to be less than $10,000,000 (a) as of the last day of each fiscal month of Parent or (b) for a period of 3 consecutive days or more in any fiscal month.

SECTION 6.17.  *Subsidiaries*.  Parent shall not and will not permit any of its Subsidiaries to form, create or acquire any Subsidiary without the prior written consent of the Required Lenders.

SECTION 6.18.  *Additional Bankruptcy Matters*.  Parent shall not, and will not permit any of its Subsidiaries to:

(a)     assert or prosecute any claim or cause of action against any of the Secured Parties (in their capacities as such), unless such claim or cause of action is in connection with the enforcement of the Loan Documents against the Administrative Agent or the Lenders;

(b)     subject to the terms of the Interim Order or the Final Order, as applicable, object to, contest, delay, prevent or interfere with in any material manner the exercise of rights and remedies by the Administrative Agent, the Collateral Agent, the Security Trustee or the Lenders with respect to the Collateral following the occurrence of an Event of Default (provided that any Loan Party may contest or dispute whether an Event of Default has occurred); or

(c)     make any payment or distribution on account of any Pre-Petition First Lien Obligations or any other Indebtedness or obligation arising prior to the Petition Date except (x) as (i) expressly provided or permitted hereunder (including to the extent pursuant to any "first day" or "second day" orders complying with the terms of this Agreement) or (ii) provided pursuant to any other order of the Bankruptcy Court acceptable to the Required IC Lenders and the Required Lenders and (y) in each case with the prior consent of the Required IC Lenders and the Required Lenders in their sole discretion following delivery of a report covering such payments in form and scope reasonably satisfactory to the Required IC Lenders.

Error! Unknown document property name.

ARTICLE VII

Events of Default

SECTION 7.01.  ***Events of Default***.  In case of the happening of any of the following events ("***Events of Default***"):

(a)     any representation or warranty made or deemed made in or in connection with any Loan Document or the borrowings, or any representation, warranty, statement or information contained in any report, certificate, financial statement or other instrument furnished in connection with or pursuant to any Loan Document, shall prove to have been false or misleading in any material respect when so made, deemed made or furnished;

(b)     default shall be made in the payment of any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or by acceleration thereof or otherwise;

(c)     default shall be made in the payment of any interest on (or premium with respect to) any Loan  or any other amount (other than an amount referred to in (b) above) due under any Loan Document, when and as the same shall become due and payable, and such default shall continue unremedied for a period of two (2) Business Days;

(d)     default shall be made in the due observance or performance by Parent or any Subsidiary of any covenant, condition or agreement contained in Section 2.25, 5.01(a), 5.04(i), 5.04(j), 5.04(k), 5.04(l), 5.04(m), 5.05, 5.08, 5.12, 5.14, 5.16 or 5.19 or in Article VI;

(e)     default shall be made in the due observance or performance by Parent or any Subsidiary of any covenant, condition or agreement contained in any Loan Document (other than those specified in (b), (c) or (d) above) and such default shall continue unremedied for a period of fifteen days (or, in the case of Sections 5.04(a) and **Error! Reference source not found.**, five days) after the earlier of (i) notice thereof from the Administrative Agent or the Required Lenders to Parent and (ii) any Loan Party becoming aware of such default;

(f)     the Borrower, Parent or any Subsidiary shall (i) fail to pay any principal or interest, regardless of amount, due in respect of any Indebtedness in a principal amount in excess of the Threshold Amount, when and as the same shall become due and payable (other than the Obligations and any Indebtedness of any Debtor that was incurred prior to the Petition Date that is (A) required to be paid under the Bankruptcy Code or pursuant to an Order of the Bankruptcy Court and (B) subject to the automatic stay applicable under section 362 of the Bankruptcy Code) or (ii) fail to observe or perform any other term, covenant, condition or agreement contained in any agreement or instrument evidencing or governing any such Indebtedness or any other event or condition occurs, in any such case of this clause (ii), if the effect thereof is to cause, or to enable or permit the holder or holders of such Indebtedness or a trustee or other agent or representative on its or their behalf (with or without the giving of notice, the lapse of time or both) to cause, such Indebtedness to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its stated maturity; *provided* that subclause (ii) above shall not apply to secured Indebtedness that becomes due as a result of the

104

Error! Unknown document property name.

voluntary sale or transfer of the property or assets securing such Indebtedness in a transaction expressly permitted by the Loan Documents;

(g)     other than the Cases, an involuntary proceeding shall be commenced or an involuntary petition shall be filed in a court of competent jurisdiction seeking (i) relief in respect of Parent or any Subsidiary, or of a substantial part of the property or assets of Parent or a Subsidiary, under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal, state or non-U.S. bankruptcy, insolvency, examinership, receivership, administration, judicial management or similar law (including under the laws of Australia), (ii) the appointment of a receiver, judicial manager, trustee, examiner, administrator, custodian, sequestrator, conservator, liquidator, manager or similar official for Parent or any Subsidiary or for a substantial part of the property or assets of Parent or any Subsidiary, (iii) the winding-up, dissolution or liquidation of Parent or any Subsidiary; and such proceeding or petition shall continue undismissed for sixty days or an order or decree approving or ordering any of the foregoing shall be entered, or (iv) a composition, assignment or arrangement with any creditor of any member of the Group;

(h)     other than the Cases, Parent or any Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking relief under Title 11 of the United States Code, as now constituted or hereafter amended, or any other federal, state or non-U.S. bankruptcy, insolvency, examinership, receivership, administration, judicial management, scheme of arrangement or similar law (including under the laws of Australia), (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or the filing of any petition described in (g) above, (iii) apply for or consent to the appointment of a receiver, judicial manager, administrator, examiner, trustee, custodian, sequestrator, conservator, liquidator, manager or similar official for Parent or any Subsidiary or for a substantial part of the property or assets of Parent or any Subsidiary, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors, (vi) become unable, admit in writing its inability or fail generally to pay its debts as they become due or (vi) take any action for the purpose of effecting any of the foregoing;

(i)     other than as a result of the commencement of the Cases, Parent or any Subsidiary incorporated or organized under the laws of Australia (x) is or is presumed or deemed to be unable or admits inability to pay its debts as they fall due; or (y) suspends making payments on any of its debts (other than any debts in respect of the Indebtedness of any Debtor that was incurred prior to the Petition Date and subject to the automatic stay applicable under section 362 of the Bankruptcy Code);

(j)     one or more judgments arising after the Petition Date for the payment of money the aggregate amount is in excess of the Threshold Amount (to the extent not covered by insurance provided by an insurer that is not an Affiliate of Parent, with respect to which coverage has been acknowledged by such insurer) shall be rendered against Parent, any Subsidiary or any combination thereof and the same shall remain undischarged for a period of forty-five consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to levy upon assets or properties of Parent or any Subsidiary to enforce any such judgment;

105

Error! Unknown document property name.

(k)      a moratorium shall have taken effect by operation of law or shall have been declared in respect of any Indebtedness of any Loan Party incorporated or registered in Singapore;

(l)      any Loan Party shall have been declared by the Minister of Finance of Singapore to be a company to which Part IX of the Singapore Companies Act applies;

(m)      an ERISA Event shall have occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events, has had or could reasonably be expected to result in a Material Adverse Effect;

(n)      (i) any Loan Document or any Guarantee under any of the Loan Documents for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Loan Party shall deny in writing that it has any further liability under any Loan Document to which it is a party (other than as a result of the discharge of such Guarantor in accordance with the terms of the Loan Documents) or (ii) any Loan Party shall fail to comply with the terms of any Intercreditor Agreement in any material respect or any such document for any reason shall cease to be in full force and effect (other than in accordance with its terms), or any Loan Party shall so assert;

(o)      any security interest purported to be created by any Security Document shall cease to be, or shall be asserted by the Borrower or any other Loan Party not to be, a valid, perfected, first priority (except as otherwise expressly provided in this Agreement or such Security Document or the Orders) security interest in the securities, assets or properties covered thereby with a fair market value in excess of $500,000, except as a result of the release of a Loan Party or the sale or other disposition of the applicable Collateral in a transaction permitted under the Loan Documents;

(p)      there shall have occurred a Change of Control;

(q)      any subordinated Indebtedness of Parent or any Subsidiary (including any Subordinated Indebtedness) shall cease (or any Loan Party or an Affiliate of any Loan Party shall so assert), for any reason, to be validly subordinated to the Obligations as required pursuant to the Loan Documents and as provided, to the extent applicable, in the Subordinated Indebtedness Documents related thereto or other definitive documents evidencing such subordinated Indebtedness;

(r)      any of the following shall occur:

(i)      any of the Cases of the Loan Parties shall be dismissed or converted to a case under chapter 7 of the Bankruptcy Code;

(ii)      (A) a trustee, responsible officer or an examiner having expanded powers (beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) (other than a fee examiner) is appointed or elected in the any of the Cases, (B) any Loan Party applies for, consents to, supports, acquiesces in or fails to promptly oppose, any such appointment or (C) the Bankruptcy Court shall have entered an order providing for such appointment;

Error! Unknown document property name.

(iii)     an order of the Bankruptcy Court shall be entered denying or terminating use of Cash Collateral by the Loan Parties and the Loan Parties shall have not obtained use of Cash Collateral pursuant to an order consented to by, and in form and substance acceptable to, the Required IC Lenders and the Required Lenders;

(iv)     any Pre-Petition First Lien Lender shall have exercised any remedy under the Pre-Petition First Lien Loan Documents;

(v)     any Loan Party, or any person on behalf of any Loan Party, shall file a motion or other pleading seeking, or otherwise consenting to, any of the matters set forth in clauses (i) through (iii) above or the granting of any other relief that if granted would give rise to an Event of Default;

(vi)     any Loan Party or any of its Subsidiaries, or any person claiming by or through any Loan Party or any of its Subsidiaries shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding against (A) the Administrative Agent or any of the Lenders relating to the DIP Term Facility, or (B) the Pre-Petition First Lien Agents or any Pre-Petition First Lien Lender, in each case other than, with respect to a Loan Party, in the case of a Person that has obtained an order from the Bankruptcy Court, over the objection of the Loan parties, granting such Person derivative standing to commence, join in, assist or otherwise participate as an adverse party;

(s)     the existence of any claims or charges, or the entry of any order of the Bankruptcy Court authorizing (i) any claims or charges, other than in respect of the DIP Term Facility and the Carve-Out or as otherwise permitted under the applicable Loan Documents or the Orders, entitled to superpriority administrative expense claim status in any chapter 11 case pursuant to section 364(c)(1) of the Bankruptcy Code that are pari passu with or senior to the claims of the Administrative Agent and the Lenders under the DIP Term Facility, or there shall arise or be granted by the Bankruptcy Court any claim having priority over any or all administrative expenses of the kind specified in clause (b) of section 503 or clause (b) of section 507 of the Bankruptcy Code (other than the Carve-Out), or (ii) any Lien on the Collateral having a priority senior to or pari passu with the Liens and security interests granted herein, except, in each case, as expressly provided in the Loan Documents or in the Order then in effect (but only in the event specifically consented to by the Administrative Agent and the Required IC Lenders), whichever is in effect;

(t)     the Bankruptcy Court shall enter an order or orders granting relief from any stay of proceeding (including, the automatic stay applicable under section 362 of the Bankruptcy Code to the holder or holders of any security interest) to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Loan Parties or (ii) permit other actions that would have a Material Adverse Effect on the Loan Parties or their estates (taken as a whole);

(u)     an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Interim Order or the Final Order, or a Loan Party files an application, motion or other pleading

Error! Unknown document property name.

