IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | § | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| SPEEDCAST INTERNATIONAL | § | |
| LIMITED, *et al.,* | § | Case No. 20-32243 (MI) |
| | § | |
| Debtors.[1] | § | (Joint Administration Requested) |
| | § | |

DECLARATION OF MICHAEL HEALY IN SUPPORT OF
DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

      I, Michael Healy, pursuant to section 1746 of title 28 of the United States Code, hereby declare that the following is true and correct to the best of my knowledge, information, and belief:

      1.      I am the Chief Restructuring Officer ("**CRO**") of Speedcast International Limited ("**Speedcast**," together with its debtor affiliates in the above captioned chapter 11 cases, as debtors and debtors in possession, the "**Debtors**").

      2.      In addition to serving as Speedcast's CRO, I am a Senior Managing Director at FTI Consulting, Inc. ("**FTI**"), a leading global business advisory firm with 103 offices worldwide and over 5,500 professionals. I have more than 20 years of restructuring experience, and have advised companies, lenders, creditors, corporate boards, and equity sponsors across a

---

[1]    A complete list of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' proposed claims and noticing agent at http://www.kccllc.net/speedcast. The Debtors' service address for the purposes of these chapter 11 cases is 4400 S. Sam Houston Parkway East, Houston, Texas 77048.

diverse range of industries both domestically and internationally. My experience includes advising on complex restructuring and turnaround situations in out-of-court restructurings and in formal bankruptcy proceedings. Specific areas of my experience include business plan development, cash flow forecasting, cash management, development and implementation of cost reduction plans, negotiating restructuring plans, bankruptcy planning, and negotiating business and asset sales. I have advised companies, lenders, and investors in a variety of industries and in select instances served as Chief Restructuring Officer, including F+W Media, Inc., All American Group, Inc., and TransCentra, Inc.

3.     On the date hereof (the "**Petition Date**"), the Debtors commenced in this Court voluntary cases (the "**Chapter 11 Cases**") under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). I am knowledgeable about and familiar with the Debtors' and their non-Debtor affiliates' (the "**Non-Debtor Affiliates**" and together with the Debtors, the "**Company**") day-to-day operations, books and records, and businesses and financial affairs as well as the circumstances leading to the commencement of these Chapter 11 Cases. I submit this declaration (this "**Declaration**") in support of the Debtors' voluntary petitions for relief and the motions (the "**First Day Motions**") and applications that the Debtors filed with this Court, including the "first-day" pleadings filed concurrently herewith (the "**First Day Pleadings**"). I am authorized to submit this Declaration on behalf of the Debtors.

4.     Except as otherwise indicated, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtors, my opinion based upon my experience, knowledge, and information concerning the Debtors' operations and financial condition, and my discussions with other employees of FTI and with Speedcast's restructuring advisors—Weil, Gotshal & Manges

2

LLP ("**Weil**") as global counsel to Speedcast, Moelis Australia Advisory Pty Ltd and Moelis & Company LLC ("**Moelis**") as investment banker, and Herbert Smith Freehills LLP ("**HSF**" and, together with Weil, FTI, and Moelis, the "**Advisors**"). If called upon to testify, I would testify to the facts set forth in this Declaration.

5. This Declaration is organized into six sections. Section I provides an overview of the Debtors and the Chapter 11 Cases. Section II provides background information on the Debtors' organizational structure and business. Section III describes the Debtors' capital structure. Section IV describes the events leading to the commencement of the Chapter 11 Cases and the Debtors' prepetition restructuring efforts. Section V provides the support for the DIP Motion. Section VI summarizes the relief requested in, and the legal and factual bases supporting, all the other the First Day Pleadings.

## I. Overview

6. The Company is an international remote communications and information technology ("**IT**") services provider focused on delivering communications solutions through a multi-access technology, multi-band, and multi-orbit network of more than 80 satellites and interconnecting global terrestrial network, bolstered by extensive on-the-ground local support in more than 40 countries. The Company provides managed information services with differentiated technology offerings, including cybersecurity, crew welfare, content solutions, data and voice applications, Internet of Things ("**IoT**") solutions and network systems integration services. The Company's primary customers are in the cruise, energy, government, and commercial maritime businesses. As described in more detail below, a combination of factors from challenging market conditions and liquidity concerns prompted the Company to evaluate options with respect to its current capital structure and liquidity. Consequently, the Company hired the Advisors to assist with exploring various ways to address the Company's near and long-term liquidity and

operational needs and/or restructure its debt obligations. Options explored included an equity raise, the refinancing of the Company's existing credit facility, asset sales, a sale or merger of the Company, and a reorganization through a formal in-court proceeding in the United States or an arrangement in Australia. After thoroughly exploring all options available to the Company with its major stakeholders, and in light of the added challenges facing the Debtors and the Company's customers from the impact of the COVID-19 pandemic, Speedcast's Board of Directors decided that the commencement of the Chapter 11 Cases was the best path forward.

## II. Debtors' Business

### A. Corporate History

7. In September 1999, a group of investors, including Asia Satellite Telecommunications Holdings Limited ("**AsiaSat**") founded the Company as a generalist satellite service provider offering primarily internet access services to the small–medium enterprise market. In 2007, the Company became a wholly owned subsidiary of AsiaSat.

8. In 2012, the Company was spun off from AsiaSat and, following a series of acquisitions of Australian and New Zealand satellite communications companies, reorganized as an Australian public company. In August 2014, the Company completed an initial public offering of 76.5 million shares (approximately 63.7% of outstanding shares at the time). On the same day, Speedcast's shares commenced trading on the Australian Stock Exchange (the "**ASX**") under the ticker symbol "SDA."

9. Since 2012, the Company has pursued a targeted M&A strategy aimed at obtaining geographic and industrial diversification, economies of scale, and operational efficiencies. The Company has acquired 16 distinct business since 2012, including three major acquisitions which were completed between 2017 and 2019:

- **Harris CapRock Acquisition**. On January 1, 2017, the Company acquired Harris CapRock, a leading provider of communications networks for remote and harsh environments, for $425 million, funded, in part, by a fully underwritten syndicated debt facility of $385 million (the "**Senior Secured Bank Loan**"). The Senior Secured Bank Loan and Accordion Facility (as defined below) were subsequently refinanced via the proceeds of the Credit Agreement (as defined below).

- **UltiSat Acquisition**. On November 1, 2017, the Company acquired UltiSat Inc. ("**UltiSat**"), a leading provider of remote communications and professional services to governments, international government organizations and NGOs, for $100 million in cash, funded, in part, by a $60 million accordion facility (the "**Accordion Facility**").

- **Globecomm Acquisition**. On December 14, 2018, the Company acquired Globecomm Systems Inc. ("**Globecomm**"), a leading provider of remote communications networks to both government and commercial clients, for $135 million, funded with proceeds of the Incremental Term Loan (as defined below).

## B.    Debtors' Operations

10.    The Company provides managed telecommunications services to a diverse range of enterprises and governments in remote locations around the world, primarily where there is limited or no terrestrial network. The Company designs, sources, configures, operates, and maintains remote communications networks. The Company primarily relies on satellite network technology to deliver services to its customers, and offers a range of value-added services, including cybersecurity, crew welfare, content solutions, data and voice applications, IoT solutions, and network systems integration services.

11.     In 2019, the Company served more than 3,200 customers in over 140 countries across a wide range of industries.  The following map illustrates the locations of the Company's operations:



12.     The Company operates across four key business verticals:  (i) Commercial Maritime and Cruise (the "**Maritime Business**"); (ii) Energy (the "**Energy Business**"); (iii) Enterprise & Emerging Markets (the "**EEM Business**"); and (iv) Government (the "**Government Business**").

13.     **The Maritime Business**.  The Maritime Business provides remote and secure communications services primarily to commercial shipping, passenger cruise, ferry, yachting, and commercial fishing customers that require broadband connectivity and other services.  The Company serves about 50% of ocean-going cruise ships globally, and the Company uses Very Small Aperture Terminal ("**VSAT**"), L-Band, and 4G/LTE networks to deliver communications across oceans and coastlines to its commercial shipping and cruise clients.  In December 2018, the Company signed a three-year VSAT contract with Carnival Cruise Line,

which was, at the time, the largest VSAT contract awarded in the industry. The Company added a net 763 VSAT vessels in 2018 and ended the year with a total of 3,036 VSAT vessels. In addition, the number of L-band terminals managed by the Company increased to 13,308. The Maritime Business's revenue was $248 million in FY19 and $211.5 million in FY18.

14. **The Energy Business**. The Company's Energy Business provides high-bandwidth remote communication services to all segments of the global energy industry, including companies involved in drilling and exploration, floating production storage, offloading, offshore service, general service, engineering, and construction. The Company provides the necessary expertise, infrastructure, and network capacity to their energy customers to keep vital applications running and crews connected to support operations and the safety of customers' employees. The Energy Business's revenue was $164.5 million in FY19 and $158.3 million in FY18.

15. **The EEM Business**. The Company's EEM Business serves a wide range of markets and customers across multiple sectors, including cellular and telecom operators, humanitarian organizations, utilities, mining, and media companies across multiple markets in the Pacific and South East Asia regions, South America, and the Sub-Sahara region of Africa. These services allow these enterprises and organizations to function in remote areas with limited access to wireless communications. The Company deploys engineering teams to carry out physical network design, installation, maintenance, and integration of infrastructure in these remote areas. The Company also provides mobile communications solutions for humanitarian and disaster response teams that can be used in harsh environments at unexpected times. The EEM Business's revenue was $79.6 million in FY19 and $74.5 million in FY18.

16. **The Government Business**. The Company's Government Business provides secure, reliable, end-to-end managed communications, airborne Intelligence Surveillance and Reconnaissance ("**ISR**"), Communications-On-The-Move ("**COTM**") solutions, and professional services for mission-critical applications. The Government Business delivers high-value solutions to end users in some of the most remote and harsh locations in over 135 countries. The Government Business's customers include U.S. government agencies (approximately 34%), defense contractors (approximately 52%), and international governments (approximately 14%). The Government Business's revenue was $149.2 million in FY19 and $97.3 million in FY18.

17. The Company achieved $722.3 million revenue in FY19. Net losses amounted to $459.8 million, but a large portion of the loss was attributable to impairment charges and write-downs totaling $413.8 million. The Company's revenues and net losses in FY18 were $611.9 and $6.8 million, respectively.

18. **Continuous and Reliable Communications Networks**. The unifying commitment to all of the Company's customers—whether it be recreational cruise lines or government intelligence agencies—is uninterrupted and reliable access to communication services in remote locations. Each customer, almost without exception, relies on the Company to facilitate communications in the most remote, unpredictable environments in crucial and sometimes perilous situations. Customers that experience service disruptions are incentivized to switch providers, leading to both direct loss of revenue to the Company, as well as long-term reputational harm that risks future revenues.

### III. Corporate and Capital Structure

**A.     Corporate Structure**

19.     The Company consists of more than 115 entities organized in multiple jurisdictions.  Speedcast is publicly listed on the ASX.  At the Company's request, Speedcast is currently suspended from quotation from the ASX (as discussed below).  All the Debtors are direct or indirect subsidiaries of Speedcast.  A copy of the Company's organization chart, showing both the Debtors and the Non-Debtor Affiliates, is annexed hereto as **Exhibit A**.