seeking such entry of such an order or supports or fails to promptly oppose such an order, in each case without the prior written consent of the Required IC Lenders or the Required Lenders (and with respect to any provision that affects the rights or duties of any Agent, the applicable Agent);

(v)      the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date) shall cease to create a valid and perfected Lien on the Collateral or to be in full force and effect, shall have been reversed, modified, amended, stayed, vacated, or subject to stay pending appeal, in the case of modification or amendment (and subject to Section 9.08), without prior written consent of the Required IC Lenders and the Required Lenders (and with respect to any provision that affects the rights or duties of any Agent, the applicable Agent);

(w)      an order shall have been entered by the Bankruptcy Court avoiding or requiring disgorgement by any of the Agents or any of the Lenders of any amounts received in respect of the Obligations;

(x)      an order shall have been entered by the Bankruptcy Court terminating or modifying the exclusive right of any Loan Party to file a chapter 11 plan pursuant to section 1121 of the Bankruptcy Code, without the prior written consent of the Required IC Lenders and the Required Lenders;

(y)      any of the Loan Parties shall fail to comply with a material provision of the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date);

(z)      an order in the Cases shall be entered charging any of the Collateral (as defined herein and in the Pre-Petition First Lien Credit Agreement) under section 506(c) of the Bankruptcy Code against the Lenders or the Pre-Petition First Lien Lenders, or the commencement of other actions in any of the Cases that are (x) materially adverse to Agents or the Lenders or inconsistent with any of the Loan Documents or (y) materially adverse to Pre-Petition Agents or Pre-Petition First Lien Lenders or inconsistent with any of the Pre-Petition First Lien Loan Documents;

(aa)      any order shall be entered which dismisses any of the Cases of the Loan Parties and which order does not provide for payment in full in cash of the Obligations under the Loan Documents (other than contingent indemnification obligations not yet due and payable), or any of the Loan Parties and their Subsidiaries shall seek, support or fail to contest in good faith the entry of any such order;

(bb)      failure to satisfy any of the Milestones in accordance with the terms relating to such Milestone (unless waived or extended with the consent of the Required IC Lenders);

(cc)      any Loan Party or any Subsidiary thereof shall take any action in support of any matter set forth in this Section 7.01 or any other Person shall do so and such action is not contested in good faith by the Loan Parties and the relief requested is granted in an order that is not stayed pending appeal;

108

Error! Unknown document property name.

(dd)     any Loan Party or any Subsidiary thereof shall obtain court authorization to commence, or shall commence, join in, assist or otherwise participate as an adverse party in any suit or other proceeding seeking, or otherwise consenting to (i) the invalidation, subordination or other challenging of the Superpriority Claims and Liens granted to secure the Obligations or any other rights granted to the Agents and the Lenders in the Orders or this Agreement or (ii) any relief under section 506(c) of the Bankruptcy Code with respect to any Collateral;

(ee)     any Loan Party shall challenge, support or encourage a challenge of any payments made to any Agent or any Lender with respect to the Obligations or any Pre-Petition First Lien Agent or any Pre-Petition First Lien Lender with respect to the Pre-Petition First Lien Obligations, other than to challenge the occurrence of a Default or Event of Default;

(ff)     without the consent of the Administrative Agent, the Required IC Lenders and the Required Lenders, the filing of any motion by the Loan Parties seeking approval of (or the entry of an order by the Bankruptcy Court approving) adequate protection to any pre-petition agent, trustee or lender that is inconsistent with the Interim Order (prior to the Final Order Entry Date) or the Final Order (on and after the Final Order Entry Date);

(gg)     without Administrative Agent's, the Required IC Lenders' and the Required Lenders' consent, the entry of any order by the Bankruptcy Court granting, or the filing by any Loan Party or any of its Subsidiaries of any motion or other request with the Bankruptcy Court (in each case, other than the Orders and motions seeking entry thereof or permitted amendments or modifications thereto) seeking, authority to use any cash proceeds of any of the Collateral without the Administrative Agent's, the Required IC Lenders' and the Required Lenders' consent or to obtain any financing under section 364 of the Bankruptcy Code other than the facility hereunder unless such motion or order contemplates payment in full in cash of the Obligations immediately upon consummation of the transactions contemplated thereby;

(hh)     without the consent of the Administrative Agent, the Required IC Lenders and the Required Lenders, the filing of any motion by the Loan Parties or any person on behalf of any Loan Party seeking authority to consummate a sale of assets of the Loan Parties or the Collateral outside the ordinary course of business and not otherwise permitted hereunder;

(ii)     if any Loan Party or any of its Subsidiaries is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any part of the business affairs of the Loan Parties and their Subsidiaries, taken as a whole, which could reasonably be expected to have a Material Adverse Effect; *provided* that the Loan Parties shall have two Business Days after the entry of such an order to obtain a court order vacating, staying or otherwise obtaining relief from the Bankruptcy Court or another court to address any such court order;

(jj)     without the consent of the Administrative Agent, the Required IC Lenders and the Required Lenders, the making by any Loan Party of any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition Indebtedness or payables other than payments permitted under this Agreement to the extent authorized by one or more "first day" orders, the Interim Order or the Final Order,

109

Error! Unknown document property name.

consistent with the Approved Budget and approved by the Required IC Lenders in their sole discretion;

(kk)    if, unless otherwise approved by the Administrative Agent, the Required IC Lenders and the Required Lenders, an order of the Bankruptcy Court shall be entered providing for a change in venue with respect to the Cases and such order shall not be reversed or vacated within ten days;

(ll)    without the Required IC Lenders' and the Required Lenders' consent, any Loan Party or any Subsidiary thereof shall file any motion or other request with the Bankruptcy Court seeking (i) to grant or impose, under section 364 of the Bankruptcy Code or otherwise, liens or security interests in any Collateral, whether senior, equal or subordinate to the Agents' liens and security interests; (ii) to use, or seek to use, Cash Collateral; or (iii) to modify or affect any of the rights of the Agents, or the Lenders under the Orders or the Loan Documents, by any order entered in the Cases;

(mm)    without the Required IC Lenders' and the Required Lenders' consent, any Loan Party shall file a motion seeking or take any action supporting a motion seeking, or the Bankruptcy Court shall enter an order in any of the Cases authorizing the sale of all or substantially all of the Loan Parties' assets (unless such order contemplates payment in full in cash of the Obligations upon the closing of such financing or consummation of such sale, whether pursuant to a plan of reorganization or otherwise);

(nn)    the Borrower or other debtor in a chapter 11 case proposes or otherwise supports any plan of reorganization or sale process that is not permitted by the Approved Restructuring, without the Required IC Lenders' and the Required Lenders' consent; or

(oo)    Any termination or rejection in any insolvency proceeding of any Intelsat Agreement without the consent of the Required IC Lenders;

then, and in every such event, and at any time thereafter during the continuance of such event, the Administrative Agent, with the consent of the Required Lenders may, and at the request of the Required Lenders shall, by notice to Parent, take any or all of the following actions, at the same or different times: (i) terminate forthwith the Commitments, (ii) declare the Loans then outstanding to be forthwith due and payable in whole or in part, whereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower and the other Loan Parties accrued hereunder and under any other Loan Document, shall become forthwith due and payable and (iii) exercise on behalf of itself and the other Secured Parties all rights and remedies available to it and the Secured Parties under the Loan Documents, in each case, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by Parent and the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Notwithstanding anything to the contrary herein, subject to the provisions of the Interim Order (and, when entered, the Final Order), (x) with respect to enforcement of Liens or remedies with respect to Collateral, the Administrative Agent shall provide the Borrower [five] Business Days'

Error! Unknown document property name.

notice prior to taking such action (in any hearing after the giving of such notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing (the "**Remedies Notice Period**")), and (y) after expiration of the Remedies Notice Period, the Administrative Agent shall, at the direction of the Required Lenders, (x) terminate the consensual use of Cash Collateral and (y) exercise all other rights and remedies provided for in this Agreement, the Security Documents, the Orders and under applicable law; *provided* that no such notice shall be required for any exercise of rights or remedies (A) to block or limit withdrawals from any bank accounts that are a part of the Collateral (including, without limitation, by sending any control activation notices to depositary banks pursuant to any control agreement or the equivalent action in any foreign jurisdiction) and (B) in the event of Obligations that have not been paid in full in cash (other than contingent indemnification obligations for which no claim has yet been made) on the applicable termination of the Loan Documents.   During the Remedies Notice Period, the Debtors may continue to use Cash Collateral solely to fund (A) payroll and other expenses critical to keeping the business of the Loan Parties operating in accordance with the Approved Budget and (B) the Carve-Out. During the Remedies Notice Period, any party in interest shall be entitled to seek an emergency hearing with the Bankruptcy Court, for the sole purpose of contesting whether an Event of Default has occurred and/or is continuing and cash collateral may be used for this purpose during the Remedies Notice Period.

SECTION 7.02. ***Application of Proceeds***.   Subject to the DIP Intercreditor Agreement and the Orders, the Agents shall apply (a) the proceeds of any collection, sale, foreclosure or other realization upon any Collateral, including any Collateral consisting of cash, (b) any amounts received in respect of the Obligations following the termination of the Commitments and any of the Loans becoming due and payable pursuant to Section 7.01 and (c) subject to the Carve-Outs, each prepayment of Loans pursuant to Sections 2.11, 2.12 and 2.13, in each case as follows:

*FIRST*, to the payment of all costs and expenses incurred by the Agents (in their respective capacities as such hereunder or under any other Loan Document) in connection with any collection, sale, foreclosure or realization or otherwise in connection with this Agreement, any other Loan Document or any of the Obligations, including all court costs and the fees and expenses of its agents and legal counsel, the repayment of all advances made by any Agent hereunder or under any other Loan Document on behalf of any Loan Party, any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Loan Document, any amounts for which any Agent (including for this purpose, the Pre-Petition First Lien Agents as provided in Section 8.01 and Section 9.05(b)) is entitled to indemnification, fees (including Agent Fees), or reimbursement of costs or expenses under the terms of any Loan Document, and any other Obligations owed to any of the Agents, in their respective capacities as such hereunder or under any other Loan Document;

*SECOND*, to the payment in full of all Obligations consisting of accrued and unpaid fees, indemnities and other amounts (other than principal and interest) payable to the Lenders;

111

Error! Unknown document property name.

*THIRD*, to the payment in full of all Obligations consisting of accrued and unpaid interest on the Loans (other than the Roll-Up Loans) ratably among the Lenders (other than Defaulting Lenders);

*FOURTH*, to the payment in full of all Obligations consisting of unpaid principal amount of the Loans (other than the Roll-Up Loans) and any premium thereon or breakage or termination fees, costs or expenses related thereto ratably among the Lenders (other than Defaulting Lenders);

*FIFTH*, to the payment in full of all Obligations consisting of accrued and unpaid interest on the Roll-Up Loans ratably among the Lenders (other than Defaulting Lenders);

*SIXTH*, to the payment in full of all Obligations consisting of unpaid principal amount of the Roll-Up Loans and any premium thereon or breakage or termination fees, costs or expenses related thereto ratably among the Lenders (other than Defaulting Lenders);

*SEVENTH*, ratably to the payment in full of all Obligations owing to the Defaulting Lenders;

*EIGHTH*, to the payment in full of all other Obligations;

*NINTH*, ratably to payment of any superpriority adequate protection claims of the Pre-Petition First Lien Agents;

*TENTH*, to the payment of the Pre-Petition First Lien Obligations in accordance with the terms of the Pre-Petition First Lien Loan Documents; and

*ELEVENTH*, to the Borrower, its successors or assigns, or as a court of competent jurisdiction may otherwise direct.