**B.     Directors and Officers**

20.     Speedcast's Board of Directors consists of six members:

| Name | Position |
|---|---|
| Stephe Wilks | Independent Director / Chair |
| Peter Shaper | Executive Director |
| Joe Spytek | Executive Director |
| Grant Scott Ferguson | Independent Director |
| Michael Martin Malone | Independent Director |
| Peter Jackson | Independent Director |

21.     On August 27, 2019, following lower than expected half-year results for FY19, the Company announced the implementation of a board renewal process.  As part of the process, the Company announced Stephe Wilks' appointment as Independent Director and Chairman of the Board of Directors, and John Mackay's resignation from his position as Director and Chairman of the Board of Directors.  On September 27, 2019, the Company further announced the appointments of Peter Shaper and Joe Spytek as Executive Directors, and Caroline van Scheltinga's retirement from the Board of Directors.   Including Stephe Wilks, the Company currently has four Independent Directors.  Independent Directors Grant Scott Ferguson, Michael

Martin Malone, and Peter Jackson were appointed as Independent Directors in 2012, 2014, and 2018, respectively.

22.     The Debtors' senior management team consists of the following individuals:

| Name | Position |
|------|----------|
| Peter Shaper | Chief Executive Officer |
| Joe Spytek | President / Chief Commercial Officer |
| Peter Myers | Chief Financial Officer |
| John Truschinger | Chief Administrative Officer |
| Jennifer Grigel | Chief Operating Officer |
| Athina Vezyri | Chief Commercial Officer—Maritime |
| Dominic Gyngell | General Counsel |

23.     As outlined above, on November 1, 2017, the Company acquired UltiSat and on December 14, 2018, the Company acquired Globecomm. UltiSat and Globecomm (collectively, the "**Proxy Companies**"), which form the Company's Government Business, are managed through that certain Proxy Agreement with Respect to Capital Stock of Ultisat, Inc., dated November 26, 2018, by and among Speedcast, Speedcast Group Holdings Pty Ltd., Speedcast Americas, Inc., UltiSat, and James David Bryan, Rand Hilton Fisher, and Paul Theodore Hengst (collectively, the "**Proxy Board**"), and the U.S. Department of Defense (the "**Proxy Agreement**"), as required by the U.S. National Industrial Security Program ("**NISP**").

24.     The Proxy Agreement is an instrument designed to mitigate the risk of foreign ownership, control, or influence over a U.S. entity that has security clearance under the NISP. The Proxy Agreement enables UltiSat and Globecomm to have access to classified information and to compete for, receive, and perform classified contracts with the U.S. Department of Defense. The Proxy Agreement conveys the Company's voting rights to the Proxy Board and

places some restrictions on sharable information and interactions between UltiSat and Globecomm and the rest of the Company. The Proxy Board is comprised of three U.S. citizens, cleared and approved by the U.S. Defense Counterintelligence and Security Agency (formerly, the Defense Security Services).

25.     The Proxy Board operates independently from the Company. However, there is relatively significant operational cooperation between the Government Business and the rest of the Company, with both parties providing services to the other through that certain Master Services Agreement for Cooperative Commercial Arrangements, dated June 30, 2018, by and between UltiSat and Speedcast Communications, Inc.

### C.     Debtors' Capital Structure

#### i.     *Equity Ownership*

26.     Speedcast is a public company and files annual reports with, and furnishes other information to, the Australian Securities and Investments Commission ("**ASIC**"). Historically, Speedcast's shares were listed on the ASX under the ticker symbol "SDA." However, on February 3, 2020, following the Company's announcement that its FY19 results would be 10% lower than expected by previous guidance, Speedcast requested that its shares be placed in a trading halt. On February 5, 2020, Speedcast further requested that the securities of Speedcast be suspended from quotation from the ASX until the release of official financial results for FY19. Further extension requests for suspension from the ASX were made in February and March 2020. As of January 31, 2020, the last date on which Speedcast's common shares were trading on ASX, the share price of Speedcast closed at $0.79 AUD per share.

ii.     *Prepetition Indebtedness*[2]

27.     As of the Petition Date, the Debtors have outstanding funded debt obligations in the aggregate amount of approximately $689.1 million, which amount consists of (i) approximately $87.7 million of borrowings under the Revolving Credit Facility (as defined below); (ii) approximately $591.4 million in Term Loans (as defined below); and (iii) an approximately $10.6 million Prepetition Credit Facility Outstanding Letters of Credit (as defined below).

28.     Certain of the Debtors are parties to that certain Syndicated Facility Agreement, dated as of May 15, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**") by and among (i) Speedcast and certain of its subsidiaries, as borrowers, (ii) the Lenders (as defined in the Credit Agreement), (iii) the Issuing Banks (as defined in the Credit Agreement), and (iv) Credit Suisse AG, Cayman Islands Branch, as administrative agent, collateral agent, and security trustee.  Under the Credit Agreement, the Debtors received: (i) a $425 million senior secured credit facility with coupon of LIBOR plus 2.50% (the "**Initial Term Loan**"); and (ii) a $100 million senior secured revolving credit facility (the "**Revolving Credit Facility**"), including $30 million of letters of credit, maturing on May 15, 2023, of which $10.6 million is outstanding (the "**Prepetition Credit Facility Outstanding Letters of Credit**").

29.     In September 2018, the Debtors received an additional $175 million of term loans under the Credit Agreement (the "**Incremental Term Loan**," and together with the Initial Term Loan, the "**Term Loan**") to fund the acquisition of Globecomm.  The Incremental Term

---

[2]   The description of the Debtors' capital structure herein is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

Loan, priced at LIBOR plus 2.75%, shares the same terms with the Initial Term Loan. Under the Credit Agreement, Speedcast is required to keep the net leverage ratio (net debt to EBITDA) below 4.5x (reduced to 4.0x upon payment of any dividends or other certain restricted payments) (the "**Net Leverage Covenant**").

### iii. *Equipment Financing*

30. In addition, certain of the Debtors are also parties or guarantors to asset financing arrangements with: (i) ST Engineering iDirect (Europe) CY NV, a seller of hardware engaged in the business of designing, developing, and manufacturing equipment, software and technologies for satellite communication; and (ii) Thrane & Thrane A/S and Seal Tel Inc., manufacturers of satellite and radio communication terminals and earth stations for land, marine, and airborne applications, along with Australia and New Zealand Banking Group Limited, for equipment used as part of the Debtors' operations (together, the "**Financing Arrangements**"). As of the Petition Date, the Debtors have outstanding obligations under the Financing Arrangements in the amount of (a) $10.8 million and (b) $3.7 million, respectively.

### IV. <u>Events Leading to Commencement of the Chapter 11 Cases</u>

31. To capture the potential synergies and margins possibly arising from the Company's recent growth, the Company was pursuing an operational transformation plan (the **"Transformation Plan"**) that contemplated an equity raise and internal reorganization that would maximize the value of the enterprise on a go-forward basis. Despite its efforts, a number of factors throughout 2019 contributed to the lower than expected financial results, including (i) compressions in margin, (ii) higher than expected revenue declines in Speedcast's Globecomm business compared to the initial investment case, (iii) cost-saving measures hampering the realization of integration scale benefits, (iv) key customer profitability issues, and (v) financial stress impacting relationships and improvement programs.

32.     Further, the lasting and distressed market conditions in the maritime and oil and gas industries, and the recent and dramatic impact of the COVID-19 pandemic, have impacted all players in the global marketplace.  The Company has been particularly hard hit by these adverse market conditions.   The outsized impact on the Company's Maritime Business and Energy Business customers has manifested in a dramatic reduction in cash receipts.  This macroeconomic downturn, along with the above-mentioned headwinds that contributed to the lower than expected FY19 financial results, made clear that the Company would not satisfy the Net Leverage Covenant under the Credit Agreement.

33.     In March 2020, the Company announced that, given the equity market conditions precluding a meaningful equity raise, it had retained Moelis to advise on funding and recapitalization alternatives, including the potential sale or merger of the Company, select asset sales, and/or other financing options.   Recapitalization objectives included (i) the reduction of debt, through a conversion of debt to equity (by the Ad Hoc Group (as defined below) and/or third party investors), (ii) raising liquidity to meet working capital needs and transforming the business, and (iii) positioning the business for recovery and growth as trading conditions stabilize. Additionally, any recapitalization was to be designed to have no impact on the businesses of the Proxy Companies.

34.     The Company subsequently considered a number of alternative paths to address its capital structure and liquidity needs without the need for a comprehensive in-court restructuring process, including conducting a multi-track strategic and financial alternative process with the assistance of the Advisors, which included execution of a forbearance agreement, a new secured debt financing, exploring a sale of some or all of the Company's assets, and restructuring options.  Given its global footprint, the Company spent a significant amount of time and resources

analyzing restructuring alternatives in foreign jurisdictions, particularly in Australia. However, given the short time frame allowed for obtaining additional financing and deteriorating conditions in the capital markets, Speedcast's Board of Directors commenced the Chapter 11 Cases to properly restructure the Company and protect its operations and employees, as well as preserve value for its stakeholders.

> i.      *Entry into a Forbearance Agreement*

35.     Starting in March 2020, Speedcast and its advisors actively engaged in discussions and negotiations regarding restructuring alternatives with an ad hoc group of syndicated lenders under the Credit Agreement (the "**Ad Hoc Group**"), represented by Davis Polk & Wardwell LLP ("**Davis Polk**"), Greenhill & Co., LLC ("**Greenhill**"), Skadden, Arps, Slate, Meagher & Flom LLP ("**Skadden**"), and King & Wood Mallesons ("**KWM**" and, collectively, with Davis Polk, Greenhill, and Skadden, the "**Ad Hoc Group Advisors**"). To provide Speedcast with the necessary runway to consider its restructuring and liquidity options, on April 1, 2020, Speedcast executed a forbearance agreement under the Credit Agreement (the "**Forbearance Agreement**"), whereby the Ad Hoc Group agreed to provide temporary forbearance of actions under the Credit Agreement as a result of the potential breach of the Net Leverage Covenant, and other breaches including the non-payment of interest and amortization as of March 31, 2020. On April 17, 2020, to provide additional time for the Debtors' preparation for the Chapter 11 Cases and negotiations relating to the DIP Facility, the Ad Hoc Group agreed to extend the outside termination date of the Forbearance Agreement from April 17, 2020, 11:59 p.m. New York time to April 24, 2020, 11:59 p.m. New York time.