The Agents shall have absolute discretion as to the time of application of any such proceeds, moneys, balances or amounts in accordance with this Agreement and the other Loan Documents. Upon any sale of Collateral by any Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of any Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to any Agent or such officer or be answerable in any way for the misapplication thereof.

ARTICLE VIII

The Agents, Etc.; Certain ERISA Matters

SECTION 8.01. **The Administrative Agent, the Collateral Agent and the Security Trustee, Etc.**

112

Error! Unknown document property name.

In order to expedite the transactions contemplated by this Agreement, Credit Suisse AG, Cayman Islands Branch, is hereby irrevocably appointed to act as Administrative Agent, Collateral Agent and Security Trustee on behalf of each of the Lenders (for purposes of this Article VIII, the Administrative Agent, the Collateral Agent and the Security Trustee are referred to collectively as the "*Agents*").   Each of the Lenders and each assignee of any such Lender hereby irrevocably authorizes each of the Agents to take such actions on behalf of such Lender or assignee and to exercise such powers as are delegated to such Agent by the terms and provisions hereof and of the other Loan Documents, together with such actions and powers as are reasonably incidental thereto, including to negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender. Without limiting the generality of the foregoing, the Agents are hereby expressly authorized to (i) execute any and all documents (including releases) with respect to the Collateral, the Guarantees of the Obligations and the rights of the Secured Parties with respect thereto, as contemplated by and in accordance with the provisions of this Agreement and the Security Documents, and (ii) negotiate, enforce or settle any claim, action or proceeding affecting the Lenders in their capacity as such, at the direction of the Required Lenders, which negotiation, enforcement or settlement will be binding upon each Lender.

It is understood and agreed that the use of the term "Agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent, Collateral Agent or Security Trustee is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law.  Instead, such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

None of the Agents shall have any duties or obligations except those expressly set forth in the Loan Documents, and each Agent's duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, (a) none of the Agents shall be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) none of the Agents shall have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.08) and in the absence of such direction or consent, may refrain from taking any such discretionary actions or exercising such discretionary power; provided that none of the Agents shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Loan Document or applicable law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law, and (c) except as expressly set forth in the Loan Documents, none of the Agents shall have any duty to disclose, nor shall it be liable for the failure to disclose, any information relating to Parent or any of the Subsidiaries that is communicated to or obtained by the bank serving as Administrative Agent, Collateral Agent and/or Security Trustee or any of its Affiliates in any capacity.  None of the Agents shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary

113

Error! Unknown document property name.

under the circumstances as provided in Section 9.08) or in the absence of its own gross negligence or willful misconduct as determined by a court of competent jurisdiction by a final and non-appealable judgment.  None of the Agents shall be deemed to have knowledge of any Default unless and until written notice thereof is given to such Agent by Parent or a Lender.  No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Loan Document, (ii) the contents of any certificate, report or other document delivered thereunder or in connection therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Loan Document or occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of any Loan Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in Article IV or elsewhere in any Loan Document, other than to confirm receipt of items expressly required to be delivered to such Agent.  Each party to this Agreement acknowledges and agrees that the Agents may from time to time use one or more outside service providers for the tracking of all UCC or PPSA financing statements (and/or other collateral related filings and registrations from time to time) required to be filed or recorded pursuant to the Loan Documents and the notification to the Agents, of, among other things, the upcoming lapse or expiration thereof or (vi) any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of any Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith.  No Agent shall be responsible or liable to the Secured Parties for any failure to monitor or maintain any portion of the Collateral.  In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, each Agent may presume that such condition is satisfactory to such Lender unless each Agent shall have received written notice to the contrary from such Lender prior to the making of such Loan.

Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed or sent by the proper person.  Each Agent may also rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper person, and shall not incur any liability for relying thereon.  Each Agent may consult with legal counsel (who may be counsel for the Loan Parties), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  The Security Trustee's liability under this Agreement and the other Loan Documents is limited in the manner set out in the Security Trust Deed.

Each Agent may perform any and all its duties and exercise its rights and powers under this Agreement or under any other Loan Document by or through any one or more sub-agents appointed by it.  Each Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.  None of the Agents shall be responsible for the negligence or misconduct of any sub-agents, or any Related Parties of any sub-agents, except to the extent that a court of competent

114

Error! Unknown document property name.

jurisdiction determines in a final and non-appealable judgment that such Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

Subject to the elapsing of the 30-day period for the appointment and acceptance of a successor Agent as provided below, any Agent may resign at any time by notifying the Lenders and Parent.  Upon any such resignation, the Required IC Lenders and the Required Lenders shall have the right to appoint a successor, with, so long as no Event of Default shall have occurred and be continuing, the approval of Parent (such approval not to be unreasonably withheld, conditioned or delayed and which approval shall be deemed to have been given by Parent if Parent has not responded within five (5) Business Days of a request for such approval).  If no successor shall have been so appointed by the Required IC Lenders and the Required Lenders as provided above and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation, then the retiring Agent may, on behalf of the Lenders and the other Secured Parties, and with, so long as no Event of Default shall have occurred and be continuing, the approval of Parent (such approval not to be unreasonably withheld, conditioned or delayed and which approval shall be deemed to have been given by Parent if Parent has not responded within five (5) Business Days of a request for such approval), appoint a successor Agent.  If no successor Agent has been appointed pursuant to the immediately preceding sentence by the 30th day after the date such notice of resignation was given by such Agent, such Agent's resignation shall become effective and the Required IC Lenders and the Required Lenders shall thereafter perform all the duties of such Agent hereunder and/or under any other Loan Document until such time, if any, as the Required IC Lenders and the Required Lenders appoint, with, so long as no Event of Default shall have occurred and be continuing, the approval of Parent (such approval not to be unreasonably withheld, conditioned or delayed and which approval shall be deemed to have been given by Parent if Parent has not responded within five (5) Business Days of a request for such approval), a successor Administrative Agent, Collateral Agent and/or Security Trustee, as the case may be.  Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent, and the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents; *provided* that if no successor agent has been appointed pursuant to this paragraph by the 30th day after the date of such notice of resignation was given by such Agent, such resignation shall nonetheless become effective in accordance with such resignation notice, and the retiring Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by such Agent on behalf of the Secured Parties under any of the Loan Documents, the retiring Agent shall continue to hold such collateral security until such time as a successor Agent is appointed).  The fees payable by the Borrower to a successor Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor.  After an Agent's resignation hereunder, the provisions of this Article and Section 9.05 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while acting as Agent.  Furthermore, notwithstanding anything to the contrary herein, (i) each successor Agent appointed pursuant to this paragraph shall be a nationally recognized commercial bank with an office in New York, New York and (ii) the consent of the Required Lenders under this paragraph shall require the consent of two or more unaffiliated Lenders if at any time there are three or more Lenders.

115

Error! Unknown document property name.

With respect to the Loans, each institution serving as an Agent hereunder (in its individual capacity and not as Agent) shall have the same rights and powers as any other Lender, and may exercise the same as though it were not an Agent, and the Agents and their Affiliates may accept deposits from, lend money to, act as financial advisor or in any other advisory capacity for, and generally engage in any kind of business with Parent or any Subsidiary or other Affiliate thereof as if it were not an Agent.  The term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the person serving as an Agent hereunder in its individual capacity.

Each Lender agrees (a) to reimburse the Agents, on demand, in the amount of its pro rata share (based on its share of the sum of the outstanding Loans and unused Commitments at the time (in each case, determined as if no Lender were a Defaulting Lender)) of any costs and expenses incurred by the Agents in connection with the Loan Documents, the Escrow Agreement and the transactions contemplated by each of the foregoing, including reasonable counsel fees and compensation of agents and employees paid for services rendered on behalf of the Lenders, that shall not have been reimbursed by any Loan Party (and without limiting any such Loan Party's obligation to do so) and (b) to indemnify and hold harmless each Agent, each Pre-Petition First Lien Agent and any of their respective Related Parties, on demand, in the amount of such pro rata share thereof, from and against any and all liabilities, taxes, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever that may be imposed on, incurred by or asserted against it in its capacity as Agent or as Pre-Petition First Lien Agent or any of them in any way relating to or arising out of the Escrow Agreement, this Agreement or any other Loan Document or any action taken or omitted by it or any of them under the Escrow Agreement, this Agreement or any other Loan Document, to the extent the same shall not have been reimbursed by the Borrower or any other Loan Party (and without limiting the Borrower's or any such Loan Party's obligation to do so) (including the syndication of the credit facilities provided for herein and including, with respect to each Pre-Petition First Lien Agent, entry into, and actions taken in connection with, the Roll-Up, any Order, the DIP Documents, the DIP Intercreditor Agreement, and actions taken (or not taken) at the direction of Pre-Petition First Lien Lenders constituting at least the "Required Lenders" under and as defined in the Pre-Petition First Lien Credit Agreement in connection with any of the foregoing); *provided* that no Lender shall be liable to an Agent or any such other indemnified person for any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Agent or any of its directors, officers, employees or agents.

Each Lender acknowledges that it has, independently and without reliance upon the Agents or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon any Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement or any other Loan Document, any related agreement or any document furnished hereunder or thereunder.

116

Without limiting the foregoing, no Secured Party (other than the Agents) shall (i) have any right individually to realize upon or commence any remedial procedures with respect to any of the Collateral or to enforce any Guarantee of the Obligations or (ii) take or institute any actions or proceedings, judicial or otherwise, for any right or remedy against any Loan Party under any of the Loan Documents (including the exercise of any right of setoff, rights on account of any banker's lien or similar claim or other rights of self-help) or with respect to any property of any Loan Party, unless expressly provided for herein or in any other Loan Document, without the prior written consent of the Administrative Agent; it being understood and agreed that all powers, rights and remedies under the Loan Documents may be exercised solely by the Agents on behalf of the Secured Parties in accordance with the terms thereof.

The Secured Parties hereby irrevocably authorize each Agent, at the direction of the Required Lenders, to credit bid all or any portion of the Obligations (including accepting some or all of the Collateral in satisfaction of some or all of the Obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of the Collateral (a) at any sale thereof conducted under the provisions of the Bankruptcy Code, including under sections 363, 1123 or 1129 of the Bankruptcy Code, or any similar laws in any other jurisdictions to which a Loan Party is subject, or (b) at any other sale or foreclosure or acceptance of collateral in lieu of debt conducted by (or with the consent or at the direction of) any Agent (whether by judicial action or otherwise) in accordance with any applicable law; *provided* that the Obligations of any regulated Lender may not be credit bid if such regulated Lender cannot comply with such applicable law.   In connection with any such credit bid and purchase, the Obligations owed to the Secured Parties shall be entitled to be, and shall be, credit bid on a ratable basis (with Obligations with respect to contingent or unliquidated claims receiving contingent interests in the acquired assets on a ratable basis that would vest upon the liquidation of such claims in an amount proportional to the liquidated portion of the contingent claim amount used in allocating the contingent interests) in the asset or assets so purchased (or in the Equity Interests or debt instruments of the acquisition vehicle or vehicles that are used to consummate such purchase); *provided* that none of the Secured Parties shall be allowed to credit bid any of the Obligations independently and all such credit bids shall have to be submitted through, and administered by, an Agent (at the direction of the Required Lenders), as set forth herein.  In connection with any such bid (i) each Agent shall be authorized to (x) form one or more acquisition vehicles to make a bid and (y) adopt documents providing for the governance of the acquisition vehicle or vehicles (provided that any actions by any Agent with respect to such acquisition vehicle or vehicles, including any disposition of the assets or Equity Interests thereof, shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions by the Required Lenders contained in Section 9.08 of this Agreement) and (ii) to the extent that Obligations that are assigned to an acquisition vehicle are not used to acquire Collateral for any reason (as a result of another bid being higher or better, because the amount of Obligations assigned to the acquisition vehicle exceeds the amount of debt credit bid by the acquisition vehicle or otherwise), such Obligations shall automatically be reassigned to the Lenders pro rata and the Equity Interests and/or debt instruments issued by any acquisition vehicle on account of the Obligations that had been assigned to the acquisition vehicle shall automatically be cancelled, without the need for any Secured Party or any acquisition vehicle to take any further action.