## V. **The Proposed Debtor in Possession Financing**

### A. **DIP Motion Overview**

36.     Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (II) Granting Adequate Protection to the Prepetition Secured Parties, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief* (the "**DIP Motion**"), the Debtors request authority to, among other things, (i) enter into a multiple-draw superpriority, senior secured term loan debtor-in-possession ("**DIP**") financing in an aggregate new money principal amount of $90 million (the "**DIP Facility**"), of which $35 million is available on an interim basis, (ii) grant first-priority, priming, and junior liens and superpriority administrative expense claims to the DIP Lenders as security for the DIP Financing, (iii) use Cash Collateral, (iv) grant adequate protection to the Prepetition Lenders to the extent of any diminution of value of their interests in their collateral, (v) modify the automatic stay as necessary to effectuate the Debtors' entry into the DIP Facility, and (vi) schedule a final hearing for consideration of the relief requested in the DIP Motion on a final basis.  In addition, the Debtors are seeking approval of a two-stage "roll-up" of a maximum of $90 million of the approximate $680 million owed under the Prepetition Credit Agreement (the "**Roll-Up**"), to a second-out position in the DIP Facility.

37.     In addition to the financing contemplated in the DIP Facility in exchange for the Prepetition Lenders' consent to the Debtors' use of collateral and cash collateral (as such term is defined in section 363(a) of the Bankruptcy Code, the "**Cash Collateral**"), the Debtors are granting adequate protection to the Prepetition Lenders in the form of replacement liens, superpriority claims, reporting obligations, and payment of advisor fees.

**B.     The Need for DIP Financing and Use of Cash Collateral**

38.     As discussed above, the Company's financial position was first frustrated by lower-than-expected profits and cash flow in 2019 and further compounded by the 2020 decline in revenues in the Company's Energy Business and Maritime Business resulting from the putative OPEC price war and the worldwide decline in demand due to COVID-19.  As of the Petition Date, the Debtors will only have approximately $30 million in cash on hand, approximately $21 million of which is subject to liens pledged in favor of the Prepetition Lenders and constitutes Cash Collateral, and approximately $9 million of which is cash held by Debtors who are unrestricted subsidiaries (not Loan Parties under the prepetition debt facility) and, therefore, is unencumbered. Based on the Company's 13-week cash flow report and DIP Budget, without the ability to use Cash Collateral, the Debtors are projected to be cash flow negative starting April 27.

39.     Access to cash is essential to ensure the viability of the Company and its operations.  Principally, the Company's ability to provide uninterrupted service to its customers is critical to the Company's long-term stability.  Even an isolated and brief disruption of service likely would cause customers (some of whom are not subject to contracts) to seek alternative service providers, which would lead to additional declines in the Company's revenues.  Further, given the important—sometimes dangerous—nature of the situations for which the Company provides communications, the reputational harm caused by service interruptions would be extremely damaging to the Company and make replacing or luring back lost customers unlikely. In this regard, the Company's ability to access cash to meet its current obligations, including to bandwidth providers, as they come due is directly linked to its future revenues.  The Debtors will thus use the DIP Facility funds to stabilize their businesses, including ensuring continued services from the Debtors' key suppliers whose services are essential to the Debtors' ongoing operations.

40.     In addition, having the funding available under the DIP Facility will allow the Debtors to instill confidence in their critical customer base, employees, counterparties, and business partners by assuring them that the Debtors will be able to continue operating "business as usual" and otherwise pay their obligations as they come due after the Petition Date.  Further, the DIP Facility will provide the Debtors with the necessary liquidity to, among other things, fund payroll for employees and satisfy their other working capital and general corporate requirements. Absent the ability to access the DIP Facility, even for a limited period of time, there is a substantial risk that the Debtors will be unable to continue operating their businesses and will instead be forced to liquidate, resulting in a significant deterioration in the value to the detriment of all stakeholders.

41.     Furthermore, with the commencement of these chapter 11 cases, which are necessary to provide the Company with relief to pursue a value-maximizing restructuring and reorganize as a going concern, the Company now has additional costs and expenses, which impose further strain on the Company's cash resources.

42.     Similarly, the inability to access Cash Collateral would likely irreparably harm the Debtors' business operations, which would be to the detriment of the Debtors' estates and their economic stakeholders.  The size of the DIP Facility (discussed below) was determined under the assumption that the Debtors would also have access to existing Cash Collateral and receipts generated postpetition.  Without the ability to access such Cash Collateral, the Debtors would likely be unable to fund their ongoing operations throughout the entirety of these Chapter 11 Cases without postpetition financing beyond what is contemplated in the DIP Motion.

43.     Thus, from the outset of these Chapter 11 Cases, the Debtors require immediate access to additional funding and authority to use Cash Collateral to ensure they have sufficient liquidity to operate their business as a going concern, provide the Debtors with sufficient

liquidity to meet their ongoing day-to-day obligations, and fund the operational and administrative costs of these Chapter 11 Cases. The relief requested in the DIP Motion satisfies these needs, all of which will preserve the value of the Debtors' estates for the benefit of their stakeholders.

44.     I have also review the milestones included in the DIP Motion and, in my experience, believe they are reasonable and achievable.

**C.     The DIP Sizing Process**

45.     In consultation with the Debtors' advisors, including me and other members of my financial advisory team from FTI, the Debtors' management team reviewed and analyzed the Company's projected cash flows and prepared a budget outlining the Debtors' postpetition cash needs. Specifically, the budget is a forecast that sets forth all material cash receipts and cash disbursements on a weekly basis over a 13-week period, pursuant to which the Debtors will fund operations and the costs associated with these Chapter 11 Cases. The initial budget is attached at Exhibit C to the DIP Motion (the "**Initial Budget**"). To provide an accurate reflection of the Debtors' expected funding requirements over the identified period, the budget accounts for the decline in revenue the Company is experiencing from its Maritime Business and Energy Business described above, as well as operational initiatives undertaken by the Company's customers that necessarily and directly affect the Company's revenue. The budget also includes conservative assumptions related to customer contraction, as well the Company's customers' current inability to meet certain contractual obligations due to their revenue deficits.

46.     Under my direction and oversight, professionals at FTI worked with the Debtors' and their other advisors to formulate the Initial Budget, which includes reasonable and foreseeable expenses to be incurred, and the costs of administering the Chapter 11 Cases, during the applicable period. The Debtors' use of DIP Loans will be governed by the Initial Budget, subject to permitted variances.

47.     Given the Company's current liquidity position and an estimate of the potential duration of these cases, the Debtors and their Advisors determined that any DIP Financing amount would need to be sufficient to fund the Company through the end of October 2020.  Based on that timeline, FTI: (i) forecasted weekly cash flows through the end of October 2020; (ii) layered in appropriate adjustments for chapter 11 expenses; and (iii) from that, derived the funding that would be required to maintain a reasonable minimum amount of cash through pendency of the cases.  Based on this analysis, the Debtors determined they need approximately $90 million of new money financing through the course of these Chapter 11 Cases, of which $35 million must be available during the interim period.

48.     Absent authority to enter into and access the proceeds of the DIP Financing, even for a limited period of time, the Debtors will be unable to continue operating their business, resulting in a deterioration of value and immediate and irreparable harm to the Debtors' estates. Thus, the Debtors and their Advisors are in agreement that the Debtors require immediate access to the proceeds of the DIP Financing, as well as access to Cash Collateral, to finance their operations and continue operating as a going concern during the pendency of these Chapter 11 Cases.

## VI. The First Day Motions

49.     The First Day Motions seek relief to allow the Debtors to meet necessary obligations and fulfill their duties as debtors in possession.  I am familiar with the contents of each of the First Day Motions and believe that the relief sought in each First Day Motion is necessary to enable the Debtors to operate in chapter 11 with minimal disruption or loss of productivity and value, constitutes a critical element in achieving a successful reorganization of the Debtors, and

best serves the Debtors' estates and creditors' interests. The facts set forth in each First Day Motion[3] are incorporated herein by reference.

### A. Joint Administration Motion

50. Pursuant to the *Emergency Motion of Debtors for Order Directing Joint Administration of Chapter 11 Cases* filed concurrently herewith (the "**Joint Administration Motion**"), the Debtors request entry of an order directing consolidation of these Chapter 11 Cases for procedural purposes only. I believe that joint administration of these cases would save the Debtors and their estates substantial time and expense because it would remove the need to prepare, replicate, file, and serve duplicative notices, applications, motions, and orders. Further, I believe that joint administration would relieve the Court of entering duplicative orders and maintaining duplicative files and dockets. The United States Trustee for Region 7 (the "**U.S. Trustee**") and other parties in interest would similarly benefit from joint administration of these cases, sparing them the time and effort of reviewing duplicative pleadings and papers.

51. I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes. It does not seek substantive consolidation of the Debtors' estates. Accordingly, I believe that joint administration of these Chapter 11 Cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

### B. Cash Management Motion

52. Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue Use of Their Existing Cash Management System, Including*

---

[3] Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motions. Below is an overview of each of the remaining First Day Motions.

*(A) Maintain Existing Bank Accounts, (B) Continue Intercompany Transactions, (C) Continue to Pay Bank Fees, and (D) Continue Using Credit Cards; (II) Granting a Waiver of The Requirements of 11 U.S.C. § 345(b); and (III) Granting Related Relief* filed contemporaneously herewith (the "**Cash Management Motion**"), the Debtors request an order (i) authorizing the Debtors to continue operating their existing cash management system (the "**Cash Management System**") in the ordinary course of business and consistent with past practices, as described in the Cash Management Motion, including to: (a) maintain existing bank accounts (the "**Bank Accounts**") at the existing banks (the "**Banks**") and maintain existing business forms; (b) perform and honor Intercompany Transactions (as defined below) with Debtors and, in limited circumstances, non-debtor affiliates ("**Non-Debtor Affiliates**") in the ordinary course of business and consistent with past practices; (c) pay Bank Fees (as defined herein); (d) continue the Debtors' credit card programs and pay prepetition amounts thereunder; (ii) granting a waiver of the requirements of 11 U.S.C. § 345(b); and (iii) granting related relief.

53.     I understand that the Debtors' Cash Management System consists of a centralized treasury function that oversees 200 Bank Accounts maintained at 40 Banks around the world with cash denominated in 35 different currencies.  Of the Bank Accounts, 99 are held by the Debtors and the remaining 101 are held by Non-Debtors Affiliates.  The Cash Management System is designed to (i) collect funds and pay financial obligations on an entity-by-entity basis, and (ii) permit the Company to transfer excess cash between Bank Accounts on an as-needed basis. The Cash Management System enables the Company to satisfy its operating needs, ensure cash availability and liquidity, pay obligations, and maintain control over the administration of its Bank Accounts.

54.     Through a single treasury group, the Debtors exercise the "central banker" powers essential to maintaining necessary liquidity throughout their operations around the world. Generally, funds paid by the Debtors' customers are deposited into a Bank Account owned by the applicable Debtor.  Funds held in such accounts can then, as needed, be transferred to other Debtor Bank Accounts within the Cash Management System to, among other things, pay the Debtors' obligations to their suppliers, taxing authorities, employees and to otherwise support the Company's global operations.

55.     The Company records Intercompany Transactions in their books and records.  I understand that the Debtors' ability to transfer funds is limited in certain circumstances because, in several jurisdictions in which the Debtors operate, local banking laws and regulations restrict the Debtors' ability to transfer funds to or from Bank Accounts in other jurisdictions.  I understand that the Debtors are seeking the authority to maintain the Cash Management System in the ordinary course of business.