117

**Error! Unknown document property name.**

In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relating to the Loan Documents relative to any Loan Party, each of the Agents (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether any Agent shall have made any demand on any Loan Party) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise: (a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Agents (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Agents and their respective agents and counsel and all other amounts due the Lenders and the Agents under Sections 2.05 and 9.05) allowed in such judicial proceeding; and (b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same. Any custodian, receiver, judicial manager, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender, the Security Trustee and the Collateral Agent to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, the Security Trustee and the Collateral Agent, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.05 and 9.05. Nothing contained herein shall be deemed to authorize any Agent to authorize or consent to or accept or adopt on behalf of any Lender any plan of reorganization, arrangement, adjustment or composition affecting the Obligations or the rights of any Lender or to authorize any Agent to vote in respect of the claim of any Lender in any such proceeding.

Each Agent is authorized and directed by each Lender to enter into each Intercreditor Agreement and any intercreditor, subordination, collateral trust or similar agreement (including any Intercreditor Agreement) contemplated hereby with respect to any Indebtedness (a) that is (i) required or permitted to be subordinated hereunder or (ii) secured by Liens pari passu with or junior to the Liens securing the Obligations and (b) which contemplates an intercreditor, subordination or collateral trust agreement (any such other intercreditor agreement, an "Additional Agreement"), and the Secured Parties party hereto acknowledge that any Intercreditor Agreement and any Additional Agreement is binding upon them. Each Secured Party hereto hereby (a) agrees that they will be bound by, and will not take any action contrary to, the provisions of any Intercreditor Agreement or any Additional Agreement and (b) authorizes and instructs each Agent to enter into any Intercreditor Agreement and any other Additional Agreement and to subject the Liens on the Collateral securing the Obligations and, as applicable, Guarantees of the Obligations to the provisions thereof. The foregoing provisions are intended as an inducement to the Secured Parties to extend credit to the Borrower, and the Secured Parties are intended third-party beneficiaries of such provisions and the provisions of any Intercreditor Agreement and any other Additional Agreement.

Without limiting the general application of any other provision of this Section 8.01, upon the execution of the Security Trust Deed by the Security Trustee, each Secured Party, by its acceptance of any of the benefits of the Security Trust Deed and any Transaction Security Interest (as defined in the Security Trust Deed): (i) appoints the Security Trustee under the terms

118

Error! Unknown document property name.

of the Security Trust Deed to act as its agent and/or trustee under and in relation to any Transaction Security Interest (as defined in the Security Trust Deed) and to hold the assets subject to the security thereby created as agent and/or trustee for the Secured Parties on trust and on the terms contained in the Security Trust Deed and other applicable Loan Documents, (ii) authorizes the Security Trustee under the terms of the Security Trust Deed to exercise such rights, remedies, powers and discretions as are specifically delegated to Security Trustee by the terms of the Security Trust Deed and other applicable Loan Documents, together with all such rights, remedies, powers and discretions as are incidental thereto, and the Security Trustee hereby accepts that appointment, (iii) acknowledges that it has received a copy of, and is aware of and consents to the terms of, the Security Trust Deed, (iv) agrees to comply with and be bound by the Security Trust Deed as a Beneficiary (as defined in the Security Trust Deed), (v) acknowledges and agrees as specified in clause 3.12 (Independent investigation of credit) of the Security Trust Deed, and (vi) for consideration received, irrevocably appoints as its attorney each person who under the terms of the Security Trust Deed is appointed an attorney of a Beneficiary (as defined in the Security Trust Deed) on the same terms and for the same purposes as contained in the Security Trust Deed.  This paragraph is executed as a deed poll in favor of Security Trustee and each Beneficiary (as defined in the Security Trust Deed) from time to time.

Each Secured Party, whether or not a party hereto, will be deemed, by its acceptance of the benefits of the Collateral and of the Guarantees of the Obligations provided under the Loan Documents, to have agreed to the foregoing provisions.

The provisions of this Section 8.01 are for the sole benefit of the Agents and their Related Parties and the Lenders and shall not afford any right to, or constitute a defense available to, any Loan Party (subject to any consent right of Parent expressly set forth in this Section 8.01 in connection with the resignation of any Agent with respect to the selection of any successor Agent).

SECTION 8.02.   ***Certain ERISA Matters***.

(a)      Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, each Agent and its respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that at least one of the following is and will be true:

(i)      such Lender is not using "plan assets" (within the meaning of the Plan Asset Regulations) of one or more Benefit Plans in connection with the Loans or the Commitments;

(ii)      the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers),

Error! Unknown document property name.

is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement, and the conditions for exemptive relief thereunder are and will continue to be satisfied in connection therewith;

(iii)    (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement; or

(iv)    such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b)    In addition, unless Section 8.02(a)(i) is true with respect to a Lender or such Lender has not provided another representation, warranty and covenant as provided in 8.02(a)(iv), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, each Agent and its respective Affiliates, and not, for the avoidance of doubt, to or for the benefit of the Borrower or any other Loan Party, that:

(i)    none of the Agents or any of its respective Affiliates is a fiduciary with respect to the assets of such Lender (including in connection with the reservation or exercise of any rights by any Agent under this Agreement, any Loan Document or any documents related to hereto or thereto);

(ii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is independent (within the meaning of 29 CFR § 2510.3-21, as amended from time to time) and is a bank, an insurance carrier, an investment adviser, a broker-dealer or other person that holds, or has under management or control, total assets of at least $50,000,000, in each case as described in 29 CFR § 2510.3-21(c)(1)(i)(A)-(E);

(iii)    the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is capable of evaluating investment risks independently, both in general and with regard to particular transactions and investment strategies (including in respect of the obligations);

120

**DEBTOR EXHIBIT NO. 007**
**Page 127 of 153**

(iv)     the Person making the investment decision on behalf of such Lender with respect to the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement is a fiduciary under ERISA or the Code, or both, with respect to the Loans, the Commitments and this Agreement and is responsible for exercising independent judgment in evaluating the transactions hereunder; and

(v)     no fee or other compensation is being paid directly to the Administrative Agent or any of its respective Affiliates for investment advice (as opposed to other services) in connection with the Loans, the Commitments or this Agreement.

(c)     Each Agent hereby informs the Lenders that each such Person is not undertaking to provide impartial investment advice, or to give advice in a fiduciary capacity, in connection with the transactions contemplated hereby, and that such Person has a financial interest in the transactions contemplated hereby in that such Person or an Affiliate thereof (i) may receive interest or other payments with respect to the Loans, the Commitments and this Agreement, (ii) may recognize a gain if it extended the Loans or the Commitments for an amount less than the amount being paid for an interest in the Loans or the Commitments by such Lender or (iii) may receive fees or other payments in connection with the transactions contemplated hereby, the Loan Documents or otherwise, including structuring fees, arrangement fees, commitment fees, upfront fees, underwriting fees, ticking fees, agency fees, administrative agent or collateral agent fees, utilization fees, minimum usage fees, fronting fees, deal-away or alternate transaction fees, amendment fees, processing fees, term out premiums, banker's acceptance fees, breakage or other early termination fees or fees similar to the foregoing.

ARTICLE IX

Miscellaneous

SECTION 9.01.   *Notices*.  Notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or email, as follows:

(a)     if to Parent or the Borrower, both:

(i)     SpeedCast International Limited
2401 & 08-11 Dorset House, Taikoo Place
979 King's Road, Quarry Bay
Hong Kong
Attention: General Counsel
Email: Dominic.gyngell@speedcast.com
Fax: +852 3919 6880

(ii)     SpeedCast International Limited
Unit 4F Level 1
12 Lord Street, Botany
NSW 2019, Sydney
Australia

121

Error! Unknown document property name.

Attention: Chief Financial Officer
Email: peter.myers@speedcast.com

(iii)     Weil, Gotshal & Manges LLP
767 Fifth Avenue
New York, NY 10153
Attention:  David N. Griffiths; Heather A. Viets
Email:  david.griffiths@weil.com; heather.viets@weil.com

(b)     if to the Administrative Agent, the Collateral Agent or the Security Trustee, to

Credit Suisse AG, Cayman Islands Branch
One Madison Avenue
New York, NY, 10010
Attention: Didier Siffer, Lawrence Park and Alexis D'Aversa
Email: Didier.Siffer@credit-suisse.com; lawrence.park@credit-suisse.com; alexis.daversa@credit-suisse.com); and

Skadden, Arps, Slate, Meagher & Flom LLP
One Manhattan West
New York, NY 10001
Attention: Steven Messina and George Howard
Email: Steven.Messina@skadden.com; George.Howard@skadden.com
Fax No.: +1 917 777 3509; +1 917 777 2367; and

(c)     if to a Lender to it at its address (or email or fax number) set forth on Schedule 2.01 or in the Assignment and Acceptance pursuant to which such Lender shall have become a party hereto.

All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given on the date of receipt (if such day is a Business Day, otherwise on the first Business Day after receipt) if delivered by hand or overnight courier service or sent by fax or email or on the date five Business Days after dispatch by certified or registered mail if mailed, in each case delivered, sent or mailed (properly addressed) to such party as provided in this Section 9.01 or in accordance with the latest unrevoked direction from such party given in accordance with this Section 9.01.  As agreed to among Parent, the Administrative Agent and the applicable Lenders from time to time, notices and other communications may also be delivered by e-mail to the e-mail address of a representative of the applicable person provided from time to time by such person for such purpose.

Parent and the Borrower hereby agree, unless directed otherwise by the Administrative Agent or unless the electronic mail address referred to below has not been provided by the Administrative Agent to Parent, that it will, or will cause the Subsidiaries to, provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents or to the Lenders under

Error! Unknown document property name.

Article V including all notices, requests, financial statements, financial and other reports, certificates and other information materials, but excluding any such communication that (a) is or relates to a Borrowing Request, a Notice of Disbursement or a notice pursuant to Section 2.10, (b) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefor, (c) provides notice of any Default or Event of Default under this Agreement or any other Loan Document or (d) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any Borrowing or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "**Communications**"), by transmitting the Communications in an electronic/soft medium that is properly identified in a format acceptable to the Administrative Agent to an electronic mail address as directed by the Administrative Agent.  In addition, Parent and the Borrower agree, and agree to cause their Subsidiaries, to continue to provide the Communications to the Administrative Agent, the Collateral Agent, the Security Trustee or the Lenders, as the case may be, in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

The Borrower and Parent each hereby acknowledges that (a) the Administrative Agent and the other Agents will make available to the Lenders (or potential lenders) materials and/or information provided by or on behalf of the Borrower and Parent hereunder (collectively, the "**Borrower Materials**") by posting the Borrower Materials on SyndTrak, Intralinks or another similar electronic system (the "**Platform**") and (b) certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to Parent, any of its subsidiaries or their respective securities) (each, a "**Public Lender**").  The Borrower and Parent each hereby agrees that (i) all Borrower Materials that are to be made available to Public Lenders shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Borrower Materials "PUBLIC," the Borrower and Parent shall be deemed to have authorized the Agents and the Lenders to treat such Borrower Materials as not containing any material non-public information with respect to Parent, its subsidiaries or their respective securities for purposes of foreign, United States federal and state securities laws (*provided* that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.17); (iii) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated as "Public Investor"; and (iv) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not marked as "Public Investor".  Notwithstanding the foregoing, the following Borrower Materials shall be marked "PUBLIC" (or deemed to be marked "PUBLIC"), unless Parent notifies the Administrative Agent reasonably in advance of the intended distribution that any such document contains material non-public information: (A) the Loan Documents, (B) notification of changes in the terms of the credit facilities provided for herein and (C) all financial statements, reports and certificates delivered pursuant to Sections **Error! Reference source not found.**(a), (a), and **Error! Reference source not found.** (it being understood that such financial statements, reports and certificates shall nevertheless constitute "Information").