56.     To manage cash needs, the Company engages in intercompany transactions (the **"Intercompany Transactions"**) through which cash is transferred from one entity to another and a payable owed by the receiving entity is documented.  These Intercompany Transactions are recorded either through (i) an executed intercompany note or (ii) accounting entries in the books for the applicable entities.  The Company tracks all Intercompany Transactions in their centralized accounting system and are able to ascertain, trace, and account for all Intercompany Transactions. To the extent that an entity incurs a payable in the course of any Intercompany Transactions, without settlement, an intercompany claim (an **"Intercompany Claim"**) arises in favor of such entity.  I understand that the Debtors are not seeking authority to pay or settle amounts outstanding

on account of prepetition Intercompany Transactions during the pendency of these Chapter 11 Cases and will look to settle Intercompany Transactions on a postpetition basis.

57.     As part of its central banker process, to the extent an entity requires cash from the Cash Management System, the Company first seeks to settle existing Intercompany Claims to satisfy such funding needs before a new Intercompany Claim is created.  Certain of the Debtors—namely Speedcast Limited and CapRock UK, among others—are net recipients under the Cash Management System and, accordingly, their continued access to cash through Intercompany Transactions is critical to their ongoing ability to pay employees, vendors, and other costs necessary to operate their businesses.

58.     In addition, the Debtors receive customer payments on behalf of Non-Debtor Affiliates in the ordinary course of business (the "**Affiliate Receipts**") and remit such payments to the applicable Non-Debtor Affiliate.  I understand that the Debtors are seeking authority to continue to remit Affiliate Receipts in the ordinary course of business.  I believe that allowing the Debtors to engage in Intercompany Transactions will preserve the value of the Company's entire corporate enterprise and will allow the Debtors to engage in a smooth restructuring, without the risk of portions of their business enterprise collapsing from liquidity shortages.

59.     I understand that, in the ordinary course of business, the Debtors maintain company-paid credit cards (the "**Credit Cards**").  The Credit Cards are issued by eight credit card providers: American Express, ABN Amro, Australia New Zealand Bank, Bank of Italy, Bank of Cyprus, Bank of Valletta, Barclays, and ING Bank (together the "**Credit Card Providers**").  In general, the Credit Cards are used for travel and expenses and various other corporate expenses, as well as small procurement purchases, marketing and professional development.  On average,

the Debtors incur liabilities of approximately $500,000 per month on account of the Credit Cards.

I understand that the Debtors are requesting authority to continue to make all payments in

connection with the Credit Cards in the ordinary course of business and consistent with the

Debtors' past practices. I believe that continued use of the Credit Cards is integral to the success

and stability of the Debtors' businesses. If the Debtors do not pay outstanding amounts owing,

there is a significant risk that (i) the Credit Card Providers could set-off amounts owing against

cash in the Debtors' Bank Accounts they maintain, and (ii) the Credit Card Providers could restrict

the Debtors' access to their Credit Card programs. Indeed, if the Debtors do not pay prepetition

obligations owing to the Credit Card Providers, they will likely not continue to extend credit to the

Debtors after the Petition Date. If that were to occur, it would be costly, disruptive to the

Company's operations, burdensome to the Debtors and their estates, and time-consuming for the

Debtors to establish new credit card programs with one or more alternative providers. To avoid

any disruption, the Debtors could be forced to ask employees to front the cost of purchases and

expenses on their own (and seek reimbursement later), which would more than likely damage the

Debtors' relationships with such employees.

60.     I also understand that, in the ordinary course of business, the Debtors utilize

Business Forms (as defined herein). I believe and am advised that the Debtors' requested relief to

continue using all preprinted checks, correspondence, and other business forms (collectively, the

"**Business Forms**") as such forms were in existence immediately before the Petition Date is

reasonable because such relief will minimize expenses to their estates and avoid confusion on the

part of employees, customers, vendors, and suppliers during the pendency of these Chapter 11

Cases. In addition, by preserving business continuity and avoiding the disruption and delay to the

Debtors' disbursement obligations, all parties in interests, including employees, vendors, and customers, will be best served by the relief requested herein.

61.     In the ordinary course of business, the Debtors incur and pay, honor, or allow to be deducted from the appropriate Bank Accounts certain *de minimis* service charges and other fees, costs, and expenses charged by the Banks (the "**Bank Fees**").  I believe and am advised that payment of the prepetition Bank Fees is in the best interests of the Debtors and all parties in interest in these cases because it will prevent any disruption to the Cash Management System and ensure that the Debtors' receipt of and access to funds is not delayed.  Further, because some or all of the Banks likely have setoff rights for the Bank Fees, payment of prepetition Bank Fees should not alter the rights of unsecured creditors in these Chapter 11 Cases.

62.     I believe that the Debtors' business cannot function without the efficient and established operation of the Cash Management System during the pendency of these Chapter 11 Cases.  Further, requiring the Debtors to adopt a new cash management system at this early and critical stage of these cases would be expensive, create unnecessary administrative burdens, and be extraordinarily disruptive to the Company's business operations, especially given the size of the Cash Management System.  Any such disruption would have a severe and adverse impact upon the Debtors' reorganization efforts.  Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion is in the best interest of the Debtors' estates and all parties in interest and should be granted.

### C.     Wages Motion

63.     Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to (A) Pay Prepetition Wages, Salaries, Employee Benefits, and Other Compensation and (B) Maintain Employee Benefit Programs and Pay Related Obligations; and (II) Granting Related Relief* filed concurrently herewith (the "**Wages Motion**"), the Debtors request authority to (i) pay, all prepetition

amounts required under or related to Employee Compensation Obligations and Employee Benefit Obligations (each as defined in the Wages Motion and together with all fees, costs, and expenses incident thereto, including amounts owed to Wage and Benefit Service Providers (as defined in the Wages Motion) and taxing authorities, the "**Employee Obligations**"); and (ii) maintain, continue to honor, and pay amounts with respect to, the Debtors' business practices, programs, and policies for their employees as such were in effect as of the Petition Date and as such may be modified or supplemented from time to time in the ordinary course of business. The Debtors also request that the Court authorize financial institutions to receive, process, honor, and pay any and all checks presented for payment and to honor all funds transfer requests related to such obligations.

64. Compensation of the Debtors' approximately 966 employees (each, an "**Employee**") is critical to the Debtors' continued operations and reorganization. As described more fully in the Wages Motion, the Employees perform a wide variety of critical services for the Debtors, including sales, field support, network and solutions engineering, network operations, management and build testing, capacity planning and management, service implementation and delivery, procurement and logistics, project management, accounting and finance, legal, information technology, and tax and governmental compliance. The Employees' skills and knowledge of the Debtors' infrastructure and operations are essential to the continued operation of the Debtors' business.

65. The Debtors' workforce is the most important part of their business. I believe that any delay in paying or failure to pay prepetition Employee Obligations could jeopardize the morale and loyalty of the Debtors' workforce at the time when their dedication, confidence, retention, and cooperation are most crucial. Failure to pay the Employee Obligations could also inflict a significant financial hardship on the Employees' families. The Debtors cannot risk such a substantial disruption to their business operations, and it is inequitable to put Employees at risk of such hardship. Without this

relief, otherwise-loyal Employees may seek other work opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise. Payment of these obligations in the ordinary course of business would enable the Debtors to focus on completing a successful reorganization, which would benefit all parties in interest.

66.     In the ordinary course of business, the Debtors incur and pay obligations relating to Employees' salaries and wages. The Debtors do not maintain a unified payroll system; instead, each Debtor that has employees individually processes the salaries and wages for its respective employees. The regular pay periods for each Debtor vary, but are generally either bi-weekly or monthly. The Debtors' average payroll is approximately $6.6 million per month. As of the Petition Date, the Debtors owe approximately $32,500 in unpaid wages or salaries to Employees.

67.     In the ordinary course of business, the Debtors are required by law to deduct from Employees' gross pay including various garnishments, such as tax levies, child support, and other court-ordered garnishments, 401(k) contributions, and other pre- and after-tax deductions payable pursuant to certain of the employee benefit plans discussed herein (collectively, the "**Deductions**"). On average, the Debtors withhold and remit approximately $750,000 per month on account of payroll Deductions. As of the Petition Date, the Debtors estimate that they owe only *de minimis* amounts that are withheld for remittance on account of Deductions.

68.     The Debtors are also required by law to withhold from the gross pay of U.S. Employees (as defined in the Wages Motion) certain amounts related to federal, state, and local income taxes, social security taxes, Medicare taxes, and other taxes imposed by the law, and to remit any such withheld amounts to the appropriate taxing authorities. It is my understanding that the Debtors have similar obligations, under the laws of the various foreign nations in which the Debtors operate, to withhold from Non-U.S. Employees' (as defined in the Wages Motion) gross pay (collectively, the

"**Withholding Taxes**"). The Debtors' average liability each month for Withholding Taxes totals approximately $1.5 million. The Debtors estimate that, as of the Petition Date, they hold approximately $2,500 in Withholding Taxes on their Employees' behalf.

69. It is my understanding that the Debtors are required to make additional payments from their own funds, including matching payments on account of Social Security and Medicare taxes and, subject to certain limitations, additional amounts based upon a percentage of gross payroll for, among other things, state and federal unemployment insurance. I have also been advised that the Debtors have similar obligations for Non-U.S. Employees under the laws of the foreign nations in which they operate (collectively, the "**Employer Payroll Taxes**"). On account of the Employer Payroll Taxes, the Debtors on average withhold and contribute approximately $1.5 million per month. As of the Petition Date, the Debtors estimate that they owe approximately $1.1 million in Employer Payroll Taxes. I believe that disbursement of the Deductions and payment of the Withholding Taxes and Employer Payroll Taxes would not prejudice other creditors because I have been informed by counsel that such obligations generally give rise to priority claims under section 507(a) of the Bankruptcy Code.

70. As described in the Wages Motion, the Debtors pay Payroll Administration Fees (as defined in the Wages Motion) to the Wage and Benefit Service Providers (as defined in the Wages Motion) who handle administrative functions including, but not limited to, payroll processing, withholding, remittance and reporting of payroll taxes for the Employees. Because of the services provided by the Wage and Benefit Service Providers, the Debtors do not need to employ additional human resources professionals or administer payroll and benefit programs, and therefore save substantial costs associated with administration of their payroll and benefits programs. These relationships with the Wage and Benefit Service Providers also allow the Debtors to offer better and broader benefits to their Employees for less than those benefits would cost without the Wage and Benefit Service Providers. The

Debtors pay approximately $70,000 per month to the Wage and Benefit Service Providers for the aforementioned services.

71.    In the ordinary course of business, the Debtors make various benefit plans available to their Employees.  These benefit plans fall within the following categories: (i) paid time off, including vacation and other leave (together, the "**Employee Leave Benefits**"); (ii) medical, prescription drug, dental, and vision benefits ("**Medical Benefits**"), and (iii) life insurance, accidental death and dismemberment ("**AD&D**") insurance, supplemental insurance, short-term disability, and long-term disability benefits (the "**Insurance Benefits**" and, together with the Medical Benefits, the "**Health and Welfare Benefits**"); (iv) 401(k) plan benefits and similar retirement plans or provident funds in non-U.S. jurisdictions (the "**Retirement Benefits**"); and (v) certain other miscellaneous benefits (the "**Other Benefits**") (each of (i)–(v), an "**Employee Benefit Program,**" and its corresponding obligations, the "**Employee Benefit Obligations**").