Each Public Lender agrees to cause at least one individual at or on behalf of such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate,

123

Error! Unknown document property name.

in accordance with such Public Lender's compliance procedures and applicable law, including foreign, United States federal and state securities laws, to make reference to Communications that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to Parent, its subsidiaries, or their respective securities for purposes of foreign, United States federal or state securities laws.

THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  NEITHER THE ADMINISTRATIVE AGENT NOR ANY OF ITS RELATED PARTIES WARRANTS THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS OR THE ADEQUACY OF THE PLATFORM AND EACH EXPRESSLY DISCLAIMS LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS RELATED PARTIES HAVE ANY LIABILITY TO ANY LOAN PARTY, ANY LENDER OR ANY OTHER PERSON FOR DAMAGES OF ANY KIND, WHETHER OR NOT BASED ON STRICT LIABILITY AND INCLUDING DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF ANY LOAN PARTY'S OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE LIABILITY OF ANY SUCH PERSON IS FOUND IN A FINAL RULING BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH PERSON'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT AND, IN ANY CASE, SUBJECT TO SECTION 9.05(b).

The Administrative Agent agrees that the receipt of the Communications by it at its e-mail address set forth above shall constitute effective delivery of the Communications to it for purposes of the Loan Documents.  Each Lender agrees that receipt of notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents.  Each Lender agrees to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and that the foregoing notice may be sent to such e-mail address.

Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

SECTION 9.02.  *Survival of Agreement*.   All covenants, agreements, representations and warranties made by Parent or the Borrower herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Lenders and shall survive the making by the Lenders of the Loans, regardless of any investigation made by the

124

Error! Unknown document property name.

Lenders or on their behalf, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any Fee or any other amount payable under this Agreement or any other Loan Document is outstanding and unpaid and so long as the Commitments have not been terminated.  The provisions of Sections 2.14, 2.16, 2.20 and 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of any Agent, any Lender.

SECTION 9.03.  *Binding Effect*.  This Agreement shall become effective when it shall have been executed by each of Parent, the Borrower, the Lenders as of the Closing Date and the Agents, and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto.

SECTION 9.04.  *Successors and Assigns*.  (a) Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of Parent, the Borrower, the Agents or the Lenders that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

(b)    Each Lender may assign to one or more assignees (other than any Ineligible Assignee) all or a portion of its interests, rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that (x) the Administrative Agent and, after the Syndication End Date, Parent (unless an Event of Default shall have occurred and be continuing) must give their prior written consent to such assignment (which consent shall not be unreasonably withheld, delayed or conditioned (it being understood and agreed that (1) Parent's withholding of consent to any assignment to a competitor of Parent or any Subsidiary shall not be considered to be unreasonably withheld (it being understood that no Lender, Affiliate of a Lender or an Approved Fund of  Lender shall be considered a competitor for purposes of this clause (1)), (2) Parent shall be deemed to have consented to any assignment of Loans unless it shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice thereof) and (3) no consent of Parent or the Administrative Agent shall be required with respect to an assignment of Loans to a Lender or the Agents or an Affiliate of a Lender or the Agents or an Approved Fund of a Lender and (y) the amount of the Commitment or Loans, as applicable, of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Acceptance with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 (and shall be in an integral multiple thereof), (i) the parties to each such assignment shall electronically execute and deliver to the Administrative Agent an Assignment and Acceptance via an electronic settlement system acceptable to the Administrative Agent (or, if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent an Assignment and Acceptance), and, in each case, other than assignments occurring on or prior to the Syndication End Date, shall pay to the Administrative Agent a processing and recordation fee of $3,500 (which fee may be waived or reduced at the sole discretion of the Administrative Agent and waived for purposes of effectuating any master assignment and assumption agreement or similar agreement entered into in connection the

125

Error! Unknown document property name.

fronting any the Loans and Commitments on behalf of the Lenders), and (ii) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire (in which the assignee shall designate one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including federal and state securities laws) and all applicable tax forms.  For purposes of this Section 9.04(b), the term "*Approved Fund*" shall mean, with respect to any Lender that is a fund or other investment vehicle that invests in bank loans, any other fund or other investment vehicle that invests in bank loans which is managed or advised by the same investment advisor/manager as such Lender or by an Affiliate of such investment advisor/manager.  Upon acceptance and recording pursuant to clause (e) of this Section 9.04, from and after the effective date specified in each Assignment and Acceptance, which effective date shall be at least five Business Days after the execution thereof (or such earlier date to which the Administrative Agent may agree in its sole discretion), (A) the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Acceptance, have the rights and obligations of a Lender under this Agreement and (B) the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Acceptance, be released from its obligations under this Agreement (and, in the case of an Assignment and Acceptance covering all or the remaining portion of an assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.14, 2.16, 2.20 and 9.05, as well as to any Fees accrued for its account and not yet paid).

(c)     By executing and delivering an Assignment and Acceptance, the assigning Lender thereunder and the assignee thereunder shall be deemed to confirm to and agree with each other and the other parties hereto as follows: (i) such assigning Lender warrants that it is the legal and beneficial owner of the interest being assigned thereby free and clear of any adverse claim, (ii) except as set forth in clause (i) above, such assigning Lender makes no representation or warranty and assumes no responsibility with respect to any statements, warranties or representations made in or in connection with this Agreement, or the execution, legality, validity, enforceability, genuineness, sufficiency or value of this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto, or the financial condition of Parent or any Subsidiary or the performance or observance by Parent or any Subsidiary of any of its obligations under this Agreement, any other Loan Document or any other instrument or document furnished pursuant hereto; (iii) such assignee represents and warrants that it is not an Ineligible Assignee and that it is legally authorized to enter into such Assignment and Acceptance; (iv) such assignee represents and warrants that it is not the subject of any Sanctions; (v) such assignee confirms that it has received a copy of this Agreement, together with copies of the most recent financial statements referred to in Section 3.05 or delivered pursuant to Section 5.04 and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into such Assignment and Acceptance; (vi) such assignee will independently and without reliance upon the Administrative Agent, the Collateral Agent, the Security Trustee, such assigning Lender or any other Lender and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under this Agreement; (vii) such assignee appoints and authorizes the Administrative Agent, the Collateral Agent and the Security Trustee to take such action as agent and/or trustee on its behalf and to exercise such powers under this Agreement as are delegated to

126

the Administrative Agent, the Collateral Agent and the Security Trustee, respectively, by the terms hereof, together with such powers as are reasonably incidental thereto; and (viii) such assignee agrees that it will perform in accordance with their terms all the obligations which by the terms of this Agreement are required to be performed by it as a Lender.

(d)     The Administrative Agent, acting for this purpose as a non-fiduciary agent of the Borrower, shall maintain at one of its offices in The City of New York a copy of each Assignment and Acceptance delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "*Register*").  The entries in the Register shall be conclusive absent manifest error and Parent, the Borrower, the Administrative Agent, the Collateral Agent, the Security Trustee and the Lenders shall treat each person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by Parent, the Borrower, the Collateral Agent, the Security Trustee and any Lender (but only in respect of such Lender's name and the amount of its Loans and Commitments), at any reasonable time and from time to time upon reasonable prior notice.

(e)     Upon its receipt of a duly completed Assignment and Acceptance executed by an assigning Lender and an assignee, an Administrative Questionnaire completed in respect of the assignee (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in clause (b) above and, if required, the written consent of Parent and the Administrative Agent to such assignment and any applicable tax forms, the Administrative Agent shall accept such Assignment and Acceptance and record the information contained therein in the Register.  No assignment shall be effective unless it has been recorded in the Register as provided in this clause (e).

(f)     (i) Each Lender may without the consent of Parent or the Borrower or the Administrative Agent sell participations to one or more banks or other entities (other than any Ineligible Assignee) in all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement and the other Loan Documents shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the participating banks or other entities shall be entitled to the benefit of the cost protection provisions contained in Sections 2.14, 2.16, 2.20 and 2.21 to the same extent as if they were Lenders (but, with respect to any particular participant, to no greater extent than the Lender that sold the participation to such participant, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the participant acquired the applicable participation) and (iv) Parent, the Borrower, the Agents and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and the other Loan Documents, and such Lender shall retain the sole right to enforce the obligations of Parent and the Borrower relating to the Loans and to approve any amendment, modification or waiver of any provision of this Agreement (other than amendments, modifications or waivers decreasing any fees payable to such participating bank or person hereunder or the amount of principal of or the rate at which interest is payable on the Loans in which such participant bank or person has an interest, extending any scheduled principal payment date or date fixed for the payment of interest on the

127

Error! Unknown document property name.

Loans in which such participant bank or person has an interest, changing the currency in which any amount is denominated that is required to be funded or paid under the Loan Documents (solely with respect to any Loans or Commitments in which such participant bank or person has an interest), releasing any Guarantor (other than in connection with the sale of such Guarantor in a transaction permitted by Section 6.05) or all or substantially all of the Collateral or increasing or extending the Commitments in which such participant bank or person has an interest).

(ii)     Each Lender that sells a participation and each Granting Lender shall, acting solely for this purpose as a non-fiduciary agent of Parent and the Borrower, maintain a register on which it enters the name and address of each participant and SPC, as applicable, and the principal amounts (and stated interest) of each participant's and SPC's, as applicable, interest in the Loans or other obligations under the Loan Documents (the "*Participant Register*"), which entries shall be conclusive absent manifest error; *provided* that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any person except to the extent that the relevant parties, acting reasonably and in good faith, determine that such disclosure is necessary to establish that such commitment, loan or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.

(g)     Any Lender or participant may, in connection with any assignment or participation or proposed assignment or participation pursuant to this Section 9.04, disclose to the assignee or participant or proposed assignee or participant any information relating to Parent or the Borrower furnished to such Lender by or on behalf of Parent or the Borrower; *provided* that, prior to any such disclosure of Information (as defined in Section 9.17) which Information is confidential pursuant to Section 9.17, each such assignee or participant or proposed assignee or participant shall execute an agreement whereby such assignee or participant shall agree (subject to customary exceptions) to preserve the confidentiality of such confidential information on terms no less restrictive than those applicable to the Lenders pursuant to Section 9.17.

(h)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (other than to a natural Person) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a U.S. Federal Reserve Bank or other central banking authority, *provided* that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(i)     No Borrower shall assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent and each Lender, and any attempted assignment without such consent shall be null and void.

(j)     Notwithstanding anything to the contrary contained herein, any Lender (a "*Granting Lender*") may grant to a special purpose funding vehicle (an "*SPC*"), identified as such in writing from time to time by the Granting Lender to the Administrative Agent and Parent, the option to provide to the Borrower all or any part of any Loan that such Granting Lender would otherwise be obligated to make to the Borrower pursuant to this Agreement;

128

Error! Unknown document property name.