72.    In addition to their Employees, the Debtors rely on services from various contractors and individuals working through staffing agency contracts (the "**Contract Employees**").  The Contract Employees bill the Debtors directly for their services.  The Debtors are engaged in an agreement with Royal & Ross, L.P. ("RoRo"), which provides the Debtors with Contract Employees to perform a variety of information technology services.  The Debtors also have several agreements with Contract Employees who work in countries where the Debtors do not operate any legal entities, including Greece, Indonesia, the Philippines, and Thailand.  As of the Petition Date, the Debtors estimate they may owe approximately $200,000 in the aggregate for prepetition services (the "Contractor Obligations") provided by Contract Employees.  The Debtors believe it is necessary to pay the obligations owed to Contract Employees so that they will continue to assist the Debtors with staffing needs as required.

73.     Specifically, the Debtors seek to (i) pay the prepetition Employee Obligations and Contractor Obligations and (ii) maintain and continue to honor and pay the postpetition Employee Obligations, Contractor Obligations, and Employee Benefit Programs in the ordinary course of business; provided, that all payments of prepetition Employee Obligations and Employee Benefit Programs will not exceed $1,140,000 in the aggregate; and all payments of prepetition Contractor Obligations pursuant to the Wage Motion shall not exceed $200,000 in the aggregate.

74.     I am advised that no Employees are owed prepetition amounts exceeding the $13,650 cap imposed by section 507(a)(4) of the Bankruptcy Code and that, accordingly, the Debtors are not seeking relief to pay prepetition Employee Obligations to any individual Employee in excess of such cap.  I am also advised that the Debtors are not seeking and will not seek authority to pay any amounts that are subject to the restrictions of section 503(c) of the Bankruptcy Code.  I also believe that the total amount sought to be paid by the Wages Motion is modest compared to the magnitude of the Debtors' overall business.

75.     Accordingly, I believe the relief requested in the Wages Motion is in the best interests of the Debtors, their estates, and all parties in interest, and is necessary to avoid immediate and irreparable harm.

**D.      Insurance Motion**

76.     Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Continue Insurance Programs and Pay All Obligations With Respect Thereto; and (II) Granting Related Relief* filed contemporaneously herewith (the "**Insurance Motion**"), the Debtors request (i) authority to (a) continue all the Insurance Programs (as defined herein) in accordance with the applicable insurance policies and indemnity agreements and to perform with respect thereto in the ordinary course of business, (b) pay any prepetition obligations arising under the Insurance Programs, and (c) modify the automatic stay imposed by section 362

31

of the Bankruptcy Code to the extent necessary to permit the Debtors' employees to proceed with any claims they may have under the Workers' Compensation Programs (as defined in the Insurance Motion) and (ii) related relief.

77.     In the ordinary course of business, the Debtors maintain and participate in various insurance programs (collectively, the "**Insurance Programs**") through several insurance carriers (each, an "**Insurance Carrier**").  Specifically, the Insurance Programs include workers' compensation programs and various liability, property, and other insurance programs that provide the Debtors with insurance related to, among other things, property damage and business interruption liabilities, commercial general liability, group travel liability, marine cargo liability, professional indemnity liability, directors' and officers' liability, prospectus liability, and special contingency coverage.  I believe that the continuation of these policies is essential to the ongoing operations of the Debtors' businesses and required under certain of the Debtors' prepetition agreements.  A list of the Insurance Programs, including information related to their respective coverage periods, is annexed to the Insurance Motion as Exhibit C.

78.     Pursuant to the Insurance Programs, the Debtors pay premiums ("**Insurance Premiums**") based on fixed rates established and billed by each Insurance Carrier, as well as certain other obligations related thereto, including any broker or advisor fees, taxes, or other fees (collectively, the "**Insurance Obligations**").  The Debtors' respective premiums under the various Insurance Programs that are currently in place were paid in advance, either by the Debtors directly or by the Broker (as defined herein) on the Debtor's behalf.  The aggregate annual Insurance Premiums, including all associated fees and taxes, for the current Insurance Programs was approximately $2 million.  It is my understanding that no amounts are currently owed under the current Insurance Programs for Insurance Premiums.

79.     The Debtors utilize Jardine Lloyd Thompson Limited (the "**Broker**") as their insurance agent and broker to assist with the procurement and negotiation of the majority of the Insurance Programs and, in most circumstances, to remit premium payments to the Insurance Carriers on behalf of the Debtors for the current policy periods.  In exchange for its services, the Debtors pay the Broker certain fees (the "**Broker's Fees**") that are paid on a commission basis by the Insurance Carriers, with such commissions being earned upon inception of the applicable policy term.  As of the Petition Date, the Debtors do not believe that they have any outstanding obligations owed to the Broker for Broker's Fees.

80.     I believe that the nature of the Debtors' businesses and the extent of their operations make it essential for the Debtors to maintain their Insurance Programs on an ongoing and uninterrupted basis.  The nonpayment of any premiums or related fees under the Insurance Programs could result in the Insurance Carriers attempting to terminate their existing policies, declining to renew their insurance policies or refusing to enter into new insurance agreements with the Debtors in the future.  I believe that if the Insurance Programs were allowed to lapse without renewal, the Debtors could be exposed to substantial liability for damages resulting to persons and property of the Debtors and others, which exposure could have an extremely negative impact on the Debtors' ability to successfully reorganize.  Furthermore, I am informed that the Debtors are required by the U.S. Trustee's guidelines to maintain certain of the Insurance Programs. Accordingly, the Debtors should continue the Insurance Programs as such practices, programs and policies were in effect as of the Petition Date and be authorized to satisfy any Insurance Obligations as they come due.

81.     Based upon the foregoing, I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors, their estates and all parties in interest and should be granted in all respects.

## E.     Utilities Motion

82.     Pursuant to the Emergency Motion of Debtors for an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utility Companies; (II) Establishing Procedures for Resolving Objections by Utility Companies; (III) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief filed contemporaneously herewith (the "**Utilities Motion**"), the Debtors request (i) approval of the Debtors' proposed form of adequate assurance of payment to the Utility Companies (as defined herein), (ii) establishment of procedures for resolving objections by the Utility Companies relating to the adequacy of the proposed adequate assurance, (iii) prohibition of the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on account of the commencement of these Chapter 11 Cases or outstanding prepetition invoices, and (iv) related relief.

83.     As more fully described in the Utilities Motion, the Debtors obtain a variety of utility services, electricity, natural gas, water, sewage, telecommunications, waste disposal, and other utility services (collectively, the "**Utility Services**") from a number of utility companies (collectively, the "**Utility Companies**").  I believe that uninterrupted Utility Services are essential to the Debtors' ongoing operations and the success of these Chapter 11 Cases.  Should any Utility Company alter, refuse, or discontinue service, even briefly, the Debtors' business operations could be severely disrupted.  The Debtors serve customers around the world, and any interruption in utility services—even for a brief period—could severely disrupt the Debtors' ability to continue operations.  In particular, disruptions caused by potential outages in the Debtors' teleports and data

centers could lead to significant liability claims from the Debtors' customers. I believe that any such disruption could jeopardize the Debtors' reorganization efforts to the detriment of all parties in interest. As a result, it is essential that the Utility Services continue uninterrupted during the Chapter 11 Cases.

84.     I believe that there are no defaults or arrearages for the Debtors' undisputed invoices for prepetition Utility Services. Based on a monthly average for the nine (9) months prior to the Petition Date, the Debtors estimate that their aggregate cost of Utility Services for the next 30 days will be approximately $392,000. To provide the Utility Companies with adequate assurance, the Debtors propose to deposit cash in an amount equal to approximately one half of monthly Utility Services (the "**Adequate Assurance Deposit**"), calculated using the historical average for such payments during the nine months prior to the Petition Date, into a newly created, segregated account for the benefit of the Utility Companies (the "**Utility Deposit Account**"). The Debtors estimate that the total amount of the Adequate Assurance Deposit will be approximately $196,000.

85.     Further, I believe and am advised that the Adequate Assurance Procedures (as defined in the Utilities Motion) are reasonable because they will ensure that the Utility Services continue while providing a streamlined process for Utility Companies to challenge the adequacy of the Proposed Adequate Assurance (as defined in the Utilities Motion) or seek an alternative form of adequate assurance.

86.     Based on the foregoing, I believe that the relief requested in the Utilities Motion would ensure the continuation of the Debtors' global businesses at this critical juncture as the Debtors transition into chapter 11. Furthermore, I believe that the relief requested provides the Utility Companies with a fair and orderly procedure for determining requests for additional

adequate assurance.  Accordingly, I believe that the relief requested in the Utilities Motion should be granted in all respects.

       **F.**     **Tax Motion**

       87.     Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to Pay Certain Prepetition Taxes and Assessments and (II) Granting Related Relief* filed contemporaneously herewith (the "**Tax Motion**"), the Debtors request (i) authority to satisfy, in the Debtors' sole discretion, all Taxes and Assessments (as defined in the Tax Motion) due and owing to various local, state, federal, and foreign taxing authorities (collectively, the "**Taxing Authorities**") that arose prior to the Petition Date, including all Taxes and Assessments substantially determined by audit or otherwise to be owed for periods prior to the Petition Date and (ii) related relief.

       88.     I understand that the Taxes and Fees the Debtors typically incur generally fall into the following categories: (i) sales and use taxes, (ii) franchise and income taxes, (iii) property taxes, (iv) foreign taxes, and (v) regulatory and compliance obligations (collectively, the "**Taxes and Assessments**").  I understand that approximately $17.2 million in Taxes and Assessments relating to the prepetition period will become due and owing to the Taxing Authorities after the Petition Date.

       89.     Further, I understand that failure to pay the aforementioned Taxes and Assessments may cause the Taxing Authorities to take precipitous action, including, but not limited to, filing liens, preventing the Debtors from conducting business in the ordinary course in the applicable jurisdictions in which they operate, and potentially holding directors and officers personally liable, all of which would disrupt the Debtors' day-to-day business operations, potentially impose significant costs of the Debtors' estates and their creditors, and hinder the Debtors' efforts to successfully reorganize.

90.     Based on the foregoing, I believe that the relief requested in the Taxes Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be granted in all respects.