*provided* that (i) nothing herein shall constitute a commitment by any SPC to make any Loan and (ii) if an SPC elects not to exercise such option or otherwise fails to provide all or any part of such Loan, the Granting Lender shall be obligated to make such Loan pursuant to the terms hereof.   The making of a Loan by an SPC hereunder shall utilize the Commitment of the Granting Lender to the same extent, and as if, such Loan were made by such Granting Lender. Each party hereto hereby agrees that no SPC shall be liable for any indemnity or similar payment obligation under this Agreement (all liability for which shall remain with the Granting Lender). In furtherance of the foregoing, each party hereto hereby agrees (which agreement shall survive the termination of this Agreement) that, prior to the date that is one year and one day after the payment in full of all outstanding commercial paper or other senior indebtedness of any SPC, it will not institute against, or join any other person in instituting against, such SPC any bankruptcy, reorganization, arrangement, insolvency or liquidation proceedings under the laws of the United States or any State thereof.  In addition, notwithstanding anything to the contrary contained in this Section 9.04, (i) any SPC may (x) with notice to, but without the prior written consent of, the Borrower and the Administrative Agent and without paying any processing fee therefor, assign all or a portion of its interests in any Loans to the Granting Lender or to any financial institutions providing liquidity and/or credit support to or for the account of such SPC to support the funding or maintenance of Loans and (y) disclose on a confidential basis any non-public information relating to its Loans to any rating agency, commercial paper dealer or provider of any surety, guarantee or credit or liquidity enhancement to such SPC, and (ii) the protections afforded to any SPC pursuant to the provisions of this Section 9.04(j) may not be amended or modified without the written consent of such SPC.

(k)      [Reserved].

(l)      The parties acknowledge and agree that (i) where this Agreement (including the Schedules and Exhibits thereto) or any Assignment and Acceptance Agreement would otherwise operate as an assignment of a debt due from the Borrower, there shall not be an assignment of such debt; (ii) the transaction shall for all purposes take effect as a loan under this Agreement to the Borrower made by the Lender which, but for this clause, would have been an assignee of such debt ("***Incoming Lender***") of an amount equal to the outstanding debt which would, but for this clause, have been assigned; (iii) the Borrower shall for all purposes be treated by the parties hereto as having directed the Incoming Lender to pay the amount of that loan to the Lender, which but for this clause, would have been the assignor of such debt; (iv) all references in this Agreement (including the Schedules and Exhibits hereto) and any Assignment and Acceptance Agreement will be construed accordingly; and (v) to the extent that the assignment also operates to assign any rights or interests which are not a debt due from the Borrower, the assignment shall, to that extent, take effect in accordance with its terms.

SECTION 9.05.  ***Expenses; Indemnity***.  (a) The Borrower agrees to pay all (i) reasonable and documented out-of-pocket expenses incurred by each Agent, the Escrow Agent, the Ad Hoc Group of Lenders, any Receiver and each Affiliate of the foregoing persons in connection with the structuring, documentation, negotiation, arrangement and syndication of the credit facilities provided for herein and the preparation and administration of the Escrow Agreement, this Agreement and the other Loan Documents, in connection with any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions hereby or thereby contemplated shall be consummated) and the transactions contemplated

Error! Unknown document property name.

thereby, including the reasonable and documented fees, charges and disbursements of (1) Davis Polk and Skadden or other primary counsel for the Lenders and the Agents, (2) KWM, or other Australian counsel for the Lenders and Agents, (3) Stroock & Stroock & Lavan LLP, or other special counsel for the Lenders and the Agents, (4) Greenhill and other  Ad Hoc Lender Advisors, (5) one firm of Texas local counsel for each of the Ad Hoc Group of Lenders and the Agents and (6) a firm of local counsel in each other relevant jurisdiction (and, if reasonably necessary, one special counsel) for each of the Ad Hoc Group of Lenders and the Agents and (ii) all documented out-of-pocket expenses incurred by the Ad Hoc Group of Lenders, the Administrative Agent, the Collateral Agent, the Security Trustee, the Escrow Agent, any Receiver, or any Lender in connection with the enforcement or protection of their rights in connection with the Escrow Agreement, this Agreement and the other Loan Documents or in connection with the Loans made, including the reasonable and documented fees, charges and disbursements of (1) Davis Polk and Skadden or other primary counsel for the Lenders and the Agents, (2) KWM, or other Australian counsel for the Lenders and Agents, (3) Stroock & Stroock & Lavan LLP, or other special counsel for the Lenders and the Agents, (4) Greenhill and other  Ad Hoc Lender Advisors, (5) one firm of Texas local counsel for each of the Ad Hoc Group of Lenders and the Agents and (6) one firm of local counsel in each relevant jurisdiction (and, if reasonably necessary, one special counsel) for each of the Ad Hoc Group of Lenders and the Agents.

(b)     The Borrower agrees to indemnify the Ad Hoc Group of Lenders, the Administrative Agent, the Collateral Agent, the Security Trustee, the Escrow Agent, any Receiver, each Lender, each Pre-Petition First Lien Agent (solely with respect to clause (i) below), each Affiliate of any of the foregoing persons and each of their respective directors, officers, employees, agents, trustees, members, partners, representatives, advisors and successors and assigns (each such person being called an "*Indemnitee*") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable and documented related expenses (including the reasonable and documented fees, charges and disbursements of (1) (w) Davis Polk, (x) Skadden, (y) KWM and (z) Stroock & Stroock & Lavan, LLP, as counsel for the Ad Hoc Group of Lenders and/or the Agents (or other primary counsel for the Ad Hoc Group of Lenders and the Agents), (2) Greenhill and other  Ad Hoc Lender Advisors, (3) one firm of Texas local counsel for each of the Ad Hoc Group of Lenders and the Agents and (4) one firm of local counsel in each other relevant jurisdiction (and, if reasonably necessary, one special counsel) for each of the Ad Hoc Group of Lenders and the Agents, and (5) one firm of counsel and one firm of local counsel in each relevant jurisdiction (and, if reasonably necessary, one special counsel) for all of the other Indemnitees taken as a whole (and, solely in the case of an actual or perceived conflict of interest where the Indemnitee affected by such conflict informs Parent of such conflict and thereafter retains its own counsel, of another firm of counsel for all similarly affected Indemnitees, and, if reasonably necessary, one firm of local counsel in each applicable jurisdiction for all similarly affected Indemnitees and any specialty counsel for all similarly affected Indemnitees (so long as such shared representation is consistent with and permitted by professional responsibility rules))) incurred by or asserted against any Indemnitee arising out of, in any way connected with, or as a result of (i) the execution or delivery of the Escrow Agreement, this Agreement or any other Loan Document or any agreement or instrument contemplated thereby, the performance by the parties thereto of their respective obligations thereunder or the consummation of the Transactions and the other transactions contemplated thereby (including the syndication of the credit facilities provided for

130

Error! Unknown document property name.

herein and including, with respect to each Pre-Petition First Lien Agent, entry into, and actions taken in connection with, the Roll-Up, any Order, the DIP Documents, the DIP Intercreditor Agreement, and actions taken (or not taken) at the direction of Pre-Petition First Lien Lenders constituting at least the "Required Lenders" under and as defined in the Pre-Petition First Lien Credit Agreement in connection with any of the foregoing), (ii) the use of the proceeds of the Loans, (iii) any claim, litigation, investigation or proceeding relating to any of the foregoing, whether or not any Indemnitee is a party thereto and regardless of whether such matter is initiated by a third party or by a Borrower or any of their respective Affiliates or equityholders, or (iv) any actual or alleged presence, Release or threat of Release of Hazardous Materials on any Properties, or any Environmental Claim related in any way to Parent or the Subsidiaries; *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment (A) to have resulted from (x) the gross negligence or willful misconduct of such Indemnitee or any of its Related Indemnified Parties, (y) a material breach by such Indemnitee or any of its Related Indemnified Parties of its obligations under any Loan Document to which it is a party or (z) any dispute solely among Indemnitees and not arising out of any act or omission of a Borrower or any of its Affiliates (other than any proceeding against any Indemnitee to the extent acting in its capacity or in fulfilling its role as Administrative Agent, Collateral Agent, the Security Trustee or any similar role with respect to the credit facilities provided for herein). No Indemnitee shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby, except to the extent the liability of any such person is found in a final ruling by a court of competent jurisdiction to have resulted primarily from such person's gross negligence or willful misconduct and, in any case, subject to the other provisions of this Section 9.05(b). This Section 9.05(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim. "***Related Indemnified Party***" shall mean, as to any Indemnitee, such Indemnitee's controlled affiliates or any of its or such controlled affiliates' respective officers, directors or employees, or any agent, advisor or other representative acting at the direction of such Indemnitee or any of such Indemnitee's controlled affiliates.

(c)     To the extent permitted by applicable law, none of the Loan Parties and their respective Subsidiaries and Affiliates shall assert, and Parent, on behalf of itself and its Subsidiaries and Affiliates, hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings) (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any Loan Document or any agreement or instrument contemplated hereby, the Transactions, any Loan or the use of the proceeds thereof.

(d)     The provisions of this Section 9.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of any Agent, any Lender. All amounts due under this Section 9.05 shall be payable on written demand therefor.

Error! Unknown document property name.

SECTION 9.06.  **Right of Setoff**.  If an Event of Default shall have occurred and be continuing, each Lender is hereby authorized at any time and from time to time, except to the extent prohibited by law and subject to the terms of the Orders and the provisions thereof, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of any Loan Party against any of and all the obligations of any Loan Party now or hereafter existing under this Agreement and other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured; *provided* that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.26 (to the extent applicable) and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. Each Lender agrees to notify Parent and the Administrative Agent promptly after any such setoff and application; *provided* that the failure to give such notice shall not affect the validity of such setoff and application under this Section 9.06.  The rights of each Lender under this Section 9.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.

SECTION 9.07.  **Applicable Law**.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

SECTION 9.08.  **Waivers; Amendment**.  (a) No failure or delay of any Agent, any Lender in exercising any power or right hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent, the Collateral Agent, the Security Trustee and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or any other Loan Document or consent to any departure by the Borrower or any other Loan Party therefrom shall in any event be effective unless the same shall be permitted by clause (b) below, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice or demand on any Loan Party in any case shall entitle any Loan Party to any other or further notice or demand in similar or other circumstances.