**G.     Critical Vendors Motion**

91.     Pursuant to the *Emergency Motion of Debtors for Interim and Final Orders (I) Authorizing Debtors to Pay Prepetition Obligations to (A) Critical Vendors, (B) Foreign Creditors, (C) Lien Claimants, and (D) 503(b)(9) Claimants; (II) Approving Letter Agreement with Intelsat US LLC; and (III) Granting Related Relief* filed contemporaneously herewith (the "**Critical Vendors Motion**"), the Debtors seek entry of an order (a) authorizing, but not directing, the Debtors to pay in the ordinary course of business, in their sole discretion and based on their sound business judgment, but subject in all respects to the terms of the DIP Order and DIP Documents,[4] prepetition amounts owed to (i) certain vendors, suppliers, service providers, and other similar entities that are essential to maintaining the going-concern value of the Debtors' enterprise (and as further defined below, the "**Critical Vendors**"); (ii) certain suppliers, service providers, and other entities outside of the United States that may take action against the Debtors in a foreign country (collectively, the "**Foreign Creditors**" and their prepetition claims, the "**Foreign Claims**"); (iii) the Lien Claimants (as defined below), and (iv) the 503(b)(9) Claimants (as defined below, and collectively with the Critical Vendors, the Foreign Creditors, the Lien

---

[4]     "**DIP Order**" means any interim or final order entered in connection with the *Emergency Motion of Debtors for Entry of Interim and Final Orders (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (III) Granting Adequate Protection, (IV) Modifying the Automatic Stay, (V) Scheduling a Final Hearing and (VI) Granting Related Relief,* filed contemporaneously herewith, and the definitive documents related thereto, the "**DIP Documents**").

Claimants, and the 503(b)(9) Claimants, the "**Vendor Claimants**"); (b) approving certain terms of a letter agreement between Speedcast Communications Inc. ("**SCI**"), on behalf of itself and certain of the other Debtors, and Intelsat US LLC and certain of its affiliated entities ("**Intelsat**"); and (c) granting related relief. The Debtors propose to pay the claims of Vendor Claimants (the "**Vendor Claims**") to the extent necessary and only on such terms and conditions as are appropriate, in the Debtors' business judgment, to minimize any disruptions to the Debtors' businesses.

  1.  **Vendor Claims**

  *A.*  *Critical Vendors*

  92.  To operate in the ordinary course of business, the Debtors rely heavily on certain vendors or suppliers to provide them with the goods and services critical to maintaining vital customer relationships. The Debtors generally categorize their vendors into two groups—bandwidth and non-bandwidth vendors—with bandwidth being the largest category. In order to provide services to their customers, the Debtors contract for satellite and wireless bandwidth—the pipeline for communications—from their bandwidth vendors. Bandwidth vendors, generally, are vital for the Debtors' ability to deliver communications services to all of their customers, and disruption of service would compromise the Debtors' ability to continue serving its customers.

  93.  A number of other non-bandwidth vendors provide the Debtors with ancillary goods and services in all other respects in order to facilitate the delivery of communications services to customers and to otherwise run the Debtors' business. These vendors provide a broad range of goods and services including teleport services, data center services, VSAT hardware, network equipment, warehouse rentals, and more. Each is important to the maintenance and seamless operation of the Debtors' systems.

94.     Along with the Debtors other Advisors, FTI engaged in a comprehensive process of reviewing and analyzing the Debtors' books and records, consulting with the Debtors' management and personnel responsible for operations, reviewing contracts and supply agreements, and analyzing applicable laws, regulations, and past practices to (a) identify those vendors, suppliers, and/or service providers that may be "critical" to the Debtors' businesses (who, if lost, would materially impair the going-concern viability of the Debtors' businesses), and (b) quantify the relief necessary to avoid immediate and irreparable harm to the Debtors at the outset of these Chapter 11 Cases.

95.     As a result of this analysis, the Debtors identified the universe of Critical Vendors whose support remains essential to the Debtors' own ability to preserve and enhance their value as they proceed with a seamless transition into chapter 11.

96.     In some instances, the Critical Vendors are the only available source for goods and services, due to either the remote location of the Debtors' operations or the highly specialized and technical nature of such goods and services.  In other instances, the Critical Vendors are the most preferred source from which the Debtors can procure goods and services within a timeframe and at a price that will permit the Debtors to continue to operate their businesses smoothly and effectively.  In sum, due to, among other things, the specialized nature of the goods and services required in the Debtors' business, the remote nature of Debtors' business, and the need to maintain compliance with strict safety regulations, the Debtors have limited alternative sources for certain necessary goods and services.  Replacing such Critical Vendors, even in the infrequent instances where possible, could result in substantially higher costs for the Debtors and their estates and risk delays that could harm the Debtors' businesses.

97.     In particular, most of the Debtors' bandwidth comes from a small group of Critical Vendors who provide bandwidth to the Debtors across each of their key business segments. Certain Critical Vendors are sole-source providers in jurisdictions required by the Debtors' customers.  Moreover, the Critical Vendors have proprietary specifications for the hardware used at the Debtors' operations hubs (the "**Hub Infrastructure**") and at the respective customers' facilities, which are located all over the world and often in remote areas or at sea (the "**Remote Site Infrastructure**").  To replace any of the Critical Vendors who provide bandwidth, the Debtors would need to invest substantially in new hardware to replace the Hub Infrastructure and the Remote Site Infrastructure.  The Debtors would be required to travel to their customers' remote service sites to make these replacements and ensure the Hub Infrastructure and Remote Site Infrastructure for a new bandwidth vendor are operating in tandem.  This process requires shutting down certain infrastructure and diverting bandwidth from other systems, which breaks up the consolidated capacity of the Debtors' current infrastructure and make it less efficient.  The Debtors have insufficient resources to replace this infrastructure in a timely manner.  Further, it is unclear whether new vendors would have the volume of capacity available to satisfactorily replace the Critical Vendors, especially in high demand regions.  Given the Debtors' current financial circumstances, replacement vendors would likely require the Debtors to pay in advance for bandwidth capacity.

98.     The Debtors have also developed a list of Critical Vendors that provide teleport services, data center services, VSAT hardware, network equipment, and other critical goods and services in support of the Debtors' operations.  As with the bandwidth Critical Vendors, replacing these Critical Vendors will in certain instances require substantial investment in new Hub and Remote Site Infrastructures, staffing which the Debtors cannot currently supply, and

satisfactory volume of capacity from the new vendors. Critical Vendors also support the maintenance and seamless operation of the systems the Debtors are currently running, and will be indispensable during the Debtors' restructuring.

99.     I believe that each of the Critical Vendors is of great necessity to the Debtors' businesses on a going-forward basis and cannot, if at all, be easily and efficiently replaced, and any failure to pay the Critical Vendors for the Critical Vendor Claims would likely result in a severe disruption or cessation of the Debtors' business and service to their customers and negatively impact the revenues derived therefrom, and potentially give rise to, among other things, various statutory liens or administrative expense claims, which such amounts would likely be entitled to payment priority pursuant to a chapter 11 plan. In sum, I believe that if the Debtors do not pay Foreign Claims, their value will be reduced by amounts well in excess of amounts that the Debtors seek authorization to pay.

100.     Accordingly, I believe that payment of the Critical Vendor Claims as they become due in the ordinary course of business is a sound exercise of the Debtors' business judgment because doing so will avoid business interruptions that could generate instability and jeopardize the Debtors' ability to preserve the value of the Debtors' businesses. To replace any of the Critical Vendors, the Debtors would need to invest in new infrastructure at customer locations all over the world, in remote areas and at sea. The Debtors do not have sufficient staff to construct such infrastructure in a timely manner. It is also unclear whether new vendors would have the volume or capacity immediately available in order for the Debtors to smoothly transition, especially in high demand regions.

101.     In addition, because the Critical Vendors are already familiar with the Debtors' assets and business needs, and have long-term relationships with the Debtors, I believe

they are in the best position to provide necessary goods and services to the Debtors and are the most likely to do so on commercially reasonable terms.  Further, certain Critical Vendors may be the only providers of services in particular remote locations around the world where the Debtors' customers are located.  If a replacement is even available, the cost and manpower required to build the necessary infrastructure will likely cause substantial delay in services to the Debtors' customers.

### B.    Foreign Vendors

102.    Given the global footprint of the Debtors, many of the Bandwidth Vendors, Non-Bandwidth Vendors and other day-to-day creditors are located in jurisdictions outside the United States (the "**Foreign Vendors**").

103.    The Debtors are making every effort to avoid any interruptions to their global operations and the adverse effects that even a temporary break in the supply chain could have.  Any short term disruption could generate instability and thus jeopardize the Debtors' ability to preserve their value.  Because of the nature of the Debtors' businesses, I believe many of the Foreign Creditors will make, or have made, credible actionable threats that, unless paid on account of the prepetition debt, they will cease to supply the Debtors with the goods and services necessary to maintain the operation of the Debtors' businesses.

104.    Most of the Foreign Creditors have little or no connection to the United States.  It is my understanding that, although the scope of the automatic stay set forth in section 362 of the Bankruptcy Code is universal, the Debtors may not be able to enforce the stay in foreign jurisdictions if the creditor against whom enforcement is sought has minimal or no presence in the United States.  As a result, despite the commencement of these cases and the imposition of the automatic stay, the Foreign Creditors may be able to immediately pursue remedies and seek to

collect prepetition amounts owed to them. Indeed, there is the real risk that Foreign Creditors may attach or seize the Company's assets in their jurisdictions—which would significantly disrupt operations. In sum, I believe that if the Debtors do not pay Foreign Claims, their value will be reduced by amounts well in excess of amounts that the Debtors seek authorization to pay.

105. In light of the potential for serious and irreparable consequences if the Foreign Creditors do not continue to make uninterrupted and timely deliveries and/or take actions outside the United States to collect on prepetition obligations, I believe it is a sound exercise of business judgment to make payment for these Foreign Creditors' claims and avoid costly disruptions to the Debtors' operations.

### C. Lien Claimants

106. To continue operating and serving its customers, the Debtors must also continue purchasing goods and services from certain vendors that may hold, or have the right to assert, liens against the Debtors (collectively, the "**Lien Claimants**"). I believe that any delay or disruption in the provision of goods and services by the Lien Claimants to the Debtors would materially impact the Debtors' ability to operate their businesses, to the detriment of their creditors and all parties in interest. As such, minimizing any disruption and impairment of the Debtors' supply base, including the Lien Claimants, as a result of these Chapter 11 Cases will be critical to the Debtors and their ability to properly operate their businesses.

### D. The 503(b)(9) Claimants

107. I understand that the Debtors have received certain goods from various suppliers within the 20 days leading up to the Petition Date (collectively, the "**503(b)(9) Claimants**"). I also understand that many of the Debtors' relationships with the 503(b)(9) Claimants are not governed by long-term contracts; rather, the Debtors typically place such orders

43

with the 503(b)(9) Claimants on an order-by-order basis. As a result, the 503(b)(9) Claimants may refuse to supply new goods to the Debtors without first receiving payment on account of those undisputed claims (collectively, the "**503(b)(9) Claims**") arising from the value of the goods that were received by the Debtors within 20 days leading up to the Petition Date.

108.    I believe that certain of the 503(b)(9) Claimants could reduce the Debtors' existing trade credit—or demand payment for the goods on a "cash on delivery" or "cash in advance" basis—thereby materially exacerbating the Debtors' already strained liquidity position. It is my understanding that the 503(b)(9) Claims are entitled to statutory priority for the goods received by the Debtors in the ordinary course of business within 20 days prior to the Petition Date.