(b)   Except as expressly provided in the other clauses of this Section 9.08, neither this Agreement nor any other Loan Document nor any provision hereof or thereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by each applicable Loan Party and the Required Lenders; *provided* that no such agreement shall (i) decrease the principal amount of, or extend the maturity of or any scheduled principal

132

Error! Unknown document property name.

payment date or date for the payment of any interest on any Loan, or waive or excuse any such payment or any part thereof, or decrease the rate of interest on any Loan without the prior written consent of each Lender directly and adversely affected thereby, (ii) increase or extend the Commitment or decrease or extend the date for payment of any Fees, premium or any other amount due and payable hereunder to any Lender without the prior written consent of such Lender, (iii) amend or modify the pro rata requirements of Section 2.17 or Section 7.02, the sharing provisions of Section **Error! Reference source not found.**, the provisions of Section 9.04(i), the provisions of this Section 9.08, or release Parent as a Guarantor, all or substantially all of the value of the Guarantees of Subsidiary Guarantors under the Loan Documents or all or substantially all of the Collateral, without the prior written consent of each Lender, (iv) modify the protections afforded to an SPC pursuant to the provisions of Section 9.04(j) without the written consent of such SPC, (v) reduce the percentage contained in the definition of the term, or otherwise amend or modify the definition of, "Required Lenders" or "Required LC Lenders" or impose additional material restrictions on the ability of the Lenders to assign their rights and obligations under the Loan Documents, without the prior written consent of each Lender (it being understood that with the consent of the Required Lenders, additional extensions of credit pursuant to this Agreement may be included in the determination of the Required Lenders on substantially the same basis as the Commitments on the date hereof), (vi) except as provided by operation of law and otherwise permitted hereunder, amend or modify the Superpriority Claims status of the Obligations under the Orders or under any Loan Document without the prior written consent of each Lender, (vii) change the currency in which any Commitment or Loan is denominated, without the prior written consent of each affected Lender, (viii) modify Section 2.01(b) or any of the Orders to reduce the ratio of Roll-Up Loans that are deemed funded to New Money Commitments (to less than $1.00 to $1.00) without the consent of each affected Lender, (ix) modify the restriction in Section 8.01 regarding the prohibition on Secured Parties credit bidding independently without the consent of each affected Lender or (x) modify the voting requirements set forth in the sixth paragraph of Section 8.01 in respect of the appointment of a successor Agent or the requirement that such successor Agent be a nationally recognized commercial bank with an office in New York, New York, in each case without the consent of each affected Lender; *provided, further*, that (1) no such agreement shall amend, modify or otherwise affect the rights (including rights to fees and other amounts) or duties of any Agent or Pre-Petition First Lien Agent hereunder or under any other Loan Document without the prior written consent of such Agent or Pre-Petition First Lien Agent and (2) any fee letter between any Agent, on the one hand, and any Loan Party, on the other hand, may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto (without the consent of any other Person),

    (c)    [Reserved]

    (d)    [Reserved]

    (e)    Notwithstanding anything in clause (b) or otherwise herein to the contrary, (i) guarantees, collateral security documents and related documents executed by the Loan Parties or the Subsidiaries in connection with this Agreement may be in a form reasonably determined by the Agents and may be, together with this Agreement, amended and waived with the consent of the Administrative Agent or other applicable Agent at the request of Parent without the need to obtain the consent of any other Lender if such amendment or waiver is delivered in order (x)

133

Error! Unknown document property name.

to comply with local law or advice of local counsel or (y) to cause such guarantee, collateral security document or other document to be consistent with this Agreement (including the Agreed Security Principles) and the other Loan Documents, (ii) no Lender consent is required for any Agent to enter into or to effect any amendment, modification or supplement to any Intercreditor Agreement or any other arrangement permitted under this Agreement or in any document pertaining to any Indebtedness permitted hereby that is permitted to be secured by the Collateral, for the purpose of adding the holders of such Indebtedness (or their representative) as a party thereto and otherwise causing such Indebtedness to be subject thereto, in each case as contemplated by the terms of such Intercreditor Agreement or other arrangement (it being understood that any such amendment or supplement may make such other changes to any Intercreditor Agreement, as, in the good faith determination of the Administrative Agent, are required to effectuate the foregoing; *provided* that such other changes are not adverse, in any material respect (taken as a whole), to the interests of the Lenders); *provided*, *further*, that no such agreement shall amend, modify or otherwise affect the rights or duties of any Agent hereunder or under any other Loan Document without the prior written consent of such Agent and (iii) if Parent shall request (A) the release of any Collateral to be sold as part of any Asset Sale permitted under Section 6.05 and shall deliver to the Agents a certificate to the effect that such Asset Sale and the disposition of the proceeds thereof will comply with the terms of this Agreement or (B) the subordination of the Lien of any Agent, for the benefit of the Secured Parties, on any item of Collateral to any Lien permitted by Section 6.02(k) and shall deliver to the Agents a certificate to the effect that the incurrence of such other Lien on the Collateral will comply with the terms of this Agreement, then each Agent, if reasonably satisfied that the applicable certificate is correct, shall and is hereby authorized to, without the consent of any Lender, execute and deliver all such instruments as may be required to effect the release of such Collateral (in the case of an Asset Sale described in subclause (A) above) or the subordination of the Lien of any Agent, for the benefit of the Secured Parties, in such Collateral (in the case of such other Lien as described in subclause (B) above).

(f)      The Administrative Agent (or any other Agent party to the applicable Loan Document) and the applicable Loan Party may amend any Loan Document to correct any errors, mistakes, omissions, defects or inconsistencies, or to effect administrative changes that are not adverse to any Lender without any further consent of any other party to such Loan Document; *provided* that no such amendment shall become effective until the fifth (5th) Business Day after it has been posted to the Lenders, and then only if the Required Lenders have not objected in writing thereto within such five (5) Business Day period.

(g)      Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender, (y) the date scheduled for any payment of principal (including final maturity) of the loans of any Defaulting Lender may not be postponed without the consent of such Lender and (z) any waiver, amendment or modification requiring the consent of all Lenders or each directly and adversely affected Lender that by its terms materially and adversely affects any Defaulting Lender to a greater extent than other affected Lenders shall require the consent of such Defaulting Lender.

134

Error! Unknown document property name.

SECTION 9.09.  ***Interest Rate Limitation***.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "***Charges***"), shall exceed the maximum lawful rate (the "***Maximum Rate***") which may be contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 9.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

SECTION 9.10.  ***Entire Agreement***.  This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof. Any other previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any person (other than the parties hereto and thereto, their respective successors and assigns permitted hereunder, and, to the extent expressly contemplated hereby, the Indemnitees and the Related Parties of each of the Agents) any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.

SECTION 9.11.  ***WAIVER OF JURY TRIAL.***  **EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.  EACH PARTY HERETO (a) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (b) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 9.11.**

SECTION 9.12.  ***Severability***.  In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction).  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

135

Error! Unknown document property name.

SECTION 9.13.  **Counterparts**.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract, and shall become effective as provided in Section 9.03.  Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission, including by .PDF file, shall be as effective as delivery of a manually signed counterpart of this Agreement.

SECTION 9.14.  **Headings**.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

SECTION 9.15.  **Jurisdiction; Consent to Service of Process; Waivers**.  (a) Parent and the Borrower each hereby irrevocably and unconditionally submits, for itself and its property, to the exclusive jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have, or abstains from jurisdiction, of any New York State court or federal court of the United States of America sitting in the Borough of Manhattan, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or the other Loan Documents, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined only in such New York State or, to the extent permitted by law, in such federal court sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof.  Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that any Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or the other Loan Documents against Parent, the Borrower or their respective properties in the courts of any jurisdiction.

(b)      Parent and the Borrower each hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or the other Loan Documents in the Bankruptcy Court and, if the Bankruptcy Court does not have, or abstains from jurisdiction, in any New York State or federal court sitting in the Borough of Manhattan in New York City, and any appellate court from any thereof.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(c)      Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01; *provided* that Parent hereby appoints Speedcast Communications, Inc., a Texas corporation, at 4400 S. Sam Houston Pkwy East, Houston, TX 77048, as its agent for service of process.  The Borrower hereby agrees to act as agent for service of process for each other Loan Party that is organized under the laws of a jurisdiction outside the United States upon the express conditions contained herein and the other Loan Documents, as applicable.  Notwithstanding the foregoing, promptly after any request by the Required Lenders, each Loan Party that is not a U.S. Person shall appoint an agent for service of process that is not

136

Error! Unknown document property name.

an Affiliate of the Borrower.  Nothing in this Agreement or any other Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(d)      Each party to this Agreement hereby expressly acknowledges and agrees, to the fullest extent it may lawfully do so, that (i) if the payment of the Loans is accelerated or the Loans otherwise become due and payable, in each case, including as a result of any Termination Date (including, but not limited to, upon the occurrence of a bankruptcy or insolvency event (including the acceleration of claims by operation of law)), the Exit Fee with respect to the Loans will also be due and payable as though the Loans were otherwise redeemed or repaid, prepaid or mandatorily assigned, and in all cases the Exit Fee shall constitute part of the Obligations, in view of the impracticability and extreme difficulty of ascertaining actual damages and by mutual agreement of the parties as to a reasonable calculation of each Lender's lost profits as a result thereof, (ii) such Exit Fee (x) shall be presumed to be the liquidated damages sustained by each Lender as the result any redemption (including prior to the Stated Maturity Date) and (y) is reasonable under the circumstances currently existing, (iii) such Exit Fee shall also be payable in the event that the Loans are satisfied or released by foreclosure (whether by power of judicial proceeding or otherwise), deed in lieu of foreclosure or by any other means, (iv) THE BORROWER EXPRESSLY WAIVES THE PROVISIONS OF ANY PRESENT OR FUTURE STATUTE OR LAW THAT PROHIBITS OR MAY PROHIBIT THE COLLECTION OF THE EXIT FEE IN CONNECTION WITH ANY SUCH ACCELERATION INCLUDING WITH ANY VOLUNTARY OR INVOLUNTARY ACCELERATION PURSUANT TO ANY INSOLVENCY PROCEEDING PURSUANT TO ANY DEBTOR RELIEF LAW, (v) such Exit Fee is reasonable and is the product of an arm's length transaction between sophisticated business people, ably represented by counsel, (vi) such Exit Fee shall be payable notwithstanding the then prevailing market rates at the time payment is made, (vii) there has been a course of conduct between the Lenders and the Borrower giving specific consideration in this transaction for such agreement to pay such Exit Fee, (viii) the Borrower shall be estopped hereafter from claiming differently than as agreed to in this clause (d) and otherwise in this Agreement and (ix) the Borrower's agreement to pay the Exit Fee to Lenders as herein described is a material inducement to the Lenders to make the Loans.

SECTION 9.16.  ***Conversion of Currencies***.  (a) If, for the purpose of obtaining judgment in any court, it is necessary to convert a sum owing hereunder or under any other Loan Document in one currency into another currency, each party hereto agrees, to the fullest extent that it may effectively do so, that the rate of exchange used shall be that at which in accordance with normal banking procedures in the relevant jurisdiction the first currency could be purchased with such other currency on the Business Day immediately preceding the day on which final judgment is given.

(b)      The obligations of each party to any Loan Document in respect of any sum due to any other party to any Loan Document or any holder of the obligations owing under any Loan Document (the "***Applicable Creditor***") shall, notwithstanding any judgment or order in a currency (the "***Judgment Currency***") other than the currency in which such sum is stated to be due hereunder or under any other Loan Document (the "***Agreement Currency***"), be discharged only to the extent that, on the Business Day following receipt by the Applicable Creditor of any sum adjudged to be so due in the Judgment Currency, the Applicable Creditor may in accordance with normal banking procedures in the relevant jurisdiction purchase the Agreement Currency

137

**Error! Unknown document property name.**

with the Judgment Currency; if the amount of the Agreement Currency so purchased is less than the sum originally due to the Applicable Creditor in the Agreement Currency, each Loan Party agrees, as a separate obligation and notwithstanding any such judgment or order, to indemnify the Applicable Creditor against such loss and any premiums and costs of exchange payable in connection with the purchase of or conversion into any applicable currency. The obligations of the Loan Parties contained in this Section 9.16 shall survive the termination of this Agreement and the payment of all other amounts owing hereunder, and shall continue in full force and effect notwithstanding any such judgment or order as aforesaid.