109.    The following chart summarizes the relief requested in the Critical Vendors Motion with respect to prepetition claim amounts:

| Vendor Claims | Interim Amount (21 days after the Petition Date) | Final Amount (inclusive of the Interim Amount) |
|---|---|---|
| Critical Vendors | $2,100,000 | $4,200,000 |
| Foreign Creditors | $2,600,000 | $5,200,000 |
| Lien Claimants | $455,000 | $910,000 |
| 503(b)(9) Claimants | $1,550,000 | $3,100,000 |
| **Total Claims** | $5,310,000 | $13,410,000 |

110.    In accordance with the above, I believe that paying the Vendor Claims in the ordinary course of business is prudent when compared to the amount the Debtors' stakeholders stand to lose if the Debtors' businesses are interrupted. Therefore, payment of the Vendor Claims is necessary, appropriate, and a sound exercise of the Debtors' business judgment. Accordingly, I believe that the relief requested in the Critical Vendors Motion should be approved.

### 2.      Intelsat

111.    Intelsat is a material provider of bandwidth uplink and related services to the Debtors.  In the weeks leading up to the Petition Date, the Debtors and Intelsat engaged in negotiations regarding past due balances owed by the Debtors and an agreement by Intelsat to continue providing services to the Debtors given the essential nature of Intelsat's services.  During those negotiations, a brief service outage period occurred after Intelsat cancelled the parties' prepetition agreement (the "**Outage Period**").  On April 21, 2020, Intelsat and SCI, a Debtor in these Chapter 11 Cases and the borrower under the Debtors' DIP Credit Facility, entered into a letter agreement, a copy of which is attached to the Critical Vendors Motion as Exhibit C.

112.    I was involved in the settlement negotiations and believe they were conducted in good faith and at arm's length among Intelsat, the Debtors and the Ad Hoc Group of Secured Lenders.  It is my understanding that the Debtors owe Intelsat at least $44 million in connection with prepetition services.  I am not aware of any viable claims against Intelsat in connection with the Outage Period or the prepetition agreement and, in exchange for the mutual releases and the other consideration provided for in the Intelsat Agreement, the Debtors will receive (i) essential services, without which the Debtors would face a significant likelihood of liquidation and (ii) the protection of the segregated account if Intelsat fails to perform.  Intelsat is a critical vendor that provides bandwidth to a majority of the Debtors' customers, and the loss of the bandwidth uplink and related services provided by Intelsat would significantly and negatively impact the Debtors' revenues and likely make reorganization a difficult prospect for the Debtors. Based on the foregoing, I believe the mutual releases are value maximizing to the Debtors' estates, appropriate under these circumstances, and a sound exercise of business judgement.

### H.     Notice Motion

113.     Pursuant to the *Emergency Motion of Debtors for an Order (I) Authorizing Debtors to File a Consolidated Creditor Matrix and a Consolidated List of 30 Largest Unsecured Creditors; (II) Modifying Requirement to File a List of Equity Security Holders; (III) Approving Form and Manner of Notifying Creditors of Commencement of Chapter 11 Cases and Other Information; and (IV) Granting Related Relief* filed contemporaneously herewith (the "**Notice Motion**"), the Debtors request entry of an order (i) authorizing the Debtors to file a consolidated creditor matrix (the "**Consolidated Creditor Matrix**") and a consolidated list of the Debtors' 30 largest unsecured creditors, (ii) modifying the requirement to file a list of and provide notice directly to the Debtors' equity security holders, (iii) approving the form and manner of notifying creditors of the commencement of the Chapter 11 Cases and other information, and (iv) granting related relief.

114.     I am advised that Bankruptcy Rule 1007(a)(1) requires a debtor to file a list containing the name and address of each entity included or to be included on Schedules D, E/F, G, and H.  I understand that, although a list of creditors is usually filed on a debtor-by-debtor basis, in complex chapter 11 cases involving more than one debtor, the debtors may file a consolidated creditor matrix.  Because the preparation of separate lists of creditors for each Debtor would be unduly expensive, time consuming, and administratively burdensome, the Debtors request authority to file a single consolidated creditor matrix for all the Debtors collectively.

115.     In addition, I am advised that, pursuant to Bankruptcy Rule 1007(d), a debtor generally must file a list containing the name, address and claim of the creditors that hold the twenty largest unsecured claims, excluding insiders."  Because a large number of creditors may be shared among the Debtors, the Debtors request authority to file a single, consolidated list of the

top 30 unsecured creditors for all the Debtors to help alleviate undue administrative burdens, costs, and the possibility of duplicative service.

116.     Furthermore, I am advised that Bankruptcy Rules 1007(a)(3) and 2002(d) require a debtor to (i) file a list of the debtor's equity security holders within 14 days of the petition date, and (ii) provide notice of, among other things, commencement of the chapter 11 case directly to such equity security holders.  Speedcast is a publicly traded company with over 230 million common shares outstanding and does not maintain a list of its equity security holders. Accordingly, the preparation of such a list and the provision of such notices will be expensive, time consuming, and will be of little or no benefit to the Debtors' reorganization efforts.  Therefore, I believe that the modifications proposed in the Notice Motion are necessary and appropriate.

117.     Finally, I am advised that Bankruptcy Rule 2002 requires a debtor to provide notice of the commencement of a chapter 11 case, and certain other information related thereto, to creditors and certain other parties in interest.  Here, the Debtors, through Kurtzman Carson Consultants LLC, their proposed claims and noticing agent, propose to serve the notice of commencement attached as Exhibit 1 to the Notice Motion (the "**Notice of Commencement**") on the Consolidated Creditor Matrix to advise them of the section 341 meeting of creditors.  I believe service of the Notice of Commencement on the Consolidated Creditor Matrix will not only prevent the Debtors' estates from incurring unnecessary costs associated with serving multiple notices to the parties listed on the Debtors' voluminous Consolidated Creditor Matrix, but also preserve judicial resources and prevent creditor confusion.  In addition, the Debtors propose to publish, as soon as practicable, the Notice of Commencement once in the international edition of *The Wall Street Journal*.  I believe that publication of the Notice of Commencement is the most practical method by which to notify those creditors and other parties in interest who do not receive the

47

Notice of Commencement by mail of the commencement of these Chapter 11 Cases and constitutes an efficient use of the estates' resources.

118.    Based on the foregoing, I believe that the relief requested in the Notice Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

## I.    Claims Agent Retention Application

119.    Pursuant to the *Emergency Application of Debtors Pursuant To 28 U.S.C. § 156(C), 11 U.S.C. §§ 105(A), 327, and 503(B), Fed. R. Bankr. P. 2002(F), 2014(A), and 2016, and Local Rule 2014-1 for Appointment Of Kurtzman Carson Consultants LLC as Claims, Noticing, and Solicitation Agent* filed contemporaneously herewith (the "**Claims Agent Retention Application**"), the Debtors request entry of an order appointing Kurtzman Carson Consultants ("**KCC**") as the claims, noticing, and solicitation agent ("**Claims Agent**") for the Debtors in their Chapter 11 Cases, effective as of the Petition Date.

120.    As more fully described in the Claims Agent Retention Application, the Claims Agent will provide the following services:

a.    Assist the Debtors with the preparation and distribution of all required notices in these Chapter 11 Cases including:  (i) notice of the commencement of the case; (ii) notice of any claims bar dates, to the extent ordered by the Court; (iii) notices of transfers of claims; (iv) notice of any hearings or combined hearing on chapter 11 plan(s) and disclosure statement(s) filed in these Chapter 11 Cases, including under Bankruptcy Rule 3017(d); (v) notice of the effective date of the chapter 11 plan; and (vi) all other notices, orders, pleadings, publications, and other documents as the Debtors may deem necessary or appropriate for an orderly administration of these cases;

b.    Assist the Debtors with the preparation of the Debtors' Schedules of Assets and Liabilities ("**Schedules**") and Statements of Financial Affairs ("**SOFAs**") (as needed);

c.    Assist the Debtors with plan solicitation services including (i) balloting and solicitation materials; (ii) tabulation and calculation of votes; (iii) determining with respect to each ballot cast, its timeliness and its compliance with the Bankruptcy Code; (iv) preparing an official ballot certification and testifying, if necessary, in support of the ballot tabulation results; and (v)

in connection with the foregoing services, process requests for documents from parties in interest, including, if applicable, brokerage firms, bank back-offices, and institutional holders;

     d.    Maintain (i) a list of all potential creditors, equity holders, and other parties in interest, and (ii) a "core" mailing list consisting of all parties described in Bankruptcy Rule 2002 and those parties that have filed a notice of appearance pursuant to Bankruptcy Rule 9010;

     e.    Maintain a post office box or address for the purpose of receiving correspondence, proofs of claim, ballots, and returned mail, and process all mail received;

     f.    For all notices, motions, orders or other pleadings or documents served, prepare and file or cause to be filed with the Clerk an affidavit or certificate of service no more frequently than every seven days that includes (i) either a copy of each notice served for the proceeding seven days or the docket number(s) and title(s) of the pleading(s) served during such period, (ii) a list of persons to whom it was mailed (in alphabetical order) with their addresses, (iii) the manner of service, and (iv) the date served;

     g.    Receive and process all proofs of claim received, including those received by the Clerk, check said processing for accuracy, and maintain any original proofs of claim received in a secure area; if a proof of claim is filed with the Clerk, KCC will cause any such proof of claim to be copied into the Claims Register (as defined below);

     h.    Provide an electronic interface for filing proofs of claim;

     i.    If a claims bar date is established, maintain an official claims register (the "**Claims Register**") fully accessible via KCC's website, which register shall include all claims filed either with the Clerk or otherwise with KCC, and specify therein the following information for each claim docketed: (i) any claim number assigned; (ii) the date received; (iii) the name and address of the claimant and agent, if applicable, who filed the claim; (iv) the address for payment, if different from the notice address; (v) the amount asserted; (vi) the asserted classification(s) of the claim (e.g., secured, unsecured, priority, etc.); and (vii) any disposition of the claim;

     j.    Implement necessary security measures to ensure the completeness and integrity of the Claims Register and the safekeeping of any original claims;

     k.    Record all transfers of claims and provide any notices of such transfers as required by Bankruptcy Rule 3001(e);

     l.    Upon completion of the docketing process for all claims received to date for each case, turn over to the Clerk copies of the Claims Registers for the Clerk's review (upon the Clerk's request);

     m.    Monitor the Court's docket for all notices of appearance, address changes, and claims-related pleadings and orders filed and make necessary notations on and/or changes to the claims register and any service or mailing lists, including to identify and eliminate duplicative names and addresses from such lists;

n. Assist in the dissemination of information to the public and respond to requests for administrative information regarding the cases, as directed by the Debtors and/or the Court, including through the use of a case website and/or call center;

o. Comply with all applicable federal, state, municipal, and local statutes, ordinances, rules, regulations, orders, and other requirements;

p. If these Chapter 11 Cases are converted to cases under chapter 7 of the Bankruptcy Code, contact the Clerk's office within three days of notice to KCC of entry of the order converting the cases;

q. Thirty days prior to the close of these Chapter 11 Cases, to the extent practicable, request that the Debtors submit to the Court a proposed order dismissing KCC as Claims and Noticing Agent and terminating its services in such capacity upon completion of its duties and responsibilities and upon the closing of these Chapter 11 Cases;

r. Within seven days of notice to KCC of entry of an order closing these Chapter 11 Cases, provide to the Court the final version of the Claims Register as of the date immediately before the close of these Chapter 11 Cases;

s. At the close of these Chapter 11 Cases, (i) box and transport all original documents, in proper format, as provided by the Clerk's office, to (A) the Philadelphia Federal Records Center, 14700 Townsend Road, Philadelphia, PA 19154 or (B) any other location requested by the Clerk's office; and (ii) docket a completed SF-135 Form indicating the accession and location numbers of the archived claims;

t. Provide a confidential data room if requested; and

u. Provide such other processing, solicitation, balloting, and other administrative services described in the Retention Agreement that may be requested from time to time by the Debtors, the Court or the Clerk's office.