SECTION 9.17. **_Confidentiality_**. Each Agent and each of the Lenders agrees to maintain the confidentiality of the Information (as defined below) provided to such party, except that except that Information may be disclosed (a) to (i) its Affiliates (or any of its head offices, branches or representative offices) and its and such Affiliates' respective officers, directors, employees, professionals, other experts, agents and representatives, including accountants, legal counsel and other advisors, and (ii) numbering, administration and settlement or similar service providers in connection with the administration and management of this Agreement and the other Loan Documents or otherwise as need to know such Information (including to the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the credit facilities provided for herein) and to other Persons authorized by any of the Agents and Lenders to organize, present or disseminate such Information in connection with disclosures otherwise made in accordance with this Section 9.17, (b) to the extent requested by any regulatory authority, quasi-regulatory authority or self-regulatory body (which, for the avoidance of doubt, includes any Tax Authority), (c) to the extent otherwise required pursuant to the order of any court or administrative agency, or in any pending legal or administrative proceeding or by applicable laws and regulations or by any subpoena or other compulsory process (and in each case under this clause (c), the disclosing party agrees, to the extent practicable and not prohibited by applicable law, rule or regulation, to inform Parent promptly thereof prior to such disclosure), (d) in connection with the exercise of any remedies hereunder or under the other Loan Documents or any suit, action or proceeding relating to the enforcement of its rights hereunder or thereunder, (e) subject to an agreement to be bound by the provisions of this Section 9.17 or substantially similar confidentiality undertakings, to (i) any actual or prospective assignee of or participant in any of its rights or obligations under this Agreement and the other Loan Documents or (ii) any actual or prospective direct or indirect counterparty (or its advisors) to any swap or derivative transaction relating to Parent or any Subsidiary or any of their respective obligations, (f) to Moody's and S&P and other rating agencies or to market data collectors on a confidential basis, (g) to the extent such Information (i) becomes publicly available other than as a result of a breach of this Section 9.17 or (ii) becomes available to any Agent or any Lender on a non-confidential basis from a source other than Parent or the Borrower, (h) to the extent such disclosure is permitted pursuant to, and made in accordance with the terms of, Section 9.04(g), (i) for purposes of establishing a "due diligence" defense or (j) otherwise with the consent of Parent. For the purposes of this Section, "**_Information_**" shall mean all financial statements, certificates, reports, agreements and information that are received from or on behalf of Parent or any of its Subsidiaries pursuant to or in connection with any Loan Document or the transactions contemplated thereby and that are related to Parent or any of its Subsidiaries or their respective businesses, other than any of the foregoing that were available to any Agent or any Lender on a non-confidential basis prior to its disclosure thereto by or on behalf of Parent or any of its Subsidiaries, and which are in the case

138

Error! Unknown document property name.

of Information provided after the Closing Date, either financial information or clearly identified at the time of delivery as confidential.  The provisions of this Section 9.17 shall remain operative and in full force and effect regardless of the expiration and term of this Agreement; provided that the provisions and obligations contained in this Section 9.17 shall terminate on the one-year anniversary of the date on which this Agreement has expired or been terminated.  Any Person required to maintain the confidentiality of Information as provided in this Section 9.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord its own confidential information.

SECTION 9.18.   [Reserved].

SECTION 9.19.   [Reserved].

SECTION 9.20.   *No Advisory or Fiduciary Responsibility*.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), Parent, on behalf of itself and its Subsidiaries, acknowledges and agrees that: (a) (i) the arranging and other services regarding this Agreement provided by the Agents, the Ad Hoc Group of Lenders and the Lenders are arm's-length commercial transactions between Parent and its Affiliates, on the one hand, and the Agents, the Ad Hoc Group of Lenders and the Lenders, on the other hand, (ii) each Loan Party has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate and (iii) each Loan Party is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (b) (i) each Agent, member of the Ad Hoc Group of Lenders and Lender is and has been acting solely as a principal and has not been, is not, and will not be acting as an advisor, agent or fiduciary for Parent or any of its Affiliates, or any other person, and (ii) no Agent, member of the Ad Hoc Group of Lenders or Lender has any obligation to Parent or any of its Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (c) the Agents, the Ad Hoc Group of Lenders, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of Parent and its Affiliates and no Agent, member of the Ad Hoc Group of Lenders or Lender has any obligation to disclose any of such interests to Parent or any of its Affiliates.  To the fullest extent permitted by law, Parent, on behalf of itself and its Subsidiaries, hereby waives and releases any claims that it may have against the Agents, the Ad Hoc Group of Lenders and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transactions contemplated hereby.

SECTION 9.21.   *USA PATRIOT Act and Beneficial Ownership Regulation Notice*.  Each Lender and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Loan Party that pursuant to the requirements of the USA PATRIOT Act and the Beneficial Ownership Regulation, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA PATRIOT Act and the Beneficial Ownership Regulation.

139

Error! Unknown document property name.

SECTION 9.22.   [Reserved]

SECTION 9.23.   ***Acknowledgment and Consent to Bail-In of EEA Financial Institutions***.  Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Affected Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the write-down and conversion powers of the applicable Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)   the application of any Write-Down and Conversion Powers by the applicable Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an Affected Financial Institution; and

(b)   the effects of any Bail-in Action on any such liability, including, if applicable:

(i)   a reduction in full or in part or cancellation of any such liability;

(ii)   a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such Affected Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)   the variation of the terms of such liability in connection with the exercise of the write-down and conversion powers of the applicable Resolution Authority.

SECTION 9.24.   ***Certain Privacy Principles and Laws***.

(a)   If any personal data of any natural person (including any officer, director or employee of any Loan Party or Subsidiary) is provided by or on behalf of any Loan Party or Subsidiary to any of the Agents or Lenders as required by or pursuant to the Loan Documents, then such Loan Party, on behalf of itself and its Subsidiaries, represents and warrants to the Agents and Lenders that such Loan Party and, as applicable, its Subsidiaries have, to the extent required by applicable law (including, to the extent applicable, the Australian Privacy Principles and the Singapore Personal Data Protection Act 2012): (i) notified the relevant natural person of the purposes for which data will be collected, processed, used or disclosed, and (ii) obtained such natural person's consent for, and hereby consents on behalf of such natural person to, the collection, processing, use and disclosure of his/her personal data by the Agents and/or Lenders, in each case, in accordance with or for the purposes of the Loan Documents (including any disclosure permitted by Section 9.17) or for the purposes as set out in an Agent's or Lender's privacy notice duly served on such Loan Party.  Any such consent given in connection with the Loan Documents in relation to personal data shall, subject to all applicable laws and regulations, survive death, incapacity, bankruptcy or insolvency of any such natural person and the termination or expiration of this Agreement or any other Loan Document.

140

(b)     To the extent that any information provided by or on behalf of any Loan Party to any of the Agents or Lenders as required by or pursuant to the Loan Documents comprises personal information of any officer, director or employee of Parent or any of its Subsidiaries that are incorporated or organized under the laws of Australia, such Agent or Lender (as the case may be) agrees to hold that personal information in accordance with the Australian Privacy Principles, to the extent applicable and required thereby.  If the Administrative Agent receives a request by any other Agent, Lender, the Administrative Agent will provide a privacy notice (in the form recommended by the Asia Pacific Loan Market Association (Australian Branch) or as otherwise reasonably directed by such other Agent or Lender) to a representative of the officers, directors and employees of Parent and any such Subsidiary, which details the manner in which personal information collected in connection with the Loan Documents may be used and disclosed by the Agents and/or Lenders.

(c)     Each Loan Party, on behalf of itself and its Subsidiaries, agrees and undertakes to notify the Administrative Agent promptly upon such Loan Party or any of its Subsidiaries becoming aware of the withdrawal by the relevant natural person of his/her consent to the collection, processing, use and/or disclosure by any of the Agents or Lenders of any personal data of such natural person that was provided by or on behalf of any Loan Party or Subsidiary to any of the Agents or Lenders in accordance with clause (a) or (b) above.

SECTION 9.25.  *Release of Liens*.  If any of the Collateral shall be sold, transferred or otherwise disposed of by the Borrower or any other Loan Party in a transaction permitted by this Agreement (including by way of merger, consolidation or in connection with the sale of a Subsidiary permitted hereunder, but excluding any such sale, transfer or other disposition to any other Loan Party or any Subsidiary required to become a Loan Party), then the Liens created by any of the Security Documents on such property shall be automatically released (without need for further action by any person).  If a Subsidiary Guarantor is released from its Guarantee of the Obligations pursuant to the Guarantee Agreement, then the Liens created by any of the Security Documents on the property of such person shall be automatically released (without need for further action by any person), except to the extent such assets are sold, transferred or otherwise disposed of to any other Loan Party or any Subsidiary required to become a Loan Party.  Upon the written request of Parent, any other asset may be released from any Lien created by any Security Document to the extent such release is permitted pursuant to Section 10 of the Agreed Security Principles.  In connection with any release pursuant to this Section 9.25, upon receipt by the Agents of a certificate of Parent to the effect that such transaction and the disposition of the proceeds thereof will comply with the terms of this Agreement (with such supporting detail as the Agents may reasonably request), each Agent, at the request and sole expense of the Loan Parties, shall execute and deliver without recourse, representation or warranty all releases or other documents necessary or desirable to evidence the release of the Liens created by any of the Security Documents on such Collateral.

SECTION 9.26.  *Exclusion of Certain PPSA Provisions*.  Each Loan Party acknowledges that none of the Agents or Lenders needs to give any notice to a Loan Party under the PPSA (including a notice of a verification statement) unless the notice is required by the PPSA and cannot be excluded.  If a Loan Document (or a transaction in connection with it) is or contains a security interest for the purposes of the PPSA, each party hereto agrees that, to the extent the law permits:

Error! Unknown document property name.

(a)      for the purposes of sections 115(1) and 115(7) of the PPSA, none of the Agents or Lenders needs to comply with sections 95, 118, 121(4), 125, 130, 132(3)(d) or 132(4) of the PPSA; and sections 142 and 143 of the PPSA are excluded;

(b)      for the purposes of section 115(7) of the PPSA, none of the Agents or Lenders needs to comply with sections 132 and 137(3);

(c)      if the PPSA is amended after the date of this Agreement to permit a grantor and secured party to agree to not comply with or to exclude other provisions of the PPSA, the Administrative Agent may notify the grantor of a security interest that any of these provisions is excluded, or that none of the Agents or Lenders needs to comply with any of these provisions, as notified to the grantor by the Administrative Agent; and

(d)      the grantor of a security interest agrees not to exercise its rights to make any request of any of the Agents or Lenders under section 275 of the PPSA, to authorise the disclosure of any information under that section or to waive any duty of confidence that would otherwise permit non-disclosure under that section.

SECTION 9.27.  **_DIP Orders_**.  The Loan Parties, the Administrative Agent, the Collateral Agent and the Lenders hereby expressly agree that in the event of any conflict or inconsistency between this Agreement (or any other Loan Document) and the Orders, the Orders shall control.

[Signature pages follow]

142

Error! Unknown document property name.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

Executed by **SPEEDCAST INTERNATIONAL LIMITED ACN 600 699 241**, as Parent in accordance with section 127 of the Corporations Act 2001 (Cth):

_____
Signature of Director

_____
Signature of Director/Secretary

_____
Name of Director (print)

_____
Name of Director/Secretary (print)

[Signature Page to Speedcast Syndicated Facility Agreement]

**Error! Unknown document property name.**

**DEBTOR EXHIBIT NO. 007**

**SPEEDCAST COMMUNICATIONS, INC.,**
as Borrower


By: _____
Name: _____
Title:   Authorized Signatory


[Signature Page to Speedcast Syndicated Facility Agreement]

**Error! Unknown document property name.**

**CREDIT SUISSE AG, CAYMAN ISLANDS BRANCH**, as Administrative Agent, Collateral Agent, Security Trustee and a Lender

By: _____
     Name:
     Title:   Authorized Signatory

By: _____
     Name:
     Title:   Authorized Signatory

[Signature Page to Speedcast Syndicated Facility Agreement]

**Error! Unknown document property name.**

[__], as a Lender

By: _____
Name:
Title:   Authorized Signatory

[Signature Page to Speedcast Syndicated Facility Agreement]

**Error! Unknown document property name.**