121. The appointment of KCC as the Claims and Noticing Agent will provide the most effective and efficient means of providing that notice, as well as soliciting and tabulating votes on the proposed plan of reorganization, thereby relieving the Debtors of the administrative burden associated with all of these necessary tasks. In addition, by appointing KCC as the Claims and Noticing Agent in these Chapter 11 Cases, the distribution of notices will be expedited, and the Office of the Clerk of the Bankruptcy Court will be relieved of the administrative burden of noticing.

122.    Based on the foregoing, I believe that the relief requested in the Claims Agent Retention Application is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**J.    Schedules and Statements Extension Motion**

123.    Pursuant to the *Emergency Motion of Debtors for an Order Extending Time to File Schedules of Assets and Liabilities and Statements of Financial Affairs* filed contemporaneously herewith (the "**Schedules and Statements Extension Motion**"), the Debtors request entry of an order extending the deadline by which the Debtors must file their schedules of assets and liabilities and statements of financial affairs (collectively, the "**Schedules and Statements**") by 60 days, for a total of 74 days from the Petition Date, through and including July 6, 2020, without prejudice to the Debtors' ability to request additional extensions for cause shown.

124.    To prepare their Schedules and Statements, the Debtors will have to compile information from books, records, and documents across multiple information systems relating to a substantial number of claims, assets, and contracts for each Debtor entity.  Given the global nature of the Debtors' business, the number of entities within the enterprise, and the Company's decentralized information management systems, the collection of the necessary information will undoubtedly require a significant expenditure of time, effort, and coordination on the part of the Debtors and the Debtors' employees.  In addition, because of the Debtors' decentralized information management systems, the Debtors will have to manually locate, consolidate, and reconcile their accounting and legal records to prepare their Schedules and Statements.  Such efforts will inevitably increase due to the COVID-19 pandemic and related stay-at-home orders, which will challenge the Debtors' ability to coordinate communications across numerous time zones.  Additionally, because numerous invoices related to prepetition goods and services have

51

not yet been received and entered into the Debtors' accounting system, it may be some time before the Debtors have access to all of the information required to prepare the Schedules and Statements.

125.    Although the Debtors have commenced the task of gathering the information necessary for preparing and finalizing what will be voluminous Schedules and Statements, the Debtors' resources are strained and limited.  Given the amount of work entailed in completing the Schedules and Statements and the competing demands on the Debtors and their professionals to maintain business operations, the Debtors anticipate that they will require at least 60 additional days to do so.

126.    Based on the foregoing, I believe that the relief requested in the Schedules and Statements Extension Motion is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

**K.      Automatic Stay Motion**

127.    Pursuant to the *Emergency Motion of Debtors for Entry of Order Enforcing Protections of 11. U.S.C. §§362, 365, 525, and 541* filed contemporaneously herewith (the "**Automatic Stay Motion**"), the Debtors request entry of an order enforcing the protections of sections 362, 365, 525, and 541 of the Bankruptcy Code to help ensure that the Debtors' global business operations are not disrupted.  I have been informed that the protections afforded by sections 362, 365, 541, and 525 of the Bankruptcy Code are self-executing and global; however, many of the Debtors' creditors, contract counterparties, and other parties in interest are based outside of the United States, and may not be familiar with these provisions of the Bankruptcy Code.  Accordingly, the Debtors seek entry of an order embodying these aspects of the Bankruptcy Code.  I am informed that the Debtors are not requesting any relief beyond the protections that are already automatically provided under the Bankruptcy Code.  Instead, the Debtors merely seek a "comfort order" that can be shown to parties in interest.

128.    Based on the foregoing, I believe that the relief requested in the Automatic Stay Motion is in the best interests of the Debtors, their estates, and all parties in interest and should be approved.

**L.    NOL Motion**

129.    Pursuant to the *Emergency Motion of Debtors for Entry of Interim and Final Orders Establishing Notification Procedures and Approving Restrictions on Certain Transfers of Interests In, and Claims Against, the Debtors and Claims of Certain Worthless Stock Deductions* filed contemporaneously herewith (the "**NOL Motion**"), the Debtors are seeking to establish procedures to protect the potential value of their net operating loss carryforwards ("**NOLs**") and other Tax Attributes (as defined in the NOL Motion) for use in connection with the reorganization of the Debtors and in future periods.  It is my understanding that the Company possesses certain Tax Attributes, including, as of the Petition Date, approximately $1.3 million in estimated NOLs (some of which may be subject to certain existing limitations), approximately $13 million in federal disallowed business interest expense carryforwards under section 163(j) of the U.S. Tax Code, approximately $23 million in unused general business credits, certain Non-U.S. tax attributes, and potential other favorable Tax Attributes such as net unrealized built-in losses.  The trading procedures seek authority to restrict both the trading of Common Stock (as defined in the NOL Motion) and any claim of a Worthless Stock Deduction (as defined in the NOL Motion) that could result in an Ownership Change (as defined in the NOL Motion) occurring before the effective date of a chapter 11 plan or any applicable bankruptcy court order.  Such a restriction would protect the Debtors' ability to use the Tax Attributes during the pendency of these Chapter 11 Cases, in connection with a reorganization transaction, or, potentially, in taxable years following the effective date of a chapter 11 plan.

## Conclusion

130.    The above describes the Debtors' businesses and capital structure, the factors that precipitated the commencement of these Chapter 11 Cases, and the critical need for the Debtors to restructure their financial affairs and operations.  The provisions of the Bankruptcy Code will assist the Debtors in achieving their financial reorganization and reestablishing themselves as a healthy economic enterprise able to effectively compete in their industry for the benefit of their economic stakeholders and employees.

131.    In light of the foregoing, I believe that relief requested in the Motion will deliver significant value to the Debtors and their estates, which will inure to the benefit of all parties in interest, and should be granted.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated:  April 23, 2020
            Houston, Texas

*/s/ Michael Healy*
Name: Michael Healy
Title: Chief Restructuring Officer

**Certificate of Service**

       I hereby certify that on April 23, 2020, a true and correct copy of the foregoing document was served by the Electronic Case Filing System for the United States Bankruptcy Court for the Southern District of Texas, and will be served as set forth in the Affidavit of Service to be filed by the Debtors' proposed claims, noticing, and solicitation agent.


                /s/  *Alfredo R. Perez*
                Alfredo R. Pérez





**Speedcast Group Structure**
**Update as at 29th February 2020**

**CONFIDENTIAL**
**DRAFT SUBJECT TO CHANGE**

**Speedcast Entity**

**In Liquidation**

Entity

Branch

Partnership

**For Globecomm Entity**

USG Contract Entity

Non-USG Contract Entity

Disregarded entity for US federal income tax purposes

Speedcast Americas Inc.
USA

Ultisat Inc.
USA

HCT Acquisition, LLC
(Delaware)
USA

Globecomm Systems, Inc.
(Delaware)
USA

Cosmos Holdings
Acquisition Corp.
(Delaware)
USA

Globecomm License
Sub LLC
(Delaware)
USA

Globecomm Network
Services Corporation
(Delaware)
USA

Globecomm Services
Maryland LLC
(Delaware)
USA

ProTechnic Corp.
(Delaware)
USA

Melat Networks Inc.
(Delaware)
USA

Speedcast Wireless LLC
(fka Speedcast
Innovations LLC)
(Delaware) - USA

TravelComm LLC
(Maryland)
USA

Globecomm
International LLC
(Delaware)
USA

Globecomm Asia Pte Ltd
Singapore

DKH Holdings C.V.
(New York)
USA

1%

99%

DKH International LLC
(Delaware)
USA

99% (11)

Globecomm
Cooperatief U.A.
Netherlands

1%

Globecomm International
Limited
British Virgin Islands

Evolution
Communications Group
Ltd
British Virgin Islands

Globecomm Holdings
B.V.
Netherlands

Globecomm Europe
B.V.
Netherlands

**Note:**
** All shareholdings are 100% unless otherwise shown.
(1) Not illustrated in this diagram, Spacelink Systems II, LLC retains 0.1% ownership of Speedcast Communications Servicios de Mexico S. de R.L. de C.V. and 1.0004% ownership of Speedcast Communications de Mexico S. de R.L. de C.V. (fka Harris Communications Servicios de Mexico S. de R.L. de C.V. and Harris Communications de Mexico S. de R.L.de C.V.)
(2) Remaining 51% of shares in Speedcast Communications (India) Private Limited held by an employee.
(3) Speedcast UK Holdings acquired all shares but one, one share held by PJ Beylier.
(4) Malaya Communication Holdings Sdn Bhd is owned by 2 indigenous Malay nationals, Hermes Datacommunications International Ltd has a loan and options agreement in place with this entity.
(5) Remaining 70% of shares in Speedcast Malaysia Sdn Bhd is owned by Adam Syed Nasiruddin and Dato Ng.
(6) Remaining 12% of shares in Speedcast Communications Ltd (Kurdistan) is owned by Mr. Las Ezzulddin Hamad Dzay..
(7) Remaining 2% of shares in Speedcast Mozambique Lda is owned by Speedcast Australia Pty Ltd.
(8) Remaining 0.00001 of shares in Newcom Int'l Inc Peru, S.A.C. is owned by Mr. Jaime Dickinson.
(9) One "1" share (0.02%) of Speedcast Caribbean Ltd is held by McKinney Nominees Ltd in Trust for MCS.
(10) Remaining 2% of shares in Speedcast Peru S.A.C. is owned by Speedcast Communications Inc. (USA)
(11) Globecomm International LLC (USA) is a member of Globecomm Cooperatief U.A. (NL) for the benefit and on behalf of DKH Holdings CV (USA) being its general partner.
(12) Remaining 51% of shares in Extrizone (Pty) Ltd is owned by Nkosi Johnson Trust.
(13) Remaining 5% of shares in PT Caprock Communications Indonesia held by PT RNP.
(14) Remaining 0.1% of shares in Speedcast Ecuador S.A. is owned by Speedcast Australia Pty Ltd.
(15) Remaining 51% of shares in Speedcast Salam LLC is owned by Salam Technology LLC.